**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 Case |
| | ) | |
| HEARTLAND AUTOMOTIVE HOLDINGS, INC., et al., | ) | Case No. 08-40047 (RFN) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

---

**DISCLOSURE STATEMENT RELATING TO
THE AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
FOR HEARTLAND AUTOMOTIVE HOLDINGS, INC.,
AND ITS AFFILIATED DEBTORS**

---

Dated:  December 23, 2008

WHITE & CASE LLP
Thomas E Lauria
Gerard Uzzi
Lisa Thompson
Matt Garofalo
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

CADWALADER, WICKERSHAM & TAFT LLP
Andrew M. Troop
Ingrid Bagby
David Leamon
One World Financial Center
New York, NY  10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

FORSHEY & PROSTOK LLP
Jeff P. Prostok
777 Main Street Suite 1290
Ft. Worth, TX 76012
Telephone: (817) 877-8855
Facsimile: (817) 877-4151

MUNSCH HARDT KOPF & HARR, P.C.
Joseph J. Wielebinski
Kevin M. Lippman
3800 Lincoln Plaza
500 North Akard Street
Dallas, TX  75201
Telephone: (214) 855-7500
Facsimile:  (214) 855-7584

COUNSEL FOR THE DEBTORS AND
DEBTORS IN POSSESSION

COUNSEL FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS (THE "BANKRUPTCY COURT") UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE PLAN DESCRIBED HEREIN.  ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN.  THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.[1]

---

[1]  Legend to be removed upon entry by the Clerk of the Bankruptcy Court of Order of the Bankruptcy Court approving this Disclosure Statement.

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ..................................................................................................1

II.  NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS .............................1

III. EXPLANATION OF CHAPTER 11 ........................................................................4

IV.  OVERVIEW OF THE PLAN ..................................................................................5

   A.   Summary of the Terms of the Plan .................................................5

   B.   Summary of Distributions Under the Plan......................................5

V.   GENERAL INFORMATION .................................................................................11

   A.   The Businesses of the Debtors.............................................12

   B.   Prepetition Capital Structure and Recapitalizations ................................12

   C.   Events Precipitating the Chapter 11 Cases ..........................................13

   D.   Events Leading Up to the Disclosure Statement and Plan....................15

VI.  THE REORGANIZED COMPANY .......................................................................16

   A.   Re-imaging..............................................................................16

   B.   Preservation of NOLs .............................................................17

VII. SELECTED FINANCIAL INFORMATION ............................................................17

   A.   Consolidated and Year-to-Date Annual Financial Information for the
        Debtors....................................................................................17

VIII. FINANCIAL PROJECTIONS AND ASSUMPTIONS ...............................................20

   A.   Purpose and Objectives...........................................................20

IX.  THE CHAPTER 11 CASES ................................................................................20

   A.   Commencement of the Chapter 11 Cases .................................20

   B.   Continuation of Business after the Petition Date....................20

      (a)   Cash Collateral......................................................20

      (b)   Debtor in Possession Financing .............................21

(c)     Business Operations and Employee-Related Relief ...................................21

C.      Representation of the Debtors...................................................................22

D.      Formation and Representation of the Committee ......................................22

E.      Representation of the H-II Lenders...........................................................22

F.      Representation of Quad-C..........................................................................23

G.      Matters Relating to Unexpired Leases and Executory Contracts ...........23

H.      Exclusivity .................................................................................................24

I.      Claims Administration ...............................................................................24

(a)     Schedules and Bar Dates...............................................................24

(b)     Claim Objections ...........................................................................25

J.      Committee's Examination of Quad-C Pursuant to Federal Rule of
Bankruptcy Procedure 2004.......................................................................25

K.      The Debtors' Examination of JLI and SOPUS Pursuant to Federal Rule of
Bankruptcy Procedure 2004.......................................................................26

X.      THE CHAPTER 11 PLAN ...................................................................................26

A.      Introduction................................................................................................26

B.      General Description of the Treatment of Claims and Equity Interests.................26

(a)     Unclassified Claims .......................................................................26

(b)     Treatment of Administrative Expense Claims...............................27

(c)     Treatment of Priority Tax Claims..................................................29

(d)     Classified Claims and Equity Interests .........................................29

C.      Treatment of Claims and Equity Interests .................................................30

D.      Acceptance or Rejection of the Plan; Effect of Rejection by One or More
Classes of Claims.......................................................................................30

(a)     Classes Entitled to Vote.................................................................30

(b)     Class Acceptance Requirement......................................................30

(c)    Tabulation of Votes on a Non-Consolidated Basis ................................... 30

(d)    Cramdown .......................................................................................... 30

(e)    Feasibility .......................................................................................... 30

(f)    Confirmation of All Cases .................................................................. 31

E.    Means of Implementation of the Plan ............................................................ 31

(a)    Operations between the Confirmation Date and the Effective Date .......... 31

(b)    Certain Transactions On or Prior to the Effective Date ........................... 31

(c)    Description of Certain Securities to be Issued Pursuant to the Plan .......... 31

(d)    Deemed Allowance of Certain Claims .................................................. 32

(e)    Corporate Action ............................................................................... 33

(f)    Termination of Certain Debtor Obligations ............................................ 34

(g)    Continued Corporate Existence of the Debtors ...................................... 34

(h)    Re-vesting of Assets .......................................................................... 35

(i)    Initial Boards of Directors .................................................................. 35

(j)    Officers ............................................................................................ 35

(k)    Retention of Causes of Action/Reservation of Rights ............................ 36

(l)    Appointment of the Disbursing Agent .................................................. 36

(m)    Sources of Cash for Plan Distributions ................................................. 36

F.    Distribution Provisions ............................................................................... 37

(a)    Plan Distributions ............................................................................. 37

(b)    Timing of Plan Distributions ............................................................... 37

(c)    Time Bar to Cash Payments and Issuance of New Unsecured Notes ........ 37

(d)    Surrender and Cancellation of Instruments ............................................ 38

G.    Procedures for Resolving and Treating Contested Claims .................................. 38

(a)    Objection Deadline ........................................................................... 38

|   |   |   |   |
|---|---|---|---|
| (b) | Prosecution of Contested Claims | | 38 |
| (c) | Claims Settlement | | 38 |
| (d) | Entitlement to Plan Distributions Upon Allowance | | 38 |
| (e) | Contested Claims Reserve | | 39 |
| (f) | Estimation of Claims | | 39 |
| (g) | No Recourse Against the Debtors or the Reorganized Company | | 39 |

H. Conditions Precedent to Confirmation of Plan ...................................................39

I. Conditions Precedent to Occurrence of the Effective Date .................................40

J. Waiver of Conditions ...........................................................................................41

K. Effect of Non-Occurrence of the Effective Date .................................................41

L. Exculpation of Debtors and Released Persons......................................................41

M. Releases by the Debtors .......................................................................................41

N. Release of Released Persons by Other Released Persons......................................42

O. Executory Contracts and Unexpired Leases .........................................................43

(a) Executory Contracts and Unexpired Leases ..............................................43

(b) Assumption and Rejection of Executory Contracts and Unexpired Leases..................................................................................................43

(c) Cure............................................................................................................45

(d) Claims Arising from Rejected Contracts ....................................................45

P. Settlements and Compromises ..............................................................................46

(a) JLI .............................................................................................................46

(b) SOPUS ......................................................................................................46

(c) Quad-C ......................................................................................................47

Q. Retention of Jurisdiction ......................................................................................48

R. Other Material Provisions of the Plan...................................................................48

(a) Payment of Statutory Fees .........................................................................48

(b)      Satisfaction of Claims ......................................................................48

(c)      Third Party Agreements; Subordination ..........................................49

(d)      Discharge of Liabilities...................................................................49

(e)      Discharge of Debtors ......................................................................50

(f)      Exemption from Transfer Taxes ......................................................50

(g)      Retiree Benefits...............................................................................50

(h)      Interest and Attorneys' Fees ...........................................................50

(i)      Modification of the Plan ..................................................................50

(j)      Revocation of the Plan ....................................................................51

(k)      Setoff Rights ...................................................................................51

(l)      Compliance with Tax Requirements.................................................51

(m)     Injunctions.......................................................................................52

(n)      Binding Effect..................................................................................52

(o)      Severability .....................................................................................52

(p)      No Admissions.................................................................................53

(q)      Dissolution of the Committee ..........................................................53

(r)      Plan Controls...................................................................................53

XI.    RISK FACTORS ........................................................................................53

       A.      The Reorganized Debtors' Actual Financial Results May Vary Significantly
               from the Projections Included in this Disclosure Statement..................................53

       B.      Plan Consideration Reserved for Contested Claims May Be Insufficient to
               Satisfy all Secured Claims upon Liquidation......................................................54

       C.      The Reorganized Debtors May Not Be able to Raise Additional Financing
               on Terms Favorable to the Debtors.......................................................................54

       D.      The Market Conditions Affecting the Debtors' Business May Become
               Volatile and Uncertain ..........................................................................................54

E.      The Reorganized Debtors May Not Be Able to Acquire Additional Stores as Assumed Under the Business Plan ........................................................ 54

F.      No Market for New Common Stock and New Preferred Stock or New Unsecured Notes ........................................................................................ 55

XII.    SECURITIES LAW MATTERS ................................................................... 55

A.      Issuance Of New Securities ....................................................................... 55

B.      Subsequent Transfers Of New Common Stock and New Preferred Stock ........... 55

XIII.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES .................... 57

A.      U.S. Federal Income Tax Consequences to the Debtors ............................ 58

        (a)     Cancellation of Debt Income. ........................................................ 58

        (b)     Accrued Interest. ........................................................................... 59

        (c)     Utilization of Debtors' Net Operating Loss Carryforwards. ........... 60

B.      Certain U.S. Federal Income Tax Consequences to the Holders of Allowed Claims that are Paid in Cash in Full ........................................................... 62

C.      U.S. Federal Income Tax Consequences to Holders of Allowed Claims that are Paid in Full Using Consideration other than Solely Cash ................ 62

        (a)     In General ...................................................................................... 62

        (b)     Consequences of Exchanging Allowed Claims for Stock ................ 63

        (c)     Consequences of Modifying Existing Debt Instruments ................. 64

        (d)     Reinstatement of Existing Debt Instruments ................................. 65

        (e)     Accrued but Unpaid Interest .......................................................... 65

        (f)     Market Discount ............................................................................. 65

D.      Consequences to Pre-Bankruptcy Holders of Equity Interests .................. 66

E.      Consequences of Ownership of Stock and Notes Issued Pursuant to the Plan. ........................................................................................................... 66

        (a)     Consequences of Ownership of Stock Issued Pursuant to the Plan. ........... 66

        (b)     Consequences of Ownership of Notes Issued Pursuant to the Plan. ........... 67

     F.      Backup Withholding Tax and Information Reporting Requirements....................67

XIV.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
       PLAN ..................................................................................................................68

     A.      Liquidation Under Chapter 7 of the Bankruptcy Code..........................................68

     B.      Alternative Plans of Reorganization ......................................................................69

XV.   CONCLUSION...............................................................................................................70

## SCHEDULES AND EXHIBITS

List of Defined Terms ........................................................................................... Schedule 1

List of Debtors ..................................................................................................... Schedule 2

Original H-I Notes ................................................................................................ Schedule 3

List of Assumed Executory Contracts and Unexpired Leases ............................. Schedule 4

Deemed Allowance of Certain Claims ................................................................. Schedule 5

Quad-C Contribution Documents ........................................................................ Schedule 6

New Class A Preferred Stock Term Sheet ........................................................... Schedule 7

New Class B Preferred Stock Term Sheet ............................................................ Schedule 8

New Common Stock Term Sheet .......................................................................... Schedule 9

Amended and Restated H-II Facility Term Sheet .............................................. Schedule 10

Amended and Restated H-I Facility Term Sheet ............................................... Schedule 11

Form of New Unsecured Note ............................................................................ Schedule 12

Preserved Causes of Action ............................................................................... Schedule 13

Chapter 11 Plan of Reorganization ........................................................................ Exhibit A

Disclosure Statement Order, Solicitation Procedures Order and Notice
of the Confirmation Hearing .................................................................................. Exhibit B

Projections and Summary of Significant Assumptions Related Thereto ............. Exhibit C

Pro Forma Statements ............................................................................................ Exhibit D

I.

## INTRODUCTION

**All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed thereto in the Plan (see Article I of the Plan entitled "Definitions") or Schedule 1 of this Disclosure Statement**.

THIS DISCLOSURE STATEMENT INCLUDES AND DESCRIBES THE AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION, DATED DECEMBER 23, 2008 (THE "PLAN"), A COPY OF WHICH IS ATTACHED AS EXHIBIT "A," FILED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "COMMITTEE") OF HEARTLAND AUTOMOTIVE HOLDINGS, INC. AND ITS AFFILIATED DEBTORS AND THE CHAPTER 11 DEBTORS LISTED IN SCHEDULE 2 (THE "DEBTORS").  OTHER THAN CLASS 1 – PRIORITY NON-TAX CLAIMS, CLASS 9 – INTERCOMPANY CLAIMS AND CLASS 11 – SUBSIDIARY EQUITY INTERESTS WHICH ARE UNIMPAIRED UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE ACCEPTED THE PLAN, AND CLASS 12 – OTHER EQUITY INTERESTS, WHICH ARE NOT ENTITLED TO A DISTRIBUTION UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE REJECTED THE PLAN, ALL CLASSES ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.  ACCORDINGLY, THE DEBTORS AND THE COMMITTEE ARE SOLICITING ACCEPTANCES OF THE PLAN FROM THE HOLDERS OF ALL CLAIMS AND INTERESTS, OTHER THAN THOSE HOLDING CLASS 1 – PRIORITY NON-TAX CLAIMS, CLASS 9 – INTERCOMPANY CLAIMS, CLASS 11 – SUBSIDIARY EQUITY INTERESTS, AND CLASS 12 – OTHER EQUITY INTERESTS.

THE DEBTORS AND THE COMMITTEE BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALL CLASSES OF CLAIMS AND EQUITY INTERESTS. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN.  TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY **4:00 P.M., CENTRAL STANDARD TIME, ON JANUARY 12, 2009** (THE "VOTING DEADLINE").

FOR YOUR ESTIMATED PERCENTAGE RECOVERY UNDER THE PLAN, PLEASE SEE THE CHART SET OUT IN "OVERVIEW OF THE PLAN – SUMMARY OF DISTRIBUTIONS UNDER THE PLAN."

II.

## NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN.  PLEASE READ THIS DOCUMENT WITH CARE.**

**PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND TO THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES.**

On December 23, 2008, after notice and a hearing, the Bankruptcy Court issued the Disclosure Statement Order approving the Disclosure Statement because it contains information of a kind, in sufficient detail, and adequate to enable a hypothetical, reasonable investor typical of the solicited classes of Claims of the Debtors to make an informed judgment with respect to the acceptance or rejection of the Plan (a true and correct copy of the Plan is annexed hereto as Exhibit A).  The Disclosure Statement Order and the order approving solicitation procedures are attached hereto as Exhibit B and should be referred to for details regarding the procedures for the solicitation of votes on the Plan.  **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR**

**COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE
STATEMENT.**

Each holder of a Claim entitled to vote to accept or reject the Plan should read this
Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to
accept or reject the Plan may be made except pursuant to this Disclosure Statement and section
1125 of the Bankruptcy Code. Except for the Debtors, the Committee and certain of the
professionals those parties have retained, no person has been authorized to use or promulgate any
information concerning the Debtors, their businesses, or the Plan other than the information
contained in this Disclosure Statement and if given or made, such information may not be relied
upon as having been authorized by the Debtors or the Committee. You should not rely on any
information relating to the Debtors, their businesses, or the Plan other than that contained in this
Disclosure Statement and the exhibits hereto.

After carefully reviewing this Disclosure Statement, including the attached
exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against
the Plan on the enclosed Ballot and return the same to the address set forth on the Ballot, in the
enclosed, postage prepaid, return envelope so that it will be received by the Balloting Agent, no
later than the Voting Deadline.

Each holder of a General Unsecured Claim will receive a Ballot containing the
following three elections: (i) such holder may elect to vote to accept or reject the Plan; (ii) such
holder may elect to accept the Debtors' estimate of such holder's Allowed General Unsecured
Claim or accept the Debtors' offer of settlement with respect to General Unsecured Claims that
are contingent, unliquidated or disputed and (iii) such holder may elect to receive, in full and
final satisfaction of such Claim, either (a) a New Unsecured Note in a principal amount equal to
one hundred percent (100%) percent of the amount of such holder's Allowed General Unsecured
Claim, or (b) a single Cash payment in an amount equal to seventy percent (70%) of the amount
of such holder's Allowed General Unsecured Claim if such holder elects by affirmatively
indicating on its Ballot to accept the treatment in this clause in lieu of receiving a New
Unsecured Note. Only holders of General Unsecured Claims that are Allowed Claims as of the
Effective Date are eligible to receive Cash in lieu of a New Unsecured Note.

To facilitate the ability of holders to elect Cash in lieu of a New Unsecured Note,
each holder of a General Unsecured Claim that is not an Allowed Claim as of the time of
solicitation of the Plan will have the opportunity to have such Claim deemed an Allowed Claim
as of the Effective Date. The Debtors will indicate on such holder's Ballot the
Debtors' determination of the Allowed Amount of such holder's Claim or offer of settlement of
such Claim to the extent such Claim is otherwise disputed, contingent or unliquidated. Such
holder's Claim shall be deemed an Allowed Claim, subject to the occurrence of the Effective
Date, in the amount indicated by the Debtors on such Ballot if such holder accepts the
Debtors' determination or offer of settlement by affirmatively indicating such acceptance on
such holder's Ballot. Such holder's election to accept the Debtors' offer of settlement is not
contingent upon such holder voting in favor of the Plan. In the event the Effective Date does
not occur, such election by the holder and the Debtors' estimate or offer of settlement shall have
no force and effect and shall be deemed inadmissible in any further proceedings pursuant to Rule
408 of the Federal Rules of Evidence.

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You may be bound by the Plan if it is accepted by the requisite holders of Claims even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a Confirmation Hearing on **January 16, 2009 at 9:30 a.m.**, Central Standard Time, before the Honorable Russell F. Nelms, United States Bankruptcy Judge. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before **January 12, 2009 at 4:00 p.m.** Central Standard Time, in the manner described in the related order.

**THE DEBTORS AND THE COMMITTEE SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN.**

III.

## EXPLANATION OF CHAPTER 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code, pursuant to which a debtor-in-possession may reorganize its business for the benefit of its creditors, equity holders, and other parties in interest. The formulation of a plan of reorganization is the principal purpose of a Chapter 11 case. The plan sets forth the means for satisfying the holders of claims against and interests in the debtor's estate.

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets. In either event, upon confirmation of the plan, it becomes binding on a debtor and all of its creditors and equity holders, and the obligations owed by a debtor to such parties are compromised and exchanged for the obligations specified in the plan.

After a plan of reorganization has been filed, the holders of impaired claims against and interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the solicitation of votes by the Debtors and the Committee on the Plan.**

The bankruptcy court may confirm a plan of reorganization even though fewer than all the classes of impaired claims and equity interests accept such plan. For a plan of reorganization to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan. **The Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of Claims and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims.**

IV.

**OVERVIEW OF THE PLAN**

The Plan provides for the treatment of Claims against and Equity Interests in all of the Debtors in <u>In re Heartland Automotive Holdings, Inc., et al.</u>, Chapter 11 Case No. 08-40047 (RFN), Jointly Administered.

**A.    Summary of the Terms of the Plan**

The Plan implements and is built around the following key elements:

- the Debtors' emergence from the Chapter 11 Cases under the service mark Jiffy Lube based upon amended Franchise Agreements with JLI and a new oil supply agreement with SOPUS;

- payment in full to all creditors through the issuance of New Preferred Stock[2], New Common Stock, New Unsecured Notes, amendment and restatement of (i) the Original H-I Notes with the Amended and Restated H-I Notes, and (ii) the Original H-II Secured Credit Facility with the Amended and Restated H-II Facility, or payment in Cash;

- a $28 million contribution by Quad-C[3]; and

- the preservation of Subsidiary Equity Interests.

The Plan is the product of ongoing, but as yet incomplete, negotiations between the Debtors and representatives of their constituencies, including the Committee, the H-II Lenders, and Quad-C. The Plan reflects the basic construct around which the parties have negotiated and otherwise represents, in the view of the Debtors and the Committee, a reasonable and appropriate compromise that permits the value of the Debtors' business to be maximized and allows payment in full for all creditors, other than those who may choose an accelerated but discounted cash payment.

**B.    Summary of Distributions Under the Plan**

The following is a summary of the distributions under the Plan. It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as Exhibit "A."

The claim amounts set forth below are based on information contained in the Debtors' Schedules and reflect what the Debtors and the Committee believe to be reasonable

---

[2]    Term sheets describing the principal terms of the New Preferred Stock are attached hereto as Schedules 7 and 8.

[3]    The Quad-C Contribution Documents providing for the $28 million new equity investment is attached hereto as Schedule 6.

estimates of the likely resolution of outstanding disputed Claims.  The amounts utilized may differ from the outstanding filed claims amounts.

The following chart summarizes the distribution to each class under the Plan:

## UNCLASSIFIED CLAIMS

| <u>Classes of Claims</u> | <u>Treatment of Classes of Claims</u> |
| --- | --- |
| Administrative Expense Claims (includes costs of the chapter 11 proceedings for the Debtors and expenses of operation as specified in section 503(b) and 507(a)(2) of the Bankruptcy Code including Fee Claims, Claims arising after the Petition Date, obligations with respect to assumed executory contracts and leases, and any outstanding statutory fees).<br><br>Estimated Claims:  Approximately $24.0 million | On the Distribution Date, each holder of an Allowed Administrative Expense Claim shall receive in full satisfaction of such Claims (i) the amount of such holder's Allowed Administrative Expense Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by the Debtors and such holder; <u>provided</u>, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim; <u>provided</u>, <u>further</u>, that an Administrative Expense Claim representing a liability incurred postpetition in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business.<br><br>**Estimated Recovery:  100% of Allowed Claim.** |
| Priority Tax Claims (includes all Claims entitled to priority under section 507(a)(8) of the Bankruptcy Code).<br><br>Estimated Claims:  Approximately $250,000 | Unless otherwise agreed with a holder of an Allowed Priority Tax Claim, the Debtors, in their sole discretion, may choose whether Allowed Priority Tax Claims will be paid either: (1) in Cash, in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest from the Effective Date at a fixed annual rate equal to five percent (5%) and paid in regular installments of equal amount over a period not exceeding five (5) years from the Petition Date; or (2) in full in Cash on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim.  The Debtors reserve the right to prepay, without penalty, at any time under option (1) above. Alternatively, a holder of an Allowed Priority Tax Claim may elect to receive the same treatment of its Claims as is offered to holders of Allowed General Unsecured Claims as provided |

6

in Article 5.5 of the Plan.

**Estimated Recovery:  100% of Allowed Claim.**

### CLASSIFIED CLAIMS AND INTERESTS

| Classes of Claims and Interests | Treatment of Classes of Claims and Interests |
| --- | --- |
| Class 1 – Priority Non-Tax Claims | Unimpaired. |
| Estimated Claims:  Undetermined | Each Allowed Priority Non-Tax Claim shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles the holder in respect of such Claim shall be fully reinstated and retained, and such Allowed Priority Non-Tax Claim (<u>including</u> any amounts to which such holder is entitled pursuant to section 1124(2) of the Bankruptcy Code) shall be paid in full in accordance with such reinstated rights on the Effective Date.<br><br>**Estimated Recovery:  100% of Allowed Claim.** |
| Class 2 – H-I Lender Claims | Impaired. |
| Estimated Claims:  Approximately $25 million | Each holder of an Allowed H-I Lender Claim shall, on the Distribution Date, in full satisfaction of such holder's Allowed H-I Lender Claim, receive Amended and Restated H-I Note(s) representing its *pro rata* interest in the Amended and Restated H-I Facility based on the amount of its Allowed H-I Lender Claim, the terms of which facility are set forth on Schedule 11 to the Disclosure Statement, which shall be deemed part of the Plan.  Notwithstanding Article 1.51 of the Plan, the Distribution Date with respect to the treatment of the H-I Lender Claims shall be deemed to occur on the Effective Date in accordance with the Amended and Restated H-I Facility Documents.<br><br>**Estimated Recovery:  100% of Allowed Claim.** |
| Class 3  – H-II Lender Claims | Impaired. |
| Estimated Claims:  Approximately $190.4 million, inclusive of outstanding letters of credit | Each holder of an Allowed H-II Lender Claim shall, on the Distribution Date, in full satisfaction of such holder's Allowed H-II |

Lender Claim receive a *pro rata* interest in the Amended and Restated H-II Facility based on the amount of its Allowed H-II Lender Claim, the terms of which facility are set forth in Schedule 10 to the Disclosure Statement, which shall be deemed part of the Plan. Notwithstanding Article 1.51 of the Plan, the Distribution Date with respect to the treatment of the H-II Lender Claims shall be deemed to occur on the Effective Date in accordance with the Amended and Restated H-II Facility Documents.

**Estimated Recovery: 100% of Allowed Claim.**

Class 4 – Other Secured Claims

Impaired.

Estimated Claims: $0

Except to the extent that the holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Allowed Other Secured Claim shall, on the Effective Date, be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of a default. All Allowed Other Secured Claims that are not due and payable on or before the Effective Date shall, at the Debtors' option, be paid (i) in the ordinary course of business in accordance with the course of practice between the Debtors and such holder with respect to such Claim, or (ii) by transfer of the Collateral securing such Claim to the holder of such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim.

**Estimated Recovery: 100% of Allowed Claim.**

Class 5 – General Unsecured Claims

Impaired.

Estimated Claims: Approximately $10.2 million

Each holder of an Allowed General Unsecured Claim shall receive on the Distribution Date, in full and final satisfaction of such claim, either (i) a New Unsecured Note in a principal amount

equal to one hundred percent (100%) of the amount of such holder's Allowed General Unsecured Claim, or (ii) a single Cash payment in an amount equal to seventy percent (70%) of the amount of such holder's Allowed General Unsecured Claim, if such holder elects by affirmatively indicating on its Ballot to accept the treatment in this clause (ii) in lieu of receiving a New Unsecured Note as set forth in clause (i) (the "Cash Option"); <u>provided, however,</u> that only holders of General Unsecured Claims that are Allowed Claims as of the Effective Date shall  be eligible to receive the treatment in clause (ii).

**Estimated Recovery:  100% of Allowed Claim.**

| | |
|---|---|
| Class 6 – Blackstone Debt Claims | Impaired. |
| Estimated Claims:  Approximately $67 million | Each holder of an Allowed Blackstone Debt Claim shall receive a *pro rata* share of (i) 200,000 shares of the New Class A Common Stock, and (ii) 1,000,000 shares of the New Class A Preferred Stock in full satisfaction of its Allowed Class 6 Blackstone Debt Claims.<br><br>**Estimated Recovery:  100% of Allowed Claim.** |
| Class 7 – JLI Claims | Impaired. |
| Estimated Claims: Undetermined | Except as provided in Article 13.1 of the Plan, each holder of an Allowed JLI Claim shall be deemed to have waived any and all Claims, prepetition or otherwise, against any of the Released Persons in exchange for (i) the assumption of the Franchise Agreements and related JLI Leases (in each case as modified by the New JLI Agreements), and (ii) the releases provided for in Articles 16.1 and 16.2 of the Plan.<br><br>**Estimated Recovery:  100% of Allowed Claim** |

| | |
|---|---|
| Class 8 – SOPUS Claims | Impaired. |
| Estimated Claims:  Undetermined | Except as provided in Article 13.2 of the Plan, each holder of a SOPUS Claim shall be deemed to have waived any and all Claims, prepetition or otherwise, against any of the Released Persons in exchange for (i) the replacement of all existing Supply Agreements with the Master Supply Agreement and the VMI Agreement, and (ii) the releases provided for in Article 16.1 and 16.2 of the Plan. |
| | **Estimated Recovery:  100% of Allowed Claim** |
| Class 9 – Intercompany Claims | Unimpaired. |
| Estimated Claims:  Approximately $500,000 | Each Allowed Intercompany Claim shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles a holder in respect of such Claim shall be fully reinstated and retained. |
| | **Estimated Recovery:  100% of Allowed Claim.** |
| Class 10 – Heartland Common Stock Interests | Impaired |
| | Each holder of an Allowed Heartland Common Stock Interest shall, on the Effective Date, receive one (1) share of New Class B Common Stock on account of each one thousand (1,000) shares of Allowed Heartland Common Stock Interests currently outstanding.  Upon such distribution, all Heartland Common Stock Interests shall be canceled.  Any fractional shares of New Class B Common Stock shall be rounded up so that the holder of the fractional Allowed Heartland Common Stock Interest receives one (1) additional whole share of New Class B Common Stock on account of the fractional share the holder would have received. |

| | |
|---|---|
| Class 11 – Subsidiary Equity Interests | Unimpaired |
| | Each Allowed Subsidiary Equity Interest shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Equity Interest entitles a holder in respect of such Equity Interest shall be fully reinstated and retained. |
| Class 12 – Other Equity Interests | Impaired |
| | On the Effective Date, all Other Equity Interests shall be cancelled and the holders of such Equity Interests shall receive no distribution on account of such interests. |
| Class 13 – Convenience Claims | Impaired |
| Estimated Claims: Approximately $750,000 | Each holder of an Allowed Convenience Claim shall receive on the Distribution Date a single Cash payment in an amount equal to one hundred percent (100%) of such holder's Allowed Convenience Claim. |
| | **Estimated Recovery:  100% of Allowed Claim** |

V.

## GENERAL INFORMATION

The Debtors consist of Heartland and its nine (9) direct and indirect subsidiaries. The chart below depicts the corporate structure of Heartland and its subsidiaries as of the date of this Disclosure Statement.  The description in "General Information" of the Debtors and their business does not give effect to any changes in the corporate structure of the Debtors in connection with or under the Plan.



## A.      The Businesses of the Debtors

The Debtors, headquartered in Omaha, NE, are presently the largest franchisees of JLI in the country.  Heartland has been operating Jiffy Lube stores (through its affiliated predecessor companies) continuously since 1980.  As of the filing of the Disclosure Statement, the Debtors operate 397 Jiffy Lube stores in 20 states across the East, Midwest and Western United States.  They are a leading operator in 15 major U.S. markets (Austin, Boston, Chicago, Columbus, Kansas City, Las Vegas, Los Angeles, Madison, Memphis, Minneapolis, Omaha/Lincoln, San Diego, Seattle, St. Louis and Tucson) as well as many smaller markets.  The Debtors provide a broad range of products and services to customers with a convenient way to perform preventative maintenance and fluid replacement services on their vehicles.  The Debtors are run by a professional management team with an average of 11 years of industry experience in multi-unit retail and franchise operations and extensive expertise in operating quick lube centers.  The Debtors also employ experienced finance, accounting, and new store development personnel.

## B.      Prepetition Capital Structure and Recapitalizations

While operated on an integrated basis, the Debtors' capital structure is divided into segments (H-I and H-II as described below) to accommodate collateral segregation requirements under certain of the Debtors' prepetition financings.

Beginning in March 1998, Heartland Automotive Services, Inc. ("H-I"), and in 1999, Heartland Automotive Services of Austin, Inc., entered into the Original H-I Notes with several institutions.  The Original H-I Notes are comprised of approximately eighty (80) different notes ranging from approximately $625 to approximately $1.8 million outstanding as of the Petition Date, issued under eighteen separate credit facilities.  The aggregate outstanding balance under the Original H-I Notes as of the Petition Date was approximately $24.9 million.  The Original H-I Notes are serviced by the H-I Lenders.  Certain of the Original H-I Notes were securitized by the holders of the notes; however, the Debtors are not party to such securitizations.  In addition, certain of the Original H-I Notes are guaranteed by HAS Holdings, Inc and/or Heartland Automotive Services, Inc.

In February of 2005, the Debtors completed a recapitalization by amending and restating the Original H-II Secured Credit Facility, their then-existing $90 million senior credit facility between Heartland Automotive Services II, Inc. and HAS Holdings, Inc. as borrower, and Dymas as lead arranger and administrative agent.  As part of that transaction, the total lending commitment under the Original H-II Secured Credit Facility was increased to $159 million, which included a $30 million facility dedicated solely for use in funding future franchise location acquisitions.  At the same time the Original H-II Secured Credit Facility was amended, the Debtors issued subordinated notes in the principal amount of $40 million to BMP-SPV (J) Ltd. and Blackstone Mezzanine Holdings, L.P. ("<u>Blackstone</u>").  Upon the closing of the Original H-II Secured Credit Facility and the Subordinated Note Purchase Agreement, the Debtors authorized and paid a dividend to their stockholders in an aggregate amount of approximately $52 million.

In February of 2006, the Debtors again amended and restated their then-existing $159 million Original H-II Secured Credit Facility.  The total lending commitment under the Original H-II Secured Credit Facility was increased from $159 million to $225 million, which included a $50 million lending commitment solely for use in funding future franchise location acquisitions.  At the same time the Original H-II Secured Credit Facility was amended, the Debtors amended and restated the Subordinated Note Purchase Agreement by which the subordinated notes were issued.  This amendment included the issuance of an additional $20 million in principal amount of subordinated notes to Blackstone.  Upon the closing of these amendments, the Debtors authorized and paid a dividend to their stockholders in an aggregate amount of approximately $70 million.

## C.    Events Precipitating the Chapter 11 Cases

Certain of the Debtors have operated as Jiffy Lube franchisees since 1980.  In early 2002, with the consent of JLI, the Debtors were acquired by a group of investors, led by Quad-C, with an investment strategy for the Debtors based upon aggressive growth.  Between 2002 and 2007, the Debtors built new or converted 86 locations to Jiffy Lube service centers and acquired 220 other Jiffy Lube service centers.

Starting in 2005, the relationship between the Debtors and JLI began to deteriorate.  In early 2005, to reduce oil costs and remain competitive in the marketplace, the Debtors converted a substantial portion of their oil supply from SOPUS, an affiliate of JLI, to ConocoPhillips Company ("<u>ConocoPhillips</u>").  Besides offering significant cost savings, this conversion also permitted the Debtors to align their oil costs to a set index, adding predictability to their cost base not available under their relationship with SOPUS.

In 2006, the Debtors were the subject of a negative consumer investigative report regarding certain Jiffy Lube service centers in Los Angeles.  News stories aired on television locally and nationally, and reported that Heartland-owned stores failed to perform certain services for which customers were charged.  The Debtors' response to the allegations resulted in, among other things, the termination of 19 employees and the issuance of formal reprimands to an additional 12 employees (including several senior level employees).  The Debtors also conducted widespread re-training of employees, installed video surveillance systems, developed a nationwide, toll-free employee hotline program, developed and implemented operational and

compliance audit procedures, expanded its resources in the loss prevention department, developed and implemented a state-of-the-art issue tracking and reporting system to aid in the timely and effective identification, reporting, and resolution of important issues, developed and implemented a "Code of Conduct" and hired Bare Associates, International, Inc. to begin conducting independent mystery shops nationwide throughout their stores.  On or about August 8, 2006, the Debtors and JLI entered into an agreement, which provided, among other things, for the Debtors' implementation of a program for monitoring compliance with JLI's operating policies and revision of their compensation system.

Notwithstanding this resolution, disputes between the Debtors and JLI persisted.  In November 2006, JLI informed the Debtors that it would not offer any new Jiffy Lube franchises to the Debtors, nor approve the Debtors as a transferee of existing Jiffy Lube franchises.  JLI also alleged that the Debtors were in default under certain of their Franchise Agreements because of the Debtors' sale of recycled antifreeze.  Although the Debtors converted all of their stores to conforming antifreeze products required by JLI, such conversion came at a substantial cost.

In the summer of 2007, JLI conducted an audit of the Debtors, which resulted in allegations by JLI that the Debtors were in default of advertising requirements under the Franchise Agreements.  JLI's allegations, which the Debtors dispute, are based, in part, on JLI's contention that the applicable Franchise Agreements do not give credit against advertising requirements for, significant amounts of certain advertising and promotional expenses incurred by the Debtors.

In addition to their disputes with JLI, in the year prior to the Petition Date, the Debtors experienced a decline in revenue resulting from, among other things, changing macroeconomic conditions.  Rising gasoline and oil costs took their toll on the Debtors, reducing customer visits to Debtors' store locations, which in turn decreased the Debtors' margins in 2007.  As a result of the decline in revenue and increasing costs, the Debtors experienced problems with respect to their debt obligations.  For the quarterly periods ending June 30, 2007 and September 30, 2007, the Debtors failed to comply with certain financial covenants set forth in the Original H-II Secured Credit Facility.  As a consequence, the Debtors were unable to access the revolving loan and the acquisition loan under the Original H-II Secured Credit Facility.  In addition, because of the financial covenant defaults, the Debtors were prohibited from paying the scheduled interest payments to Blackstone under the Subordinated Note Purchase Agreement that were due in September and December 2007.

In the summer/fall of 2007, the Debtors were negotiating an agreement among Dymas, as administrative agent for the H-II Lenders, Blackstone, and Quad-C regarding an out of court workout that, if concluded, the parties hoped would bring covenant relief from the H-II Lenders and Blackstone, a new equity investment of $25 million from Quad-C and the continuation of the business under the service mark Jiffy Lube.  Prior to reaching agreement, however, the relationship between JLI and the Debtors became increasingly adversarial.  For example, in meetings with JLI on November 2, 2007, JLI delivered termination/non-renewal notices regarding 25 stores as well as a general notice indicating that the Debtors were on "development hold."  Furthermore, JLI informed the Debtors that it was contemplating (i) placing all of the Debtors' stores in default on account of the alleged advertising default

described above and (ii) declaring a cross-default with respect to each of the Debtors then existing franchised locations.

Efforts to negotiate a resolution of the disputes involving advertising expenditures, store growth and re-imaging support between the Debtors and JLI failed. Accordingly, on January 7, 2008, the Debtors commenced the Chapter 11 Cases in an effort, among other things, to mitigate the risk of further franchise terminations by JLI.

**D.      Events Leading Up to the Disclosure Statement and Plan.**

Since the Petition Date, the Debtors have continued to operate their business as debtors in possession.  Shortly after the commencement of the Chapter 11 Cases, the Bankruptcy Court authorized the Debtors to obtain $10 million in post-petition financing under a facility provided by HAS Funding LLC, an affiliate of Quad-C.

At the start of the Chapter 11 Cases, the Debtors and JLI were entrenched in opposite corners as a result of the years of animosity and distrust that had built up between them. When the Committee was appointed in late January 2008, costly and protracted litigation between the Debtors and JLI over a variety of issues, including lease and Franchise Agreement disputes, seemed inevitable.  The first several months of the Chapter 11 Cases were marked by failed efforts to bring constituents together in a meaningful way and the commencement of substantial pre-litigation discovery efforts between and among the Debtors, JLI and other parties. Meanwhile, the Debtors' financial condition continued to deteriorate.  In light of such inertia, the Committee, in an exercise of its fiduciary duty to the Debtors' unsecured creditors, and with the support of the Debtors, began negotiations with JLI, SOPUS, Quad-C, Dymas, as administrative agent for the H-II Lenders, and other parties in interest over the terms of the Plan.

Over the course of several months, the Committee has been able to negotiate agreements with JLI and SOPUS that, if approved and effectuated under the Plan, will resolve all disputes between and among the Debtors, JLI and SOPUS, and lay the foundation for the Debtors to remain part of the JLI franchise system pursuant to amended Franchise Agreements and purchase oil products from SOPUS under a comprehensive Master Supply Agreement.  In addition, the Committee has been able to negotiate an agreement with Quad-C pursuant to which Quad-C will inject $28 million in new value into the Reorganized Debtors, in exchange for a continued equity stake in the Reorganized Debtors and a release of all Claims against Quad-C and its Affiliates.  The Debtors have joined in these resolutions as embodied in the Plan and in various Plan Support Agreements (the "Plan Support Agreements"),[4] certain of which were separately and previously approved by the Bankruptcy Court.

---

[4] Separate Plan Support Agreements were entered into by the Committee and the Debtors and each of (a) JLI, (b) SOPUS, (c) Quad-C, and (d) Blackstone. In summary, each of the Plan Support Agreements defines, as appropriate for the specific counterparty, contractual relationships with the Debtors on emergence from chapter 11, the capital structure for the Debtors on emergence from chapter 11, any funding commitments on emergence from chapter 11, any releases to be included in the Plan (and described in this Disclosure Statement below), and certain corporate governance requirements in exchange, subject to approval of this Disclosure Statement and solicitation of votes in accordance with the Bankruptcy Code, for support of the Plan.  The Debtors and the Committee expect to enter into Plan Support Agreements with the H-I Lenders and the H-II Lenders and Dymas.

# VI.

## THE REORGANIZED COMPANY

**A.    Re-imaging**

          i.      Decision to Remain with JLI and Re-image Stores

Upon commencement of the Chapter 11 Cases, the Debtors engaged in an analysis to determine the highest value and best use for the Debtors' assets.  As an initial matter, the Debtors determined that any plan of reorganization that contemplated the Debtors' continued operation under the service mark Jiffy Lube would require resolution of the Debtors' long-standing disputes with JLI.  The Debtors also determined that, regardless of under which service mark the Debtors operated, recoveries to stakeholders would be substantially enhanced by (a) continuing to operate the Debtors' network of stores under a single integrated enterprise as compared with breaking up the company through a series of asset sales to third parties, and (b) continuing to grow the business through the acquisition of additional stores in the future.

The Debtors and JLI, however, were unable or unwilling to negotiate with each other over these issues.  As a result, the Debtors began to analyze other strategic alternatives, including a stand-alone reorganization as a rebranded business.  Several prospective rebranding partners approached the Debtors and the Debtors entered into negotiations with BP Lubricants USA Inc. d/b/a Castrol ("Castrol").  The Debtors also considered resolving their disputes with JLI through litigation that would clarify the nature of the Debtors' relationship with JLI.  Ultimately, the Debtors entered into an agreement with Castrol.  Pursuant to said Agreement, had it otherwise been approved by the Bankruptcy Court, Castrol would have supplied various oil products to the Debtors and provided certain financial support to the Debtors to convert their stores from Jiffy Lube stores to "Castrol Premium Lube Express" stores.

While the Debtors pursued negotiations with a potential rebranding partner, separately, the Committee began direct negotiations with JLI and with SOPUS in an effort to (a) resolve potential claims of JLI and SOPUS against the Debtors, (b) establish new or revised franchise agreements with JLI that would, among other things, address the advertising, growth and re-imaging issues that had plagued the prepetition relationship between JLI and the Debtors, and (c) establish new or revised supply arrangements with SOPUS that would balance various supply requirements with beneficial pricing terms.  These discussions resulted in agreements with JLI (the New JLI Agreements) and SOPUS (the Master Supply Agreement and VMI Agreement) that in the opinion of the Committee and the Debtors, satisfactorily address the business requirements of the Debtors to reorganize and support the confirmation of the Plan and future viability of the Reorganized Debtors.  Specifically, under the New JLI Agreements, the Debtors will assume the Franchise Agreements, as amended pursuant to the New JLI Agreements, pursuant to which the Debtors shall remain part of the JLI system, shall receive re-imaging support payments to be used to re-image the Debtors' stores on a market-by-market basis, and shall have the opportunity to grow over the next five years.  The Debtors also will enter into a Master Supply Agreement with SOPUS that will replace all existing Supply Agreements, and a VMI Agreement that will assist the Debtors in managing its inventories more

efficiently and effectively.  Pursuant to the Plan, all Claims by and against SOPUS as relates to the Debtors shall be released.

In light of the filing of the Plan and the Plan Support Agreements reached among JLI, SOPUS, Blackstone, Quad-C, the Committee and the Debtors, the Debtors expect to terminate their agreement with Castrol in accordance with its terms, and anticipate paying Castrol a termination fee of $150,000 pursuant to a prior Court order authorizing that payment.  Castrol, however, alleges that in the event of such termination, the Debtors are obligated to pay Castrol a break-up fee in the amount of either $250,000 or $500,000, depending on the date of termination.  The Debtors dispute such allegation.  Nothing herein shall impair, limit or otherwise waive the Debtors' or Castrol's rights with respect to such dispute.

ii.    Overview of Amendments to Franchise Agreements, the Master Supply Agreement and the VMI Agreement

a.    Pursuant to the New JLI Agreements, the Debtors will continue to operate as JLI franchisees under the Jiffy Lube service mark.  JLI has agreed to amend the Franchise Agreements with respect to advertising, growth and reimaging support.  JLI has also agreed to modify many of its subleases with the Debtors.  JLI will support the Debtors' growth through the development of new locations, and the acquisition of both non-JLI and existing JLI stores.  In addition, the New JLI Agreements contemplate that claims by and against JLI related to the Debtors, through the Effective Date, will be released.

b.    The Reorganized Debtors will enter into the new Master Supply Agreement to replace all existing supply agreements.  Pursuant to the Master Supply Agreement, SOPUS shall provide financial support that can be used by the Reorganized Debtors for various expenditures including re-imaging.  In exchange, the Reorganized Debtors shall be obligated to meet certain minimum purchase requirements.  Pursuant to the Plan, the Debtors and SOPUS agree to execute releases, by and among JLI, the Debtors, the Committee, the H-I Lenders and the H-II Lenders, covering all pre-Effective Date claims.  The Reorganized Debtors will also enter into the VMI Agreement which is designed to maximize the use of bulk fluids while minimizing the Reorganized Debtors' investment in inventory.

**B.    Preservation of NOLs**

The Plan has been structured with the intent of retaining $28.5 million of net operating loss ("NOL") carry-forwards as of year end 2008.  The Plan contemplates the preservation of such NOL carry-forwards for future utilization by the Reorganized Debtors subject to the possible limitations and restrictions described under "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES".

VII.

**SELECTED FINANCIAL INFORMATION**

**A.    Consolidated and Year-to-Date Annual Financial Information for the Debtors**

## Consolidated Balance Sheet

|  | January 3, 2008 | August 28, 2008 |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS: | | |
| CASH | $5,094,022 | $9,647,634 |
| ACCOUNTS RECEIVABLE | 2,947,047 | 2,747,536 |
| INVENTORIES | 9,480,018 | 10,679,705 |
| PREPAIDS | 3,880,478 | 1,159,825 |
| ASSETS HELD FOR SALE | 34,088 | - |
| TOTAL CURRENT ASSETS | 21,435,653 | 24,234,700 |
| LAND, BUILDINGS & EQUIPMENT (NET) | 90,434,956 | 86,013,293 |
| OTHER ASSETS | 3,851,157 | 3,709,702 |
| INTANGIBLE ASSETS (NET) | 217,562,858 | 215,364,442 |
| TOTAL ASSETS | $333,284,624 | $329,322,137 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| CURRENT LIABILITIES: | | |
| CURRENT PORTION - LT DEBT AND CAPITAL LEASE OBLIGATIONS | $15,920,300 | - |
| TRADE ACCOUNTS PAYABLE | 12,759,178 | 6,187,324 |
| PAYROLL & BONUSES PAYABLE | 4,417,318 | 4,817,566 |
| ACCRUED EXPENSES | 21,684,725 | 5,710,337 |
| TOTAL CURRENT LIABILITIES | 54,781,521 | 16,715,226 |
| LONG-TERM DEBT AND CAPITAL LEASE OBLIGATIONS | 330,531,362 | - |
| DEFERRED CREDITS & LONG-TERM LIAB | 11,688,205 | (3,848,027) |
| LIABILITIES SUBJECT TO COMPROMISE | - | 388,628,873* |
| TOTAL LIABILITIES | 397,001,087 | 401,496,072 |
| TOTAL STOCKHOLDERS' EQUITY | (63,716,464) | (72,173,935) |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | $  333,284,624 | $  329,322,137 |

\* Liabilities Subject to Compromise include the Debtors' secured and unsecured obligations as reflected on the Debtors' Schedules D, E, and F as well as certain liabilities reflected on the Debtors' balance sheet under Generally Accepted Accounting Principles ("GAAP") which do not directly give rise to a claim and thus were not reflected on such Schedules.  Specifically, Liabilities Subject to Compromise includes $82 million of capital leases and $10 million of deferred rent.  The capital lease liability relates to certain of the Debtors' stores where the leases are capitalized under GAAP.  The deferred rent liability relates to certain of the Debtors' leases that include rent increases over the life of the lease that are accounted for on a straight-line basis resulting in the creation of deferred rent in the first portion of the lease term and the

reduction of deferred rent back to zero in the later portion of the term.  In both cases, the Debtors' leases are reflected in Schedule G - Executory Contracts and there are no corresponding claims for these GAAP accounting liabilities.

## Consolidated Statement of Income

|  | Fiscal Year Ending January 3, 2008 | 8 months Ending August 28, 2008 |
|---|---|---|
| NET SALES | $  298,612,036 | $  192,325,805 |
| DIRECT COSTS: |  |  |
| PRODUCT & LABOR COSTS | 153,997,798 | 100,552,856 |
| OTHER DIRECT COSTS | 9,668,727 | 5,365,952 |
| TOTAL DIRECT COSTS | 163,666,525 | 105,918,808 |
| GROSS PROFIT | 134,945,511 | 86,406,997 |
| STORE OPERATING EXPENSES: |  |  |
| ADVERTISING | 5,387,623 | 4,709,956 |
| OCCUPANCY | 46,500,027 | 30,727,565 |
| ROYALTIES | 11,956,232 | 7,703,062 |
| OTHER STORE EXPENSES | 17,354,840 | 11,128,680 |
| TOTAL STORE OP EXP | 81,198,722 | 54,269,263 |
| STORE LEVEL INCOME | 53,746,789 | 32,137,734 |
| ADMINISTRATIVE EXPENSES | 17,352,610 | 11,491,330 |
| EARNINGS BEFORE INTEREST & TAXES, DEPRECIATION AMORTIZATION & REORGANIZATION EXPENSES | 36,394,179 | 20,646,404 |
| REORGANIZATION AND OTHER EXPENSE | 2,074,922 | 15,704,230 |
| INTEREST EXPENSE (NET) | 30,477,699 | 11,277,697 |
| COMPENSATION EXPENSE STOCK OPTION | 51,048 | 30,648 |
| DEPRECIATION, AMORTIZATION AND OTHER EXPENSE | 14,033,741 | 7,770,745 |
| INCOME TAX PROVISION | (4,076,873) | (5,650,000) |
| NET INCOME | $   (6,166,358) | $   (8,486,915) |

VIII.

## FINANCIAL PROJECTIONS AND ASSUMPTIONS

**A.     Purpose and Objectives**

The Debtors' long term business plan (the "<u>Business Plan</u>") and the underlying projections and assumptions serve as the basis for the Plan.  The Debtors believe that the assumptions that underlie projections are reasonable under the circumstances and that achieving the projections set forth herein will maximize the value of the Debtors' businesses.  The Debtors have prepared the projected operating and financial results (the "<u>Projections</u>") on a consolidated basis for the Reorganized Debtors for the period ending five years from the Effective Date.  The Projections, and a summary of significant assumptions related thereto, are attached to this Disclosure Statement as <u>Exhibit C</u>.

**B.     Consolidated Pro Forma Statement of Financial Position**

The Debtors have prepared consolidated pro forma statements of financial position of the Reorganized Debtors (the "<u>Pro Forma Statements</u>").  The Pro Forma Statements are attached hereto as <u>Exhibit D</u> and reflect the Projections with respect to the consolidated financial position of the Reorganized Debtors assuming the effects of certain transactions that will occur in connection with and upon consummation of the Plan.

IX.

## THE CHAPTER 11 CASES

**A.     Commencement of the Chapter 11 Cases**

On January 7, 2008, Heartland and its affiliated Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, the Honorable Russell F. Nelms presiding.

**B.     Continuation of Business after the Petition Date**

Since the Petition Date, the Debtors have continued to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have sought Bankruptcy Court approval for all transactions that were outside the ordinary course of their businesses.  As discussed in this section, during the period immediately following the Petition Date, the Debtors sought and obtained authority from the Bankruptcy Court with respect to a number of matters deemed by the Debtors to be essential to their smooth and efficient transition into chapter 11 and the stabilization of their operations.

(a)     **Cash Collateral**

On January 9, 2008, the Court authorized the immediate use of Cash, including Cash Collateral, on an emergency and interim basis, subject to certain limitations such as a set Cash Collateral budget.

## A.     The Businesses of the Debtors

The Debtors, headquartered in Omaha, NE, are presently the largest franchisees of JLI in the country.  Heartland has been operating Jiffy Lube stores (through its affiliated predecessor companies) continuously since 1980.  As of the filing of the Disclosure Statement, the Debtors operate 397 Jiffy Lube stores in 20 states across the East, Midwest and Western United States.  They are a leading operator in 15 major U.S. markets (Austin, Boston, Chicago, Columbus, Kansas City, Las Vegas, Los Angeles, Madison, Memphis, Minneapolis, Omaha/Lincoln, San Diego, Seattle, St. Louis and Tucson) as well as many smaller markets. The Debtors provide a broad range of products and services to customers with a convenient way to perform preventative maintenance and fluid replacement services on their vehicles.  The Debtors are run by a professional management team with an average of 11 years of industry experience in multi-unit retail and franchise operations and extensive expertise in operating quick lube centers.  The Debtors also employ experienced finance, accounting, and new store development personnel.

## B.     Prepetition Capital Structure and Recapitalizations

While operated on an integrated basis, the Debtors' capital structure is divided into segments (H-I and H-II as described below) to accommodate collateral segregation requirements under certain of the Debtors' prepetition financings.

Beginning in March 1998, Heartland Automotive Services, Inc. ("H-I"), and in 1999, Heartland Automotive Services of Austin, Inc., entered into the Original H-I Notes with several institutions.  The Original H-I Notes are comprised of approximately eighty (80) different notes ranging from approximately $625 to approximately $1.8 million outstanding as of the Petition Date, issued under eighteen separate credit facilities.  The aggregate outstanding balance under the Original H-I Notes as of the Petition Date was approximately $24.9 million.  The Original H-I Notes are serviced by the H-I Lenders.  Certain of the Original H-I Notes were securitized by the holders of the notes; however, the Debtors are not party to such securitizations. In addition, certain of the Original H-I Notes are guaranteed by HAS Holdings, Inc and/or Heartland Automotive Services, Inc.

In February of 2005, the Debtors completed a recapitalization by amending and restating the Original H-II Secured Credit Facility, their then-existing $90 million senior credit facility between Heartland Automotive Services II, Inc. and HAS Holdings, Inc. as borrower, and Dymas as lead arranger and administrative agent.  As part of that transaction, the total lending commitment under the Original H-II Secured Credit Facility was increased to $159 million, which included a $30 million facility dedicated solely for use in funding future franchise location acquisitions.  At the same time the Original H-II Secured Credit Facility was amended, the Debtors issued subordinated notes in the principal amount of $40 million to BMP-SPV (J) Ltd. and Blackstone Mezzanine Holdings, L.P. ("Blackstone").  Upon the closing of the Original H-II Secured Credit Facility and the Subordinated Note Purchase Agreement, the Debtors authorized and paid a dividend to their stockholders in an aggregate amount of approximately $52 million.

In February of 2006, the Debtors again amended and restated their then-existing $159 million Original H-II Secured Credit Facility.  The total lending commitment under the Original H-II Secured Credit Facility was increased from $159 million to $225 million, which included a $50 million lending commitment solely for use in funding future franchise location acquisitions.  At the same time the Original H-II Secured Credit Facility was amended, the Debtors amended and restated the Subordinated Note Purchase Agreement by which the subordinated notes were issued.  This amendment included the issuance of an additional $20 million in principal amount of subordinated notes to Blackstone.  Upon the closing of these amendments, the Debtors authorized and paid a dividend to their stockholders in an aggregate amount of approximately $70 million.

## C.    Events Precipitating the Chapter 11 Cases

Certain of the Debtors have operated as Jiffy Lube franchisees since 1980.  In early 2002, with the consent of JLI, the Debtors were acquired by a group of investors, led by Quad-C, with an investment strategy for the Debtors based upon aggressive growth.  Between 2002 and 2007, the Debtors built new or converted 86 locations to Jiffy Lube service centers and acquired 220 other Jiffy Lube service centers.

Starting in 2005, the relationship between the Debtors and JLI began to deteriorate.  In early 2005, to reduce oil costs and remain competitive in the marketplace, the Debtors converted a substantial portion of their oil supply from SOPUS, an affiliate of JLI, to ConocoPhillips Company ("ConocoPhillips").  Besides offering significant cost savings, this conversion also permitted the Debtors to align their oil costs to a set index, adding predictability to their cost base not available under their relationship with SOPUS.

In 2006, the Debtors were the subject of a negative consumer investigative report regarding certain Jiffy Lube service centers in Los Angeles.  News stories aired on television locally and nationally, and reported that Heartland-owned stores failed to perform certain services for which customers were charged.  The Debtors' response to the allegations resulted in, among other things, the termination of 19 employees and the issuance of formal reprimands to an additional 12 employees (including several senior level employees).  The Debtors also conducted widespread re-training of employees, installed video surveillance systems, developed a nationwide, toll-free employee hotline program, developed and implemented operational and

compliance audit procedures, expanded its resources in the loss prevention department, developed and implemented a state-of-the-art issue tracking and reporting system to aid in the timely and effective identification, reporting, and resolution of important issues, developed and implemented a "Code of Conduct" and hired Bare Associates, International, Inc. to begin conducting independent mystery shops nationwide throughout their stores. On or about August 8, 2006, the Debtors and JLI entered into an agreement, which provided, among other things, for the Debtors' implementation of a program for monitoring compliance with JLI's operating policies and revision of their compensation system.

Notwithstanding this resolution, disputes between the Debtors and JLI persisted. In November 2006, JLI informed the Debtors that it would not offer any new Jiffy Lube franchises to the Debtors, nor approve the Debtors as a transferee of existing Jiffy Lube franchises. JLI also alleged that the Debtors were in default under certain of their Franchise Agreements because of the Debtors' sale of recycled antifreeze. Although the Debtors converted all of their stores to conforming antifreeze products required by JLI, such conversion came at a substantial cost.

In the summer of 2007, JLI conducted an audit of the Debtors, which resulted in allegations by JLI that the Debtors were in default of advertising requirements under the Franchise Agreements. JLI's allegations, which the Debtors dispute, are based, in part, on JLI's contention that the applicable Franchise Agreements do not give credit against advertising requirements for, significant amounts of certain advertising and promotional expenses incurred by the Debtors.

In addition to their disputes with JLI, in the year prior to the Petition Date, the Debtors experienced a decline in revenue resulting from, among other things, changing macroeconomic conditions. Rising gasoline and oil costs took their toll on the Debtors, reducing customer visits to Debtors' store locations, which in turn decreased the Debtors' margins in 2007. As a result of the decline in revenue and increasing costs, the Debtors experienced problems with respect to their debt obligations. For the quarterly periods ending June 30, 2007 and September 30, 2007, the Debtors failed to comply with certain financial covenants set forth in the Original H-II Secured Credit Facility. As a consequence, the Debtors were unable to access the revolving loan and the acquisition loan under the Original H-II Secured Credit Facility. In addition, because of the financial covenant defaults, the Debtors were prohibited from paying the scheduled interest payments to Blackstone under the Subordinated Note Purchase Agreement that were due in September and December 2007.

In the summer/fall of 2007, the Debtors were negotiating an agreement among Dymas, as administrative agent for the H-II Lenders, Blackstone, and Quad-C regarding an out of court workout that, if concluded, the parties hoped would bring covenant relief from the H-II Lenders and Blackstone, a new equity investment of $25 million from Quad-C and the continuation of the business under the service mark Jiffy Lube. Prior to reaching agreement, however, the relationship between JLI and the Debtors became increasingly adversarial. For example, in meetings with JLI on November 2, 2007, JLI delivered termination/non-renewal notices regarding 25 stores as well as a general notice indicating that the Debtors were on "development hold." Furthermore, JLI informed the Debtors that it was contemplating (i) placing all of the Debtors' stores in default on account of the alleged advertising default

described above and (ii) declaring a cross-default with respect to each of the Debtors then existing franchised locations.

Efforts to negotiate a resolution of the disputes involving advertising expenditures, store growth and re-imaging support between the Debtors and JLI failed. Accordingly, on January 7, 2008, the Debtors commenced the Chapter 11 Cases in an effort, among other things, to mitigate the risk of further franchise terminations by JLI.

**D.    Events Leading Up to the Disclosure Statement and Plan.**

Since the Petition Date, the Debtors have continued to operate their business as debtors in possession.  Shortly after the commencement of the Chapter 11 Cases, the Bankruptcy Court authorized the Debtors to obtain $10 million in post-petition financing under a facility provided by HAS Funding LLC, an affiliate of Quad-C.

At the start of the Chapter 11 Cases, the Debtors and JLI were entrenched in opposite corners as a result of the years of animosity and distrust that had built up between them. When the Committee was appointed in late January 2008, costly and protracted litigation between the Debtors and JLI over a variety of issues, including lease and Franchise Agreement disputes, seemed inevitable.  The first several months of the Chapter 11 Cases were marked by failed efforts to bring constituents together in a meaningful way and the commencement of substantial pre-litigation discovery efforts between and among the Debtors, JLI and other parties. Meanwhile, the Debtors' financial condition continued to deteriorate.  In light of such inertia, the Committee, in an exercise of its fiduciary duty to the Debtors' unsecured creditors, and with the support of the Debtors, began negotiations with JLI, SOPUS, Quad-C, Dymas, as administrative agent for the H-II Lenders, and other parties in interest over the terms of the Plan.

Over the course of several months, the Committee has been able to negotiate agreements with JLI and SOPUS that, if approved and effectuated under the Plan, will resolve all disputes between and among the Debtors, JLI and SOPUS, and lay the foundation for the Debtors to remain part of the JLI franchise system pursuant to amended Franchise Agreements and purchase oil products from SOPUS under a comprehensive Master Supply Agreement.  In addition, the Committee has been able to negotiate an agreement with Quad-C pursuant to which Quad-C will inject $28 million in new value into the Reorganized Debtors, in exchange for a continued equity stake in the Reorganized Debtors and a release of all Claims against Quad-C and its Affiliates.  The Debtors have joined in these resolutions as embodied in the Plan and in various Plan Support Agreements (the "Plan Support Agreements"),[4] certain of which were separately and previously approved by the Bankruptcy Court.

---

[4] Separate Plan Support Agreements were entered into by the Committee and the Debtors and each of (a) JLI, (b) SOPUS, (c) Quad-C, and (d) Blackstone. In summary, each of the Plan Support Agreements defines, as appropriate for the specific counterparty, contractual relationships with the Debtors on emergence from chapter 11, the capital structure for the Debtors on emergence from chapter 11, any funding commitments on emergence from chapter 11, any releases to be included in the Plan (and described in this Disclosure Statement below), and certain corporate governance requirements in exchange, subject to approval of this Disclosure Statement and solicitation of votes in accordance with the Bankruptcy Code, for support of the Plan.  The Debtors and the Committee expect to enter into Plan Support Agreements with the H-I Lenders and the H-II Lenders and Dymas.

# VI.

## THE REORGANIZED COMPANY

**A.      Re-imaging**

> i.      Decision to Remain with JLI and Re-image Stores

Upon commencement of the Chapter 11 Cases, the Debtors engaged in an analysis to determine the highest value and best use for the Debtors' assets.  As an initial matter, the Debtors determined that any plan of reorganization that contemplated the Debtors' continued operation under the service mark Jiffy Lube would require resolution of the Debtors' long-standing disputes with JLI.  The Debtors also determined that, regardless of under which service mark the Debtors operated, recoveries to stakeholders would be substantially enhanced by (a) continuing to operate the Debtors' network of stores under a single integrated enterprise as compared with breaking up the company through a series of asset sales to third parties, and (b) continuing to grow the business through the acquisition of additional stores in the future.

The Debtors and JLI, however, were unable or unwilling to negotiate with each other over these issues.  As a result, the Debtors began to analyze other strategic alternatives, including a stand-alone reorganization as a rebranded business.  Several prospective rebranding partners approached the Debtors and the Debtors entered into negotiations with BP Lubricants USA Inc. d/b/a Castrol ("Castrol").  The Debtors also considered resolving their disputes with JLI through litigation that would clarify the nature of the Debtors' relationship with JLI. Ultimately, the Debtors entered into an agreement with Castrol.  Pursuant to said Agreement, had it otherwise been approved by the Bankruptcy Court, Castrol would have supplied various oil products to the Debtors and provided certain financial support to the Debtors to convert their stores from Jiffy Lube stores to "Castrol Premium Lube Express" stores.

While the Debtors pursued negotiations with a potential rebranding partner, separately, the Committee began direct negotiations with JLI and with SOPUS in an effort to (a) resolve potential claims of JLI and SOPUS against the Debtors, (b) establish new or revised franchise agreements with JLI that would, among other things, address the advertising, growth and re-imaging issues that had plagued the prepetition relationship between JLI and the Debtors, and (c) establish new or revised supply arrangements with SOPUS that would balance various supply requirements with beneficial pricing terms.  These discussions resulted in agreements with JLI (the New JLI Agreements) and SOPUS (the Master Supply Agreement and VMI Agreement) that in the opinion of the Committee and the Debtors, satisfactorily address the business requirements of the Debtors to reorganize and support the confirmation of the Plan and future viability of the Reorganized Debtors.  Specifically, under the New JLI Agreements, the Debtors will assume the Franchise Agreements, as amended pursuant to the New JLI Agreements, pursuant to which the Debtors shall remain part of the JLI system, shall receive re-imaging support payments to be used to re-image the Debtors' stores on a market-by-market basis, and shall have the opportunity to grow over the next five years.  The Debtors also will enter into a Master Supply Agreement with SOPUS that will replace all existing Supply Agreements, and a VMI Agreement that will assist the Debtors in managing its inventories more

efficiently and effectively.  Pursuant to the Plan, all Claims by and against SOPUS as relates to the Debtors shall be released.

In light of the filing of the Plan and the Plan Support Agreements reached among JLI, SOPUS, Blackstone, Quad-C, the Committee and the Debtors, the Debtors expect to terminate their agreement with Castrol in accordance with its terms, and anticipate paying Castrol a termination fee of $150,000 pursuant to a prior Court order authorizing that payment. Castrol, however, alleges that in the event of such termination, the Debtors are obligated to pay Castrol a break-up fee in the amount of either $250,000 or $500,000, depending on the date of termination.  The Debtors dispute such allegation.  Nothing herein shall impair, limit or otherwise waive the Debtors' or Castrol's rights with respect to such dispute.

      ii.      Overview of Amendments to Franchise Agreements, the Master Supply Agreement and the VMI Agreement

      a.      Pursuant to the New JLI Agreements, the Debtors will continue to operate as JLI franchisees under the Jiffy Lube service mark.  JLI has agreed to amend the Franchise Agreements with respect to advertising, growth and reimaging support.  JLI has also agreed to modify many of its subleases with the Debtors.  JLI will support the Debtors' growth through the development of new locations, and the acquisition of both non-JLI and existing JLI stores.  In addition, the New JLI Agreements contemplate that claims by and against JLI related to the Debtors, through the Effective Date, will be released.

      b.      The Reorganized Debtors will enter into the new Master Supply Agreement to replace all existing supply agreements.  Pursuant to the Master Supply Agreement, SOPUS shall provide financial support that can be used by the Reorganized Debtors for various expenditures including re-imaging.  In exchange, the Reorganized Debtors shall be obligated to meet certain minimum purchase requirements.  Pursuant to the Plan, the Debtors and SOPUS agree to execute releases, by and among JLI, the Debtors, the Committee, the H-I Lenders and the H-II Lenders, covering all pre-Effective Date claims.  The Reorganized Debtors will also enter into the VMI Agreement which is designed to maximize the use of bulk fluids while minimizing the Reorganized Debtors' investment in inventory.

**B.**      **Preservation of NOLs**

The Plan has been structured with the intent of retaining $28.5 million of net operating loss ("<u>NOL</u>") carry-forwards as of year end 2008.  The Plan contemplates the preservation of such NOL carry-forwards for future utilization by the Reorganized Debtors subject to the possible limitations and restrictions described under "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES".

VII.

**SELECTED FINANCIAL INFORMATION**

**A.**      **Consolidated and Year-to-Date Annual Financial Information for the Debtors**

## **Consolidated Balance Sheet**

|  | January 3, 2008 | August 28, 2008 |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS: | | |
| CASH | $5,094,022 | $9,647,634 |
| ACCOUNTS RECEIVABLE | 2,947,047 | 2,747,536 |
| INVENTORIES | 9,480,018 | 10,679,705 |
| PREPAIDS | 3,880,478 | 1,159,825 |
| ASSETS HELD FOR SALE | 34,088 | - |
| TOTAL CURRENT ASSETS | 21,435,653 | 24,234,700 |
| LAND, BUILDINGS & EQUIPMENT (NET) | 90,434,956 | 86,013,293 |
| OTHER ASSETS | 3,851,157 | 3,709,702 |
| INTANGIBLE ASSETS (NET) | 217,562,858 | 215,364,442 |
| TOTAL ASSETS | $333,284,624 | $329,322,137 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| CURRENT LIABILITIES: | | |
| CURRENT PORTION - LT DEBT AND CAPITAL LEASE OBLIGATIONS | $15,920,300 | - |
| TRADE ACCOUNTS PAYABLE | 12,759,178 | 6,187,324 |
| PAYROLL & BONUSES PAYABLE | 4,417,318 | 4,817,566 |
| ACCRUED EXPENSES | 21,684,725 | 5,710,337 |
| TOTAL CURRENT LIABILITIES | 54,781,521 | 16,715,226 |
| LONG-TERM DEBT AND CAPITAL LEASE OBLIGATIONS | 330,531,362 | - |
| DEFERRED CREDITS & LONG-TERM LIAB | 11,688,205 | (3,848,027) |
| LIABILITIES SUBJECT TO COMPROMISE | - | 388,628,873* |
| TOTAL LIABILITIES | 397,001,087 | 401,496,072 |
| TOTAL STOCKHOLDERS' EQUITY | (63,716,464) | (72,173,935) |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | $  333,284,624 | $  329,322,137 |

\* Liabilities Subject to Compromise include the Debtors' secured and unsecured obligations as reflected on the Debtors' Schedules D, E, and F as well as certain liabilities reflected on the Debtors' balance sheet under Generally Accepted Accounting Principles ("GAAP") which do not directly give rise to a claim and thus were not reflected on such Schedules.  Specifically, Liabilities Subject to Compromise includes $82 million of capital leases and $10 million of deferred rent.  The capital lease liability relates to certain of the Debtors' stores where the leases are capitalized under GAAP.  The deferred rent liability relates to certain of the Debtors' leases that include rent increases over the life of the lease that are accounted for on a straight-line basis resulting in the creation of deferred rent in the first portion of the lease term and the

reduction of deferred rent back to zero in the later portion of the term.  In both cases, the Debtors' leases are reflected in Schedule G - Executory Contracts and there are no corresponding claims for these GAAP accounting liabilities.

## Consolidated Statement of Income

|  | Fiscal Year Ending January 3, 2008 | 8 months Ending August 28, 2008 |
|---|---|---|
| NET SALES | $  298,612,036 | $  192,325,805 |
| DIRECT COSTS: | | |
| PRODUCT & LABOR COSTS | 153,997,798 | 100,552,856 |
| OTHER DIRECT COSTS | 9,668,727 | 5,365,952 |
| TOTAL DIRECT COSTS | 163,666,525 | 105,918,808 |
| GROSS PROFIT | 134,945,511 | 86,406,997 |
| STORE OPERATING EXPENSES: | | |
| ADVERTISING | 5,387,623 | 4,709,956 |
| OCCUPANCY | 46,500,027 | 30,727,565 |
| ROYALTIES | 11,956,232 | 7,703,062 |
| OTHER STORE EXPENSES | 17,354,840 | 11,128,680 |
| TOTAL STORE OP EXP | 81,198,722 | 54,269,263 |
| STORE LEVEL INCOME | 53,746,789 | 32,137,734 |
| ADMINISTRATIVE EXPENSES | 17,352,610 | 11,491,330 |
| EARNINGS BEFORE INTEREST & TAXES, DEPRECIATION AMORTIZATION & REORGANIZATION EXPENSES | 36,394,179 | 20,646,404 |
| REORGANIZATION AND OTHER EXPENSE | 2,074,922 | 15,704,230 |
| INTEREST EXPENSE (NET) | 30,477,699 | 11,277,697 |
| COMPENSATION EXPENSE STOCK OPTION | 51,048 | 30,648 |
| DEPRECIATION, AMORTIZATION AND OTHER EXPENSE | 14,033,741 | 7,770,745 |
| INCOME TAX PROVISION | (4,076,873) | (5,650,000) |
| NET INCOME | $   (6,166,358) | $   (8,486,915) |

VIII.

**FINANCIAL PROJECTIONS AND ASSUMPTIONS**

**A.      Purpose and Objectives**

The Debtors' long term business plan (the "<u>Business Plan</u>") and the underlying projections and assumptions serve as the basis for the Plan. The Debtors believe that the assumptions that underlie projections are reasonable under the circumstances and that achieving the projections set forth herein will maximize the value of the Debtors' businesses. The Debtors have prepared the projected operating and financial results (the "<u>Projections</u>") on a consolidated basis for the Reorganized Debtors for the period ending five years from the Effective Date. The Projections, and a summary of significant assumptions related thereto, are attached to this Disclosure Statement as <u>Exhibit C</u>.

**B.      Consolidated Pro Forma Statement of Financial Position**

The Debtors have prepared consolidated pro forma statements of financial position of the Reorganized Debtors (the "<u>Pro Forma Statements</u>"). The Pro Forma Statements are attached hereto as <u>Exhibit D</u> and reflect the Projections with respect to the consolidated financial position of the Reorganized Debtors assuming the effects of certain transactions that will occur in connection with and upon consummation of the Plan.

IX.

**THE CHAPTER 11 CASES**

**A.      Commencement of the Chapter 11 Cases**

On January 7, 2008, Heartland and its affiliated Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, the Honorable Russell F. Nelms presiding.

**B.      Continuation of Business after the Petition Date**

Since the Petition Date, the Debtors have continued to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have sought Bankruptcy Court approval for all transactions that were outside the ordinary course of their businesses. As discussed in this section, during the period immediately following the Petition Date, the Debtors sought and obtained authority from the Bankruptcy Court with respect to a number of matters deemed by the Debtors to be essential to their smooth and efficient transition into chapter 11 and the stabilization of their operations.

(a)      **Cash Collateral**

On January 9, 2008, the Court authorized the immediate use of Cash, including Cash Collateral, on an emergency and interim basis, subject to certain limitations such as a set Cash Collateral budget.

On January 22, 2008, January 29, 2008, February 25, 2008, March 11, 2008 and March 18, 2008, the Bankruptcy Court entered additional interim bridge orders extending the period of time during which the Debtors could access the Cash Collateral pursuant to additional fixed budgets.

On March 20, 2008, the Court entered a final order (the "<u>Final Cash Collateral Order</u>") authorizing the Debtors' use of Cash, including Cash Collateral, on a final basis and providing adequate protection, subject to certain limitations. The Bankruptcy Court granted the H-I Lenders and H-II Lenders replacement liens in (i) their respective pre-bankruptcy collateral (the "<u>Prepetition Collateral</u>"); (ii) all property acquired by the Debtors after the Petition Date of the same nature, kind, and character as their Prepetition Collateral, and all proceeds and products thereof; and (iii) all existing and after acquired property, with the replacement liens and security interests senior to any liens granted in connection with the DIP Loan Facility.

Pursuant to the Final Cash Collateral Order, and subject to a full reservation of rights for all parties, the Bankruptcy Court authorized the Debtors to pay the H-II Lenders and the H-I Lenders, other than Capmark Finance Inc., postpetition interest accrued during the prior month, and due under the applicable Loan Documents.

(b)    **Debtor in Possession Financing**

On March 20, 2008, the Bankruptcy Court entered an order authorizing the Debtors to enter into the DIP Loan Facility, a $10 million revolving credit facility with the DIP Lender. Under the DIP Loan Facility, all of the Debtors other than Heartland Automotive Services of Austin, Inc. are borrowers. The DIP Lender was granted superpriority administrative status with respect to all amounts outstanding under the DIP Loan Facility and was granted (i) liens on and security interests in all existing and after acquired assets of the Debtors, and all proceeds thereof, that were not subject to liens as of the Petition Date; and (ii) second priority or other junior liens on and security interests in all existing or after acquired property of the Debtors, and proceeds thereof, that were subject to liens in existence on the Petition Date.

As of the date hereof, there is $1,000,000 outstanding under the DIP Loan Facility. All obligations of the Debtors under the DIP Loan Facility will be satisfied either through (i) the release by the DIP Agent, the DIP Lender and any other holder of a DIP Claim of the Effective Date DIP Balance, which, to the extent applicable, will be waived by the DIP Agent, the DIP Lender and any other holder of a DIP Claim, if the Quad-C Contribution shall have been made and irrevocably funded or (ii) the payment of the Effective Date DIP Balance in full in Cash on the Effective Date, if the Quad-C Contribution shall not have been made and irrevocably funded.

(c)    **Business Operations and Employee-Related Relief**

On January 9, 2008, the Bankruptcy Court granted the Debtors "first day" relief, including among other things, (i) authorizing the Debtors to continue to use their existing cash management system, (ii) authorizing the Debtors to pay certain prepetition obligations owing to the Debtors' employees; (iii) authorizing the Debtors to reimburse employee for business expenses incurred in the ordinary course; (iv) prohibiting the Debtors' utility companies from

altering, refusing or discontinuing service; and (v) authorizing the Debtors to pay certain
prepetition trust fund taxes owed to taxing authorities in the ordinary course of business.

On January 15, 2008, the Bankruptcy Court authorized the Debtors to honor, in
their discretion, their prepetition obligations to customers under certain customer programs and
to otherwise continue prepetition customer program practices in the ordinary course of business.

## C.    Representation of the Debtors

In 2002, the Debtors retained White & Case LLP ("W&C") to provide legal
advice with respect to various corporate and litigation matters.  W&C has since been retained as
lead bankruptcy counsel to the Debtors in connection with the Chapter 11 Cases.  The Debtors
also retained Forshey & Prostok LLP to serve as bankruptcy co-counsel.

The Debtors also obtained approval from the Bankruptcy Court to retain Alvarez
& Marsal North America, LLC ("A&M") as the Debtors' restructuring advisors and Goldsmith,
Agio, Helms & Lynner, LLC (d/b/a Lazard Middle Market) ("Lazard") as the Debtors' financial
advisors.

## D.    Formation and Representation of the Committee

On January 17, 2008, the U.S. Trustee appointed the Committee.  On January 24,
2008, the U.S. Trustee expanded the Committee by appointing additional members.  The
Committee retained as counsel the law firms of Cadwalader Wickersham & Taft LLP and
Munsch, Hardt, Kopf & Harr P.C.  In addition, the Committee retained Navigant Capital
Advisors LLC, as its financial adviser, and Tavenner & Beran PLC as its special litigation
counsel in connection with its investigation of Quad-C (see Section 9(J), below).

The current members of the Committee include:

| | |
|---|---|
| BMP-SPV (J) LTD. | Hi-Tech Antifreeze Recycling/ |
| Blackstone Mezzanine Holdings, L.P. | Pittsburgh Geni, LLC |
| AutoEdge Distribution, Inc. | Bare Associates, International, Inc. |
| Products Plus, Inc. | ConocoPhillips Company |
| ExxonMobil Oil Corporation | |

## E.    Representation of the H-II Lenders

Dymas, as administrative agent for the H-II Lenders, retained Klee Tuchin
Bogdanoff & Stern LLP ("KTB&S") and Baker Botts L.L.P. ("Baker Botts") as legal counsel
and Houlihan Lokey Howard & Zukin Inc. as financial advisors in connection with the Chapter
11 Cases.  Additionally, certain of the H-II Lenders retained KTB&S and Baker Botts as set forth
in the Verified Statement Pursuant to Federal Rule of Bankruptcy Procedure 2019 Re: Attorneys
for Dymas Funding Company, LLC, Administrative Agent and Lenders Under Secured Credit
Agreement, filed in these cases at Docket No. 205.

F.      **Representation of Quad-C**

Quad-C retained McGuireWoods LLP as legal counsel in connection with the Chapter 11 Cases.

G.      **Matters Relating to Unexpired Leases and Executory Contracts**

Section 365 of the Bankruptcy Code grants a debtor the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. As amended, section 365(d)(4) of the Bankruptcy Code provides that if a debtor does not assume or reject an unexpired lease of nonresidential real property under which a debtor is the lessee (i) within 120 days after the petition date (the "365(d)(4) Deadline"), (ii) within an additional 90-day period as the bankruptcy court, for cause, may allow, or (iii) within such additional time as the bankruptcy court may permit with the consent of the landlord of the leased premises, then such lease is deemed rejected.

The Debtors sought, and the Bankruptcy Court approved, an initial 90-day extension of the 365(d)(4) Deadline from May 6, 2008 to August 4, 2008.  On July 29, 2008, the Bankruptcy Court granted an additional extension of the 365(d)(4) Deadline to December 31, 2008 with respect to 121 Unexpired Leases for which the landlords provided their written consent for such an extension.

By Orders of the Bankruptcy Court dated July 29, 2008, the Bankruptcy Court authorized the Debtors to assume two hundred (200) of their Unexpired Leases and to assume, as amended, another thirty-six (36) of the Unexpired Leases, subject to curing certain defaults thereunder and providing the respective landlords with adequate assurance of future performance.

The Debtors determined not to assume certain of the Unexpired Leases within the time period prescribed by section 365(d)(4) of the Bankruptcy Code.  Accordingly, as of the date hereof, thirty-two (32) of the Debtors' Unexpired Leases were deemed rejected.  The Debtors remain in discussions with the landlords for the yet to be assumed or rejected Unexpired Leases and expect to reach further agreements with the landlords prior to confirmation.

In addition to the foregoing leases, the Debtors are party to seventy-seven (77) subleases with an affiliate of JLI as sub-landlord.   By motion, dated June 27, 2008, the Debtors sought to assume these subleases.  JLI objected to such assumption asserting that the Debtors could not assume the subleases without assuming the related Franchise Agreements because the Franchise Agreements were integrated with the subleases.  The Debtors dispute JLI's contentions.  By agreement of the parties, the issue has been continued pending a ruling on confirmation of the Plan.

The Debtors executed Contingent Assumption and Assignment Agreements (or "CAAs") with respect to eighty-two (82) leases already assumed by the Debtors and additional approximate seventy-four (74) leases still pending assumption or rejection.  The CAAs purport to grant an affiliate of JLI the right to dispossess the Debtors of the underlying lease upon the occurrence of, among other things, the Debtors' default under the Franchise Agreements.  Any claims arising under the CAAs shall be waived upon execution of the New JLI Agreements.

The Debtors are also party to approximately six hundred executory contracts. The Plan contemplates the automatic rejection of executory contracts, as of and subject to the occurrence of the Effective Date, except for the Franchise Agreements, related JLI Leases, or any executory contract specifically designated for assumption.

With respect to the Franchise Agreements and the related JLI Leases, the Plan contemplates the assumption, as amended, of such contracts as of the Effective Date.

## H.    Exclusivity

Pursuant to sections 1121(b) and (c)(3) of the Bankruptcy Code, the Debtors have a certain amount of time within which (a) to file their Plan (the "Filing Period"); and (b) to solicit acceptances of their timely filed Plan (the "Solicitation Period") before other parties in interest are permitted to file plans. The initial Filing Period and the initial Solicitation Period of May 6, 2008 and July 5, 2008, respectively, were extended on May 6, 2008, by order of the Bankruptcy Court to September 3, 2008 and November 5, 2008, respectively. Pursuant to six stipulated bridge orders among the Debtors, the Committee, Pennzoil and JLI, the last of which was entered on November 14, 2008, the Filing Period and the Solicitation Period were further extended to November 21, 2008 and January 20, 2009, respectively. The Committee and the Debtors filed the Plan on November 21, 2008. Accordingly, no other party may file a plan unless the Solicitation Period expires or the Bankruptcy Court orders otherwise.

## I.    Claims Administration

### (a)    **Schedules and Bar Dates**

On April 7, 2008, after having received an extension from the Bankruptcy Court, the Debtors filed their respective Schedules. On July 2, 2008 and September 19, 2008, the Debtors filed amendments to certain of the original Schedules. The aggregate scheduled liabilities for the Debtors were approximately $289,846,863.20. In addition to claims scheduled by the Debtors, approximately 1,300 proofs of claim have been filed against the Debtors in these Chapter 11 Cases in an amount exceeding $3 billion in the aggregate. Based upon a preliminary analysis conducted by the Debtors, a significant amount of the asserted claims represent duplicate or otherwise redundant claims and accordingly, a significant amount of claims that have been filed are subject to disallowance by the Bankruptcy Court. While it is likely that only a small portion of the filed claims will be allowed, the claims resolution process is in its nascent stages and the resolution and allowance of such claims remain subject to determination of the Bankruptcy Court.

By order dated June 9, 2008 (the "Bar Date Order"), the Bankruptcy Court fixed July 25, 2008 at 5:00 p.m. Prevailing Eastern Time (the "Bar Date") as the deadline for all holders of alleged Claims against the Debtors to file proofs of claim against the Debtors. The Bar Date Order also approved the form of publication notice (the "Bar Date Notice") and the form of the proof of claim to be utilized by creditors. The Bar Date Notice was published on July 2, 2008 in The New York Times (National Edition) and in the following local papers: Burlington Free Press; Rutland Herald; Lebanon Valley News; Newark Advocate; Zanesville Times Recorder; Chillicothe Gazette; Marion Star; Grand Isle Independent; Worcester Telegram;

Columbus Dispatch; Minneapolis Star Tribune; Kansas City Star; St. Louis Dispatch; Omaha World-Herald; Lincoln Journal Star; State Journal; Chicago Tribune; Memphis Commercial Appeal; Austin American Statesman; Tucson Star; Las Vegas Review Journal Sun; Seattle Times-Post-Intelligencer; and San Diego Union Tribune.

Pursuant to the Bar Date Order, claims associated with the rejection of an executory contract or unexpired lease must be filed by the later of the Bar Date or 30 days from the notice of the order rejecting the executory contract or unexpired lease.  With respect to claims affected by amended schedules, such claims must be filed by the later of the Bar Date or 30 days from the notice of the amended schedules, and only if such schedule amendment affects such claim as described in the Bar Date Order.

(b)    **Claim Objections**

In the ordinary course of business, the Debtors maintain books and records (the "Books and Records") that reflect, among other things, the Debtors' liabilities and the amounts owed to their creditors in connection with such liabilities.  The Debtors and their professionals have started the process of reviewing the proofs of claim submitted in the Chapter 11 Cases, including any supporting documentation, and comparing the Claims asserted in the proofs of claim with the Books and Records to determine the validity of such Claims.  On December 17, 2008, the Debtors filed four procedural omnibus objections seeking to disallow and expunge certain proofs of claim that (i) are duplicative of other filed proofs of claim against the same Debtor, (ii) are duplicative of other filed against different Debtors, (iii) were filed after the Bar Date, or (iv) have been satisfied post-petition pursuant to orders of the Bankruptcy Court.  The Debtors are continuing to review the proofs of claim submitted in the Chapter 11 Cases, and may file additional procedural objections based upon such review.

The Debtors anticipate filing substantive objections that will further reduce the amount of Claims against the Debtors.  From and after the Effective Date, only the Reorganized Debtors shall have the right to assert Claims Objections.  The Debtors are continuing to examine all of the Claims and anticipate filing additional objections during the pendency of these Chapter 11 Cases.

J.    **Committee's Examination of Quad-C Pursuant to Federal Rule of Bankruptcy Procedure 2004**

In July 2008, the Committee filed a Motion pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure seeking discovery from Quad-C Partners VI, L.P. and certain of its affiliates regarding prepetition recapitalization transactions.  In connection therewith, the Committee has sought, among other things, information regarding the dividend distributions of approximately $122.5 million to the stockholders of Heartland, and the funding of such distributions by the Debtors' prepetition lenders, the H-II Lenders and Blackstone.

The Committee is investigating, among other things, the reasonableness of these distributions in relation to the Debtors' financial condition at the time of the transfers and as a result of the recapitalizations.  The Committee is also seeking discovery from Quad-C and other

parties in respect to the Debtors' negotiations with JLI regarding disputes associated with the Franchise Agreements.

The Committee and Quad-C and certain of its Affiliates have reached an agreement regarding the production and treatment of the documents requested by the Committee, and Quad-C has begun producing documents to the Committee.

As described below, the Plan provides for a release of all Claims of the Debtors, JLI, SOPUS and various other Persons against Quad-C and its Affiliates in exchange for the Quad-C Contribution.

**K.      The Debtors' Examination of JLI and SOPUS Pursuant to Federal Rule of Bankruptcy Procedure 2004**

On or about August 4, 2008, the Debtors brought motions pursuant to Federal Rule Bankruptcy Procedure 2004 seeking discovery of JLI, SOPUS and Shell Oil Company to assist the Debtors in identifying, among other things, causes of action against such entities. After a hearing on the motions, the Court approved the Debtors' 2004 examinations of JLI and SOPUS and denied the examination of Shell without prejudice to the Debtors. As of the date of the Disclosure Statement, the 2004 examinations of JLI and SOPUS have been stayed by agreement of all parties pending confirmation of the Plan. The Plan provides for the complete satisfaction of the disputes between the Debtors, JLI and SOPUS, including the dismissal of the 2004 examinations.

X.

**THE CHAPTER 11 PLAN**

**A.      Introduction**

The following is a summary of certain terms and provisions of the Plan. This summary of the Plan is qualified in its entirety by reference to the full text of the Plan, which is annexed to this Disclosure Statement as Exhibit "A."

**B.      General Description of the Treatment of Claims and Equity Interests**

(a)      <u>Unclassified Claims</u>

Administrative Expense Claims and Priority Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively. Administrative Expense Claims and Priority Tax Claims are not designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

(b)    **Treatment of Administrative Expense Claims**

a.     Administrative Expense Claims Defined.

Administrative Expense Claims are rights to payment constituting a cost or expense of administration of any of the Chapter 11 Cases allowed under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the estates of each of the Debtors, any actual and necessary costs and expenses of operating the businesses of each of the Debtors, any indebtedness or obligations incurred or assumed by any of the Debtors in connection with the conduct of its business on or after the Petition Date, any allowances of compensation and reimbursement of expenses to the extent allowed by a Final Order under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estates of the Debtors under 28 U.S.C. § 1930.

b.     Time for Filing Administrative Expense Claims.

The holder of an Administrative Expense Claim, other than (i) a DIP Claim; (ii) a Fee Claim; (iii) a liability incurred and payable after the Petition Date in the ordinary course of business by a Debtor (and not past due); (iv) a Section 503(b)(9) Claim; or (v) an Administrative Expense Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors, the Committee, and the U.S. Trustee, notice of such Administrative Expense Claim within forty (40) days after service of Notice of Confirmation or such other specific date as may be established by the Bankruptcy Court. Such notice must include at a minimum (A) the name of the Debtor(s) which are purported to be liable for the Claim, (B) the name of the holder of the Claim, (C) the amount of the Claim, and (D) the basis of the Claim (including any documentation evidencing or supporting such Claim). **THE FAILURE TO FILE A PROOF OF ADMINISTRATIVE CLAIM ON OR BEFORE THE ADMINISTRATIVE CLAIMS BAR DATE SHALL RESULT IN SUCH ADMINISTRA-TIVE CLAIM BEING FOREVER BARRED, DISALLOWED AND DISCHARGED WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT**.

c.     Time for Filing Fee Claims.

Each Professional who holds or asserts a Fee Claim shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within forty-five (45) days after the Effective Date or such other specific date as may be established by the Bankruptcy Court. **THE FAILURE TO FILE TIMELY AND SERVE SUCH FEE APPLICATION SHALL RESULT IN THE FEE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

d.     Time for Filing Section 503(b)(9) Claims.

On November 25, 2008, the Bankruptcy Court established a bar date for holders of any Claims against the Debtors for the value of any goods received by any of the Debtors within twenty (20) days before the Petition Date in the ordinary course of business pursuant to Section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Bar Date Order"). Pursuant to the 503(b)(9) Bar Date Order, such holders must submit a request for allowance of 503(b)(9) Claims to the Claims Agent, with copies to counsel for the Debtors and the Committee (the "Notice

Parties") so as to be actually received by the Notice Parties by December 22, 2008 at 5:00 p.m. Prevailing Eastern Time (the "Section 503(b)(9) Bar Date").  **THE FAILURE TO SUBMIT SUCH REQUEST BY THE SECTION 503(b)(9) BAR DATE SHALL RESULT IN THE SECTION 503(b)(9) CLAIM BEING DEEMED DISALLOWED AS AN ADMINISTRATIVE EXPENSE CLAIM.**  Such disallowance will not prevent such Claim from being allowed as a Claim, other than as an Administrative Expense Claim, to the extent otherwise allowable.

> e.      Allowance of Administrative Expense Claims/Fee Claims/Section 503(b)(9) Claims.

> An Administrative Expense Claim (other than a Fee Claim, a DIP Claim or a Section 503(b)(9) Claim) with respect to which notice has been properly filed and served pursuant to Article 6.2(a) of the Plan, or a Section 503(b)(9) Claim with respect to which a request for allowance has been properly submitted pursuant to Article 6.2(c) of the Plan, shall become an Allowed Administrative Expense Claim if no objection is filed within thirty (30) days after the later of (i) the Effective Date, or (ii) the date of service of the applicable notice of Administrative Expense Claim or such later date as may be approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing.  If an objection is filed within such 30-day period (or any extension thereof), the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order.  A Fee Claim in respect of which a Fee Application has been properly filed and served pursuant to Article 6.2(b) of the Plan shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order.

> f.      DIP Claims.

> All amounts due on account of DIP Claims have been Allowed as super-priority Administrative Expense Claims pursuant to decretal paragraph 7 of the DIP Order.  All obligations of the Debtors under the DIP Loan Facility will be satisfied either through (i) the release by the DIP Agent, the DIP Lender and any other holder of a DIP Claim of Effective Date DIP Balance, which, to the extent applicable, will be waived by the DIP Agent, the DIP Lender and any other holder of a DIP Claim, if the Quad-C Contribution shall have been made and irrevocably funded or (ii) the payment of the Effective Date DIP Balance in full in Cash on the Effective Date, if the Quad-C Contribution shall not have been made and irrevocably funded.

> g.      Payment of Allowed Administrative Expense Claims.

> On the Distribution Date, each holder of an Allowed Administrative Expense Claim, excluding DIP Claims, which shall be satisfied in accordance with Article 6.2(e) of the Plan, shall receive in full satisfaction of such Claims (i) the amount of such holder's Allowed Administrative Expense Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by the Debtors and such holder; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim; provided, further, that an Administrative Expense Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business.

(c)    **Treatment of Priority Tax Claims**

Unless otherwise agreed with a holder of an Allowed Priority Tax Claim, the Debtors, in their sole discretion, may choose whether Allowed Priority Tax Claims will be paid either: (1) in Cash, in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest from the Effective Date at a fixed annual rate equal to five percent (5%) and paid in regular installments of equal amount over a period not exceeding five (5) years from the Petition Date; or (2) in full in Cash on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim. The Debtors reserve the right to prepay, without penalty, at any time under option (1) above. Alternatively, a holder of an Allowed Priority Tax Claim may elect to receive the same treatment of its Claims as is offered to holders of Allowed General Unsecured Claims as provided in Article 5.5 of the Plan.

The Confirmation Order shall enjoin any holder of an Allowed Priority Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer or director of the Debtors that otherwise would be liable to such holder for payment of a Tax Claim so long as the Debtors are in compliance with Article 6.3 of the Plan. So long as the holder of an Allowed Priority Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person, officer or director under Article 6.3 of the Plan or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding shall be tolled.

(d)    **Classified Claims and Equity Interests**

The classified Claims against, and Equity Interests in, the Debtors are classified in the Plan as follows:

      i.       Class 1 — Priority Non-Tax Claims

      ii.      Class 2 — H-I Lender Claims

      iii.     Class 3 — H-II Lender Claims

      iv.     Class 4 — Other Secured Claims

      v.      Class 5 — General Unsecured Claims

      vi.     Class 6 — Blackstone Debt Claims

      vii.    Class 7 — JLI Claims

      viii.   Class 8 — SOPUS Claims

      ix.     Class 9 — Intercompany Claims

      x.      Class 10 — Heartland Common Stock Interests

      xi.     Class 11 — Subsidiary Equity Interests

xii.     Class 12 –- Other Equity Interests

xiii.    Class 13 — Convenience Claims

**C.     Treatment of Claims and Equity Interests**

The treatment of each class of claims is summarized in Section IV.B – "Summary of Distributions Under the Plan."

**D.     Acceptance or Rejection of the Plan; Effect of Rejection by One or More Classes of Claims**

(a)     <u>**Classes Entitled to Vote**</u>

<u>Except</u> for Priority Non-Tax Claims, Intercompany Claims, Subsidiary Equity Interests, and Other Equity Interests, all classes of Claims and Equity Interests are entitled to vote on the Plan.

(b)     <u>**Class Acceptance Requirement**</u>

A class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such class that have voted on the Plan.  A class of Equity Interests shall have accepted the Plan if it is accepted by holders of at least two-thirds (2/3) in amount of the Equity Interests in such class that actually vote on the Plan.

(c)     <u>**Tabulation of Votes on a Non-Consolidated Basis**</u>

The Balloting Agent will tabulate all votes on the Plan on a non-consolidated basis by class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code with respect to each Debtor.

(d)     <u>**Cramdown**</u>

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code, <u>except</u> subsection (8) thereof, the Plan shall be treated as a request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of section 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each class of Claims that is impaired under, and has not accepted, the Plan.

(e)     <u>**Feasibility**</u>

The Bankruptcy Code conditions confirmation of a plan of reorganization on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor.  For purposes of determining whether the Plan satisfies this condition, the Debtors' have analyzed the capacity of each Debtor to service its obligations under the Plan.  Based upon its analysis of their Projections, the Debtors believe they

will be able to make all payments required to be made under the Plan.  See "Financial Projections and Assumptions."

      (f)      **Confirmation of All Cases**

Except as provided in Article 16.18 of the Plan, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors.

**E.     Means of Implementation of the Plan**

      (a)      **Operations between the Confirmation Date and the Effective Date**

Through the Effective Date, the Debtors shall not (a) enter into, renew or extend any contract or other agreement (i) outside the ordinary course of business; or (ii) with annual expenditures of more than $100,000.00; or (iii) having a term of more than one year or (b) terminate or hire any executive with an annual compensation of greater than $100,000.00 without obtaining the written consent of Blackstone and the Committee, which consent shall not be unreasonably withheld or delayed; provided, however, that the forgoing limitations shall not apply to the renewal or extension of leases of nonresidential real property, and solely in accordance with the terms of the Plan Documents.

      (b)      **Certain Transactions On or Prior to the Effective Date**

Pursuant to section 1123(a)(5) of the Bankruptcy Code, the Reorganized Debtors shall, on or prior to the Effective Date (i) issue all Plan Securities; (ii) execute and deliver all debt instruments and related documents, including collateral documents, contemplated under the Plan; (iii) perform all of their obligations under the Quad-C Contribution Documents; (iv) execute and deliver the New JLI Agreements, the Master Supply Agreement and the VMI Agreement; (v) implement all settlements and compromises as set forth in or contemplated by the Plan; (vi) amend and restate its constituent documents in accordance with the terms of the Plan; and (vii) perform all obligations under the Plan Documents.

      (c)      **Description of Certain Securities to be Issued Pursuant to the Plan**

Pursuant to the Plan, the following debt, equity and rights will be issued:

      (i)      New Common Stock

      (ii)      New Preferred Stock

      (iii)      New Unsecured Notes

      (iv)      Amended and Restated H-I Notes

      (v)      Amended and Restated H-II Facility

      (d)     **Deemed Allowance of Certain Claims**

          Subject to the occurrence of the Effective Date, the Claims of each holder of an H-I Lender Claim that votes in favor of the Plan shall be deemed Allowed and fully secured in the amounts set forth on Schedule 5 and Schedule 11 to the Disclosure Statement, and such holders shall waive any rights to (i) any prepayment penalties on account of such provisions in the Original H-I Notes, and (ii) any attorneys' fees or any interest on account of such H-I Lender Claims arising after the Petition Date, except to the extent such fees and interest were required to be paid by the Cash Collateral Order and have not been paid by the Debtors.  Notwithstanding the foregoing, Capmark shall not be deemed to have waived any claim for (i) reasonable unpaid costs and expenses incurred on account of Capmark's legal and financial advisors from the Petition Date, to the extent unpaid, as and to the extent provided for under the EMAC Loan Documents, and (ii) accrued and unpaid postpetition interest in accordance with the EMAC Loan Documents.  The Debtors and their Estates shall be deemed to have waived any and all rights and claims regarding the perfection, validity and enforceability of the H-I Lender Claims, rights of offset or recoupment against the H-I Lender Claims, rights to recover payments made by the Servicers or any existing or prior H-I Lender to or on behalf of the Debtors prepetition or postpetition, rights to seek to recharacterize the H-I Lender Claims in any way, any and all rights to subordinate the H-I Lender Claims, Avoidance Actions against the Servicers and existing or prior H-I Lender, or rights to challenge the value or adequacy of the collateral securing the H-I Lender Claims.

          Subject to the occurrence of the Effective Date, provided that Dymas has not objected to the Plan in violation of its obligations under the H-II PSA, the H-II Lender Claims shall be deemed Allowed and fully secured in the aggregate amount of $190,408,859.88 (inclusive of all outstanding letters of credit), plus interest, attorneys' and other advisory fees payable under the Cash Collateral Order, to the extent such interest, attorneys' and other advisory fees have not been paid in accordance therewith, but excluding any claim for interest, attorneys' or other advisory fees not payable in accordance with the Cash Collateral Order.  The Debtors and their Estates shall be deemed to have waived any and all rights and claims regarding the perfection, validity and enforceability of the H-II Lender Claims, rights of offset or recoupment against the H-II Lender Claims, rights to recover payments made by Dymas or any existing or prior H-II Lender to or on behalf of the Debtors prepetition or postpetition, rights to seek to recharacterize the H-II Lender Claims in any way, any and all rights to subordinate the H-II Lender Claims, Avoidance Actions against Dymas and any existing or prior H-II Lender, or rights to challenge the value or adequacy of the collateral securing the H-II Lender Claims.

          Each Ballot for a General Unsecured Claim shall indicate the Debtors' estimate of such holder's Allowed General Unsecured Claim, or, to the extent such Claim is disputed, contingent or unliquidated, the Debtors' good faith offer of settlement with respect to such General Unsecured Claim.  Each holder of a General Unsecured Claim may accept the Debtors' estimate or offer of settlement with respect to such Claim by affirmatively indicating such acceptance on such holder's Ballot.  Upon such election, subject to the occurrence of the Effective Date, such holder's General Unsecured Claim shall be deemed an Allowed Claim in the amount indicated by the Debtors on such Ballot without further order of the Court.  In the event that the Effective Date does not occur, such election by the holder and the Debtors' estimate or

offer of settlement shall have no force and effect and shall be deemed inadmissible in any further proceedings pursuant to Rule 408 of the Federal Rules of Evidence.

(e)    **Corporate Action**

The entry of the Confirmation Order shall constitute authorization for the Debtors and the Reorganized Debtors (as the case may be) to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, underlined including without limitation, any action required by the stockholders or directors of the Debtors and the Reorganized Debtors (as the case may be), including, among other things, (i) the adoption or amendment of any organizational documents; (ii) the termination and cancellation of any Original Debt Documents or any other outstanding instrument, document or agreement evidencing Debt Claims as required by the Plan; (iii) the issuance of the Plan Securities; (iv) the execution and delivery of the Quad-C Contribution Documents; (v) all transfers of Assets that are to occur pursuant to the Plan; (vi) the incurrence of all obligations contemplated by the Plan and the making of all Plan Distributions; (vii) the reinstatement and assumption of all indemnity obligations to the directors and officers of the Debtors; (viii) the implementation of all settlements and compromises as set forth in or contemplated by the Plan; (ix) taking of all actions to preserve and provide for the prosecution of the Avoidance Actions; and (x) entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule or regulation.

The officers of the Debtors and the Reorganized Debtors, as the case may be, are authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary action required in connection therewith, in the name of and on behalf of the Debtors.  All obligations of the Debtors to indemnify and hold harmless their current and former directors, officers and employees, whether arising under the Debtors' constituent documents, contract, law or equity, shall be fully reinstated and assumed by the Debtors upon the occurrence of the Effective Date with the same effect as though such obligations constituted executory contracts that are assumed (or assumed and assigned, as applicable) under section 365 of the Bankruptcy Code, and all such obligations shall be fully enforceable on their terms from and after the Effective Date.  Nothing in the Plan, including Articles 16.1 and 16.2, shall release any obligations of the Debtors to indemnify and hold harmless their current and former directors, officers and employees.  Nothing in the Plan, including Article 16.22, shall enjoin any of the Debtors' current and former directors, officers and employees from asserting any indemnity or hold harmless right against the Debtors, excluding any claim for payment of attorneys' fees arising out of or relating to the Chapter 11 Cases or investigations related thereto, except to the extent such attorneys' fees were incurred in the defense of a claim that was asserted or the subject of investigation or discovery after the Effective Date and which claim was released pursuant to Articles 16.1 and 16.2 of the Plan.  (By way of example only, no person or entity falling within the definition of Quad-C shall be entitled to any indemnity from the Debtors or Reorganized Debtors with respect to any fee, cost expense, loss or the like incurred in connection with the Committee's investigation or discovery with respect to possible claims or Causes of Action against Quad-C undertaken during the course of the Chapter 11 Cases, which possible

claims and Causes of Action are to be released pursuant to the Plan.)  The prosecution of any so-indemnified Cause of Action shall upon the occurrence of the Effective Date be enjoined and prohibited, <u>except</u> solely for the purpose of obtaining a recovery from the issuer of any available insurance policy proceeds.

The constituent documents of the Reorganized Debtors shall, as of the Effective Date, be amended to (i) authorize and issue the New Preferred Stock; (ii) authorize and issue the New Common Stock; and (iii) require the New Common Stock to vote together as a single class; and (iv) prohibit the issuance of non-voting equity securities by such Debtor as required by section 1123(a)(6) of the Bankruptcy Code, <u>provided</u>, <u>however</u>, that following the Effective Date, the Reorganized Debtors shall be entitled to issue non-voting securities, in their sole discretion.

(f)    **Termination of Certain Debt Obligations**

Upon the occurrence of the Effective Date, the Subordinated Note Purchase Agreement shall be cancelled and annulled (along with such other documents appurtenant thereto).  Immediately upon the completion of all Plan Distributions to the holders of Debt Claims, the Reorganized Debtors shall be authorized and directed (without further approval, act or other determination under applicable law, regulation, order or rule) to take such action as shall be necessary or appropriate to terminate and extinguish all of the Debtors' obligations under the Subordinated Note Purchase Agreement.

(g)    **Amendment and Restatement of Certain Debt Obligations**

Upon the occurrence of the Effective Date, the Original H-II Facility (along with such other documents appurtenant thereto) shall be amended and restated in accordance with the terms of the Amended and Restated H-II Facility Documents.  Notwithstanding Article 8.5 of the Plan, any other provision of the Plan, the Confirmation Order, or applicable non-bankruptcy law, the liens, security interests, mortgages and other interests in collateral granted to the H-II Lenders shall remain valid, perfected and in full force and effect in accordance with their terms, without interruption or the need for any restatement, reaffirmation or re-perfection, but shall secure the obligations under the Amended and Restated H-II Facility.

Upon the occurrence of the Effective Date, the Original H-I Notes (along with such other documents appurtenant thereto), shall be amended and restated in accordance with the terms of the Amended and Restated H-I Facility.  Notwithstanding Article 8.5 of the Plan, any other provision of the Plan, the Confirmation Order, or applicable non-bankruptcy law, the liens, security interests, mortgages and other interests in collateral granted to the H-I Lenders shall remain valid, perfected and in full force and effect in accordance with their terms,, without interruption or the need for any restatement, reaffirmation or re-perfection, but shall secure the obligations under the Amended and Restated H-I Facility and the Amended and Restated H-I Notes.

(h)     **Continued Corporate Existence of the Debtors**

Each of the Debtors shall continue to exist, as a Reorganized Debtor, after the Effective Date as a separate entity, with all the powers available to such legal entity, in accordance with applicable law and pursuant to their constituent documents, as modified by the Plan.  On or after the Effective Date, the Reorganized Debtors may, within their sole and exclusive discretion, take such action as permitted by applicable law, their constituent documents, and the Plan Documents, as they determine is reasonable and appropriate, including (a) causing any or all of the Reorganized Debtors to be merged into one or more of the other Reorganized Debtors or other legal entities; (b) liquidating any of the Reorganized Debtors; and (c) changing the legal name of any of the Reorganized Debtors.

(i)     **Re-vesting of Assets**

Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates and any property acquired by a Debtor or Reorganized Debtor under the Plan shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided herein.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for all fees, disbursements, expenses or related support services of Professionals (including fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

(j)     **Initial Boards of Directors**

From and after the Effective Date, the members of the board of directors (or managers, as applicable) of the Reorganized Debtors shall be as identified in the Plan Supplement.  Thereafter, the members of the board of directors (or managers, as applicable) of each of the Reorganized Debtors shall selected and determined in accordance with the provisions of the organizational documents of such Reorganized Debtor and applicable law, including the Reorganized Heartland Shareholder Agreement that is included in the Plan Documents.

(k)     **Officers**

The current officers of each of the Debtors shall continue in such positions after the Effective Date in accordance with their respective employment agreements, if any, and applicable law.  From and after the Effective Date, the officers of each of the Reorganized Debtors shall be selected and appointed by the respective boards of directors of such entities, in accordance with, and pursuant to, the provisions of applicable law and their respective organizational documents, including the Reorganized Heartland Shareholder Agreement that is included in the Plan Documents.

(l)    **Retention of Causes of Action/Reservation of Rights**

Except as set forth in Articles 16.1 and 16.2 of the Plan, all Causes of Action belonging to any of the Debtors shall, upon the occurrence of the Effective Date, shall be vested in the Reorganized Debtors for the benefit of the Debtors and their Estates.  Except as set forth in Articles 16.1 and 16.2 of the Plan, the rights of the Reorganized Debtors to commence, prosecute or settle such Causes of Action, respectively, shall be preserved notwithstanding the occurrence of the Effective Date.

**No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Committee will not pursue any and all available Causes of Action against them. The Debtors and the Estates, on their own behalf and on behalf of the Committee, expressly reserve all rights to prosecute any and all Causes of Action against any Person, <u>except</u> as otherwise provided in the Plan.**  Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, the Debtors, on their own behalf and on behalf of the Committee, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, <u>including</u> without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon or after the confirmation or consummation of the Plan.

Except as set forth in Articles 16.1 and 16.2 of the Plan, nothing in the Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claims left unimpaired by the Plan, except for avoidance actions pursuant to section 547 of the Bankruptcy Code (provided, however, that the Debtors' right to object to any Claim pursuant to section 502(d) of the Bankruptcy Code is fully preserved, including but not limited to the right to object to any Claim of a recipient of a transfer that is avoidable under section 547 of the Bankruptcy Code).

Although these rights are preserved, the Plan does not contemplate the prosecution of preference or fraudulent conveyance claims.

(m)    **Appointment of the Disbursing Agent**

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be appointed to serve as the Disbursing Agent, and shall have all powers, rights, duties and protections afforded the Disbursing Agent under the Plan.

(n)    **Sources of Cash for Plan Distributions**

All Cash necessary for the Disbursing Agent to make payments and Plan Distributions shall be obtained from the Cash of the Reorganized Debtors and the Cash held in the Contested Claims Reserve, if any, as applicable.

**F.**     **Distribution Provisions**

(a)     <u>**Plan Distributions**</u>

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall make the required Plan Distributions specified under the Plan on the relevant Distribution Date therefor.  The Disbursing Agent shall make all distributions on account of H-II Lender Claims to Dymas, in its capacity as administrative agent for the H-II Lenders, which funds Dymas shall distribute to the H-II Lenders pursuant to the Plan.  Dymas shall be entitled to the exculpation protections provided in Article 9.3 of the Plan with respect to any distributions Dymas makes on account of H-II Lender Claims.

(b)     <u>**Timing of Plan Distributions**</u>

Each Plan Distribution shall be made on the relevant Distribution Date therefor. In the event a Plan Distribution shall be payable on a day other than a Business Day, such Plan Distribution shall instead be paid on the immediately succeeding Business Day, but shall be deemed to have been made on the date otherwise due.  A Plan Distribution shall be deemed to have been timely made if made on such date or within ten (10) days thereafter.

For federal income tax purposes, <u>except</u> to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest, <u>provided</u>, <u>however</u>, that notwithstanding all of the foregoing, the application of any distributions made on account of the H-I Lender Claims or the H-II Lender Claims and payments under the Amended and Restated H-I Facility and the Amended and Restated H-II Facility shall be governed by the Amended and Restated H-II Facility, respectively.

(c)     <u>**Time Bar to Cash Payments and Issuance of New Unsecured Notes**</u>

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof.  Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.  Any claim in respect of such a voided check shall be made within one hundred and eighty (180) days after the date of issuance of such check. If no request is made as provided in the preceding sentence, any claims in respect of such void check shall be discharged and forever barred and such unclaimed Plan Distribution shall revert to the Reorganized Debtors.

New Unsecured Notes issued under the Plan on account of Allowed Claims but not claimed by the holders of such Allowed Claims within one hundred and eighty (180) days after the date of the allowance of such Claim thereof shall be cancelled, and any unpaid interest or principal shall revert to the Reorganized Company.

(d)      **Surrender and Cancellation of Instruments**

As a condition to receiving any Plan Distribution, on or before the Distribution Date, the holder of an Allowed Claim evidenced by a certificate, instrument or note, other than any such certificate, instrument or note that is being reinstated or being left unimpaired under the Plan, shall (i) surrender such certificate, instrument or note representing such Claim, and (ii) execute and deliver such other documents as may be necessary to effectuate the Plan in the sole determination of the Disbursing Agent.  Such certificate, instrument or note, shall thereafter be cancelled and extinguished.  The Disbursing Agent shall have the right to withhold any Plan Distribution to be made to or on behalf of any holder of such Claims unless and until (1) such certificates, instruments or notes are surrendered, or (2) any relevant holder provides to the Disbursing Agent an affidavit of loss or such other documents as may be required by the Disbursing Agent together with an appropriate indemnity in the customary form.  Any such holder who fails to surrender such certificates, instruments or notes, or otherwise fails to deliver an affidavit of loss and indemnity prior to the second anniversary of the Effective Date, shall be deemed to have forfeited its Claims and shall not participate in any Plan Distribution.  All property in respect of such forfeited Claims shall revert to the Reorganized Debtors.

**G.      Procedures for Resolving and Treating Contested Claims**

(a)      **Objection Deadline**

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date (subject to being extended by the order of the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made.

(b)      **Prosecution of Contested Claims**

After the Effective Date, only the Reorganized Debtors may object to the allowance of Contested Claims filed with the Bankruptcy Court.  All objections that are filed and prosecuted as provided herein shall be litigated to Final Order or compromised and settled in accordance with Article 11.3 of the Plan.

(c)      **Claims Settlement**

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Disbursing Agent shall have authority to settle or compromise all Claims and Causes of Action without further review or approval of the Bankruptcy Court.

(d)      **Entitlement to Plan Distributions Upon Allowance**

Notwithstanding any other provision hereof, if any portion of a Claim is a Contested Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Claim becomes an Allowed Claim that is not a Contested Claim, subject to the setoff rights as provided in Article 16.19 of the Plan.  When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim the holder of such

Allowed Claim shall thereupon become entitled to receive the Plan Distributions in respect of such Claim the same as though such Claim had been an Allowed Claim on the Effective Date.

(e)    **Contested Claims Reserve**

The Debtors may establish a Contested Claims Reserve in a segregated account for the purpose of effectuating distributions to the holders of Contested Claims pending the allowance or disallowance of such Claims in accordance with the Plan.

(f)    **Estimation of Claims**

The Debtors and the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Contested Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Contested Claim, the amount so estimated shall constitute either (a) the Allowed amount of such Contested Claim; (b) a maximum limitation on such Contested Claim, or (c) in the event such Contested Claim is estimated in connection with the estimation of other Claims within the same Class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Contested Claims so estimated.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, or on more than one such Claim within a Class of Claims, as applicable, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claims.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or otherwise resolved by any mechanism approved by the Bankruptcy Court.

(g)    **No Recourse Against the Debtors or the Reorganized Company**

If a Contested Claims Reserve is established pursuant to Article 11.5 of the Plan prior to the Effective Date, any holder of a Contested Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable distribution under the Plan solely from the Contested Claims Reserve established on account of such Contested Claim.  In no event shall any holder of a Contested Claim have any recourse with respect to distributions made, or to be made, under the Plan to holders of such Claims, to any Debtor or the Reorganized Debtors on account of such Contested Claim, regardless of whether such Contested Claim shall ultimately become an Allowed Claim, and regardless of whether sufficient Cash or other property remains available for distribution in the Contested Claims Reserve established on account of such Contested Claim at the time such Claim becomes entitled to receive a distribution under the Plan.

**H.    Conditions Precedent to Confirmation of Plan**

The following are conditions precedent to confirmation of the Plan:

(a)    The Clerk of the Bankruptcy Court shall have entered an order or orders:

(i)     approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii)     authorizing the solicitation of votes with respect to the Plan;

(iii)     determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan;

(iv)     confirming and giving effect to the terms and provisions of the Plan;

(v)     determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtors and the Plan;

(vi)     approving the Plan Documents;

(vii)     authorizing the Debtors to execute, enter into, and deliver the Plan Documents and to execute, implement, and to take all actions otherwise necessary or appropriate to give effect to, the transactions contemplated by the Plan and the Plan Documents;

(viii)     approving the Amended and Restated H-II Facility Documents;

(ix)     approving the Amended and Restated H-I Facility Documents; and

(ix)     approving the New JLI Agreements, the Master Supply Agreement and the VMI Agreement.

(b)     The Confirmation Order, the Plan Documents and the Plan are each in a form satisfactory to the Committee and the Debtors.

## I.    Conditions Precedent to Occurrence of the Effective Date

The following are conditions precedent to the occurrence of the Effective Date:

(a)     The Confirmation Order shall have been entered by the Clerk of the Bankruptcy Court, be in full force and effect and not be subject to any stay or injunction;

(b)     There is sufficient available free Cash to make a seventy percent (70%) distribution on account of all Allowed General Unsecured Claims who have elected the Cash Option under the Plan.

(c)     All necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan, including, without limitation, satisfaction or waiver of all conditions to the obligations of (i) the Debtors under the Plan and the Plan Documents, (ii) JLI and SOPUS under the New JLI Agreements, the Master Supply Agreement and the VMI Agreement, (iii) Quad-C to make payments under the Quad-C Contribution Documents, and (iv) the Debtors and JLI under the Amended and Restated

H-II Facility Documents.

(d)     The New JLI Agreements, the Master Supply Agreement and the VMI Agreement have been executed and delivered; and

(e)     (i)     The Quad-C Contribution shall have been made and funded; or

(ii)    If Quad-C fails to make the Quad-C Contribution, alternative equity funding has been obtained.

**J.     Waiver of Conditions**

The Committee and the Debtors may waive any one or more of the conditions set forth in Article 14.1 or Article 14.2(b), (c) or (d) of the Plan in a writing executed by each of them without notice or order of the Bankruptcy Court and without notice to any parties in interest.  Article 14.3 of the Plan is subject to the obligations of the Committee and the Debtors under the H-II PSA.

**K.     Effect of Non-Occurrence of the Effective Date**

If the Effective Date shall not occur, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Equity Interests in a Debtor; (b) prejudice in any manner the rights of any party-in-interest; or (c) constitute an admission, acknowledgement, offer or undertaking by the Debtors, the Committee or any other party-in-interest.  Without limiting the generality of the foregoing sentence, in the event that the Effective Date has not occurred on or before June 30, 2009, Quad-C shall be permitted to seek confirmation of a plan of reorganization other than the Plan, subject to receiving any and all necessary relief from the Bankruptcy Court.

**L.     Exculpation of Debtors and Released Persons**

**The Debtors and any Released Persons shall not be liable for any Cause of Action arising in connection with or out of the administration of the Chapter 11 Cases, pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct as determined by Final Order of the Bankruptcy Court.  The Confirmation Order shall enjoin all holders of Claims and Equity Interests from asserting or prosecuting any Claim or cause of action against any Released Person as to which such Released Person has been exculpated from liability pursuant to the preceding sentence.**

**M.     Releases by the Debtors**

**On the Effective Date, except as expressly provided in Articles 13.1 and 13.2 of the Plan, each of the Released Persons shall be released by each Debtor and their respective Estates, from any and all Claims, including, without limitation, Avoidance Actions, liens, encumbrances, security interests, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that any Debtor is**

entitled to assert in its own right or on behalf of the holder of any claim or equity interest or other Person, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or prior to the Effective Date in any way relating to any Debtor, the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Plan, or the property to be distributed under the Plan, the disclosure statement concerning the Plan, any contract, employee pension or other benefit plan, instrument, release or other agreement of document created, modified, amended, terminated or entered into in connection with either the Plan or any agreement between the Debtors and any Released Person, or any other act taken or omitted to be taken in connection with the Company's bankruptcy.  Without limitation of the foregoing, each such Released Person shall be released and exculpated from any and all Claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that any holder of a claim or equity interest is entitled to assert in its own right or on behalf of any other person, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence relating to the Debtors and taking place prior to the Effective Date.

N.      **Release of Released Persons by Other Released Persons**

On the Effective Date, except (a) as expressly provided under the Plan with respect to (i) Plan Distributions on account of Allowed Claims or Allowed Equity Interests, if any, that any of the Released Persons may have against any of the Debtors' estates, and (ii) any other rights or obligations under the Plan or the Plan Documents, and (b) as otherwise provided in Articles 13.1 and 13.2 of the Plan, each of the Released Persons shall release each other from any and all Claims, including without limitation Avoidance Actions, liens, encumbrances, security interests, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that any Released Person is entitled to assert against any other Released Person, based in whole or in part upon any act or omission, transaction, agreement, event or occurrence taking place on or before the Effective Date in any way relating to any Debtor, the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Plan, or the property to be distributed under the Plan, the disclosure statement concerning the Plan, any contract, employee pension or other benefit plan, instrument, release or other agreement of document created, modified, amended, terminated or entered into in connection with either the Plan or any agreement between the Debtors and any Released Person, or any other act taken or omitted to be taken in connection with the Company's bankruptcy.  Notwithstanding any of the foregoing, this Plan shall not release any obligations of the Debtors to indemnify and hold harmless their current and former directors, officers and employees, except for claims or causes of actions against any current and former directors, officers and employees resulting from the willful misconduct or gross negligence of such indemnified party, whether arising under the Debtors' constituent documents, contract, law or equity.  In addition, the Debtors shall not indemnify or hold harmless any current and former

directors, officers and employees for any claim for payment of attorneys' fees arising out of or relating to the Chapter 11 Cases or any investigation related thereto.

**O.       Settlement of Controversies**

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution, releases, treatment, and other benefits provided under the Plan, including without limitation, the provisions of Articles 13, 16.1 and 16.2 of the Plan, the provisions of the Plan shall constitute a good faith settlement of all claims and controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing settlements and all other settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such settlements are in the best interests of the Debtors, their Estates, creditors, and other parties in interest and are fair, equitable, and within the range of reasonableness.

**P.       Executory Contracts and Unexpired Leases**

(a)       **Executory Contracts and Unexpired Leases**

The Bankruptcy Code entitles the Debtors, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases.  The Bankruptcy Code further entitles the Debtors, subject to satisfaction of certain conditions, to assign assumed executory contracts and unexpired leases to another entity.  Rejection or assumption and assignment may be effected under a plan of reorganization.

(b)       **Assumption and Rejection of Executory Contracts and Unexpired Leases**

All executory contracts and unexpired leases of the Debtors shall be rejected pursuant to the provisions of section 365 of the Bankruptcy Code effective as of and subject to the occurrence of the Effective Date, unless another date is specified in the Plan except:  (i) any executory contracts and unexpired leases that are the subject of separate motions to assume or assume and assign filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the Effective Date; (ii) contracts and leases listed in Schedule 4 attached hereto and any subsequently filed "Schedule of Assumed Executory Contracts and Unexpired Leases" to be filed by the Debtors with the Bankruptcy Court before the entry of, or as an exhibit to, the Confirmation Order; (iii) all executory contracts and unexpired leases assumed or assumed and assigned under the Plan or by order of the Bankruptcy Court entered before the Effective Date; (iv) any executory contract or unexpired lease that is the subject of a dispute over the amount or manner of cure pursuant to the next article hereof and for which the Debtors make a motion to reject such contract or lease based upon the existence of such dispute filed at any time; (v) any agreement, obligation, security interest, transaction or similar undertaking that the Debtors believe is not executory or a lease that is later determined by the Bankruptcy Court to be an executory contract or unexpired lease that is subject to assumption or rejection under section 365 of the Bankruptcy Code; (vi) any oral or written joint defense agreements relating to actual, potential, or threatened litigation or investigations involving any of the Debtors, which shall be assumed; (vii) any guaranty or similar agreement executed by a third party which guarantees

repayment or performance of an obligation owed to any of the Debtors or to indemnify the Debtors; and (viii) agreements with third parties regarding preservation of the confidentiality of documents produced by the Debtors.  Any order entered postconfirmation by the Bankruptcy Court, after notice and a hearing, authorizing the rejection of an executory contract or unexpired lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief was granted and such order was entered preconfirmation.  The Debtors reserve the right to amend Disclosure Statement Schedule 4 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" prior to the entry of the Confirmation Order.  Each executory contract and unexpired lease to be assumed by the Debtors shall include modifications, amendments, supplements, restatements or other similar agreements made directly or indirectly by any agreement, instrument or other document that affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Disclosure Statement Schedule 4 or any "Schedule of Assumed Executory Contracts and Unexpired Leases."

The inclusion of a contract, lease or other agreement in Article 12.1(a) of the Plan or on Disclosure Statement Schedule 4 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" shall not constitute an admission by the Debtors as to the characterization of whether any such included contract, lease, or other agreement is, or is not, an executory contract or unexpired lease or whether any claimants under any such contract, lease or other agreement are time-barred from asserting Claims against the Debtors.  The Debtors reserve all rights with respect to the characterization of any such agreements.

The Plan shall constitute a motion to reject such executory contracts and unexpired leases rejected pursuant to Article 12.1 of the Plan, and the Debtors shall have no liability thereunder <u>except</u> as is specifically provided in the Plan.  Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code, subject to the occurrence of the Effective Date, and a finding by the Bankruptcy Court that each such rejected agreement, executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interests of the Debtors and their estates.

The Plan shall constitute a motion to assume and assign to the Reorganized Debtors such executory contracts and unexpired leases as set forth in Schedule 4 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" or otherwise designated for assumption in Article 12.1 of the Plan.  Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumption and assignment pursuant to sections 365(a), (b) and (f) of the Bankruptcy Code, and a finding by the Bankruptcy Court that the requirements of section 365(f) of the Bankruptcy Code have been satisfied.  **Any non-Debtor counterparty to an agreement listed on Schedule 4 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" or any other contract or unexpired lease otherwise designated as being assumed or assumed and assigned in Article 12.1(a) of the Plan who disputes the assignment of an executory contract or unexpired lease must file with the Bankruptcy Court, and serve upon the Debtors and the Committee, a written objection to the assumption and assignment, which objection shall set forth the basis for the dispute by no later than ten (10) days prior to the Confirmation Hearing.  The failure to timely object shall be deemed a waiver of any and all objections to the assumption and**

assignment of executory contracts and leases as set forth in Schedule 4 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" or as otherwise designated as being assumed or assumed and assigned in Article 12.1(a) of the Plan.

      (c)    **<u>Cure</u>**

      At the election of the Debtors, any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code: (a) by payment of the default amount in Cash on the Effective Date or as soon thereafter as practicable; or (b) on such other terms as agreed to by the parties to such executory contract or unexpired lease. In the event of a dispute regarding: (i) the amount of any cure payments; (ii) the ability to provide adequate assurance of future performance under the contract or lease to be assumed or assigned; or (iii) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption or assignment, as applicable. Disclosure Statement Schedule 4 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" attached to the Disclosure Statement set forth the Debtors' cure obligations for each agreement which a cure obligation must be satisfied as a condition to the assumption and assignment of such agreement. **Any non-Debtor counterparty to an agreement listed on the Disclosure Statement Schedule 4 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" who disputes the scheduled cure obligation (or objects to the omission of a scheduled cure obligation) must file with the Bankruptcy Court, and serve upon the Debtors and the Committees, a written objection to the cure obligation, which objection shall set forth the basis for the dispute, the alleged correct cure obligation, and any other objection related to the assumption or assumption and assignment of the relevant agreement by no later than ten (10) Business Days prior to the Confirmation Hearing. If a non-Debtor counterparty fails to file and serve an objection which complies with the foregoing, the cure obligation set forth on the Disclosure Statement Schedule 4 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" shall be binding on the non-Debtor counterparty, and the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption and assignment of the relevant agreement as proposed by the Debtors.**

      (d)    **<u>Claims Arising from Rejected Contracts</u>**

      Rejection Damage Claims must be submitted to the Claims Agent, with copies to counsel for the Debtors and the Committee, by the first Business Day that is at least thirty (30) days following the Effective Date. The foregoing submission deadline applies only to Rejection Damage Claims arising out of executory contracts and unexpired leases that are rejected pursuant to the Plan. Nothing in the Plan shall alter the submission deadline for a party to an executory contract or unexpired lease that was rejected by separate motion or by operation of law. Properly submitted Rejection Damage Claims shall be treated as Class 5 General Unsecured Claims under the Plan subject to objection by the Reorganized Debtors. Any such Rejection Damage Claims that are not properly submitted pursuant to Article 12.3 of the Plan will forever be barred from assertion and shall not be enforceable against the Reorganized Debtors, their respective Estates, Affiliates or Assets.

Q.    **Settlements and Compromises**

(a)    **JLI**

As set forth in Article 5.7 of the Plan, as of the Effective Date, JLI (and any other Person who may be a holder of a JLI Claim as of the Effective Date) shall be deemed to have waived any and all Claims it holds or may hold against (i) any other Released Person and (ii) any of the Debtors arising prior to the Effective Date (whether prepetition, rejection, arising under section 503(b)(9) of the Bankruptcy Code or otherwise) and relating to any of the Debtors in exchange for (a) the assumption of the Franchise Agreements and related JLI Leases (in each case as modified by the New JLI Agreements in the Plan Documents), and (b) the releases provided for in Articles 16.1 and 16.2 of the Plan.  Notwithstanding any of the foregoing, the Plan shall in no way limit or waive JLI's right to assert Claims for unpaid but accrued royalties on actual Gross Sales (as defined in the Franchise Agreements), lease payments and Franchise Agreement renewal fees, each arising after the Petition Date, and the Debtors' right to assert claims for fleet credits, rebates, other credits and similar items owing to the Debtors after the Petition Date.  Except as provided in this Article, neither JLI (nor any other Person who may be a holder of a JLI Claim) shall be entitled to receive any Plan Distribution.

All of the Franchise Agreements, as amended pursuant to the terms of the New JLI Agreements, shall be assumed as of the Effective Date.  The Amendments shall supersede any contrary provisions in the Franchise Agreements, and shall contain such other terms and conditions as may be agreed upon between JLI and the Debtors.  The amendments to the Franchise Agreements shall be set forth as a single global amendment, provided, however, that each Franchise Agreement shall remain a valid and distinct contractual obligation (as amended by such global amendment) existing independent of any other Franchise Agreement.

(b)    **SOPUS**

As set forth in Article 5.8 of the Plan, as of the Effective Date, SOPUS (and any other Person who may be a holder of a SOPUS Claim as of the Effective Date) shall be deemed to have waived any and all Claims it holds or may hold against (i) any other Released Person and (ii) any of the Debtors arising prior to the Effective Date (whether pre-petition, rejection, arising under section 503(b)(9) of the Bankruptcy Code or otherwise) and relating to any of the Debtors in exchange for (i) the replacement of all existing Supply Agreements with the Master Supply Agreement and the VMI Agreement included in the Plan Documents, and (ii) the releases provided for in Articles 16.1 and 16.2 of the Plan.  Notwithstanding any of the foregoing, the Plan shall not release and shall in no way limit SOPUS's right to assert any Claim for unpaid goods or services delivered to the Debtors after the Petition Date, and the Debtors' right to assert Claims for rebates, credits and similar items owing by SOPUS to the Debtors for goods or services delivered to the Debtors after the Petition Date and nothing herein alters a party's obligation to comply with the terms of the existing product supply agreements through the Effective Date.  Except as provided in this Article, neither SOPUS nor any other Person who may be a holder of a SOPUS Claim shall be entitled to receive any Plan Distribution.

All of the existing Supply Agreements shall be terminated as of the Effective Date and shall be replaced as of the Effective Date by the Master Supply Agreement.  The Master

Supply Agreement shall supersede any earlier agreements by and among the Debtors and SOPUS and shall contain other such terms and conditions as may be agreement upon between SOPUS and the Debtors.  In addition, the VMI Agreement shall be entered in and effective as of the Effective Date.  For proprietary and confidentiality reasons, the Master Supply Agreement and VMI Agreement filed or to be filed with the Plan or Plan Supplement have been redacted with respect to, among other things, pricing terms.

> (c)    **Quad-C**

On or before the Effective Date, HAS Funding LLC or its designee(s) shall fulfill its obligations under the Quad-C Contribution Documents.  In addition, Quad-C shall release and waive all of their respective Claims against each other Released Person as set forth in Article 16.2 of the Plan.

In exchange for its performance under the Quad-C Contribution Documents, HAS Funding LLC or its designee(s) shall receive on the Effective Date (i) 300,000 shares of New Class B Common Stock, less any shares of New Class B Common Stock to be issued to holders of Allowed Heartland Common Stock Interests, as provided for in Article 5.10; and (ii) 1,000,000 shares of New Class B Preferred Stock.  In addition, Quad-C shall receive releases and waivers of all Claims against them from each other Released Person as set forth in Articles 16.1 and 16.2 of the Plan.

Since their execution, the Quad-C Contribution Documents and the New Common Stock Term Sheet, annexed hereto as Schedules 6 and 9, respectively, have been amended by side letter to, among other things, (i) reduce the aggregate number of shares to be issued while retaining the same proportion of ownership between Blackstone on the one hand and holders of Heartland Common Stock Interests on the other hand, and (ii) make clear that all holders of Heartland Common Stock Interests including Quad-C will receive their respective distributions from the 300,000 shares of New Class B Common Stock to be issued under the Plan.

If, on the Effective Date, HAS Funding LLC or its designee(s) has not deposited into the Debtors' main operating account an amount (the "New Money Contribution") equal to the difference between $28 million and the Effective Date DIP Balance, (i) Quad-C shall not be entitled to the release provided for in Article 13.3(b) of the Plan, (ii) the defined term "Released Persons" in Article 1.118 shall be modified to exclude the reference to Quad-C in clause (a) of such definition and exclude Quad-C from clause (c) of such definition regardless of whether Quad-C might otherwise be an affiliate, officer, director, principal, shareholder, parent, subsidiary, member, auditor, accountant, financial advisor, predecessor, successor, servant, employee, agent, counsel, attorney, partner, insurer, underwriter, administrator, executor, representative or assign of a Released Person, and (iii) the releases set forth in Articles 16.1 and 16.2 of the Plan shall not apply to Quad-C, and any Claims or Causes of Action that any of the Released Persons holds or may hold against Quad-C are expressly preserved and vest in the Reorganized Debtors for their benefit and the benefit of their creditors.  Further, if, on the Effective Date, HAS Funding LLC or its designee(s) has not deposited the New Money Contribution (as calculated above) into the Debtors' main operating account, in accordance with Article 13.3(a) of the Plan, Article 14.2(e)(i) shall be deleted from the Plan.

If on or before December 31 2008, Quad-C has not represented to the Debtors, the Committee and Blackstone that HAS Funding LLC has direct control over immediately available funds in the amount of the New Money Contribution and that such funds have been segregated for the sole purpose of satisfying the New Money Contribution, the Debtors and/or the Committee shall have the right to seek to replace the Quad-C Contribution with funding from alternative sources, upon notice to and a hearing before the Bankruptcy Court, and subject to the terms of the Quad-C Plan Support Agreement approved by the Bankruptcy Court on December 18, 2008, as amended from time to time. Provided that (i) the terms of such alternative funding are not materially less favorable to the Debtors or the H-II Lenders than the terms of the Quad-C Contribution and (ii) the Bankruptcy Court approves such alternative funding, the Plan shall be deemed amended without the need for further notice or solicitation.

**R.      Retention of Jurisdiction**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) as otherwise set forth in the Plan.

**S.      Other Material Provisions of the Plan**

(a)      **Payment of Statutory Fees**

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date.

(b)      **Satisfaction of Claims**

The rights afforded in the Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, underlining any accrued postpetition interest, against the Debtors and the Debtors-in-Possession, or any of their Estates, Assets, properties, or interests in property. Except as otherwise provided herein, on the Effective Date, all Claims against and Equity Interests in the Debtors and the Debtors-in-Possession shall be satisfied, discharged, and released in full. The Reorganized Debtors shall not be responsible for any pre-Effective Date obligations of the Debtors or the Debtors-in-Possession, except those expressly assumed by any Reorganized Debtor(s), as applicable. Except as otherwise provided herein, all Persons and Entities shall be precluded and forever barred from asserting against the Reorganized Debtors, their respective successors or assigns, or their Estates, Assets, properties, or interests in property any event, occurrence, condition, thing, or other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

(c)      **Third Party Agreements; Subordination**

The Plan Distributions to the various classes of Claims and Equity Interests hereunder shall not affect the right of any Person to levy, garnish, attach, or employ any other legal process with respect to such Plan Distributions by reason of any claimed subordination rights or otherwise.  All of such rights and any agreements relating thereto shall remain in full force and effect, <u>except</u> as compromised and settled pursuant to the Plan.  Plan Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan.  The right of the Debtors to seek subordination of any Claim or Equity Interest pursuant to section 510 of the Bankruptcy Code is fully reserved; and the treatment afforded any Claim or Equity Interest that becomes a Subordinated Claim or subordinated Equity Interest at any time shall be modified to reflect such subordination. Unless the Confirmation Order provides otherwise, no Plan Distributions shall be made on account of a Subordinated Claim or subordinated Equity Interest.  Notwithstanding the foregoing, neither the Debtors, the Reorganized Debtors, nor any other party in interest shall reserve or preserve any right to subordinate the H-I Lender Claims, which are expressly Allowed as provided in Article 3.3(a) hereof and satisfied as provided in Article 5.2 hereof.  Notwithstanding the foregoing, (i) the subordination rights of the holders of H-II Lender Claims under the H-II Lender Subordination Agreement shall be deemed fully satisfied by the distributions made pursuant to Article 5.3 of the Plan, and (ii) neither the Debtors, the Reorganized Debtors, nor any other party in interest shall reserve or preserve any right to subordinate the H-II Lender Claims, which are expressly Allowed as provided in Article 3.3(b) hereof and satisfied as provided in Article 5.3 of the Plan.

(d)      **Discharge of Liabilities**

Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, the Debtors shall be discharged from all Claims and Causes of Action to the fullest extent permitted by section 1141 of the Bankruptcy Code, and all holders of Claims and Equity Interests shall be precluded from asserting against the Reorganized Debtors, the Debtors, the Estates, the Assets, or any property dealt with under the Plan, any further or other Cause of Action based upon any act or omission, transaction, event, thing, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date.

**<u>EXCEPT</u> AS OTHERWISE PROVIDED IN THE PLAN, THE REORGANIZED DEBTORS SHALL NOT HAVE, AND SHALL NOT BE CONSTRUED TO HAVE OR MAINTAIN ANY LIABILITY, CLAIM, OR OBLIGATION, THAT IS BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OTHER OCCURRENCE OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE PLAN (<u>INCLUDING</u>, WITHOUT LIMITATION, ANY LIABILITY OR CLAIMS ARISING UNDER APPLICABLE NON-BANKRUPTCY LAW AS A SUCCESSOR TO THE DEBTORS) AND NO SUCH LIABILITIES, CLAIMS, OR OBLIGATIONS FOR ANY ACTS SHALL ATTACH TO THE REORGANIZED DEBTORS.**

(e)    **Discharge of Debtors**

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, without further notice or order, all Claims of any nature whatsoever shall be automatically discharged forever.  Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the Debtors, their Estates, and all successors thereto shall be deemed fully discharged and released from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or (c) the holder of a Claim based upon such debt has accepted the Plan.  The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors, their Estates, and all successors thereto.  As provided in section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtors, their Estates, or any successor thereto at any time obtained to the extent it relates to a Claim discharged, and operates as an injunction against the prosecution of any action against the Reorganized Debtors or property of the Debtors or their Estates to the extent it relates to a discharged Claim.

(f)    **Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

(g)    **Retiree Benefits**

Pursuant to section 1129(a)(13), on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

(h)    **Interest and Attorneys' Fees**

i.    Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in the Plan, the Confirmation Order or as otherwise required by the Bankruptcy Court or by applicable law.

ii.    Except as set forth in the Plan or as ordered by the Bankruptcy Court, no award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim.

(i)    **Modification of the Plan**

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Committee and the Debtors at any time before confirmation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the

Bankruptcy Code, and the Committee and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  The Committee and the Debtors may modify the Plan at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.  Article 16.18 of the Plan is subject to the obligations of the Committee and the Debtors under the H-II PSA.

       (j)     **Revocation of the Plan**

The Committee and the Debtors reserve the right to, after consultation with JLI and SOPUS, revoke and withdraw the Plan or to adjourn the Confirmation Hearing with respect to the Plan and/or submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code.  If the Committee and the Debtors revoke or withdraw the Plan, or if the Effective Date does not occur under  the Plan, all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained herein and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims against or Equity Interests or to prejudice in any manner the rights of any of the Debtors or any other Person in any other further proceedings involving any of the Debtors. Article 16.19 of the Plan is subject to the obligations of the Committee and the Debtors under the H-II PSA.

       (k)     **Setoff Rights**

Except as otherwise provided in Articles 3.3(a) and 3.3(b) of the Plan, in the event that any Debtor has a Claim of any nature whatsoever against the holder of a Claim against such Debtor, then such Debtor may, but is not required to, set off against the Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) such Debtor's Claim against such holder, subject to section 553 of the Bankruptcy Code. Neither the failure to set off nor the allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that any Debtor may have against the holder of any Claim.

       (l)     **Compliance with Tax Requirements**

In connection with the Plan, the Reorganized Debtors and the Disbursing Agent, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local, and foreign taxing authorities and all Plan Distributions hereunder shall be subject to such withholding and reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim or Equity Interest that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, <u>including</u> income, withholding and other tax obligations, on account of such Plan Distribution.  The Disbursing Agent has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to the Disbursing Agent for payment of any such tax obligations.

(m)   **Injunctions**

On the Effective Date and **except** as otherwise provided herein, all Persons who have been, are, or may be holders of Claims against or Equity Interests in the Debtors shall be permanently enjoined from taking any of the following actions against or affecting the Debtors, the Reorganized Debtors, the Estates, the Assets, the Disbursing Agent, or any of the Released Persons, or their respective assets and property, with respect to such Claims or Equity Interests (other than actions brought to enforce any rights or obligations under the Plan):

i)   commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (**including**, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);

ii)   enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order;

iii)   creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance; and

iv)   asserting any setoff, right of subrogation or recoupment of any kind; **provided**, that any defenses, offsets or counterclaims which the Debtors may have or assert in respect of the above referenced Claims are fully preserved in accordance with Article 16.19 of the Plan.

(n)   **Binding Effect**

The Plan shall be binding upon the Reorganized Debtors, the holders of all Claims and Equity Interests, parties in interest, Persons and Entities and their respective successors and assigns. To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

(o)   **Severability**

IN THE EVENT THE BANKRUPTCY COURT DETERMINES THAT ANY PROVISION OF THE PLAN IS UNENFORCEABLE EITHER ON ITS FACE OR AS APPLIED TO ANY CLAIM OR EQUITY INTEREST OR TRANSACTION, THE DEBTORS AND THE COMMITTEE MAY MODIFY THE PLAN IN ACCORDANCE WITH ARTICLE 16.17 OF THE PLAN SO THAT SUCH PROVISION SHALL NOT BE APPLICABLE TO THE HOLDER OF ANY SUCH CLAIM OR EQUITY INTEREST OR TRANSACTION SUCH A DETERMINATION OF UNENFORCEABILITY SHALL NOT (A) LIMIT OR AFFECT THE ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF THE PLAN OR (B) REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR REJECTION OF THE PLAN.

(p)    <u>**No Admissions**</u>

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTIONS, THE PLAN AND THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  NEITHER THE PLAN NOR THE DISCLOSURE STATEMENT SHALL BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS OR THEIR AFFILIATES, AS DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CHAPTER 11 CASES.**

(q)    <u>**Dissolution of the Committee**</u>

Effective on the Effective Date, the Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to (i) applications for Fee Claims or reimbursement of expenses incurred as a member of the Committee, and (ii) any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order or pending appeals of Orders entered in the Chapter 11 Cases.

(r)    <u>**Plan Controls**</u>

Unless otherwise specified, all section, article, and exhibit references in the Plan are to the respective section in, article of, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time.  Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender. The Disclosure Statement may be referred to for purposes of interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy Court to be ambiguous.

XI.

**RISK FACTORS**

A.    **The Reorganized Debtors' Actual Financial Results May Vary Significantly from the Projections Included in this Disclosure Statement**

The financial projections included in this Disclosure Statement are dependent upon the successful implementation of the Reorganized Debtors' business plan and the validity of the numerous assumptions contained therein.  The significant assumptions underlying the Projections are discussed in greater detail in this Disclosure Statement under "Financial Projections and Assumptions – Summary of Significant Assumptions."

Many of these assumptions are beyond the control of the Debtors and the Committee and may not materialize.  In addition, unanticipated events and circumstances

occurring subsequent to the preparation of the projections may adversely affect the financial results of the Debtors.  Although the Debtors and the Committee believe that the projections and assumptions are reasonable, variations between the actual financial results and those projected may be material.

**B.      Plan Consideration Reserved for Contested Claims May Be Insufficient to Satisfy all Secured Claims upon Liquidation**

The Plan authorizes, but does not require, the establishment of a Contested Claims Reserve for the purposes of satisfying Contested Claims.  The Debtors and the Reorganized Debtors reserve the right to seek estimation of such Contested Claims pursuant to section 503(c) of the Bankruptcy Code.  The actual amount at which such Contested Claims are ultimately allowed may differ from the estimates.  If a Contested Claims Reserve is established, holders of Contested Claims are entitled to receive distributions under the Plan upon allowance of such Claims solely from the Contested Claim Reserve established on account of such Claim.  If such contested Claim is ultimately allowed and at the time of such allowance, insufficient Plan consideration is available for distribution from the Contested Claim Reserve, the distributions on account of such Allowed Claim will be limited to such available amounts and the holder of such Allowed Claim will have no recourse against the Debtors or the Reorganized Debtors for any deficiency that may arise.

**C.      The Reorganized Debtors May Not Be able to Raise Additional Financing on Terms Favorable to the Debtors**

The Reorganized Debtors' business is expected to require certain amounts of working capital and growth capital.  While the Projections assume that sufficient funds to meet these needs for the foreseeable future will be available from the cash generated by the business of the Reorganized Company and from the proceeds of the Quad-C Contribution, the ability of the Reorganized Company to gain access to additional capital on terms consistent with the terms assumed in the Projections, if needed, cannot be assured, particularly in light of current financial market conditions.

**D.      The Market Conditions Affecting the Debtors' Business May Become Volatile and Uncertain**

The Business Plan does not contemplate high volatility and unpredictability of oil and gasoline prices.  There can be no assurance however that such prices will not become to volatile.

**E.      The Reorganized Debtors May Not Be Able to Acquire Additional Stores as Assumed Under the Business Plan**

The Business Plan contemplates considerable store growth to offset negative industry trends and to allow the Reorganized Debtors to take advantage of certain fixed costs through operational leverage.  Over the Projection Period, the Reorganized Debtors plan to acquire or open approximately 100 stores.  There can be no assurance however that the Reorganized Debtors will be successful in their efforts to acquire or open additional stores.

**F.     No Market for New Common Stock and New Preferred Stock or New Unsecured Notes**

      The shares of the New Common Stock will not qualify for listing at the time they are issued on the Effective Date of the Plan, and Heartland does not anticipate that the New Common Stock will ever be listed or quoted on any securities exchange or quotation system. Lack of liquidity of the New Common Stock may make it more difficult for Heartland to raise additional capital, if necessary, through equity financings. Similarly, the New Preferred Stock also will not be listed or quoted, and is not expected to be listed or quoted, on any securities exchange or quotation system. In addition, the New Unsecured Notes will not be registered and the Debtors and the Committee do not anticipate that there will be a market for the New Unsecured Notes.

XII.

**SECURITIES LAW MATTERS**

**A.     Issuance Of New Securities**

      Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act of 1933, as amended (the "Securities Act"), and state securities laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property. Except as noted below, the Debtors believe that the offer and sale of New Common Stock and New Preferred Stock to the holders of Blackstone Debt Claims satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

**B.     Subsequent Transfers Of New Common Stock and New Preferred Stock**

      The New Common Stock and the New Preferred Stock to be issued pursuant to the Plan may (except as may be limited under any shareholder or other contractual agreement) be freely transferred by most recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the New Common Stock and the New Preferred Stock are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities. Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

      (i)     persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

(ii)    persons who offer to sell securities offered under a plan for the holders of such securities;

(iii)    persons who offer to buy such securities from the holders of such securities, if the offer to buy is:

    (A)    with a view to distributing such securities; and

    (B)    under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

(iv)    a person who is an "issuer" with respect to the securities as the term "issuer" is defined in section 2(11) of the Securities Act.

Under section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.

To the extent that persons who receive New Common Stock and the New Preferred Stock pursuant to the Plan are deemed to be "underwriters," resales by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Persons deemed to be underwriters may, however, be permitted to sell such New Common Stock or New Preferred Stock without registration pursuant to the provisions of Rule 144 under the Securities Act. These rules may permit the public sale of securities received by "underwriters" if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Common Stock and the New Preferred Stock or other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors and the Committee express no view as to whether any particular person receiving New Common Stock and New Preferred Stock or other securities under the Plan would be an "underwriter" with respect to such New Common Stock, New Preferred Stock, or other securities.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. The Debtors recommend that potential recipients of the New Common Stock and the New Preferred Stock consult their own counsel concerning whether they may freely trade New Common Stock and New Preferred Stock.

XIII.

**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES**

The following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan. This discussion is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), as in effect on the date of this Disclosure Statement and on U.S. Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, as well as judicial and administrative interpretations thereof available on or before such date. All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences described below. There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below, and no ruling from the IRS has been or will be sought with respect to any issues which may arise under the Plan.

The following summary is for general information only and discusses certain U.S. federal income tax consequences of the Plan to the Debtors, the "U.S. Holders" of Allowed Claims or Equity Interests and the "U.S. Holders" of New Common Stock, New Preferred Stock (sometimes referred to together as "Stock"), or the New Unsecured Notes or any debt instruments issued in respect of the Amended and Restated H-I Notes or the Amended and Restated H-II Facility (sometimes referred to together as "Notes") who receive such Stock or Notes as a result of the Plan. For purposes of this summary, a "U.S. Holder" is a beneficial owner of Stock or Notes that, for U.S. federal income tax purposes, is: (a) a citizen or resident of the United States; (b) a partnership or corporation created or organized in or under the laws of the United States or any state thereof (including the District of Columbia); (c) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (d) a trust if such trust validly elects to be treated as a United States person for U.S. federal income tax purposes, or if (I) a court within the United States is able to exercise primary supervision over its administration and (II) one or more United States persons have the authority to control all of the substantial decisions of such trust. This summary does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder. The tax treatment of a U.S. Holder of Allowed Claims, Equity Interests, Stock or Notes, as the case may be, may vary depending upon such holder's particular situation. The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtors and the U.S. Holders of Allowed Claims, Equity Interests, Stock or Notes. This summary does not address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an equity interest or a security in a Debtor as a position in a "straddle" or as part of a "hedging," "conversion" or "integrated" transaction for U.S. federal income tax purposes, persons that have a "functional currency" other than the U.S. dollar, persons who acquired an equity interest or a security in a Debtor in connection with the performance of services and persons who are not United States persons (as defined in the Tax Code).

If a partnership (or any other entity treated as a partnership for U.S. federal income tax purposes) holds Allowed Claims, Equity Interests, Stock or Notes, the tax treatment of a partner in such partnership generally will depend on the status of the partner and the

activities of the partnership.  Any such partner should consult its tax advisor as to its tax consequences.

EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.  EACH HOLDER OF STOCK AND NOTES SHOULD CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE RECEIPT, OWNERSHIP AND DISPOSITION OF SUCH STOCK OR NOTES.

## INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE

PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR 230, WE HEREBY INFORM YOU THAT THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO U.S. FEDERAL TAX ISSUES WAS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAYBE IMPOSED ON THE TAXPAYER UNDER THE U.S. INTERNAL REVENUE CODE.  THIS DESCRIPTION IS LIMITED TO THE U.S. FEDERAL TAX ISSUES DESCRIBED HEREIN.  IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE U.S. FEDERAL TAX TREATMENT OF THE MATTER THAT IS THE SUBJECT OF THE DESCRIPTION NOTED HEREIN, AND THIS DESCRIPTION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES.  TAXPAYERS SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**A.      U.S. Federal Income Tax Consequences to the Debtors.**

The Debtors file consolidated U.S. federal income tax returns which take into account the income and losses of all of the Debtors (some of which are treated as partnerships or disregarded entities for U.S. federal income tax purposes).  The Debtors' consolidated net operating loss carryforwards ("NOLs") for U.S. federal income tax purposes were approximately $25 million as of December 31, 2007 and are projected to be approximately $28.5 million as of the end of 2008.

As discussed below, in connection with the implementation of the Plan, the amount of the Debtors' NOLs may be reduced, restricted or eliminated and therefore the Debtors' utilization of any remaining NOLs and certain other tax attributes may be limited following the Effective Date.

(a)      **Cancellation of Debt Income.**

It appears that pursuant to the terms of the Plan, no material cancellation of debt ("COD") income will be realized by the Debtors, except to the extent a holder of Class 5 – General Unsecured Claims opts to receive a Cash payment in amount equal to 70% of such

holder's Allowed Claim rather than a New Unsecured Note with a principal amount equal to 100% of such holder's Allowed Claim.  Debtors generally realize "COD" income to the extent a creditor receives in discharge of its claim, an amount of consideration in respect of such claim that is less than the amount of the claim, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income (as in the case where the payment of the cancelled debt would have given rise to a tax deduction.  The amount of consideration paid to a creditor generally would equal the amount of cash, the fair market value of property (including fair market value of any stock under Section 108(e)(8) of the Tax Code), and/or the issue price of any new debt instrument issued to such creditor (under Section 108(e)(10) of the Tax Code).  The issue price of such new debt instrument issued to the creditor is determined under either Section 1273 or 1274 of the Tax Code.  Generally, these provisions treat the fair market value of a publicly-traded debt instrument as its issue price and the stated principal amount of any other debt instrument as its issue price if its terms provide for adequate stated interest.

When the discharge of indebtedness occurs in a proceeding under the Bankruptcy Code, the reorganized debtors are able to exclude any COD income from gross income.  As a consequence of this exclusion (the "Bankruptcy Exclusion"), however, such reorganized debtors must reduce certain tax attributes, such as NOLs, tax credits and tax basis in assets, to the extent COD income is excluded under the Bankruptcy Exclusion.

The Plan provides for the payment of Allowed Claims through a combination of reinstatement of claims, payment in Cash and by the issuance of Stock or Notes.  In particular, the Plan provides for the payment of the Allowed Claims of (i) Class 2 – H-I Lender Claims with amendment and restatement of the Original H-I Notes, (ii) Class 3 –H-II Lender Claims with a *pro rata* beneficial interest in the Amended and Restated H-II Facility, (iii) Class 4 – Other Secured Claims with reinstatement of Other Secured Claims, (iv) Class 5 – General Unsecured Claims with a Cash payment in an amount equal to 70% of the Allowed Claim or a New Unsecured Note with a principal amount equal to 100% of the Allowed Claim, (v) Class 6 – Blackstone Debt Claims with a combination of New Preferred Stock and New Common Stock, (vi) Class 10 – Heartland Common Stock Interests with a conversion to New Class B Common Stock, and (vii) Class 13 – Convenience Claims with Cash.  The Committee and the Debtors expect, however, that holders of Claims entitled to distributions under the Plan generally will receive an amount of consideration that should equal the total amount of their Allowed Claims (including accrued but unpaid interest), except to the extent a holder of Class 5 – General Unsecured Claims opts to receive Cash.  Accordingly, it is expected that the Debtors should recognize a limited amount of COD income, if any, as a result of the Plan.

(b)     **Accrued Interest.**

To the extent that there exists accrued but unpaid interest on the indebtedness owing to holders of Allowed Claims and to the extent that such accrued but unpaid interest has not been deducted previously by a Debtor, portions of payments made in consideration for the indebtedness underlying such Allowed Claims that are allocable to such accrued but unpaid interest should be deductible by such Debtor.  Any such interest that is not paid will not be deductible by such Debtor and will not give rise to COD income.

To the extent that a Debtor has previously taken a deduction for accrued but unpaid interest, any amounts so deducted that are paid will not give rise to any tax consequences to such Debtor.  If such amounts are not paid, they will give rise to COD income that would be excluded from gross income pursuant to the Bankruptcy Exclusion.  As a result, the Debtor would be required to reduce its tax attributes to the extent of such interest previously deducted and not paid.

(c)  **Utilization of Debtors' Net Operating Loss Carryforwards.**

a. *Limitation on NOLs and Other Tax Attributes.*

Following the implementation of the Plan, any remaining NOLs, tax credit carryforwards, losses or deductions that are "built-in" (i.e., economically accrued but unrecognized) and possibly, certain other tax attributes of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") may be subject to an annual limitation under Section 382 of the Tax Code if there is an "ownership change" of the Debtors (unless a special bankruptcy exception applies, as discussed in *Special Bankruptcy Exceptions" below).* In general, an ownership change occurs when the percentage of a corporation's stock owned by certain "5 percent shareholders" increases by more than 50 percentage points in the aggregate over the lowest percentage owned by them at any time during the applicable "testing period" (generally, the shorter of (a) the 36-month period preceding the testing date or (b) the period of time since the most recent ownership change of the corporation).

Pursuant to the Plan, the Debtors will be issuing New Common Stock and New Preferred Stock to Quad-C in connection with the Quad-C Contribution and will be issuing New Common Stock and New Preferred Stock to the holders of Blackstone Debt Claims.  As a result, Quad-C's ownership will be reduced from approximately 75% to no less than 51%, subject to a management set aside, and the remaining ownership interests in Debtors will be held by the holders of Blackstone Debt Claims.  Although the conclusion is not certain, the Debtors do not expect that such changes in ownership percentages will constitute an "ownership change" under Section 382 of the Tax Code.  The uncertainty exists because it is difficult to ascertain complete information about direct or indirect investors in Quad-C and it is difficult to value stock that has different voting rights.  There is particular uncertainty because changes in ownership of Quad-C and its direct and indirect owners must be taken into account and such changes are not within the Debtors' control (nor are they something about which the Debtors will have actual knowledge). Consequently, it is not certain that the annual limitation of section 382 will not apply to the Debtors.

b. *General Section 382 Annual Limitation.*

In general, the amount of the annual limitation to which a loss corporation (or a loss consolidated group) that undergoes an ownership change would be subject is equal to the product of (i) the fair market value of the stock of the loss corporation immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (currently 4.94% in November 2008).  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  However, the annual limitation may be further reduced if the loss

corporation (or the loss consolidated group) (i) does not continue its historic business or uses a significant portion of its assets in a new business for two years after the ownership change or (ii) undergoes a second ownership change.  In addition, if a loss corporation (or loss consolidated group or subgroup) has a "net unrealized built-in loss" beyond a certain minimum amount immediately before an ownership change, then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as a Pre-Change Loss and will be subject to the annual limitation.  Conversely, if the loss corporation (or loss consolidated group) has a net unrealized built-in gain immediately before an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized.  Although the rules applicable to net unrealized built-in losses generally apply to consolidated groups on a consolidated basis, special rules apply to a corporation that joins the consolidated group within five years prior to the ownership change.

In general, a loss corporation's (or loss consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of: (i) $10,000,000, or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.  It is anticipated that the Debtors' net unrealized loss will exceed this minimum threshold.

c. *Special Bankruptcy Exceptions.*

Even if the Debtors were to undergo an "ownership change", special bankruptcy exceptions to the Section 382 annual limitation may be available.  Section 382(l)(5) of the Tax Code provides an exception (the "Section 382(l)(5) Exception") where the pre-bankruptcy equity holders and the so-called "old and cold creditors" of a company in bankruptcy receiving stock of the company in respect of their claims, own at least 50% of the vote and value of the stock of the reorganized debtor pursuant to a confirmed Chapter 11 Plan.  If the Debtors qualify for the Section 382(1)(5) Exception, the annual limitation will not apply to the Debtors' use of its Pre-Change Losses.  However, if the Debtors do not qualify for the Section 382(l)(5) Exception, an additional ownership change within two years could result in the Debtors' NOLs being reduced to zero.  It is unclear whether the Debtors would qualify for the Section 382(l)(5) Exception and if they do qualify, whether they would elect for the Section 382(l)(5) Exception not to apply.  If the Debtors qualify for the Section 382(l)(5) exception and do not elect out of such exception, the Debtors' Pre-Change Losses would be reduced by recomputing such Losses as if no deduction were allowable for the interest paid or accrued by the Debtors on indebtedness that was converted into stock pursuant to the Plan during (i) the three taxable years preceding the taxable year in which the ownership change occurs and (ii) the part of the taxable year during which the ownership change occurs that precedes the date of such change.

If the Debtors do not qualify for the Section 382(1)(5) Exception or if the Debtors elect out of Section 382(l)(5), then the exception under Section 382(l)(6) of the Tax Code (the "382(l)(6) Exception") would be available.  Under the 382(l)(6) Exception, a corporation in bankruptcy that undergoes an "ownership change" calculates its annual limitation under Section 382 by taking into account the increase in equity value of the old loss corporation resulting from any surrender or cancellation of creditors' claims pursuant to the Plan.

**B.      Certain U.S. Federal Income Tax Consequences to the Holders of Allowed Claims that are Paid in Cash in Full.**

Pursuant to the Plan, holders of Class 5 – General Unsecured Claims and Class 13 – Convenience Claims may receive solely Cash in full satisfaction of their Allowed Claims.

A holder who receives Cash in exchange for its Allowed Claim pursuant to the Plan will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of Cash received in exchange for its Allowed Claim, and (ii) the holder's adjusted tax basis in its Allowed Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Allowed Claim in such holder's hands, whether the Allowed Claim constitutes a capital asset in the hands of the holder, whether the Allowed Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Allowed Claim.  To the extent that any amount received by a holder of an Allowed Claim is attributable to accrued interest, such amount should be taxable to the holder as interest income.  Conversely, a holder of an Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Allowed Claims was previously included in the holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

**C.      U.S. Federal Income Tax Consequences to Holders of Allowed Claims that are Paid in Full Using Consideration other than Solely Cash.**

Pursuant to the Plan, holders of Class 2 – H-I Lender Secured Claims may receive an Amended and Restated H-I Note, holders of Class 3 – H-II Lender Claims may receive a *pro rata* beneficial interest in the Amended and Restated H-II Facility, holders of Class 4 – Other Secured Claims may have Other Secured Claims reinstated, holders of Class 5 – General Unsecured Claims may receive New Unsecured Notes, and holders of Class 6 – Blackstone Debt Claims will receive a combination of New Preferred Stock and New Common Stock.

(a)      **In General**

The U.S. federal income tax consequences to holders of Allowed Claims that are not paid in full solely in Cash under the Plan may vary depending upon, among other things: (i) the type of consideration received by the holder in exchange for its Allowed Claim or Equity Interest; (ii) for Allowed Claims, the nature of the indebtedness owing to the holder; (iii) whether the holder has previously claimed a bad debt or worthless security deduction in respect of such holder's Allowed Claim or Equity Interest; and (iv) whether such Allowed Claim or Equity Interest constitutes a "security" for purposes of the reorganization provisions of the Tax Code (as described below).  For tax purposes, the modification of a claim may represent an exchange of the claim for a new claim, even though no actual transfer takes place.

(b)    **Consequences of Exchanging Allowed Claims for Stock**

If a holder's Allowed Claims are treated as "securities" (as described below), the exchange of such Allowed Claims for Stock and Cash (if any) should be treated as a recapitalization and therefore as a tax-free reorganization under the Tax Code.  If a holder's Allowed Claims are not treated as "securities" for federal income tax purposes, a holder should be treated as exchanging its Allowed Claims for Stock and Cash (if any) in a fully taxable exchange.

Whether the indebtedness underlying the creditors' Allowed Claims constitutes "securities" for purposes of the reorganization provisions of the Tax Code is not determined by definition in the Tax Code.  The determination of whether an Allowed Claim constitutes a "security" depends upon the nature of the indebtedness or obligation.  Important factors to be considered include, among other things, the length of time to maturity, the degree of continuing interest in the issuer, and the purpose of the borrowing.  Generally, corporate debt instruments that mature within five years of issuance are not considered "securities" and corporate debt instruments that mature ten years or more from the time of issuance are considered "securities".  Allowed Claims for accrued interest generally are not considered "securities".  Holders of Allowed Claims should consult their own tax advisors regarding whether their Allowed Claims, and consideration received in exchange therefor, constitute "securities" for these purposes.

If a holder's Allowed Claims are treated as "securities" for U.S. federal income tax purposes and thus the exchange of a holder's Allowed Claims for stock qualifies as a tax-free reorganization, (i) a holder will not recognize loss with respect to the exchange and (ii) if there is gain (i.e. the fair market value of the consideration received exceeds the tax basis of the property exchanged) a holder will recognize such gain up to the value of any property (other than Stock) and any Cash received (except to the extent such property or Cash is paying accrued but unpaid interest on the Allowed Claims).  A holder receiving solely Stock should obtain a tax basis in such Stock equal to the tax basis of the Allowed Claims exchanged therefor, and allocated according to the fair market value of such Stock as of the Effective Date.  A holder should have a holding period for the Stock that includes the holding period for the pre-petition Allowed Claims.

If a holder's Allowed Claims are not treated as "securities" for U.S. federal income tax purposes, a holder should be treated as exchanging its Allowed Claims for Stock and Cash (if any) in a fully taxable exchange.  In that case, the holder should recognize gain or loss equal to the difference between (i) the fair market value of the Stock and Cash (if any) received as of the Effective Date that is not allocable to accrued interest, and (ii) the holder's tax basis in the Allowed Claims surrendered by the holder.  Such gain or loss should be capital in nature and should be long-term capital gain or loss if the Allowed Claims were held for more than one year by the holder.  To the extent that a portion of the Stock and Cash (if any) received in the exchange is allocable to accrued interest, the holder may recognize ordinary income.  A holder's tax basis in the Stock should be equal to the fair market value of the Stock as of the Effective Date.  A holder's holding period for the Stock should begin on the day following the Effective Date.

(c)    **Consequences of Modifying Existing Debt Instruments**

Where a creditor's Allowed Claim is a debt instrument that is exchanged for a New Unsecured Note ,an Amended and Restated H-I Note or an interest in the Amended and Restated H-II Facility, it may be a modification of a debt instrument that, if significant, will be treated as a "deemed exchange" of such Allowed Claims (an "old" debt instrument) for the New Unsecured Note , Amended and Restated H-I Note or such interest in the Amended and Restated H-II Facility (a "new" debt instrument) under the Treasury Regulations to Section 1001 of the Tax Code.  Such a "deemed exchange" would be a taxable event, unless a non-recognition provision of the Tax Code were to apply.  If the debt modification does not constitute a significant modification of the old debt instrument, the modification would not result in a "deemed exchange" of a holder's old debt instrument for new debt instrument, and therefore a holder would not recognize gain or loss as a result of a deemed exchange.

If the modification constitutes a significant modification, the resulting "deemed exchange" of a holder's old debt instrument for new debt instrument may constitute either (i) a tax-free recapitalization or (ii) a taxable exchange.  The exchange is a tax-free recapitalization if both the old debt instrument and the new debt instruments are treated as "securities" for U.S. federal income tax purposes (see discussion above as to what constitutes a "security").  If the deemed exchange is a tax-free recapitalization, a holder will not recognize a loss and a holder will only recognize a gain to the extent that the principal amount of the new debt instrument exceeds the principal amount of the old debt instrument.  The holder will have initial tax basis in the new debt instruments received in the deemed exchange equal to the holder's tax basis in the old debt instrument deemed exchanged therefor immediately prior to the deemed exchange, and the holder's holding period for the new debt instrument will include the period during which the holder held the old debt instrument deemed surrendered in the deemed exchange.

If the deemed exchange is not treated as a tax-free recapitalization, a holder generally will recognize gain or loss on such deemed exchange in an amount equal to the difference, if any, between (i) the issue price of the new debt instruments as determined under Section 1273 or 1274 and (ii) the holder's adjusted tax basis in the old debt instruments.  Any gain recognized in a taxable exchange generally will be capital gain and will be long-term capital gain if, at the time of the deemed exchange, the old debt instruments have been held for more than one year.  Such gain or loss should generally be capital in nature and should be long-term capital gain or loss if, at the time of the deemed exchange, the old debt instruments have been held for more than one year.  However, holders may not be allowed to recognize currently any loss resulting from the deemed exchange if the deemed exchange is treated as involving 'substantially identical' properties and thus as a "wash sale" within the meaning of Section 1091 of the Tax Code.

The application of the Treasury Regulations to Section 1001 of the Tax Code to the debt modification and the U.S. federal income tax consequences of the resulting deemed exchange is complex.  Creditors are urged to consult their own tax advisors regarding the tax consequences of the exchange of their Allowed Claims for Notes.

(d)  **Reinstatement of Existing Debt Instruments**

Holders generally should not recognize gain, loss or other taxable income upon the reinstatement of their Allowed Claims under the Plan, provided the reinstatement is not a substantial modification of the terms of the Allowed Claim.  Taxable income, however, may be recognized by those holders if they are considered to receive interest, damages or other income in connection with the reinstatement, or if the reinstatement is considered for tax purposes to involve a significant modification of the Allowed Claim.  A reinstatement generally will constitute a significant modification of the Allowed Claim if, based on all of the facts and circumstances, the legal rights and obligations under the reinstated obligation differ from those under the original obligation to a degree that is economically significant.  If a reinstatement of the Allowed Claim constitutes a significant modification, such reinstatement will be treated as an exchange for U.S. federal income tax purposes.  If such an exchange does not qualify as a tax-free reorganization, the holder of the Allowed Claim would have to recognize gain or loss in an amount equal to the difference between the amount realized on such exchange (the issue price of the new debt instrument) and such holder's adjusted tax basis in its Allowed Claim.

(e)  **Accrued but Unpaid Interest**

In general, to the extent a holder of a debt instrument receives cash or property in satisfaction of interest accrued during the holding period of such instrument, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, such holder may recognize a deductible loss to the extent that any accrued interest claimed or amortized original issue discount was previously included in its gross income and is not paid in full.  The extent to which cash or property received by a holder of a debt instrument will be attributable to accrued but unpaid interest is unclear.  Pursuant to the Plan, all distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, and thereafter to accrued but unpaid interest, if any.  Certain legislative history indicates that an allocation of consideration between principal and interest provided in a bankruptcy plan of reorganization generally is binding for U.S. federal income tax purposes.  However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Each holder of an Allowed Claim is urged to consult its tax advisor regarding the inclusion in income of amounts received in satisfaction of accrued but unpaid interest, the allocation of consideration between principal and interest, and the deductibility of previously included unpaid interest and Original Issue Discount for tax purposes.

(f)  **Market Discount**

If a holder of an Allowed Claim purchased the underlying security or debt obligation at a price less than its issue price, the difference would constitute "market discount" for U.S. federal income tax purposes.  Any gain recognized by a holder on the exchange of its Allowed Claim on the Effective Date should be treated as ordinary income to the extent of any market discount accrued on the underlying securities or debt obligation by the holder on or prior to the date of the exchange.  Any additional accrued but unrecognized market discount should carry over to any "securities" (as described above) or debt obligation received in a tax-free

exchange pursuant to the Plan, and should be allocated among such securities or debt obligation based upon their relative fair market values as of the Effective Date. Any gain recognized by such holder on a subsequent disposition of such securities or debt obligation received under the Plan may be treated as ordinary income to the extent of such accrued but unrecognized market discount.

**D.      Consequences to Pre-Bankruptcy Holders of Equity Interests**

Pursuant to the Plan, each holder of an Allowed Heartland Common Stock Interest shall, on the Effective Date, receive one (1) share of New Class B Common Stock on account of each one thousand (1,000) shares of Allowed Heartland Common Stock Interests currently outstanding. Upon such distribution, all Heartland Common Stock Interests shall be canceled. Any fractional shares of New Class B Common Stock shall be rounded up so that the holder of the fractional Allowed Heartland Common Stock Interest receives one  (1) additional whole share of New Class B Common Stock on account of the fractional share the holder would have received. A holder of Heartland Common Stock Interests will not recognize gain or loss on the conversion of such Interests into New Class B Common Stock. A holder's adjusted basis in the New Class B Common Stock received will be the same as its adjusted basis in the Heartland Common Stock Interest exchanged therefor. A holder's holding period in the New Class B Common Stock received will include the holding period of the Heartland Common Stock Interest exchanged therefor. Upon a subsequent sale or disposition of the New Class B Common Stock, a holder will recognize capital gain or loss equal to the difference between the amount realized and the holder's adjusted basis in the New Class B Common Stock.

**E.      Consequences of Ownership of Stock and Notes Issued Pursuant to the Plan.**

The following is a description of the principal U.S. federal income tax consequences that may be relevant with respect to the ownership and disposition of the Stock and the Notes. This discussion addresses only the U.S. federal income tax considerations of U.S. Holders that will receive Stock or Notes under the Plan and that will hold such Stock or Notes as capital assets.

(a)      **Consequences of Ownership of Stock Issued Pursuant to the Plan.**

*a.      Distributions.*

The gross amount of any distribution of Cash or property made to a U.S. Holder with respect to the Stock generally will be includible in gross income by such holder as dividend income to the extent such distributions are paid out of the current or accumulated earnings and profits of Debtors as determined under U.S. federal income tax principles. Dividends received by corporations may qualify for a dividends-received-deduction if certain holding period and taxable income requirements are satisfied, but such corporate holders may be subject to "extraordinary dividend" provisions of the Tax Code. Dividends received by non-corporate holders in taxable years beginning before January 1, 2011 may qualify for a reduced rate of taxation if certain holding period and other requirements are met.

A distribution in excess of Debtors' current and accumulated earnings and profits will first be treated as a return of capital to the extent of the holder's adjusted basis in the Stock and will be applied against and reduce such basis.  To the extent that such distribution exceeds the holder's adjusted basis in its Stock, the distribution will be treated as capital gain, which will be treated as long-term capital gain if such holder's holding period in its Stock exceeds one year as of the date of the distribution.  Long term capital gains may be eligible for reduced rates of taxation.

          b.       *Sale or Exchange of Stock.*

For U.S. federal income tax purposes, a holder generally will recognize capital gain or loss on the sale, exchange, or other taxable disposition of any of its Stock in an amount equal to the difference, if any, between the amount realized for the Stock and the holder's adjusted tax basis in the Stock.  Capital gains of non-corporate holders derived with respect to a sale, exchange, or other disposition of Stock held for more than one year may be eligible for reduced rates of taxation.  The deductibility of capital losses is subject to limitations.

    (b)    **Consequences of Ownership of Notes Issued Pursuant to the Plan.**

          a.       *Interest*

It is expected that the Notes will not be issued with original issue discount.  If you are a U.S. Holder of Notes, interest paid to you on a Note will be includible in your gross income as ordinary interest income in accordance with your usual method of tax accounting.

          b.       *Sale, Exchange or Retirement of Notes*

If you are a U.S. Holder of Notes, upon the sale, exchange or retirement of a Note you will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or retirement, other than accrued but unpaid interest which will be taxable as such, and your adjusted tax basis in the Note.  Any such gain or loss will be capital gain or loss.  Capital gains of non-corporate holders derived with respect to a sale, exchange, or other disposition of Notes held for more than one year may be eligible for reduced rates of taxation.  The deductibility of capital losses is subject to limitations.

## F.     Backup Withholding Tax and Information Reporting Requirements

U.S. federal backup withholding tax and information reporting requirements generally apply to certain payments to certain non-corporate holders of the Debtors' stock or debt obligations regardless of whether such stock or debt obligations existed prior to the Plan or were issued pursuant to the Plan.  Information reporting generally will apply to payments under the Plan and to payments of dividends on, interest on, and proceeds from the sale or redemption of such stock or debt obligations made within the United States to a holder of the Debtors' stock or debt obligations.  A payor will be required to withhold backup withholding tax from any payments made under the Plan, and payments of dividends on, interest on or the proceeds from the sale or redemption of, the debtors' stock or debt obligations within the United States to a holder, other than an exempt recipient, if such holder fails to furnish its correct taxpayer

identification number or otherwise fails to comply with, or establish an exemption from, such backup withholding tax requirements.  The backup withholding tax rate is currently 28 percent.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

THE ABOVE SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL, PURPOSES ONLY.  ALL HOLDERS OF ALLOWED CLAIMS, EQUITY INTERESTS, STOCK OR NOTES ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

XIV.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors and the Committee have evaluated numerous alternatives to the Plan, including, without limitation, the sale of the Debtors as a going concern, either as an entirety or on limited bases and the liquidation of the Debtors.  After studying these alternatives, the Debtors and the Committee have concluded that the Plan is the best alternative and will maximize recoveries of holders of Claims and Equity Interests.  The following discussion provides a summary of the analysis supporting the conclusion that a liquidation of the Debtors or an alternative plan of reorganization for the Debtors will not provide higher value to holders of Claims and Equity Interests.

## A.      Liquidation Under Chapter 7 of the Bankruptcy Code

If no plan of reorganization can be confirmed, the Chapter 11 Cases of the Debtors may be converted to cases under chapter 7, in which event a trustee would be elected or appointed to liquidate the properties and interests in property of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The Debtors and the Committee believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (1) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee for bankruptcy and professional advisors to such trustee; (2) the erosion in value of assets in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; (3) the adverse effects on the salability of business segments as a result of the likely departure of key employees and the loss of customers; and (4) the substantial increases in claims which would have to be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases.  Accordingly, the Debtors and the Committee have determined that confirmation of the Plan will provide each holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7.

Section 1129(a)(7) of the Bankruptcy Code provides that with respect to impaired classes, each holder of a claim or interest of such class must receive or retain under the plan on

account of such claim or interest property of a value, as of the effective date of the plan, that is
not less than the amount such holder would so receive or retain if the debtor liquidated under
chapter 7 of this title on such date.  As the Plan provides for a full recovery to holders of Claims
and unimpaired holders of Equity Interests, the Plan satisfies section 1129(a)(7).

**B.      Alternative Plans of Reorganization**

If the Plan is not confirmed, any other party in interest could undertake to
formulate a different plan of reorganization.  Such a plan of reorganization might involve either
(x) a reorganization and continuation of the business of the Debtors, (y) the sale of the Debtors as
a going concern or (z) an orderly liquidation of the properties and interests in property of the
Debtors.  With respect to an alternative plan of reorganization, the Debtors and the Committee
have examined various other alternatives in connection with the process involved in the
formulation and development of the Plan.  The Debtors and the Committee believe that the Plan,
as described herein, enables holders of Claims and Equity Interests to realize the best recoveries
under the present circumstances.  In a liquidation of the Debtors under chapter 11, the properties
and interests in property would be sold in a more orderly fashion and over a more extended
period of time than in a liquidation under chapter 7, probably resulting in marginally greater
recoveries.  Further, if a trustee were not appointed, since one is not required in a chapter 11
case, the expenses for professional fees would most likely be lower than in a chapter 7 case.
However, although preferable to a chapter 7 liquidation, the Debtors and the Committee believe
that a liquidation under chapter 11 for the Debtors is a much less attractive alternative to holders
of Claims and Equity Interests than the Plan because the recovery realized by holders of Claims
and Equity Interests under the Plan is likely to be greater than the recovery under a chapter 11
liquidation.

## XV.

## CONCLUSION

The Debtors and the Committee believe that the Plan is in the best interest of all holders of Claims and Equity Interests, and urge all holders of impaired Claims and Equity Interests in the Debtors to vote to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the instructions accompanying the Disclosure Statement.

Dated: December 23, 2008

Respectfully submitted,

**The Official Committee of Unsecured Creditors of Heartland Automotive Holdings, Inc., et al.**

By:_____
Name: Salvatore Gentile
Title:  Committee Co-chair

**Heartland Automotive Holdings, Inc.**

By:_____
Name: Eric F. Glover
Title:  President and Chief Executive Officer

**HAS Holdings, Inc.,**

By:_____
Name: Eric F. Glover
Title:  President and Chief Executive Officer

**Heartland Automotive Services, Inc.**

By:_____
Name: Eric F. Glover
Title:  President and Chief Executive Officer

**Heartland Automotive Services of Austin, Inc.**

By:_____
Name: Eric F. Glover
Title:  President and Chief Executive Officer

## XV.

## CONCLUSION

The Debtors and the Committee believe that the Plan is in the best interest of all holders of Claims and Equity Interests, and urge all holders of impaired Claims and Equity Interests in the Debtors to vote to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the instructions accompanying the Disclosure Statement.

Dated: December 23, 2008

Respectfully submitted,

**The Official Committee of Unsecured Creditors of Heartland Automotive Holdings, Inc., et al.**

By:_____
Name: Salvatore Gentile
Title:  Committee Co-chair

By:_____
Name: J Greg Pritchard
Title:  Agent for Products Plus

**Heartland Automotive Holdings, Inc.**

By:_____
Name: Eric F. Glover
Title:  President and Chief Executive Officer

**HAS Holdings, Inc.,**

By:_____
Name: Eric F. Glover
Title:  President and Chief Executive Officer

**Heartland Automotive Services, Inc.**

By:_____
Name: Eric F. Glover
Title:  President and Chief Executive Officer

## XV.

### CONCLUSION

The Debtors and the Committee believe that the Plan is in the best interest of all holders of Claims and Equity Interests, and urge all holders of impaired Claims and Equity Interests in the Debtors to vote to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the instructions accompanying the Disclosure Statement.

Dated: December **23**, 2008

Respectfully submitted,

**The Official Committee of Unsecured Creditors
of Heartland Automotive Holdings, Inc., et al.**

By:_____
Name: Salvatore Gentile
Title:  Committee Co-chair

By:_____
Name:
Title:

**Heartland Automotive Holdings, Inc.**

By:_____
Name: Eric F. Glover
Title:  President and Chief Executive Officer

**HAS Holdings, Inc.**

By:_____
Name: Eric F. Glover
Title:  President and Chief Executive Officer

**Heartland Automotive Services, Inc.**

By:_____
Name: Eric F. Glover
Title:  President and Chief Executive Officer

**Heartland Automotive Services of Austin, Inc.**

By: _____

Name: Eric F. Glover

Title:  President and Chief Executive Officer

**Heartland Automotive Services II, Inc.**

By: _____

Name: Eric F. Glover

Title:  President and Chief Executive Officer

**Oil Express, Inc.**

By: _____

Name: Eric F. Glover

Title:  President and Chief Executive Officer

**Lube Pit, Inc.**

By: _____

Name: Eric F. Glover

Title:  President & Chief Executive Officer

**Lube Acquisition, Inc.**

By: _____

Name: Eric F. Glover

Title:  President & Chief Executive Officer

**A. Fanticola Companies, Inc.**

By: _____

Name: Eric F. Glover

Title:  President & Chief Executive Officer

**A.F.C. Northwest, Inc.**

By: _____

Name: Eric F. Glover

Title:  President & Chief Executive Officer

# SCHEDULE 1

# DEFINED TERMS

## GLOSSARY OF DEFINED TERMS

1.      "Cash Collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the Debtors' bankruptcy estate and an entity other than the Debtors' bankruptcy estate have an interest and includes the proceeds, products, offspring, rents, or profits of property subject to a security interest as provided in section 552 (b) of the Bankruptcy Code, whether existing before or after the commencement of the Chapter 11 Cases.

# SCHEDULE 2

## LIST OF DEBTORS

**HEARTLAND AUTOMOTIVE HOLDINGS, INC.,**
**HAS HOLDINGS, INC.,**
**HEARTLAND AUTOMOTIVE SERVICES, INC.,**
**HEARTLAND AUTOMOTIVE SERVICES II, INC.,**
**A. FANTICOLA COMPANIES, INC.,**
**A.F.C. NORTHWEST, INC.,**
**LUBE ACQUISITION, INC.,**
**OIL EXPRESS, INC.,**
**LUBE PIT, INC., and**
**HEARTLAND AUTOMOTIVE SERVICES OF AUSTIN, INC.**

# SCHEDULE 3

# ORIGINAL H-I NOTES

**Original H-I Notes**

| Lender or Loan Servicer | Loan Document |
|---|---|
| | |
| H-I Lender | Original H-I Notes |
| AMRESCO Commercial Finance, LLC, as loan servicer | Each of the Notes issued pursuant to, and as defined in, the Loan Agreement between Heartland Automotive Services, Inc and Atherton Capital Incorporated (Tranche A), dated as of March 25, 1998 as amended as of July 7, 1998 and February 28, 2002. |
| | Each of the Notes issued pursuant to, and as defined in, the Loan Agreement between Heartland Automotive Services, Inc and Atherton Capital Incorporated (Tranche B), dated as of March 25, 1998 as amended as of July 7, 1998 and February 28, 2002. |
| | Each of the Notes issued pursuant to, and as defined in, the Loan Agreement between Heartland Automotive Services, Inc and Atherton Capital Incorporated (Tranche C), dated as of March 25, 1998 as amended as of July 7, 1998 and February 28, 2002. |
| | Each of the Notes issued pursuant to, and as defined in, the Loan Agreement between Heartland Automotive Services, Inc and Atherton Capital Incorporated (Tranche D), dated as of March 25, 1998 as amended as of July 7, 1998 and February 28, 2002. |
| | Each of the Notes issued pursuant to, and as defined in, the Loan Agreement between Heartland Automotive Services, Inc and Atherton Capital Incorporated (Tranche E), dated as of March 25, 1998 as amended as of July 7, 1998 and February 28, 2002. |
| | Each of the Notes issued pursuant to, and as defined in, the Loan Agreement between Heartland Automotive Services, Inc and Atherton Capital Incorporated (Tranche F), dated as of March 25, 1998 as amended as of July 7, 1998 and February 28, 2002. |
| | Each of the Notes issued pursuant to, and as defined in, the Loan Agreement between Heartland Automotive Services, Inc and Atherton Capital Incorporated (Tranche G), dated as of March 25, 1998 as amended as of July 7, 1998 and February 28, 2002. |
| | Each of the Notes issued pursuant to, and as defined in, the Loan Agreement between Heartland Automotive Services, Inc and Atherton Capital Incorporated (Tranche H), dated as of March 25, 1998 as amended as of July 7, 1998 and February 28, 2002. |

| |
|---|
| Each of the Notes issued pursuant to, and as defined in, the Loan Agreement between BVJ Enterprises, Inc. and Atherton Capital Incorporated, dated as of July 28, 1998 (as amended as of February 28, 2002) with Heartland Automotive Services, Inc assuming all of the obligations and duties of the borrower, BVJ Enterprises, Inc., pursuant to a Loan Assumption Agreement dated January [  ], 2002  between Heartland Automotive Services, Inc, BVJ Enterprises, Inc. and Bankers Trust Company, as certificate trustee of the Atherton Intermediate Funding 1999-A Grantor Trust (successor in interest to the original lender, Atherton Capital Incorporated). |
| Each of the Assumed Notes issued pursuant to, and as defined in, the Agreement for Assumption of Loan between FoCo, Inc. as Assignor, Robert H. Fox Jr. as Assignor Guarantor, Heartland Automotive Services, Inc. as Assignee and Amresco Commercial Finance, Inc. as Lender, dated as of February 28, 2001, relating to various notes issued on July 7, 1997. |
| Each of the Notes issued pursuant to, and as defined in, the Loan Agreement between Heartland Automotive Services, Inc and Atherton Capital Incorporated (Tranche IL, LV, LK), dated as of August 18, 1998  as amended as of  February 28, 2002. |
| Each of the Notes issued pursuant to, and as defined in, the Loan Agreement between Heartland Automotive Services, Inc. and Atherton Capital Incorporated, dated January 11, 1999. (#29) |
| Each of the Notes issued pursuant to, and as defined in, the Loan Agreement between Heartland Automotive Services, Inc. and Atherton Capital Incorporated, dated January 11, 1999. (#2005) |
| Each of the Notes issued pursuant to, and as defined in, the Loan Agreement between Heartland Automotive Services, Inc. and Atherton Capital Incorporated, dated as of December 8, 1998  as amended as of  January 6, 1999 and February 28, 2002. |
| Each of the Notes issued pursuant to, and as defined in, the Loan Agreement between Heartland Automotive Services, Inc. and Atherton Capital Incorporated, dated as of February 10, 1999 as amended as of  February 10, 1999 and February 28, 2002. |

| H-I Lender | Original H-I Notes |
|---|---|
| Capmark Finance Inc., as servicer for LaSalle Bank National Association (f/k/a LaSalle National Bank), as Loan Pool Trustee for EMAC Owner Trust 1999-1, under that certain Loan Pool Pooling and Servicing Agreement dated March 26, 1999. | The Note issued pursuant to, and as defined in, the Loan Agreement between Enterprise Mortgage Acceptance Company, LLC  and Baromitor Petroleum Inc ("BPI") as borrower dated as of July 10, 1998, with Heartland Automotive Services of Austin, Inc assuming all of the obligations and duties of the borrower, Baromitor Petroleum Inc, pursuant to a General Assignment, Assumption and Modification Agreement dated as of March 31, 1999 between Heartland Automotive Services of Austin, Inc, Baromitor Petroleum Inc and EMAC-2, LLC. |

| H-I Lender | Original H-I Notes |
|---|---|
| CEF Funding II, L.L.C. and General Electric Capital Business Asset Funding Corporation of Connecticut | The Note issued pursuant to, and as defined in, the Loan Agreement between Heartland Automotive Services, Inc and Atherton Capital Incorporated (Tranche LNK), dated as of June 1, 2000 as amended as of  February 19, 2002. |
| | Each of the Notes issued pursuant to, and as defined in, the Loan Agreement between Heartland Automotive Services, Inc. and Atherton Capital Incorporated, dated as of March 30, 2001  as amended as of  February 28, 2002. |
| | Each of the Notes issued pursuant to, and as defined in, the Loan Agreement between Heartland Automotive Services, Inc. and Atherton Capital Incorporated, dated as of December 17, 1999  as amended on or around February 20, 2002. |

# SCHEDULE 4

## ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**Heartland Automotive Holdings, Inc. and its Affiliated Debtors**
**Schedule 4 to Disclosure Statement**
**List of Assumed Executory Contracts and Unexpired Leases**

| Contract Type | Contract Description | Creditor Name | Cure Cost |
|---|---|---|---|
| Executory Contract | Provide background checks to company for employment purposes | AbsoluteBackgrounds.com | $ 0 |
| Executory Contract | Advertising agreement | Access Development & Access VG, LLC | $ 0 |
| Executory Contract | Agreement to run a customer service hotline | ACCURATE COMMUNICATIONS | $ 5.93 |
| Insurance Policy | Insurance - Underground Storage Tank - California | ACE American | $ 0 |
| Executory Contract | Alarm and security services | ALARM DETECTION SYSTEMS, INC | $ 1,213.91 |
| Sublease | Sublease at Store 1348 | Alexander Tire | $ 0 |
| Executory Contract | Copier maintenance agreement - Los Angeles 107. S. Victory | ANDERSON BUSINESS TECHNOLOGY | $ 0 |
| Sublease | Sublease at Store 2070 | Arissa Espresso (Molly Flatten) | $ 0 |
| Sublease | Sublease at Store 2898 | B&J Tile & Stone | $ 0 |
| Executory Contract | Video Mystery Shops | BARE ASSOCIATES INC | $ 137,837.95 |
| Executory Contract | BBB membership for Eastern Washington, North Idaho & Montana | Better Business Bureau | $ 0 |
| Executory Contract | BBB membership - Western Washington (Oil Express, Inc.) | Better Business Bureau | $ 0 |
| Executory Contract | Maintenance of office equipment | BISHOP BUSINESS EQUIPMENT | $ 171.95 |
| Sublease | Sublease at Store 2898 | Bliss Nail Spa | $ 0 |
| Executory Contract | Employment agreement with Bob Kmiecik, General Counsel | Bob Kmiecik | $ 0 |
| Employment Agreement | Employment Agreement for Mike Boler, Vice President of MIS | Boler, Mike | $ 0 |
| Sublease | Sublease at Store 1261 | Bookworm Exchange | $ 0 |
| Executory Contract | Agreement to install and maintain a billboard | CBS OUTDOOR - REG 25 | $ 0 |
| Executory Contract | Amendment to Agreement for Preventative Maintenance Services for Automobiles and | CITY OF LINCOLN | $ 170.81 |
| Executory Contract | Maintenance service for city vehicles | City of Overland Park Kansas | $ 0 |
| Executory Contract | Agreement regarding a mail machine | CLARITUS INC | $ 44.54 |

| Contract Type | Contract Description | Creditor Name | Cure Cost |
|---|---|---|---|
| Employment Agreement | Employment Agreement for Vice President of Finance and Controller of the company | CLARK BRIAN D | $ 0 |
| Executory Contract | Copier maintenance agreement - Austin | DAHILL INDUSTRIES | $ 265.37 |
| Executory Contract | Copier maintenance agreement | Direct Copiers & Fax Co., Inc | $ 87.50 |
| Insurance Policy | Workers Compensation - CA | EMPLOYERS DIRECT INSURANCE CO | $ 0 |
| Executory Contract | Fleet Service Agreement | Enterprise d/b/a ELRAC Inc. | $ 0 |
| Executory Contract | Maintenance agreement - Austin state inspector | ENVIRONMENTAL SYSTEMS PRODUCTS | $ 76,843.18 |
| Executory Contract | Agreement for use and support of the CompVision Software License Agreement | ENVISION TECHNOLOGY SOLUTIONS | $ 0 |
| Storage Unit Lease | Lease for storage unit located at 5120 San Fernando Road; Glendale, CA 91204. | EXTRA SPACE STORAGE - GLENDALE | $ 0 |
| Sublease | Sublease at Store 1969 | EZ Take Out Burger | $ 0 |
| Insurance Policy | Flood Insurance - Lincoln, NE | FIDELITY NATIONAL PROPERTY | $ 0 |
| Insurance Policy | Flood Insurance - Des Plaines, MO | FIDELITY NATIONAL PROPERTY | $ 0 |
| Executory Contract | Agreement to be electronic payment and acquiring provider for Jiffy Lube | First Data Merchant Services Corporation | $ 0 |
| Employment Agreement | Employment Agreement for Vice President of Operations of the company | Chuck Gamm | $ 0 |
| Executory Contract | Contract for local telecommunications service | GRANITE TELECOMMUNICATIONS | $ 12,760.78 |
| Insurance Policy | Insurance - Crime | Great American | $ 0 |
| Sublease | Sublease at Store 2598 | Heart to Heart Espresso | $ 0 |
| Sublease | Sublease at Store 2758 | Huongs Expresso | $ 0 |
| Executory Contract | Agreement to provide concepts and materials for company wide marketing program. | IDEAL IMAGES INC | $ 133.75 |
| Insurance Policy | Insurance -Fiduciary | Illinois National | $ 0 |
| Insurance Policy | Insurance - Directors & Officers | Illinois National | $ 0 |
| Insurance Policy | Insurance - Employment Practices Liability | Illinois National | $ 0 |
| Executory Contract | Subscription to Sales Genie Online | INFOUSA | $ 0 |
| Employment Agreement | Employment Agreement for Vice President of Operations of the company | Steve Isom | $ 0 |

| Contract Type | Contract Description | Creditor Name | Cure Cost |
|---|---|---|---|
| Executory Contract | Fleet Agreement | Jackson County, Missouri - Purchasing Department | $ 21,054.18 |
| POS Lease | Point-of-sale hardware support agreement for each of Debtor's stores | Jiffy Lube International, Inc. | $ 0 |
| Franchise Agreement | Franchise Agreements for each of the Debtor's stores | JIFFY LUBE INTERNATIONAL, INC. FF | $ 0 |
| Employment Agreement | Employment Agreement for Executive Vice President and Secretary of the company | Richard Lange | $ 0 |
| Sublease | Sublease at Store 2668 | Luke Group - Jiffy Smog | $ 0 |
| Sublease | Sublease at Store 2030 | Luke Group - Jiffy Smog | $ 0 |
| Sublease | Sublease at Store 2867 | Luke Group - Jiffy Smog | $ 0 |
| Sublease | Sublease at Store 2665 | Luke Group - Jiffy Smog | $ 0 |
| Sublease | Sublease at Store 1967 | McCreary & Hoffman Car Wash | $ 0 |
| Executory Contract | Copier maintenance agreement - Minnesota | METRO SALES INC. | $ 0 |
| Executory Contract | Agreement to represent Heartland before the Assessor of Cook County and additional appeals in seeking reduction of proposed 2006-2008 assessed value and to seek tax refunds | MICHAEL D. GERTNER, LTD | $ 2,610.46 |
| Storage Unit Lease | Lease for storage unit located at 4500 E Speedway Blvd #34; Tucson, AZ 85712. | MIDWAY RV & SELF STORAGE | $ 110.17 |
| Executory Contract | Benefits Third Part Administrator | MIDWEST SECURITY ADMINISTRATOR | $ 0 |
| Executory Contract | Contact to use a secure mailbox near the property | MIELKE DEVELOPMENT LLC | $ 90.45 |
| Storage Unit Lease | Leases for storage units located at 10607 Bedford Avenue; Omaha, NE 68137. | MILT'S MINI STORAGE | $ 28.59 |
| Storage Unit Lease | Leases for storage units located at 11425 P Street; Omaha, NE 68137. | MILT'S MINI STORAGE | $ 148.39 |
| Executory Contract | Master Amendment to the terms and conditions of various off-site storage agreements | MOBILE MINI INC | $ 0 |
| Executory Contract | Master Amendment to the terms and conditions of various off-site storage agreements. Executed on behalf of the Heartland Automotive Services and the Jiffy Lube Oil Center at 2911 Poplar in Memphis, TN | MOBILE MINI INC | $ 1,202.35 |
| Tenant Sublease | The Debtor has entered into 3 subleases with Monsoon where it subleases certain space to Monsoon for their carwashes | MONSOON CARWASH | $ 8,994.16 |

| Contract Type | Contract Description | Creditor Name | Cure Cost |
|---|---|---|---|
| Executory Contract | Agreement for EZ to market maintenance service for Jiffy Lube | myEZ Car Care LLC | $ 0 |
| Insurance Policy | New York Disability Insurance | NATIONAL BENEFIT LIFE INS CO | $ 0 |
| Sublease | Sublease at Store 2667 | North Tire (Llantera del Norte) | $ 0 |
| Executory Contract | Agreement for Jiffy Lube to work exclusively with NovaSource in creating new facilities in the selected market | NOVASOURCE DEVELOPMENT | $ 0 |
| Executory Contract | Agreement to provide promotional materials and do direct marketing. Executed on behalf of Oil Express, Inc. dba Jiffy Lube | Passport Unlimited | $ 0 |
| Storage Unit Lease | Lease for storage unit located at 4849 W. 115th St.; Aslip, IL 60803. | PUBLIC STORAGE ILLINOIS | $ 34.39 |
| Executory Contract | Agreement to host a website for Heartland | RACKSPACE | $ 47.56 |
| Executory Contract | Property Tax Service in St. Louis County, MO | RASH & ASSOCIATES, LP | $ 0 |
| Membership Agreement | Regional advertising Co-op membership agreement as amended | REGIONAL AD COOP OF S CAL, INC | $ 113,178.65 |
| Executory Contract | Agreement for waste hauling services | Republic Waste Services, Inc. | $ 0 |
| Consulting Agreement | Internet marketing services | SEO Logic | $ 0 |
| Executory Contract | Mutual Nondisclosure Agreement | ServiceMaster Brands Management LLC | $ 0 |
| Storage Unit Lease | Leases for storage units located at 6355 Howdershell; Hazelwood, MO 63402 | SOVRAN SELF STORAGE, LP | $ 84.06 |
| Storage Unit Lease | Storage Rental Agreement | SOVRAN SELF STORAGE, LP | $ 41.25 |
| Executory Contract | Vehicle Maintenance Service - Topeka for various state agencies | STATE OF KS - KC / OLATHE | $ 0 |
| Executory Contract | Vehicle Maintenance Service - Kansas City/Olathe, KS - Metropolitan Area for various state agencies. RFP was applied for by Heartland Automotive Services, Inc. d/b/a Jiffy Lube, but contract was executed as Jiffy Lube | STATE OF KS - KC / OLATHE | $ 0 |
| Executory Contract | Fleet Agreement | STATE OF KS - KC / OLATHE | $ 0 |
| Executory Contract | Minnesota DOT Fleet Agreement | State of Minnesota Department of Administration | $ 0 |
| Executory Contract | Amendment to fleet contract | State of Minnesota Department of Administration | $ 0 |
| Consulting Agreement | Tax consulting services | TALX  CORPORATION | $ 0 |
| Executory Contract | Boeing Employee Discount Program | The Boeing Company | $ 0 |

| Contract Type | Contract Description | Creditor Name | Cure Cost |
|---|---|---|---|
| Executory Contract | Contract to advertise in the Kansas City Star newspaper | THE KANSAS CITY STAR | $ 25,896.60 |
| Executory Contract | Beverage and refreshment service | The Standard Companies, Inc. | $ 0 |
| Insurance Policy | Property Insurance | TRAVELERS FLOOD INSURANCE | $ 0 |
| Insurance Policy | Insurance - Umbrella | TRAVELERS FLOOD INSURANCE | $ 0 |
| Executory Contract | Vehicle Maintenance Service for county vehicles | Travis County (Texas) Purchasing Office | $ 0 |
| Executory Contract | Discount agreement benefiting the United Way | United Way of Greater Kansas City | $ 0 |
| Executory Contract | Collection of non-hazardous wastes.  Service agreement was executed on behalf of Jiffy Lube | Waste Management | $ 5,648.99 |
| Insurance Policy | Workers Compensation - Churchill | ZURICH NORTH AMERICA | $ 0 |
| Insurance Policy | Insurance - General Liability | ZURICH NORTH AMERICA | $ 0 |
| Insurance Policy | Automobile Insurance | ZURICH NORTH AMERICA | $ 0 |
| Executory Contract | Regional advertising Co-op membership agreement - Chicago Jiffy Lubes | CHICAGO ADI COOP ASSOCIATION, INC. | $ 88,645.37 |
| Executory Contract | Regional advertising Co-op membership agreement - New England Jiffy Lubes | NEW ENGLAND JIFFY LUBE ADVERTISING COOP, INC. | $ 44,419.56 |
| Executory Contract | Fleet Billing Services Agreement | Sound Billing, LLC | $ 0 |
| Executory Contract | Merchant Charge Card Agreement | Wright Express | $ 0 |
| Executory Contract | Used Oil Purchase and Sale Agreement | Safety-Kleen Systems, Inc. | $ 0 |
| Executory Contract | ReconNet Maintenance Agreement | Trintech Inc. | $ 0 |
| Executory Contract | General Ledger Maintenance Agreement | ASI, Inc. | $ 0 |
| Executory Contract | Fleet Agreement | Arizona Dept of Public Safety | $ 0 |
| Executory Contract | Package Carrier Agreement | United Parcel Service | $ 0 |
| Real Property Lease | Store# 71 Land and Building 1717 Sycamore View Rd. Memphis TN 38134 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 73 Land and Building 2911 Poplar Ave. Memphis TN 38111 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 190 Land and Building 5147 Golf Road Skokie IL 60077 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 194 Land and Building 1 East Roosevelt Rd Lombard IL 60148 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 196 Land and Building 866 E Dundee Road Palatine IL 60067 | JLI of Maryland | $ 0 |

| Contract Type | Contract Description | Creditor Name | Cure Cost |
|---|---|---|---|
| Real Property Lease | Store# 219 Land and Building<br>9401 West Golf Rd Des Plaines IL 60016 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 256 Land and Building<br>411 W. Ogden Ave. Westmont IL 60559 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 447 Land and Building<br>9756 S Cicero Ave #4 Oak Lawn IL 60453 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 482 Land and Building<br>3295 Ogden Ave Lisle IL 60532 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 495 Land and Building<br>539 N 2nd St El Cajon CA 92012 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 496 Land and Building<br>11703 W 63 St Shawnee KS 66203 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 548 Land and Building<br>3120 Excelsior Blvd Minneapolis MN 55416 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 552 Land and Building<br>3349 W 183rd St Homewood IL 60430 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 613 Land and Building<br>2139 Zumbehl Rd St Charles MO 63303 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 753 Land and Building<br>4416 So Kingshighway St Louis MO 63109 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 759 Land and Building<br>3232 Glenview Rd Glenview IL 60025 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 760 Land and Building<br>12621 Research Blvd Austin TX 78759 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 831 Land and Building<br>5540 Lake Murray Blvd La Mesa CA 91942 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 850 Land Only<br>4630 E. Broadway Boulevard  Tucson AZ 85711- | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 867 Land and Building<br>4504 Lemay Ferry Rd Mehlville MO 63129 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 897 Land and Building<br>593 E ST Chula Vista CA 91910 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 924 Land and Building<br>11944 Dorsett Rd Maryland Heights MO 63043 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 990 Land and Building<br>726 West Main West Dundee IL 60118 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 1019 Land and Building<br>2651 Garnet Ave San Diego CA 92109 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 1046 Land and Building<br>15849 Manchester Rd Ellisville MO 63011 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 1067 Land and Building<br>7210 Watson Rd Shrewsbury MO 63119 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 1092 Land and Building<br>605 S. Sprague Avenue Tacoma WA 98405- | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 1095 Land and Building<br>10415 Holman Road NW Seattle WA 98133- | JLI of Maryland | $ 0 |

| Contract Type | Contract Description | Creditor Name | Cure Cost |
|---|---|---|---|
| Real Property Lease | Store# 1096 Land and Building<br>1020 Northgate Way Seattle WA 98125 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 1097 Land and Building<br>6001 196th Street SW Lynnwood WA 98036- | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 1100 Land and Building<br>17 West 620 Butterfield Rd Oakbrook IL 60181 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 1109 Land and Building<br>10510 Main Street Bellevue WA 98004-5903 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 1175 Land and Building<br>13803 Pacific Ave So Tacoma WA 98444 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 1313 Land and Building<br>490 W Central Street Franklin  MA 02308 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 1684 Land and Building<br>630 N. Graham St. Memphis TN 38122 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 1685 Land and Building<br>7020 Winchester Rd. Memphis TN 38125 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 1686 Land and Building<br>2889 Bartlett Blvd. Memphis TN 38134 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 1687 Land and Building<br>1135 E. Shelby Dr.  Memphis TN 38116 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 1738 Land and Building<br>2100 Plum Grove Rd Rolling Meadow IL 60008 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 1874 Land and Building<br>1574 Palm Ave Imperial Beach CA 92154-1016 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2031 Land and Building<br>1409 North Eastern Avenue Las Vegas NV | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2037 Land and Building<br>2020 East Sahara Avenue Las Vegas NV 89104 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2049 Land and Building<br>5912 100th Street SW Lakewood WA 98499- | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2051 Land and Building<br>251 NE 45th St Seattle WA 98105 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2054 Land and Building<br>12427 NE 124th Street Kirkland WA 98034- | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2055 Land and Building<br>4070 Guide Meridian Bellingham WA 98226 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2058 Land and Building<br>5121 Point Fosdick Drive NW Gig Harbor WA | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2065 Land and Building<br>1475 Marvin Road NE Lacey WA 98516-5768 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2070 Land and Building<br>12807 4th Avenue W Everett WA 98204-6340 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2073 Land and Building<br>7204 NE Bothell Way Kenmore WA 98028-3518 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2074 Land and Building<br>309 S Washington Kent WA 98032 | JLI of Maryland | $ 0 |

| Contract Type | Contract Description | Creditor Name | Cure Cost |
|---|---|---|---|
| Real Property Lease | Store# 2075 Land and Building<br>4902 25th NE Seattle WA 98105 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2077 Land and Building<br>2025 4th Avenue  Seattle WA 98121-2414 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2078 Land and Building<br>23610 Pacific Hwy S Kent WA 98032 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2079 Land and Building<br>13654 1st Ave S Burien WA 98168 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2080 Land and Building<br>1616 Freeway Dr Mount Vernon WA 98273 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2082 Land and Building<br>10022 Holman Raod NW Seattle WA 98177- | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2083 Land and Building<br>3515 Kitsap Way Bremerton  WA 98312-2639 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2215 Land and Building<br>1603 E. Colorado Boulevard  Pasadena CA | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2219 Land and Building<br>3209 W. 190th Street Torrance CA 90504-5902 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2224 Land and Building<br>9655 Valley Boulevard Rosemead CA 91770- | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2227 Land and Building<br>6305 State Hwy 303 NE Bremerton  WA 98311- | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2229 Land and Building<br>19210 Hyw 410 Bonney Lake WA 98391 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2230 Land and Building<br>41 Kemp Street Port Angeles WA 98362 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2232 Land and Building<br>4000 SW Alaska St Seattle WA 98116 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2445 Land and Building<br>3896 N. Oracle Road  Tucson AZ 85705-3227 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2446 Land and Building<br>3219 N. Campbell Avenue Tucson AZ 85719- | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2448 Land and Building<br>405 W. Valencia Road Tucson AZ 85706-7634 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2501 Land and Building<br>215 W Rand Rd Arlington Heights IL 60004 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2504 Land and Building<br>6140 W Ogden Ave Cicero IL 60804 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2507 Land and Building<br>6645 W 95th St Oak Lawn IL 60453 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2574 Land and Building<br>32836 Pacific Hwy S  Federal Way WA 98003 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2578 Land and Building<br>14710 Aurora Ave N Shoreline WA 98133 | JLI of Maryland | $ 0 |
| Real Property Lease | Store# 2584 Land and Building<br>3601 Broadway Everett WA 98201 | JLI of Maryland | $ 0 |

| Contract Type | Contract Description | Creditor Name | | Cure Cost |
|---|---|---|---|---|
| Real Property Lease | Store# 2665 Land and Building<br>3420 South Rainbow Las Vegas NV 89146 | JLI of Maryland | $ | 0 |
| Real Property Lease | Store# 2667 Land and Building<br>333 South Decatur Las Vegas NV 89107 | JLI of Maryland | $ | 0 |
| | | 179 Contracts  -  Total Cure Costs: | $ | 541,770.85 |

# SCHEDULE 5

# DEEMED ALLOWANCE OF CERTAIN CLAIMS

## Deemed Allowance of Certain Claims

| Lender or Loan Servicer | Amount Deemed Allowed if holders of Claims vote in favor of the Plan |
|---|---|
| | |
| H-I Lender or Servicer | |
| AMRESCO Commercial Finance, LLC | $20,153,385.38 |
| | |
| Capmark Finance Inc. as servicer for LaSalle Bank National Association (f/k/a LaSalle National Bank), as Loan Pool Trustee for EMAC Owner Trust 1999-1, under that certain Loan Pool Pooling and Servicing Agreement, dated March 26, 1999. | $2,488,207.86 as of November 30, 2008 plus interest at the per diem rate of $581.95 from November 30, 2008 to the Effective Date and Capmark's reasonable unpaid costs and expenses incurred on account of Capmark's legal and financial advisors from the Petition Date to the Effective Date, to the extent unpaid, and as to the extent provided for under the EMAC Trust, and subject to approval by the Bankruptcy Court. |
| | |
| CEF Funding II, L.L.C. | $2,065,351.88 |
| General Electric Capital Business Asset Funding Corporation of Connecticut | $370,531.88 |

# SCHEDULE 6

# QUAD-C CONTRIBUTION DOCUMENTS

**SERIES B PREFERRED AND CLASS B COMMON**

**STOCK PURCHASE AGREEMENT**

**Dated as of November 21, 2008**

**By and Between**

**HEARTLAND AUTOMOTIVE HOLDINGS, INC.**

**As Issuer**

**And**

**HAS FUNDING LLC**

**As Purchaser**

# TABLE OF CONTENTS

**Page**

1.    GENERAL PROVISIONS ............................................................................ 1
    1.1   DEFINITIONS.......................................................................................... 1
    1.2   OTHER DEFINITIONS; INTERPRETATION ...................................... 5
2.    AGREEMENT TO SELL AND PURCHASE ............................................. 5
    2.1   AUTHORIZATION OF SHARES ......................................................... 5
    2.2   SALE; PURCHASE AND RELEASE ................................................... 5
    2.3   LIENS ...................................................................................................... 6
    2.4   USE OF PROCEEDS .............................................................................. 6
    2.5   SHARE CERTIFICATES....................................................................... 6
3.    REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ......... 6
    3.1   ORGANIZATION AND GOOD STANDING .................................... 6
    3.2   POWER AND AUTHORITY.................................................................. 6
    3.3   NO CONFLICT ....................................................................................... 7
    3.2   SECURITIES MATTERS ....................................................................... 7
4.    ACTIONS BEFORE THE CLOSING........................................................ 8
    4.1   GENERAL............................................................................................... 8
    4.2   GOVERNMENT APPROVALS ............................................................ 8
5.    CLOSING AND CONDITIONS TO CLOSING. ........................................ 8
    5.1   CLOSING ............................................................................................... 8
    5.2   CONDITIONS TO OBLIGATIONS OF THE PURCHASER ............. 9
    5.3   CONDITIONS TO OBLIGATIONS OF THE COMPANY ............. 11
6.    SURVIVAL ............................................................................................... 11
7.    INDEMNIFICATION............................................................................... 11
8.    FURTHER ASSURANCES AND ASSISTANCE ...................................... 12
9.    NOTICES.................................................................................................... 12
10.   TERMINATION OF THIS AGREEMENT .............................................. 13
11.   ENTIRE AGREEMENT............................................................................ 13
12.   SECTION HEADINGS ............................................................................. 13
13.   APPLICABLE LAW; JURISDICTION .................................................... 13
14.   EXPENSES................................................................................................ 14

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 15. | WAIVER | 13 |
| 16. | SEVERABILITY | 14 |
| 17. | EXHIBITS AND SCHEDULES | 14 |
| 18. | PARTIES IN INTEREST | 14 |
| 19. | NO STRICT CONSTRUCTION | 14 |
| 20. | ASSIGNMENT | 14 |
| 21. | COUNTERPARTS | 15 |
| 22. | CONFIDENTIALITY | 15 |
| 23. | SPECIFIC PERFORMANCE | 15 |

EXHIBITS

EXHIBIT A -- STOCKHOLDERS' AGREEMENT TERM SHEET
EXHIBIT B -- COPY OF THE PLAN
EXHIBIT C -- COMPANY CLOSING CERTIFICATE

## STOCK PURCHASE AGREEMENT

THIS SERIES B PREFERRED AND CLASS B COMMON STOCK PURCHASE AGREEMENT (this "Agreement"), dated as of November 21, 2008 is entered into by and between **HEARTLAND AUTOMOTIVE HOLDINGS, INC.**, a Delaware corporation (the "Company"), and **HAS FUNDING LLC** a Delaware limited liability company (the "Purchaser").

### WITNESSETH:

WHEREAS, upon the terms and subject to the conditions contained herein, Purchaser desires to purchase from the Company, and the Company desires to issue and sell to Purchaser, (a) 1,000,000 shares of Series B Preferred Stock, par value $0.01 per share, of the Company (the "Series B Preferred Stock"), and (b) 300,000,000 shares of Class B Common Stock, par value $0.01 per share, of the Company (the "Class B Common Stock", and together with the Series B Preferred Stock, the "Shares"); and

WHEREAS, at the Closing (as defined below), Purchaser will enter into an Amended and Restated Stockholders' Agreement (the "Stockholders' Agreement"), by and among the Company, the Purchaser and Blackstone (as defined below) which must be reasonably agreeable to the Company, the Committee, Blackstone and the Purchaser with the principal terms and conditions as set forth in the term sheet attached hereto as Exhibit A.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties hereto agree as follows:

1.    **GENERAL PROVISIONS.**

    1.1    **DEFINITIONS.**    As used in this Agreement, the following terms have the respective meanings set forth below or set forth in the Sections referred to below.

        "Affiliate" means with respect to any party, any person which or who directly or indirectly controls, is controlled by, or is under common control with such party; provided that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person, whether through the ownership of voting securities, by contract or otherwise.

        "Agreement" shall have the meaning set forth in the preamble of this Agreement.

        "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as codified at title 11 of the United States Code, as amended from time to time and applicable to the Chapter 11 Cases.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, or such other court having jurisdiction over the Chapter 11 Cases.

"Blackstone" means BMP-SPV (J) LTD and Blackstone Mezzanine Holdings L.P.

"Blackstone Plan Support Agreement" means that certain plan support agreement by and among the Debtors, the Committee and Blackstone dated as of November 21, 2008.

"Chapter 11 Cases" means the cases commenced under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to each of the Debtors styled as In re Heartland Automotive Holdings, Inc., et al., Chapter 11 Case No. 08-40047 (RFN), Jointly Administered.

"Chosen Courts" shall have the meaning set forth in Section 13.

"Claim" means (a) any right to payment, whether or not such right is known or unknown, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is known or unknown, reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Class B Common Stock" shall have the meaning set forth in the recitals to this Agreement.

"Closing" shall have the meaning set forth in Section 5.1.

"Company" shall have the meaning set forth in the preamble to this Agreement.

"Company Closing Certificate" shall have the meaning set forth in Section 5.1.2.5.

"Committee" shall have the meaning set forth in the Plan.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan.

"Debtors" means the Company, and its direct and indirect subsidiaries that are debtors in the Chapter 11 Cases as identified on Exhibit A annexed to the Plan.

"DIP Loan" means that certain debtor in possession financing loan to the Debtors under a post-petition financing agreement.

NEWYORK 6923509 (2K)

"<u>Disclosure Statement</u>" means the Disclosure Statement filed with respect to the Plan, as it may be amended or modified from time to time.

"<u>Effective Date</u>" means the date the Plan becomes effective.

"<u>Effective Date DIP Balance</u>" means the amounts due pursuant to the DIP Loan as of the Effective Date, calculated to include all attorneys' fees (to the extent permitted under the DIP Order), but without any penalties, default rates of interests or premiums or other charges.

"<u>Estates Release</u>" shall have the meaning in <u>Section 2.2</u>.

"<u>Governmental Approvals</u>" means all consents, approvals, licenses, permits and authorizations of, and filings, recordings and regulations with, Governmental Authorities, necessary so that the consummation of the transactions contemplated hereby shall be in compliance with applicable Laws.

"<u>Governmental Authority</u>" means collectively, the United States of America or any other nation, any state, province, or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government, including any court, in each case having jurisdiction over the Company, the Purchaser, or any Affiliate thereof.

"<u>JLI</u>" shall have the meaning set forth in the Plan.

"<u>JLI Plan Support Agreement</u>" means that certain plan support agreement by and among the Debtors, the Committee and JLI dated as of November 21, 2008.

"<u>Laws</u>" means any foreign, federal, state, provincial, or local law, statute, rule, regulation, code, plan, interpretation, ordinance, order, judgment, ruling, charge, injunction or decree of any Governmental Authority.

"<u>Lien</u>" means a mortgage, pledge, hypothecation, lien (statutory or otherwise), preference, priority, security interest, security agreement, easement, charge, claim, option, right of first refusal, voting trust, or other encumbrance of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing and any assignment or deposit arrangement in the nature of a security device).

"<u>Losses</u>" shall have the meaning set forth in <u>Section 7</u>.

"<u>Outside Date</u>" shall have the meaning set forth in <u>Section 10</u>.

- 3 -

"Plan" means the Joint Chapter 11 Plan of Reorganization for Heartland Automotive Holdings, Inc., and its Affiliated Debtors filed on November 21, 2008 by the Committee and the Debtors in the Chapter 11 Cases. A copy of the Plan is attached hereto as Exhibit B.

"Plan Support Agreements" means the JLI Plan Support Agreement, the Quad-C Plan Support Agreement, the SOPUS Plan Support Agreement, and the Blackstone Plan Support Agreement.

"Purchase Price" shall have the meaning set forth in Section 2.2.

"Purchaser" shall have the meaning set forth in the preamble of this Agreement.

"Quad-C" shall have the meaning set forth in the Plan.

"Quad-C Plan Support Agreement" means that certain plan support agreement by and among the Debtors, the Committee and Quad-C dated as of November 21, 2008.

"Quad-C Release" shall have the meaning set forth in Section 2.2.

"Released Parties" means (a) (i) the Debtors and the Reorganized Debtors (as defined in the Plan), (ii) the Committee and the members thereof in their capacities as such, (iii) Shell Oil Company, (iv) JLI, and (v) SOPUS; and each of (b) (i) Dymas (as defined in the Plan), (ii) the H-I Lenders (as defined in the Plan), (iii) the H-II Lenders (as defined in the Plan), (iv) BMP-SPV (J) Ltd., (v) Blackstone Mezzanine Holdings, L.P., to the extent such person votes in favor of the Plan and does not otherwise object to confirmation of the Plan; and (c) all affiliates, officers, directors, principals, shareholders, parents, subsidiaries, members, auditors, accountants, financial advisors, predecessors, successors, servants, employees, agents, counsel, attorneys, partners, insurers, underwriters, administrators, executors, representatives or assigns of each of the foregoing person listed in clause (a) or (b) to the extent such person is a Released Party.

"Releases" shall have the meaning in Section 2.2.

"Series B Preferred Stock" shall have the meaning set forth in the recitals to this Agreement.

"Shares" shall have the meaning set forth in the recitals of this Agreement.

"SOPUS" shall have the meaning set forth in the Plan.

- 4 -

"SOPUS Plan Support Agreement" means that certain plan support agreement by and among the Debtors, the Committee and SOPUS dated as of November 21, 2008.

"Stockholders' Agreement" shall have the meaning set forth in the recitals to this Agreement.

1.2    **OTHER DEFINITIONS; INTERPRETATION.**  For purposes of this Agreement, except when the context otherwise requires:

    1.2.1    The term "parties" means the Company and the Purchaser.

    1.2.2    The term "person" includes any natural person, firm, association, partnership, corporation, limited liability company, Governmental Authority or other entity.

    1.2.3    When introducing a series of items, the term "including" is not intended to limit the more general description that precedes the items listed.

    1.2.4    All dollar amounts, $ or "USD" designations are United States Dollars.

2.    **AGREEMENT TO SELL AND PURCHASE.**

2.1    **AUTHORIZATION OF SHARES.**  On or prior to the Closing (defined below), the Company shall have authorized the sale and issuance to the Purchaser of the Shares.  The Shares shall have the rights, preferences, privileges and restrictions set forth in the Stockholders' Agreement and an Amended and Restated Certificate of Incorporation of the Company which shall be in the form of the certificate of incorporation submitted as a Plan Document (as defined in the Plan).

2.2    **SALE, PURCHASE AND RELEASE.**  Subject to the terms and conditions hereof, at the Closing, the Company hereby agrees to issue and sell to the Purchaser, and the Purchaser agrees to purchase from the Company: (a) 1,000,000 shares of the Series B Preferred Stock for an aggregate consideration of $23,000,000, and (b) 300,000,000 shares of the Class B Common Stock for an aggregate consideration of $5,000,000 (collectively, the "Purchase Price").  Subject to the terms and conditions hereof, and as additional consideration for the transaction contemplated by this Agreement, at the Closing, immediately following receipt of the Purchase Price in accordance with the terms hereof, the Company and the Released Parties shall release Quad-C pursuant to the Plan (the "Estates Release").  Subject to the terms and conditions hereof, and as additional consideration for the transaction contemplated by this Agreement, at the Closing, the Purchaser hereby agrees to cause Quad-C to execute and deliver a release for the benefit of the Released Parties as contemplated in section 16.2 of the Plan (the "Quad-C Release", and with the

- 5 -

Estates Release, collectively, the "Releases").  At the Closing, the Purchaser shall deliver to the Company an amount in cash equal to the difference between the Purchase Price and the Effective Date DIP Balance via wire transfer of immediately available funds to an account specified by the Company.  The Company shall specify the account number for the specified account, in writing, not later than two (2) business days prior to the Closing.

2.3 **LIENS.**  The Shares shall be sold and delivered to the Purchaser at the Closing free and clear of any and all Liens, except as contemplated by the Stockholders' Agreement.

2.4 **USE OF PROCEEDS.**  The Company shall use the proceeds of the sale of the Shares to make distributions pursuant to the Plan, for working capital and general corporate purposes, or as otherwise directed by the Board of Directors of the Company.

2.5 **SHARE CERTIFICATES.**  Upon receipt of the Purchase Price at the Closing, the Company shall immediately deliver to the Purchaser fully executed stock certificates of the Company representing the Shares acquired by the Purchaser hereunder.

**3.** **REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.**  The Purchaser hereby represents and warrants to the Company as follows (such representations and warranties do not lessen or obviate the representations and warranties of the Company contained in the Company Closing Certificate):

3.1 **ORGANIZATION AND GOOD STANDING.**  The Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

3.2 **POWER AND AUTHORITY.**  The Purchaser has all necessary power and authority under all applicable provisions of Law to execute and deliver this Agreement and to carry out its provisions.  All action on the part of the Purchaser, and its managing member and the holder of its membership interest necessary for the authorization of the transactions contemplated hereby and for the lawful execution and delivery of this Agreement and the performance of the transactions contemplated hereby has been or will be effectively taken prior to the Closing. Upon its execution and delivery, this Agreement will be valid and binding obligations of the Purchaser, enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights and (b) general principles of equity that restrict the availability of equitable remedies.

- 6 -

3.3 **NO CONFLICT.**  Neither the execution and delivery by the Purchaser of this Agreement, nor the consummation of the transactions contemplated hereby, nor compliance by the Purchaser with any of the provisions hereof, will conflict with or result in any violation of or default under, or give rise to a right of termination, cancellation or acceleration of any obligation or loss of a material benefit under, (a) any judgment or law applicable to the Purchaser, (b) any material contract to which the Purchaser is a party or by which any of its assets or property are bound, or (c) the constitutional documents of the Purchaser, except in the case of clauses (a) and (b) above, for such conflicts, violations, defaults, consents, approvals or breaches which would not have any materially adverse effect (including any material delay) on the ability of the Purchaser to perform its obligations hereunder.

3.4 **SECURITIES MATTERS**.  (a) The Purchaser is acquiring the Shares for its own account for investment and not with a view to or for resale in connection with any distribution of the Shares in violation of the Securities Act of 1933, as amended (the "Securities Act").  The Purchaser acknowledges and understands that the Shares purchased pursuant to this Agreement have not been registered under the Securities Act or the securities laws of any state and are issued by reason of specific exemptions from registration under the provisions thereof which depend in part upon the investment intent of the Purchaser and upon the other representations made by the Purchaser in this Agreement.  The Purchaser acknowledges and understands that the Company is relying upon the representations, warranties and agreements made by the Purchaser in this Agreement.

(b)  The Purchaser acknowledges and agrees that it may not offer, sell or transfer any Shares unless such Shares are registered pursuant to the requirements of the Securities Act and of any applicable state or "blue sky" securities laws or regulations.  The Purchaser further acknowledges and agrees that there is no assurance that any exemption from registration under the Securities Act and any applicable state or "blue sky" securities laws or regulations will be available, or if available, that such exemption will allow the Purchaser to dispose of or otherwise transfer any or all of the Shares in the amounts or at the times that the Purchaser may propose.

(c)  The Purchaser represents that the Company, or any person acting on behalf of the Company, has not offered to sell or sold the Shares (or any other securities of the Company) to the Purchaser by means of any form of general solicitation or general advertising.

(d)  The Purchaser (i) has such knowledge, sophistication and experience in business and financial matters that it is capable of evaluating the merits and risks of the transactions contemplated by this Agreement; (ii) has been granted the opportunity to ask questions of, and receive satisfactory answers from,

- 7 -

representatives of the Company concerning the Company's business affairs and financial condition and the terms and conditions of the purchase of the Shares and has had the opportunity to obtain and has obtained any additional information which it deems necessary regarding such purchase; (iii) has not relied on any person in connection with its investigation of the accuracy or sufficiency of such information or its investment decision; (iv) fully understands the nature, scope and duration of the limitations applicable to the Shares; and (v) is able to bear the economic risk of the investment in the Shares for an indefinite period of time.

## 4.    ACTIONS BEFORE THE CLOSING.

4.1    **GENERAL.**   Each of the parties hereto shall use its commercially reasonable efforts, in good faith, to take all actions and to do all things necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement and the Stockholders' Agreement.

4.2    **GOVERNMENT APPROVALS.**   Each party hereto shall use its commercially reasonable efforts to obtain all authorizations, consents, orders and approvals of, and to give all notices to and make all filings with, all Governmental Authorities (including those pertaining to the Governmental Approvals) and third parties that may be or become necessary for its execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, and will cooperate fully with the other parties in promptly seeking to obtain all such authorizations, consents, orders and approvals, giving such notices, and making such filings.

## 5.    CLOSING AND CONDITIONS TO CLOSING.

5.1    **CLOSING.**   Upon the terms and subject to the conditions set forth in this Agreement, the closing of the transactions contemplated by this Agreement (the "Closing") will take place at 10:00 a.m. (New York, New York local time) on the Effective Date, which shall be no later than the third business day after satisfaction or (to the extent permitted) waiver of the conditions set forth in Sections 5.2 and 5.3 below (other than those conditions that by their terms cannot be satisfied until the Closing, but subject to the satisfaction or waiver of such conditions at such time), at the offices of McGuireWoods LLP, 1345 Avenue of the Americas, New York, New York 10105-0106, unless another time, date or place is agreed to in writing by the Purchaser and the Company.  The Closing will be deemed to be effective as of 12:01 AM eastern time on the Effective Date.

5.1.1    **THE PURCHASER'S DELIVERIES.**   At the Closing, the Purchaser will deliver, or will cause to be delivered, to the Company:

- 8 -

5.1.1.1    an amount in US Dollars equal to the difference of the Purchase Price and the Effective Date DIP Balance by wire transfer of immediately available funds to an account designated in writing by the Company in accordance with <u>Section 2.2</u> hereof;

5.1.1.2    counterpart signature pages to the Quad-C Release; and

5.1.1.3    counterpart signature pages to the Stockholders' Agreement.

5.1.2    **THE COMPANY'S DELIVERIES.** At the Closing, the Company will deliver, or will cause to be delivered, to the Purchaser:

5.1.2.1    a certified copy of the Confirmation Order;

5.1.2.2    a certified copy of the charter of the Company, as filed with the Secretary of State of the State of Delaware including the provisions governing the relative rights and preferences of the Shares;

5.1.2.3    counterpart signature pages to the Stockholders' Agreement;

5.1.2.4    the stock certificates evidencing the Shares;

5.1.2.5    a certificate, signed by a duly authorized officer of the Company and dated as of the Effective Date certifying to the effect set forth in <u>Exhibit C</u>, as of the Effective Date (the "<u>Company Closing Certificate</u>"); and

5.1.2.6    an opinion of White & Case LLP, counsel for the Company, dated as of the Effective Date, that states that White & Case LLP has reviewed the docket of the Chapter 11 Cases, and pleadings and orders served on White & Case LLP in the Chapter 11 cases, and White & Case LLP has no knowledge, from that review or otherwise, that the Confirmation Order has been amended, supplemented, vacated, rescinded, modified or stayed.

5.2    **CONDITIONS TO OBLIGATIONS OF THE PURCHASER.** The obligations of the Purchaser to complete the purchase of the Shares and the other transactions contemplated by this Agreement at the Closing are subject to the following conditions, any of which may be waived in a writing executed by the Purchaser:

- 9 -

5.2.1   The Plan and Disclosure Statement shall have been filed on or before December 31, 2008;

5.2.2   The Disclosure Statement shall have been approved on or before February 15, 2009;

5.2.3   A Confirmation Order shall have been entered on the docket of the Chapter 11 Cases on or before March 31, 2009;

5.2.4   the Effective Date of the Plan shall have occurred on or before April 15, 2009;

5.2.5   neither the Debtors nor the Committee, exercising their fiduciary duties, or otherwise, have taken any affirmative action which is materially inconsistent with the terms of this Agreement or the Quad-C Plan Support Agreement;

5.2.6   neither the Plan nor any of the Plan Documents shall have been modified such that the securities to be received by the Purchaser pursuant to this Agreement shall be materially and adversely impacted by such modification;

5.2.7   none of the Chapter 11 Cases shall have been converted to cases under chapter 7 of the Bankruptcy Code or have been dismissed, or a trustee or examiner with expansive powers shall have been appointed;

5.2.8   the pro forma business projections, capital structure, and financial and operational viability of the Company as contemplated by the Committee Plan, must be reasonably acceptable to Quad-C.  Quad-C acknowledges that the pro forma business projections and capital structure provided within the Ancillary Documents to the SOPUS Plan Support Agreement are reasonably acceptable, and if the pro forma business projections and capital structure in the Committee Plan as approved at the hearing on the Disclosure Statement are not materially worse than those within the Ancillary Documents to the SOPUS Plan Support Agreement, the pro forma business projections, capital structure, and financial and operational viability of the Company in the Committee Plan will be deemed to be reasonably acceptable;

5.2.9   none of the Plan Support Agreements have been terminated;

5.2.10  the Releases provided to Quad-C in the Debtors' confirmed plan of reorganization are not materially less protective than the Releases provided for in the Plan;

- 10 -

NEWYORK 6923509 (2K)

5.2.11  The Company shall have performed in all material respects all of the material covenants and obligations required to be performed by it hereunder prior to or as of the Closing; and

5.2.12  on the Effective Date, the Company shall have delivered to the Purchaser all of the deliveries contemplated by <u>Section 5.1.2</u>.

5.3    **CONDITIONS TO OBLIGATIONS OF THE COMPANY.**  The obligations of the Company to complete the sale of the Shares and the other transactions contemplated by this Agreement at the Closing are subject to the following conditions, any of which may be waived in a writing executed by the Company:

5.3.1  The Purchaser shall have performed in all material respects all of the material covenants and obligations required to be performed by it hereunder prior to or as of the Closing;

5.3.2  Each representation and warranty of the Purchaser made in <u>Section 3</u> shall be true and correct at and as of the Effective Date as though such representations and warranties were made or given on and as of the Effective Date, except for representations and warranties that speak as of a specific date or time (which need be true and correct only as of such date or time);

5.3.3  All the conditions precedent to confirmation of the Plan and the occurrence of the Effective Date shall have been satisfied or waived in accordance with the terms of the Plan; and

5.3.4  On the Effective Date, the Purchaser shall have delivered to the Company all of the deliveries contemplated by <u>Section 5.1.1</u>.

6.    **SURVIVAL.**  The representations, warranties, covenants and agreements made herein shall survive any investigation made by the Purchaser and the closing of the transactions contemplated hereby.  All statements as to factual matters contained in any certificate or other instrument delivered by or on behalf of the Company pursuant hereto in connection with the transactions contemplated hereby shall be deemed to be representations and warranties by the Company hereunder solely as of the date of such certificate or instrument.

7.    **INDEMNIFICATION.**  The Company shall indemnify and hold harmless the Purchaser against and from any losses, claims, damages, liabilities or expenses, including reasonable attorneys' and accountants' fees and costs and court costs ("<u>Losses</u>") insofar as the Losses (or actions in respect thereof) arise out of or are based upon the falsity or incorrectness as of the Closing of any representation or warranty of the Company contained in the Company Closing Certificate. Notwithstanding the foregoing, the rights to indemnification

- 11 -

pursuant to this <u>Section 7</u> shall constitute the sole and exclusive remedy from and after the Closing with respect to any Losses suffered, sustained, incurred or paid by the Purchaser resulting from or arising out of any breach of any representation or warranty (and any claims resulting from and related to such breach) made by any person.

8.      **FURTHER ASSURANCES AND ASSISTANCE.**  Each of the parties hereto agrees to execute such other documents or agreements as may be reasonably requested for the implementation of this Agreement and the Stockholders' Agreement, and the consummation of the transactions contemplated hereby and thereby.

9.      **NOTICES.**  Any notices or other communications required or permitted hereunder shall be sufficiently given if in writing and personally delivered or sent by registered or certified mail, return receipt requested, postage prepaid, or by facsimile (confirmed by one- or two-day courier service) or by one- or two-day courier service, addressed as follows or to such other address as the parties shall have given notice of pursuant hereto.

If to the Company:      If to the Debtors, to:
                        White and Case LLP
                        1155 Avenue of the Americas
                        New York, NY 10036
                        Attn: Gerard Uzzi, Esq. and Lisa Thompson, Esq.
                        Telecopier: (212) 354-8113
                        Electronic mail: guzzi@ny.whitecase.com;
                        lthompson@ny.whitecase.com

                        - and -

                        Forshey & Prostok LLP
                        777 Main Street, Suite 1290
                        Ft. Worth, TX 76012
                        Attn: Jeff Prostok, Esq.
                        Telecopier: (817) 877-4151
                        Electronic mail: jpp@forsheyprostok.com

If to Quad-C:
                        McGuireWoods LLP
                        1345 Avenue of the Americas, 7th Floor
                        New York, NY 10105
                        Attn:  James P. Ricciardi, Esq.
                        Patrick L. Hayden, Esq.
                        Telecopier: (212) 548-2150
                        Electronic mail: jricciardi@mcguirewoods.com;
                        phayden@mcguirewoods.com

- 12 -

10.    **TERMINATION OF THIS AGREEMENT.**  The exclusive right of the parties hereto to terminate this Agreement and the obligations hereunder is as set forth in this <u>Section 10</u>. This Agreement may be terminated and the transactions contemplated hereby may be abandoned, at any time prior to the Effective Date:  (a) by either the Purchaser or the Company, if the Closing shall not have occurred by April 15, 2009 (or such later date as the parties may mutually agree in writing from time to time) (the "<u>Outside Date</u>"), (b) by either the Purchaser or the Company, if the Quad-C Plan Support Agreement has been validly terminated, (c) by either the Purchaser or the Company, if a Governmental Authority shall have issued an order, decree or ruling or taken any other action, in any case having the effect of permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement, which order, decree, ruling or other action is final and non-appealable, (d) by the mutual written consent of the parties hereto, or (e) by either the Purchaser or the Company in the event of a material breach of this Agreement by the non-terminating party if such non-terminating party fails to cure such breach within ten (10) business days following notification thereof by the terminating party; <u>provided however</u>, <u>Section 13</u> of this Agreement shall survive termination of this Agreement.

11.    **ENTIRE AGREEMENT.**  This Agreement, the Exhibits and Schedules hereto represent the entire understanding and agreement and supersede all prior agreements, understandings or arrangements among the parties hereto with respect to the subject matter hereof and can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of such amendment, supplement, modification or waiver is sought.

12.    **SECTION HEADINGS.**  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

13.    **APPLICABLE LAW; JURISDICTION.**  This Agreement shall be governed by and construed and enforced in accordance with the law of the State of New York without regard to its choice of law provisions.  Each party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the Stockholders' Agreement exclusively in either (a) the United States District Court for the Southern District of New York sitting in New York County or (b) the New York State Supreme Court sitting in New York County (the "<u>Chosen Courts</u>"), and solely in connection with claims arising under this Agreement or the Stockholders' Agreement (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto and (iii) agrees that service of process upon such party in any such

- 13 -

action or proceeding shall be effective if notice is given in accordance with <u>Section 9</u> of this Agreement.

14.    **EXPENSES.**    Except as otherwise provided herein, whether or not the transactions contemplated hereby are consummated, the parties hereto shall pay their own respective expenses.

15.    **WAIVER.**    Any party may, by written notice to another party: (a) extend the time for the performance of any of the obligations or other actions of such other party; (b) waive any inaccuracies in the representations of such other party contained in this Agreement; or (c) waive compliance with any of the agreements of such other party contained in this Agreement or waive or consent to the modification of performance of any of the obligations of such other party.   No other action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, condition, or agreement contained herein.

16.    **SEVERABILITY.**    If any provision of this Agreement shall finally be determined to be unlawful, then such provision will be deemed to be severed from this Agreement and replaced by a lawful provision which carries out, as closely as possible, the intention of the parties and preserves the economic bargain contemplated by this Agreement and, in such case, each and every other provision of this Agreement will remain in full force and effect.

17.    **EXHIBITS AND SCHEDULES.**    The Exhibits and Schedules to this Agreement constitute integral parts of this Agreement and are hereby incorporated into this Agreement by this reference.

18.    **PARTIES IN INTEREST.**    This Agreement shall be binding upon and inure solely to the benefit of each party, and nothing in this Agreement, expressed or implied, other than the Quad-C Release when tendered in accordance with the terms hereof, is intended to or shall confer upon any other person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

19.    **NO STRICT CONSTRUCTION.**    The language used in this Agreement and the other agreements contemplated hereby shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.

20.    **ASSIGNMENT.**    This Agreement will be binding upon and inure to the  benefit of the parties hereto and their respective successors and assigns.   Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated by any party hereto in any manner whatsoever, whether directly or by operation of law or

- 14 -

otherwise, without the prior written consent of the other parties hereto; <u>provided</u>, <u>however</u>, that the Purchaser may assign its rights, interests and obligations under this Agreement (including the right to acquire the Shares) to an Affiliate of the Purchaser.

21.    **COUNTERPARTS.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.  Signatures by fax shall be binding.

22.    **CONFIDENTIALITY.**  Each party hereto agrees that, except with the prior written consent of the other party, it shall at all times keep confidential and not divulge, furnish or make accessible to anyone any confidential information, knowledge or data concerning or relating to the business or financial affairs of the other parties to which such party has been or shall become privy by reason of this Agreement or the Stockholders' Agreement, discussions or negotiations relating to this Agreement or the Stockholders' Agreement, the performance of its obligations hereunder or the ownership of the Shares purchased hereunder.

23.    **SPECIFIC PERFORMANCE**.  The parties hereto understand and agree that money damages would not be a sufficient remedy for any breach of this Agreement by any party hereto, and further understand and agree that each non-breaching party hereto shall be entitled to the remedy of specific performance and injunctive or other equitable relief as a non-exclusive remedy of any such breach.

*[Signature Page Follows]*

- 15 -

     **IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement effective as of the day and year first above written.

<u>**The Purchaser**</u>:

**HAS FUNDING LLC**

By: _____, its Managing Member


By: _____
Name:
Title:




<u>**The Company**</u>**:**

**HEARTLAND AUTOMOTIVE HOLDINGS, INC.**


By: _____
Name:
Title:

- 16 -

**Exhibit A**
**Stockholders' Agreement Term Sheet**

- 17 -

**HEARTLAND AUTOMOTIVE HOLDINGS, INC.**

## Shareholders Agreement

### SUMMARY OF TERMS

| | |
|---|---|
| ***Parties to the Shareholders Agreement***: | Certain entities affiliated with Blackstone Mezzanine Partners L.P. (collectively, "<u>Blackstone</u>") and certain entities affiliated with [Quad-C] (collectively, "<u>Quad-C</u>") and, together with Blackstone and any other holder of shares of Preferred Stock or Common Stock of Holdings, each a "<u>Holder</u>" and, collectively, the "<u>Holders</u>"). |
| ***Board of Directors:*** | The Board of Directors will be elected by vote of the holders of Heartland Automotive Holdings, Inc.'s ("<u>Holdings</u>") common stock, voting as a single class utilizing non-cumulative voting (Class A – 3 votes per share, Class B – 1 vote per share). Holdings' Board of Directors will initially consist of up to seven directors. Notwithstanding the foregoing, the Holders agree to the following: |

- So long as Quad-C owns Class B Preferred Stock and Class B Common Stock of Holdings which, on the Closing Date, had an aggregate purchase price of at least $7,500,000, which shall include Class B Common Stock with a purchase price of at least $3,750,000 (the "<u>Quad-C Minimum Hold</u>"), the holders of Class A Common Stock agrees to the vote for the election of a director nominated by Quad-C (the "<u>Quad-C Director</u>"). Such right to nominate a director is not transferable. At the request of the majority of the Board, such Quad-C Director shall resign from the Board if Quad-C no longer owns the Quad-C Minimum.
- It is the Holders intention that one of Holdings' directors be a member of Holdings' senior management (the "<u>Management Director</u>").

| | |
|---|---|
| ***Quad-C Director Issues:*** | In addition, to requiring approval of the Company's Board of Directors and shareholders (to the extent required under corporate law), the following |

transactions shall require the consent of the Quad-C Director, if such director is currently a member of the Holdings' Board of Directors:

- Prior to the five-year anniversary of the Effective Date, the incurrence of debt, the proceeds of which are utilized to pay a distribution on the Series A preferred stock (whether through payment of accrued dividends, repurchase, etc.), if Holdings' ratio of total indebtedness to adjusted LTM EBITDA after giving effect to such incurrence of debt exceeds 5.5x.

- Approval of a sale of all or substantially all of the business of Holdings and its subsidiaries (whether effected as a transfer, issuance, or redemption of equity securities, a sale of assets, a merger or consolidation or otherwise) (a "Sale Transaction"). Such consent right shall not be applicable (i) after the thirty-month anniversary of the Effective Date if, at the time of such transaction approval, the holders of Holdings' Series A Preferred Stock have not received payment in full, in cash, of the Series A Liquidation Preference; provided that if Quad-C is the holder of all of the Series A Preferred Stock at the time that definitive agreements with respect to a Sale Transaction are entered into by Holdings, consent of the Quad-C Director shall be required to enter into such Sale Transaction; or (ii) after the twelve-month anniversary of the Effective Date, if Holdings' EBITDA for the prior twelve months is less than $29 million (any Sale Transaction not requiring the Quad-C Director's consent as described above, an "Excluded Transaction"). With respect to any Excluded Transaction, there shall be no difference in the price per share paid for the Class A Common Stock and the Class B Common Stock and the indemnity, escrow, and expense obligations shall be borne ratably in proportion to claims on marginal proceeds.

- Prior to the eighteen-month anniversary of the Effective Date, the sale of Holdings' common stock to Blackstone or its affiliates.

- The issuance of indebtedness owed to or sale of Holdings' common stock to Blackstone or its affiliates if the proceeds of such issuance or sale are used to redeem or otherwise retire any Series A Preferred Stock.
- Other than in connection with acquisitions or similar transactions or in connection with management incentive plans, the sale of preferred stock senior to the Series A Preferred Stock or Series A Preferred Stock, in each case, for consideration other than cash.

***Restrictions on Securities Issuances:***

Holdings shall not issue indebtedness to Blackstone unless approved by Holdings' Board of Directors, including a determination by the Holdings' Board of Directors that such indebtedness is being issued to Blackstone on terms no less favorable to the Company than those that would be available from unaffiliated lenders.

Holdings shall not issue common stock to Blackstone unless such issuance is approved by a majority of the disinterested members of Holdings' Board of Directors or Holdings' Board of Directors determines in good faith that such stock is being issued for fair value.

***Quad-C Purchase Option:***

At any time prior to the thirty-month anniversary of the Effective Date, Quad-C shall have the right to purchase the Series A Preferred Stock for a cash purchase price equal to the Series A Preferred Stock Liquidation Preference.

***Drag-Along Rights:***

Subject to the approval rights of the Quad-C Director described above, Blackstone shall have the right to cause a sale of all or substantially all of the business of Holdings and its subsidiaries (whether effected as a transfer, issuance, or redemption of equity securities, a sale of assets, a merger or consolidation or otherwise), including the right to initiate a sale process and direct and control all decisions in connection therewith, including the hiring or termination of any investment bank or professional adviser, provided that Blackstone shall not be permitted to hire Blackstone or any of its affiliates as

such investment bank or professional adviser, and shall have customary drag-along rights in connection therewith, including the right to require each equity holder of Holdings (i) to vote for, consent to and raise no objections against any such transaction, (ii) to waive any dissenter's rights, appraisal rights or similar rights in connection therewith, (iii) as applicable, to transfer its equity securities in connection therewith, and (iv) to take all actions in connection therewith as are reasonably requested by Blackstone, including the execution of such agreements and such instruments and other actions to provide customary representations, warranties, covenants, indemnities and escrow arrangements relating to such transaction; provided that there is no difference in the price per share proposed to be paid for the Class A Common Stock and the Class B Common Stock and that indemnity, escrow, and expense obligations are borne ratably in proportion to claims on marginal proceeds.

***Tag-Along Rights:***

Quad-C shall have the opportunity to participate in any sale of Class A Common Stock by holders of the Class A Common Stock (carve-out for cumulative sales of up to 10% of the Class A Common Stock). Quad-C shall have the opportunity to sell Class B Common Stock in such sale on a pro rata basis based on the number of shares held by the holders of the Class A Common Stock participating in such sale and Quad-C shall receive the same consideration, on a per share basis, as the consideration received by the holders of the Class A Common Stock participating in such sale.

Blackstone shall have the opportunity to participate in any sale of Class B Common Stock by holders of the Class B Common Stock (carve-out for cumulative sales of up to 10% of the Class B Common Stock). Blackstone shall have the opportunity to sell Class A Common Stock in such sale on a pro rata basis based on the number of shares held by the holders of the Class B Common Stock participating in such sale and Blackstone shall receive the same consideration, on a per share basis, as the consideration received by the

|                                         | holders of the Class B Common Stock participating in such sale. |
|-----------------------------------------|---|
| ***Pre-Emptive Rights:*** | Holders of the Class A and Class B Common Stock shall have pre-emptive rights to purchase up to their proportionate share of any proposed issuance of debt (other than senior secured debt or debt incurred in connection with a supply contract), preferred stock or common stock by Holdings (based on their relative holdings of shares Holdings' common stock), subject to exclusions for issuances to management and other customary exclusions.  With respect to issuances of such securities for consideration other than cash, the pre-emptive rights will include provisions to convert such non-cash consideration into a cash value to allow the pre-emptive rights to be utilized. |
| ***Voting Rights Agreement:*** | With respect to all matters subject to a shareholder vote, the Class A Common Stock and Class B Common Stock shall vote as a single class (Class A – 3 votes per share, Class B – 1 vote per share). Holders of the Series B Preferred Stock and Class B Common Stock shall enter into a voting rights agreement requiring such holders to vote their shares in support of (and otherwise not object to) any transaction effected by Holdings' Board of Directors or the holders of Class A Common Stock so long as such transaction is consistent with the transactions contemplated by this term sheet or the term sheets describing Holdings' Common Stock, Series A Preferred Stock or Series B Preferred Stock. Holdings' Board of Directors shall not approve any matter or take any action that would materially and disproportionately adversely affect the Class B Common Stock relative to the Class A Common Stock. |
| ***Certain Related Party Transactions:*** | The parties to this term sheet hereby agree to negotiate in good faith regarding prohibitions on certain related party transactions. |
| ***Governing Law:*** | The Shareholders Agreement shall be governed by and construed in accordance with the laws of the State of New York.  The Shareholders Agreement shall provide that the venue for any suit to enforce such |

.

agreement shall be a state or federal court in New
York County.

.

**Exhibit B**
**Copy of the Plan**

**Exhibit C**
**Company Closing Certificates**

**1.   ORGANIZATION AND GOOD STANDING AND QUALIFICATION.**   As of the Effective Date, the Company shall be a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

**2.     POWER AND AUTHORITY.**   As of the Effective Date, the Company shall have all requisite corporate power and authority to own, lease, operate and encumber its properties and assets, to execute and deliver this Agreement, to issue and sell the Shares, to carry out the provisions of this Agreement, and to carry on its businesses and operations as presently conducted and as presently proposed to be conducted.

**3.   AUTHORIZATION; BINDING OBLIGATIONS.**   All corporate action on the part of the Company, its officers, directors and stockholders necessary for the authorization of this Agreement, the performance of all obligations of the Company hereunder at the Closing and the authorization, sale, issuance and delivery of the Shares pursuant hereto have been taken on or prior to the Closing.   As of the Effective Date, the Agreement shall be valid and binding obligations of the Company enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights, and (b) general principles of equity that restrict the availability of equitable remedies.

**4.   CAPITALIZATION.**   At the Effective Date, the sale of the Shares shall not be subject to any pre-emptive rights or rights of first refusal that will not have been modified pursuant to the Plan, waived or properly complied with.   At the Effective Date, the issued and outstanding Shares acquired hereunder (a) shall be duly authorized and validly issued to the Purchaser, (b) shall be fully paid and non-assessable and (c) shall be issued in compliance with all applicable state and federal laws, including title 11 of the United States Code, concerning the issuance of securities.   As of the Effective Date, there shall be no outstanding options, warrants, rights (including conversion or pre-emptive rights and rights of first refusal), proxy or stockholder agreements (other than the Stockholders' Agreement), or agreements of any kind for the purchase or acquisition from the Company of any of its securities.

- 19 -

# SCHEDULE 7

# NEW CLASS A PREFERRED STOCK TERM SHEET

**HEARTLAND AUTOMOTIVE HOLDINGS, INC.**

## Series A Preferred Stock

### PREFERRED STOCK SUMMARY OF TERMS

| | |
|---|---|
| ***Issuer of Preferred Stock:*** | Heartland Automotive Holdings, Inc. ("<u>Holdings</u>"), a Delaware corporation. |
| ***Preferred Stock Holders***: | Certain entities affiliated with Blackstone Mezzanine Partners L.P. (collectively, "<u>Blackstone</u>"). |
| ***Issue:*** | Series A Preferred Stock (the "<u>Series A Preferred Stock</u>"). |
| ***Authorized and Issued Shares of Series A Preferred Stock:*** | There shall be one million two hundred thousand (1,200,000) authorized shares of Series A Preferred Stock, one million (1,000,000) of which shall be issued to Blackstone in satisfaction of $64.06 million of its claim pursuant to the plan of reorganization for the Debtors as filed on November __, 2008 (the "<u>Plan of Reorganization</u>"). |
| ***Mandatory Redemption:*** | The Series A Preferred Stock will be subject to mandatory redemption at the Liquidation Preference (as defined below) on the ten-year anniversary of the effective date of the Plan of Reorganization (the "<u>Effective Date</u>"). |
| ***Optional Redemption:*** | The Series A Preferred Stock may be redeemed at any time at the Company's option upon payment in cash of the Liquidation Preference (as defined below). |
| ***Dividends:*** | Holders of Series A Preferred Stock (each a "<u>Holder</u>") shall be entitled to receive, when and as declared by the Board of Directors of Holdings, out of funds legally available therefor, dividends on the Series A Preferred Stock at a rate equal to 12.5% per annum (the "<u>Dividend Rate</u>") of the current Liquidation Preference (as defined below), in preference to any distribution on Junior Securities (as defined below), which dividends shall accrue from the date of issuance of the Series A Preferred Stock and, unless |

.

declared and paid in full in cash, will compound on a quarterly basis at the Dividend Rate. No dividend or distribution, except for regularly scheduled payment in kind dividends, shall be made in respect of Junior Securities, including, without limitation, any repurchase, redemption or other direct or indirect acquisition of Junior Securities by Holdings, long as any Series A Preferred Stock is outstanding (subject to a carve-out for repurchases of Junior Securities from current and former employees, directors and managers with annual and aggregate maximums to be agreed upon).

*Ranking:*

With respect to dividends, distributions, redemptions, repurchases and rights on liquidation, winding up and dissolution, the Series A Preferred Stock will rank senior to (a) all classes of common stock of Holdings and (b) each other class of capital stock or series of preferred stock issued by Holdings (whether outstanding on the Effective Date or issued thereafter, including, without limitation, the Series B Preferred Stock) ((a) and (b) above, the "Junior Securities").

*Additional Preferred Stock:*

Holdings shall not issue additional Series A Preferred Stock without the consent of the holders of a majority of the Series A Preferred Stock, other than shares of Series A Preferred Stock issued pursuant to management incentive plans approved by Holdings' Board of Directors.

*Liquidation Preference:*

In the event of any liquidation or dissolution or winding up of the affairs of Holdings, whether voluntary or involuntary (a "Liquidation Event"), or the occurrence of a Liquidity Event (to be defined), the Holders shall be entitled (prior and in preference to any distribution of any assets of Holdings to the holders of Junior Securities by reason of their ownership thereof) to receive, an amount in cash (the "Liquidation Preference") equal to $[64.06] per share of Series A Preferred Stock plus an amount equal to all accrued and unpaid dividends thereon (whether or not there are funds of Holdings legally available for the payment of dividends) to and including the date of final distribution. Pursuant to management incentive plans approved by Holdings' Board of Directors,

.

additional shares of Series A Preferred Stock may be issued to and other incentive compensation arrangements may be entered into with Holdings' management which would participate in value senior to or pari passu with the Series A Preferred Stock.

*Voting Rights:*                                   None other than those required as a matter of corporate law and section 1123(a)(6) of the United States Bankruptcy Code.

*Transferability:*                                 The Series A Preferred Stock shall be transferable by the Holders thereof (other than to a competitor of Holdings, other than in connection with a Sale Transaction (as defined in the Shareholders Agreement) approved by Holdings' Board of Directors, including, when required, the consent of the Quad-C Director), subject to the terms of the Shareholders Agreement.

*Governing Law:*                                   The Series A Preferred Stock shall be governed by and construed in accordance with the laws of the State of Delaware.

.

# SCHEDULE 8

# NEW CLASS B PREFERRED STOCK TERM SHEET

# HEARTLAND AUTOMOTIVE HOLDINGS, INC.

## Series B Preferred Stock

### PREFERRED STOCK SUMMARY OF TERMS

| | |
|---|---|
| ***Issuer of Preferred Stock:*** | Heartland Automotive Holdings, Inc. ("<u>Holdings</u>"), a Delaware corporation. |
| ***Preferred Stock Purchaser***: | Certain entities affiliated with [Quad-C] (collectively, "<u>Quad-C</u>"). |
| ***Issue:*** | Series B Preferred Stock (the "<u>Series B Preferred Stock</u>"). |
| ***Authorized and Issued Shares of Series B Preferred Stock:*** | There shall be one million two hundred thousand (1,200,000) authorized shares of Series B Preferred Stock, one million (1,000,000) of which shall be issued to Quad-C pursuant to the Series B Preferred Stock Purchase Agreement. |
| ***Purchase Price:*** | $23,000,000. |
| ***Closing Date:*** | The effective date of the plan of reorganization for the Debtors as filed on November __, 2008 (the "<u>Plan of Reorganization</u>"). |
| ***Mandatory Redemption:*** | The Series B Preferred Stock will be subject to mandatory redemption at the Liquidation Preference on the eleven-year anniversary of the effective date of the Plan of Reorganization (the "<u>Effective Date</u>"). |
| ***Optional Redemption:*** | Subject to the restrictions described below, the Series B Preferred Stock may be redeemed at any time at the Company's option upon payment in cash of the Liquidation Preference (as defined below). |
| ***Dividends:*** | Holders of Series B Preferred Stock (each a "<u>Holder</u>") shall be entitled to receive, when and as declared by the Board of Directors of Holdings, out of funds legally available therefor, dividends on the Series B Preferred Stock at a rate equal to 12.5% per annum (the "<u>Dividend Rate</u>") of the current Liquidation |

.

Preference (as defined below), in preference to any distribution on Junior Securities (as defined below), which dividends shall accrue from the date of issuance of the Series B Preferred Stock and, unless declared and paid in full in cash, will compound on a quarterly basis at the Dividend Rate. No dividend or distribution, except for regularly scheduled payment in kind dividends, shall be made in respect of the Series B Preferred Stock, including, without limitation, any repurchase, redemption or other direct or indirect acquisition of any Series B Preferred Stock, as long as any Series A Preferred Stock is outstanding.

No dividend or distribution in respect of Junior Securities, including, without limitation, any repurchase, redemption or other direct or indirect acquisition of Junior Securities by Holdings, shall be made as long as any Series B Preferred Stock is outstanding (subject to a carve-out for repurchases of Junior Securities from current and former employees, directors and managers with annual and aggregate maximums to be agreed upon).

*Ranking:*

With respect to dividend rights and rights on liquidation, winding up and dissolution, the Series B Preferred Stock will rank junior to the Series A Preferred Stock and senior to (a) all classes of common stock of Holdings and (b) each other class of capital stock or series of preferred stock issued by Holdings other than the Series A Preferred Stock and any preferred stock that ranks senior to the Series A Preferred Stock (whether outstanding on the Effective Date or issued thereafter) ((a) and (b) above, the "Junior Securities").

*Additional Preferred Stock:*

Holdings shall not issue additional Series B Preferred Stock without the consent of the holders of a majority of the Series B Preferred Stock, other than shares of Series B Preferred Stock issued pursuant to management incentive plans approved by Holdings' Board of Directors.

*Liquidation Preference:*

In the event of any liquidation or dissolution or winding up of the affairs of Holdings, whether

voluntary or involuntary (a "Liquidation Event"), or the occurrence of a Liquidity Event (to be defined), the Holders shall be entitled (prior and in preference to any distribution of any assets of Holdings to the holders of Junior Securities by reason of their ownership thereof) to receive, an amount in cash (the "Liquidation Preference") equal to $23.00 per share of Series B Preferred Stock plus an amount equal to all accrued and unpaid dividends thereon (whether or not there are funds of Holdings legally available for the payment of dividends) to and including the date of final distribution. Such Liquidation Preference shall only be payable to holders of the Series B Preferred Stock if the holders of Holdings' Series A Preferred Stock have received payment in full, in cash, of the Series A Liquidation Preference and the holders of any preferred stock that ranks senior to the Series A Preferred Stock have received payment in full, in cash, of such preferred stock's liquidation preference. Pursuant to management incentive plans approved by Holdings' Board of Directors, additional shares of Series B Preferred Stock may be issued to and other incentive compensation arrangements may be entered into with Holdings' management which would participate in value senior to or pari passu with the Series B Preferred Stock.

**Voting Rights:**    None other than those required as a matter of corporate law and section 1123(a)(6) of the United States Bankruptcy Code.

**Transferability:**    The Series B Preferred Stock shall be transferable by the Holders thereof (other than to a competitor of Holdings, other than in connection with a Sale Transaction (as defined in the Shareholders Agreement) approved by Holdings' Board of Directors, including, when required, the consent of the Quad-C Director), subject to the terms of the Shareholders Agreement.

**Closing Conditions:**    As contained in the Quad-C Contribution Documents.

.

***Governing Law:***      The Series B Preferred Stock shall be governed by and construed in accordance with the laws of the State of Delaware. The agreements related the Series B Preferred Stock shall provide that the venue for any suit to enforce such agreements shall be a state or federal court in New York County.

## SCHEDULE 9

## NEW COMMON STOCK TERM SHEET

**HEARTLAND AUTOMOTIVE HOLDINGS, INC.**

**Common Stock**

**SUMMARY OF TERMS**

<u>Class A Common Stock</u>

| | |
|---|---|
| ***Issuer of Class A Common Stock:*** | Heartland Automotive Holdings, Inc. ("<u>Holdings</u>"), a Delaware corporation. |
| ***Class A Holders***: | Certain entities affiliated with Blackstone Mezzanine Partners L.P. (collectively, "<u>Blackstone</u>"). |
| ***Authorized and Issued Shares of Class A Common Stock:*** | There shall be three hundred million (300,000,000) authorized shares of Class A common stock of Holdings (the "<u>Class A Common Stock</u>"). 200,000,000 shares of Class A Common Stock shall be issued to Blackstone in connection with the settlement of a portion of its claims ($3,333,333) pursuant to the plan of reorganization for the Debtors as filed on November __, 2008 (the "<u>Plan of Reorganization</u>"). |
| ***Voting:*** | The Class A Common Stock shall have three votes per share with respect to all matters which require a vote of Holdings' shareholders, including the election of the Holdings' Board of Directors.  With respect to all matters requiring a vote of Holdings' shareholders, The Class A Common Stock and Class B Common Stock shall vote as a single class of stock (Class A – 3 votes per share; Class B – 1 vote per share). |
| ***Economic Rights:*** | All classes of common stock shall have the same rights, except solely for voting rights, determined on a per share basis. |
| ***Transferability:*** | The Class A Common Stock shall be transferable by the Holders thereof (other than to a competitor of Holdings, other than in connection with a Sale Transaction (as defined in the Shareholders Agreement) approved by Holdings' Board of Directors, including, when required, the consent of the Quad-C Director), subject to the terms of the Shareholders Agreement. |

.

C - 1

Class B Common Stock

| | |
|---|---|
| ***Issuer of Class B Common Stock:*** | Holdings. |

| | |
|---|---|
| ***Class B Holders***: | Certain entities affiliated with [Quad-C] (collectively, "Quad-C"). |

| | |
|---|---|
| ***Authorized and Issued Shares of Class B Common Stock:*** | There shall be four hundred million (400,000,000) authorized shares of Class B common stock of Holdings (the "Class B Common Stock"). 300,000,000 shares of Class B Common Stock shall be issued to Quad-C for a cash purchase price of $5,000,000; pursuant to a stock purchase agreement attached as an exhibit to the Quad-C Plan Support Agreement.  ] |

| | |
|---|---|
| ***Closing Date:*** | The effective date of the plan of reorganization for the Debtors as filed on November __, 2008 (the "Plan of Reorganization"). |

| | |
|---|---|
| ***Voting:*** | The Class B Common Stock shall have one vote per share with respect to all matters which require a vote of Holdings' shareholders, including the election of the Holdings' Board of Directors.  With respect to all matters requiring a vote of Holdings' shareholders, The Class A Common Stock and Class B Common Stock shall vote as a single class of stock (Class A – 3 votes per share; Class B – 1 vote per share). |

| | |
|---|---|
| ***Economic Rights:*** | All classes of common stock shall have the same rights, except solely for voting rights, determined on a per share basis. |

| | |
|---|---|
| ***Transferability:*** | The Class B Common Stock shall be transferable by the Holders thereof (other than to a competitor of Holdings, other than in connection with a Sale Transaction (as defined in the Shareholders Agreement) approved by Holdings' Board of Directors, including, when required, the consent of the Quad-C Director), subject to the terms of the Shareholders Agreement. |

.

| | |
|---|---|
| ***Closing Conditions:*** | As contained in the Quad-C Contribution Documents. |
| ***Current Common Stock:*** | Current holders of Holdings common stock (456,275 shares) shall be holders of Class B Common Stock. |
| ***Governing Law:*** | The agreements related to the Common Stock shall be governed by and construed in accordance with the laws of the State of New York. The agreements related the Common Stock shall provide that the venue for any suit to enforce such agreements shall be a state or federal court in New York County. |

.

# SCHEDULE 10

# AMENDED AND RESTATED H-II FACILITY TERM SHEET

**SUMMARY OF TERMS AND CONDITIONS**

**FOR TREATMENT OF H-II SECURED LENDERS**

**12-19-08 (FINAL)**

**CO-BORROWERS:**

Heartland Automotive Holdings, Inc., and affiliates (collectively, Borrowers).

**ADMINISTRATIVE AGENT:**

Dymas Capital Management Company, LLC or one of its affiliates, and any successor, including any successor agent (collectively, "Dymas ").

**LENDERS:**

The existing H-II Secured Lenders (including Dymas affiliates individually). The H-II Secured Lenders will share pro rata in both the Term A and Term B tranches of the Senior Secured Lending Facility, as described below.

**BANKRUPTCY EXIT COSTS AND POST-PETITION LIQUIDITY:**

This Term Sheet is predicated on (i) consummation, in connection with the effective date of a Plan of Reorganization for Borrowers (the "Plan", and such date, the "Effective Date"), of the transactions, claims resolution, debt conversion and capital infusions, as applicable, described in the various Plan Support Agreements with JLI, SOPUS, Blackstone and Quad-C, (ii) no less than $10.0 million of Cash and Cash Equivalents, as defined in the Second Amended and Restated Financing Agreement, dated as of February 27, 2006, as amended ("Existing Credit Facility") at the Effective Date of the Plan, after satisfying or making provision for obligations required to be satisfied on or about the Effective Date and (iii) occurrence of the effectiveness of the Plan for Borrowers no later than April 15, 2009. The H-II Secured Lenders' commitment to the terms of this Term Sheet shall terminate if the Plan does not incorporate this treatment or the Plan is modified in any other way that adversely impacts the H-II Secured Lenders' treatment under this Term Sheet in a material respect, unless otherwise agreed to by the H-II Secured Lenders.

HEARTLAND AUTOMOTIVE                                    SUMMARY OF TERMS AND CONDITIONS

**SENIOR SECURED LENDING FACILITY:**

A Senior Secured Facility equal to the full face amount of the prepetition senior secured indebtedness of the H-II Secured Lenders of approximately $187.7 million (together with the Amended and Restated H-I Facility, the "Senior Lending Facility") consisting of the loans described below, and having security and priority senior to any indebtedness of Borrowers other than the Amended and Restated H-I Facility. (The Amended and Restated H-I Facility shall have a senior security interest in the same collateral prepetition under the existing H-I facilities (i.e., the assets of Heartland Automotive Services, Inc. and its subsidiary Heartland Automotive Services of Austin, Inc.) and shall receive pro rata payment (based on the principal amounts outstanding of the Term Loan A and the Amended and Restated H-I Facility) of all principal amortization, prepayments and repayments, all as described in the Plan in a manner consistent with this Term Sheet)). Note: the preceding estimate of the aggregate claim amount of the Senior Lending Facility (which does not include undrawn but outstanding letters of credit) assumes that interest continues to be paid monthly pursuant to the Final Order Authorizing the Use of Cash, Including Cash Collateral, and Providing Adequate Protection ("Cash Collateral Order").[1] To the extent interest is not paid in accordance with, or was not authorized to be paid under, the Cash Collateral Order, such amounts (at the rate specified in the Cash Collateral Order as applicable, or if not specified, at the non-default rate) shall be added to the principal balance monthly through the Effective Date, with ratable adjustments in the principal amounts set forth below.

The allocation of the total principal amount, $187.7 million, between Term Loan A and B will be as follows:

- A first lien 5-year senior secured term loan ("Term Loan A") with a principal amount of $112.7 million outstanding at closing.

- A second lien 5-year senior secured term loan ("Term Loan B") with a principal amount of $75.0 million outstanding at closing.

---

[1] Although this amount does not include undrawn but outstanding letters of credit, the letter of credit facility under the Existing Credit Facility shall remain in place under the Senior Lending Facility on terms consistent with the Existing Credit Facility with the following modifications to the extent required: outstanding letters of credit shall remain outstanding until the earlier of (i) they are drawn, (ii) they are cancelled by the Borrowers or (iii) the Senior Secured Facility matures in accordance with its terms. If a letter of credit is drawn, Borrowers shall issue additional Term Loan B notes in an amount equal to such draw, to be issued to the original revolving lenders, or their successors/assigns, in proportion to their commitment. Letter of credit and agent monitoring fees shall be paid as set forth in the Existing Credit Facility.

HEARTLAND AUTOMOTIVE                                    SUMMARY OF TERMS AND CONDITIONS

**TERM LOAN AMORTIZATION:** [2]  The Term Loan A shall be payable in equal quarterly installments of principal during each loan year according to the following amortization schedule, with the remaining principal balance due at maturity:

| | |
|---|---|
| Year 1: | $0.0 million |
| Year 2: | $2.868 million |
| Year 3: | $3.277 million |
| Year 4: | $4.097 million |
| Year 5: | $4.097 million |
| Principal Balance: $98.361 million | |
| **Total** | **$112.7 million** |

The Term Loan A principal payments shall be due on the last day of each calendar quarter commencing with the quarter ended June 30, 2009.

There will be no regularly scheduled principal payments on the Term Loan B.

**INTEREST:**  The Borrowers shall (A) pay cash interest on each of Term Loan A and Term Loan B, as specified in the following table, at either of the following rates (at the option of the Borrowers, on terms consistent with the Existing Credit Facility): (i) the LIBOR Rate plus the applicable margin specified below ("Applicable Margin for LIBOR Loans"), or (ii) the Base Rate plus the applicable margin specified below ("Applicable Margin for Base Rate Loans"), provided that the Base Rate shall be defined as specified below (following the table), and provided further, that neither the LIBOR Rate nor the Base Rate shall at any time be less that the "Interest Rate Floors" specified in the table; and (B) accrue PIK interest on the Term Loan B, as specified in the table:

| Interest Rate Floors: | | |
|---|---|---|
| LIBOR | 2.25% | |
| Base Rate | 3.25% | |
| | | |
| | | |

---

[2]     This amortization schedule shows the principal amortization payments for the H-II Secured Lenders.  The total of the amortization payments available to be made on a pro rata basis between the total principal amounts outstanding on the Effective Date of the Term Loan A and the Amended and Restated H-I Facility (which pro rata basis shall also determine the allocation of any other principal prepayments or repayments) is as follows:

| | |
|---|---|
| Year 1: | $0.0 million |
| Year 2: | $3.5 million |
| Year 3: | $4.0 million |
| Year 4: | $5.0 million |
| Year 5: | $5.0 million |
| Principal Balance: $120.0 million | |
| **Total** | **$137.5 million.** |

| Term Loan A | Cash | PIK |
|---|---|---|
| LIBOR | LIBOR + 5.0% | |
| Base Rate | Base Rate + 4.0 % | |
| | | |
| **Term Loan B** | | |
| | | |
| LIBOR | LIBOR + 5. 0% | 2.0% |
| Base Rate | Base Rate + 4.0% | 2.0% |

"Base Rate" shall be defined in a manner consistent with the Existing Credit Facility.

Interest on LIBOR Rate loans shall be payable on the last day of the applicable interest period, or if such interest period is longer than three months, at each three month interval, or if such day is not a business day, on the next business day. The PIK interest will also be added to the principal balance on the last day of the applicable interest period, at each three month interval.

Interest on Base Rate loans shall be payable on the last business day of each month. The PIK interest also will be added to the principal balance on the last business day of each month.

All interest and fees shall be computed on the basis of a year of 360 days for the actual days elapsed commencing on the Plan Effective Date. After the occurrence and during the continuance of an event of default, at the request of the Administrative Agent or the requisite lenders, interest on the obligations shall be increased by 2.0% per annum and shall be in accordance with the terms set forth above, provided that nothing herein shall be deemed to limit Dymas' and the H-II Secured Lenders' rights to accelerate the entire indebtedness in accordance with the terms of the Definitive Documents following the occurrence of an Event of Default and the passage of any cure period, and to recover default interest in connection therewith.

**OPTIONAL PREPAYMENT/ INCENTIVE FOR EARLY REPAYMENT:**

The Term Loans may be prepaid without penalty or premium, other than LIBOR breakage fees (which shall be paid in conjunction with any prepayment). Any prepayments of Term Loans, however, shall be applied first to the Term Loan A, on a pro rata basis with the Amended and Restated H-I Facility, until the respective outstanding principal balances are zero and then shall be applied to the remaining outstanding principal balance of the Term Loan B.

Subject to the preceding, if the Term Loan B is repaid within the first year following the Effective Date, 100% of the accumulated PIK interest will be forgiven. If the Term Loan B is repaid after the end

of the first year following the Effective Date but on or before the end of the second year following the Effective Date, 50% of the accumulated PIK interest will be forgiven.  If the Term Loan B is repaid after the end of the second year following the Effective Date but on or before the end of the third year following the Effective Date, 25% of the accumulated PIK interest will be forgiven.

**MANDATORY PREPAYMENT:**   In addition to the amortization set forth above, customary mandatory prepayments will be included in the Definitive Documentation, e.g., issuance of additional equity (with carve-outs for certain issuances consistent with Permitted Acquisitions), debt (with carve-outs for certain issuances consistent with Permitted Acquisitions), non-ordinary course sale of assets, tax refunds (to the extent paid), casualty events, and proceeds received from other "corporate events" or any other extraordinary receipts, with customary exceptions to be agreed upon by the Administrative Agent.  Any such prepayment will be made on a pro rata basis when aggregated with mandatory prepayments of the Amended and Restated H-I Facility as set forth above, which also shall be made on a pro rata basis, provided that to the extent such extraordinary receipt (such as non-ordinary course sale, tax refund, casualty event etc.) pertains to collateral as to which the H-II Secured Lenders hold a senior lien, such prepayment shall be applied to obligations under the Senior Secured Lending Facility, whereas to the extent such extraordinary receipt pertains to collateral as to which the H-I Secured Lenders hold a senior lien, such prepayment shall be applied to obligations under the Amended and Restated H-I Facility.

In addition, provided that the pro forma adjusted LTM EBITDA (inclusive of pro forma adjusted LTM EBITDA from acquisitions during such twelve months), calculated at the end of each fiscal year, is no less than $40 million and $42.5 million, respectively, Borrowers shall make prepayments annually in an amount equal to twenty one and one-half percent (21.5%) and forty-one percent (41%), respectively,[3] of annual Excess Cash Flow for the immediately preceding fiscal year; provided that Borrowers shall not be required to pay Excess Cash Flow if such payment, plus the mandatory prepayments required under the Amended and Restated H-I Facility based on Excess Cash Flow, would result in the Borrowers' Cash and Cash Equivalents to be below $7.5 million after giving effect to such payment, provided further, however, that in such instance Borrowers shall pay such amount of Excess Cash Flow as would not cause Borrowers' Cash and Cash Equivalents to be less than $7.5 million, after fully accounting for the mandatory prepayments required under the Amended and Restated H-I Facility based on Excess Cash Flow, at the time such payment is due.  Excess Cash Flow to be defined as consolidated adjusted EBITDA actually

---

[3] These percentages reflect the H-II Secured Lenders' pro rata share of the total Excess Cash Flow available for all Mandatory Prepayments to both the H-I and H-II Secured Lenders, calculated consistent with the relationship between the principal amount of the Amended and Restated H-I Facility debt and the Term Loan A debt as described in footnote 2 and its accompanying text above.

generated during such year, minus the sum of scheduled cash principal payments and voluntary prepayments of the Senior Lending Facility actually made, scheduled payments of principal on other indebtedness actually made, unfinanced growth, maintenance and reimaging capital expenditures (and any budgeted but unspent capital expenditures for such fiscal year and all prior years including, without limitation, but without double counting, unspent funding for such expenditures provided by JLI and/or SOPUS as contemplated by their respective Plan Support Agreements) cash interest expense, income and franchise taxes paid in cash, certain restricted payments, any obligation payable in cash to SOPUS for such fiscal year as the result of not meeting any annual minimum purchase requirements in the Master Supply Agreement with SOPUS, and any other cash expenditures added back in connection with calculating adjusted EBITDA or appearing below the EBITDA line, and increases in working capital, plus, decreases in working capital.  All prepayments shall be applied first to Term Loan A until the outstanding principal balance is zero and then shall be applied to the remaining outstanding principal balance of Term Loan B.

**CLOSING DATE:**                Effective Date of the Plan.

**COLLATERAL:**                Retain existing liens against assets, stock of each H-II operating and holding company (e.g., the collateral and enforcement rights under Existing Credit Facility).  For purposes of clarification, there will not be any liens against the stock of the parent holding company to be issued or retained pursuant to the Plan.

**CONDITIONS PRECEDENT:**        Usual (e.g., inclusion of broad releases in favor of and from H-II Secured Lenders, payment of fees and expenses of Dymas and H-II Secured Lenders).  Copies of invoices will be presented to the Committee and the Debtors for all post-petition fees and expenses of Dymas and H-II Secured Lenders paid or requested to be paid by the estates.  The same deadline for objecting to estate professional fees will be fixed for the Committee and the Debtors to present any objection to the Bankruptcy Court as to the reasonableness of any such amounts reflected in such invoices, and the Bankruptcy Court shall resolve such dispute after notice and a hearing.  For purposes of evaluating the reasonableness of any fees payable to Houlihan in the event of any objection, the substantive standard set forth in the second sentence of Bankruptcy Code section 328(a) shall be applied notwithstanding the fact that Houlihan is not an estate professional (Houlihan shall not otherwise be deemed or treated as an estate professional).

Agreement from JLI to subordinate its royalty payments in the event of default on terms consistent with JLI Plan Support Agreement.

The Agreement Concerning Collateral Assignment between Dymas and JLI ("Inter-Creditor Agreement") will be amended to conform to the JLI Plan Support Agreement but to otherwise preserve Dymas'

inter-creditor rights thereunder.

**REPRESENTATIONS AND WARRANTIES:**

Representations and warranties to be consistent in scope with Existing Credit Facility, including, but not limited to, corporate existence and good standing, authority to enter into and enforceability of loan documentation, occurrence of the effective date, governmental approvals, non-violation of other agreements, financial statements, litigation, compliance with environmental, pension and other laws, taxes, insurance, absence of material adverse event, absence of default or unmatured default under the proposed Senior Lending Facility, absence of change of control following effectiveness, no cash dividends, priority of the H-II Secured Lenders' liens as set forth above, and no management fees to Quad-C, Blackstone or affiliates (or any holder of 5% or more of the equity securities of the Company), provided that Blackstone and Quad-C shall be entitled to reimbursement of actual and reasonable out of pocket expenses in connection with Board and oversight responsibilities.

The phrase "consistent in scope" (above) means that the representations and warranties will be similar to those contained in the Existing Credit Facility. It is noted herein that most of the representations and warranties in the Existing Credit Facility are qualified by the likely occurrence of a material adverse event or the imposition of a material liability in connection therewith.

**COVENANTS:**

Non-financial covenants also will be consistent in scope with the Existing Credit Facility. Financial covenants to be tested on a quarterly basis beginning the first full fiscal quarter after the Effective Date and to key off of reasonably agreed forecast ("Forecast").

Maximum Senior Leverage Ratio:
The ratio of Senior Debt (defined as outstanding balance of the Senior Lending Facility and any other senior debt whether pari passu or senior to the Senior Lending Facility, including capital leases but specifically excluding (a) all Non-Financing Leases (as defined below) and (b) any obligation to repay funding provided by JLI and/or SOPUS as contemplated by their respective Plan Support Agreements) to trailing twelve-month pro forma adjusted EBITDA shall not exceed the multiples set forth on Exhibit A for the corresponding time periods set forth on Exhibit A under the column named Financial Covenants at any time during which amounts are outstanding on the Senior Lending Facility.

Minimum Cash Interest Coverage Ratio:
The ratio of trailing twelve-month pro forma adjusted EBITDA to the total required annual cash payments of interest on the Senior Lending Facility (and any other senior debt whether pari passu or senior to the Senior Lending Facility, including capital leases but specifically excluding (a) all Non-Financing Leases and (b) any obligation to repay funding provided by JLI and/or SOPUS as

contemplated by their respective Plan Support Agreements) shall not be less than the multiples set forth on Exhibit A for the corresponding time periods set forth on Exhibit A under the column named Financial Covenants at any time during which amounts are outstanding on the Senior Lending Facility.

Minimum Fixed Charge Coverage Ratio:
The ratio of trailing twelve-month pro forma adjusted EBITDA to the total required annual fixed charges (defined as cash interest plus cash taxes plus required amortization other than Mandatory Prepayments) shall not be less than the multiples set forth on Exhibit A for the corresponding time periods set forth on Exhibit A under the column named Financial Covenants during which amounts are outstanding on the Senior Lending Facility.

Limitations on Capital Expenditures:
Maintenance and growth capital expenditures to be consistent with Forecast for the corresponding time periods set forth on Exhibit A under the column named Limitation on Capital Expenditures and to contain rollover for all previous capital expenditures provided in the Forecast but not spent.  Note: cutbacks specified below will not apply to this financial covenant.

Pro forma adjusted EBITDA (pro forma adjustments reasonably acceptable to Dymas) is defined as EBITDA adjusted in the manner to be set forth in Definitive Documentation for underwriteable addbacks and extraordinary or one-time items.

**PERMITTED ACQUISITIONS:**   Terms of a Permitted Acquisition (which will not require further Lender consent) must be consistent with the Forecast (per annum and cumulatively, but subject to reasonable carryover) and must include:
- Target must be in the same line of business.
- Target must not be an insider or affiliate of any entity holding 5% or more of the aggregate equity securities of  Borrowers.
- Assets must be acquired by a Borrower or a wholly-owned domestic subsidiary of a Borrower, the capital stock of which H-II Secured Lenders shall be granted a senior lien.
- Target must possess positive pro forma adjusted EBITDA (both pro forma and adjustments to be reasonably acceptable to Dymas).
- Acquisition must be documented pursuant to a written agreement furnished to Dymas in substantially final form before proposed closing.
- To the extent such acquisition pertains to leased properties, Delivery of landlord waivers in a form reasonably acceptable to Dymas to the extent such acquisition pertains to leased properties.
- To the extent such acquisition pertains to leased properties,

Borrowers shall exercise commercially reasonable efforts to obtain agreement by lessor to permit leased premises to be encumbered by liens securing the Senior Secured Facility.

- Delivery of environmental due diligence reflecting the absence of any environmental liabilities associated with such Permitted Acquisition or, to extent any such environmental liabilities are identified and material in relation to the acquisition, Borrowers shall present to Dymas a plan for prompt remediation following closing (and Borrowers shall thereafter promptly effectuate such remediation post-closing).

- Acquisition approved by JLI, if required.

- To the extent necessary as reasonably determined by Dymas, the Inter-Creditor Agreement shall have been amended or modified to include the acquired assets in the definition of Equity Collateral and Non-Equity Collateral (as such terms are defined therein).

- Borrowers must be in compliance with Definitive Documentation, including, without limitation, all covenants before and after giving effect to the acquisition (financial covenants will include but not be limited to maximum leverage, minimum interest coverage, and capital expenditures, as set forth on Exhibit A under the column named Financial Covenants).

- Borrowers must have a minimum Cash and Cash Equivalents balance, after giving effect to the acquisition, of no less than $6.0 million.

- Any assets acquired shall be subject to senior lien in favor of H-II Secured Lenders, provided that Borrowers may effectuate an acquisition pursuant to which H-II Secured Lenders do not obtain a senior lien against the assets acquired ("Non-Senior Acquisitions") so long as the following additional requirements are met:

    - (i) the H-II Secured Lenders shall be granted a lien junior solely to indebtedness incurred or assumed in connection with such transaction;

    - (ii) any indebtedness incurred or assumed (including capital leases but excluding real property leases for the operating premises whether or not those leases are treated as capital or operating leases under GAAP so long as such leases are not financing leases as an economic matter, "Non-Financing Leases") in connection with such transaction shall have recourse solely to the assets acquired and not the Borrowers or their other assets; and

    - (iii) the amount of cash paid plus indebtedness incurred or assumed (including capital leases but excluding Non-Financing Leases) in connection with such transaction shall not exceed 5.0X proforma adjusted EBITDA (both pro forma and adjustments to be reasonably acceptable to Dymas), pursuant to financial information furnished to Dymas.

- Except as to any Non-Senior Acquisitions, any indebtedness incurred or assumed in connection with such transaction must be junior in all respects to the Senior Secured Facility, provided that the Definitive Documentation shall contain a to be reasonably agreed "basket" for the aggregate amount of capital lease obligations that may be incurred in connection with Permitted Acquisitions (both Non-Senior Acquisition and other Permitted Acquisitions) as to which the no lien is granted to the H-II Secured Lenders; provided, however, that so long as the proposed transaction otherwise complies with the terms herein, there shall be no limitation on indebtedness incurred or assumed in connection with such transaction for Non-Financing Leases.

- Notwithstanding anything to the contrary contained in this Term Sheet, from and after the first anniversary of the Effective Date, Borrowers shall not be entitled to enter into or effectuate an otherwise Permitted Acquisition without Dymas' consent in its sole discretion unless Borrowers are in compliance with the covenants identified under the column named Acquisition Covenants on the attached Exhibit A by the multiples identified for the time period identified for the most recent reporting period as compared to the Forecast, after accounting for the proposed acquisition on a pro forma basis (such pro forma to be reasonably acceptable to Dymas). (Such provision shall constitute a negative covenant in the Definitive Documentation).

**EVENTS OF DEFAULT:**     The Definitive Documentation shall contain events of default tied to the covenants, representations, warranties and other obligations.

**REQUISITE LENDERS:**     Consistent with the Existing Credit Facility.

**GOVERNING LAW:**     The Definitive Documentation shall be governed by the laws of the State of New York.

## EXHIBIT A

### FINANCIAL COVENANTS

All covenants are based on LTM EBITDA, Interest and Fixed Charges, as defined here or in the Term Sheet. The following covenants assume an Effective Date of April 1, 2008. These covenants assume that Fresh-Start Accounting treatment is not required, as per recommendation of the Debtors. If Fresh-Start Accounting is required these covenants would be recalculated based on any impact resulting from the application of Fresh-Start Accounting.

|  | Financial Covenants | | | | Acquisition Covenants | | |
|---|---|---|---|---|---|---|---|
|  | Senior Debt / Adjusted EBITDA | Adjusted EBITDA / Cash interest exp. | Fixed charge coverage ratio (1) | Limitation on CapEx ($000's) | Senior Debt / Adjusted EBITDA | Adjusted EBITDA / Cash interest exp. | Fixed charge coverage ratio (1) |
| Jun-09 | 8.3x | 1.6x | 1.4x |  | None | None | None |
| Sep-09 | 9.0x | 1.4x | 1.3x |  | None | None | None |
| Dec-09 | 8.3x | 1.6x | 1.4x | 9,015 | None | None | None |
| Mar-10 | 8.1x | 1.6x | 1.4x |  | 7.6x | 1.7x | 1.5x |
| Jun-10 | 8.0x | 1.7x | 1.4x |  | 7.5x | 1.8x | 1.5x |
| Sep-10 | 8.0x | 1.7x | 1.3x |  | 7.5x | 1.8x | 1.4x |
| Dec-10 | 7.7x | 1.7x | 1.3x | 18,600 | 7.5x | 1.8x | 1.4x |
| Mar-11 | 7.4x | 1.8x | 1.3x |  | 7.2x | 1.9x | 1.4x |
| Jun-11 | 7.1x | 1.9x | 1.4x |  | 6.9x | 1.9x | 1.4x |
| Sep-11 | 6.9x | 1.9x | 1.4x |  | 6.7x | 2.0x | 1.4x |
| Dec-11 | 6.6x | 2.0x | 1.4x | 12,400 | 6.4x | 2.0x | 1.4x |
| Mar-12 | 6.5x | 2.0x | 1.3x |  | 6.3x | 2.1x | 1.3x |
| Jun-12 | 6.3x | 2.0x | 1.2x |  | 6.1x | 2.1x | 1.3x |
| Sep-12 | 6.1x | 2.1x | 1.2x |  | 6.0x | 2.1x | 1.2x |
| Dec-12 | 6.0x | 2.1x | 1.1x | 12,730 | 5.8x | 2.2x | 1.2x |
| Mar-13 | 5.9x | 2.1x | 1.1x |  | 5.7x | 2.2x | 1.2x |
| Jun-13 | 5.7x | 2.2x | 1.1x |  | 5.6x | 2.2x | 1.2x |
| Sep-13 | 5.6x | 2.2x | 1.1x |  | 5.4x | 2.3x | 1.2x |
| Dec-13 | 5.5x | 2.2x | 1.1x | 13,015 | 5.3x | 2.3x | 1.2x |

(1) FCCR = Adjusted EBITDA / (Cash interest + cash taxes + required amortization).

# SCHEDULE 11

# AMENDED AND RESTATED H-I FACILITY TERM SHEET

# SUMMARY OF TERMS AND CONDITIONS
# FOR TREATMENT OF H-I SECURED LENDERS
# 12-19-08 (FINAL)

| | |
|---|---|
| **CO-BORROWERS:** | Heartland Automotive Holdings, Inc. and affiliates (collectively, the "Borrowers"). |
| **ADMINISTRATIVE AGENT:** | AMRESCO Commercial Finance LLC, Capmark Finance Inc. ("Capmark"), and GE Capital Franchise Finance Corp., or any one of their affiliates, and any successor, including any successor agent (collectively, the "Servicers").  Each Servicer shall continue to service the same H-I Secured Lenders for the same pro rata share of total H-I funds as it serviced prepetition. |
| **LENDERS:** | The existing H-I Secured Lenders.  The H-I Secured Lenders will share pro rata (according to their prepetition principal amounts outstanding) in the Senior Secured Facility, as described below. |
| **BANKRUPTCY EXIT COSTS AND POST-PETITION LIQUIDITY:** | This Term Sheet is predicated on (i) consummation, in connection with the effective date of a Plan of Reorganization for Borrowers (the "Plan", and such date, the "Effective Date"), of the transactions, claims resolution, debt conversion and capital infusions, as applicable, described in the various Plan Support Agreements with JLI, SOPUS, Blackstone and Quad-C, (ii) the Borrowers having no less than $10.0 million of Cash and Cash Equivalents, as defined in the Second Amended and Restated Financing Agreement, dated as of February 27, 2006, as amended with the H-II Lenders ("Existing H-II Credit Facility") at the Effective Date of the Plan, after satisfying or making provision for obligations required to be satisfied on or about the Effective Date and (iii) occurrence of the effectiveness of the Plan for the Borrowers no later than April 15, 2009. |

HEARTLAND AUTOMOTIVE                                    SUMMARY OF TERMS AND CONDITIONS

**SENIOR SECURED LENDING FACILITY:**

A Senior Secured Facility (with each H-I Secured Lender to be secured by the retention of its existing liens on the Borrowers' assets in their prepetition order of priority, except as set forth below in the "Collateral" section of this Term Sheet, and to receive (i) pro rata payment of all principal amortization, prepayments and repayments, and (ii) payments of interest, all as described in the Plan) equal to the full face amount of the prepetition senior secured indebtedness of the H-I Secured Lenders, subject to adjustment as set forth below (the "Amended and Restated H-I Facility", and together with the Amended and Restated H-II Facility described in the Plan, the "Senior Lending Facility").

Each H-I Secured Lender will retain its notes, which shall be amended and restated in an amount equal to its pro rata share of the Amended and Restated H-I Facility based on its prepetition principal amount outstanding (the "Amended and Restated H-I Notes"). The Amended and Restated H-1 Notes shall be recourse obligations against all Borrowers and the existing loan documentation shall be amended and restated in a manner that avoids impairment of the existing mortgages, deeds of trust and title policies. Each H-I Secured Lender, or its servicer, will service and receive payment on its own Amended and Restated H-1 Notes.

Any payment of principal or interest owing to an H-I Secured Lender which accrued during the pendency of the Borrowers' bankruptcy proceedings but was not paid in accordance with, or was not authorized to be paid under, the Final Order Authorizing the Use of Cash, Including Cash Collateral, and Providing Adequate Protection ("Cash Collateral Order") shall be allocated among and added to the principal amount of that H-I Secured Lender's Amended and Restated H-I Notes. Similarly, any payment of principal or interest owing to an H-I Secured Lender which accrued prepetition but has not been paid for any reason shall be allocated among and added to the principal amount of that H-I Secured Lender's Amended and Restated H-I Notes.

The amount of each H-I Secured Lender's claim shall be allowed and shall be equal to the principal, accrued unpaid interest and expenses owed under such H-I Secured Lender's existing loan documents as of the petition date, plus such H-I Secured Lender's reasonable unpaid expenses, costs, and legal fees incurred on account of such H-I Secured Lender's legal and financial advisors, appraisers and consultants, from the petition date through the Effective Date, as and to the extent provided for under such H-I Secured Lender's existing loan documents and subject to approval by the Bankruptcy Court, plus interest through the Effective Date calculated at the non-default rate.

The Amended and Restated H-I Facility will be a first lien 5-year senior secured term loan with a principal amount of $25.077 million outstanding at closing, adjusted only by the immediately preceding

paragraphs.

**TERM LOAN AMORTIZATION:** [1]   The Amended and Restated H-I Facility shall be payable in equal quarterly installments of principal during each loan year according to the following amortization schedule, with the remaining principal balance due at maturity:

| | |
|---|---|
| Year 1: | $0.0 million |
| Year 2: | $0.632 million |
| Year 3: | $0.723 million |
| Year 4: | $0.903 million |
| Year 5: | $0.903 million |
| Principal Balance: $21.639 million | |
| **Total** | **$25.077 million** [2] |

The Amended and Restated H-I Facility principal payments shall be due on the last day of each calendar quarter commencing with the quarter ended June 30, 2009.

**INTEREST:**   The Borrowers shall pay cash interest on each Amended and Restated H-I Note at the rate specified in the existing loan documentation for such note.

Interest only shall be payable as provided in each existing H-I note, or if such day is not a business day, on the next business day, and will be made using the ACH arrangements as existed prepetition.

All interest and fees shall be computed on the basis of a year of 360

---

[1]    This amortization schedule shows the principal amortization payments for the H-I Secured Lenders.  The total of the amortization payments available to be made on a pro rata basis between the total principal amounts outstanding on the Effective Date of the Term Loan A for the H-II Secured Lenders (as described in the Plan) and the Amended and Restated H-I Facility (which pro rata basis shall also determine the allocation of any other principal prepayments or repayments) is as follows:

| | |
|---|---|
| Year 1: | $0.0 million |
| Year 2: | $3.5 million |
| Year 3: | $4.0 million |
| Year 4: | $5.0 million |
| Year 5: | $5.0 million |
| Principal Balance: $120.0 million | |
| **Total** | **$137.5 million.** |

[2]    Of this principal amount, AMRESCO Commercial Finance, LLC will be servicer for $20,153,385.38, and CEF Funding II, L.L.C. will receive notes for $2,065,351.88, GE Business Asset Funding Corporation of Connecticut will receive notes for $370,531.88, and Capmark will be servicer for $2,488,207.86 as of November 30, 2008 plus interest at the per diem rate of $581.95 from November 30, 2008 to the Effective Date and Capmark's reasonable unpaid costs and expenses incurred on account of Capmark's legal and financial advisors from the Petition Date to the Effective Date, to the extent unpaid, and as to the extent provided for under the EMAC Facility, and subject to approval by the Bankruptcy Court.

HEARTLAND AUTOMOTIVE                                    SUMMARY OF TERMS AND CONDITIONS

days for the actual days elapsed commencing on the Plan Effective Date. After the occurrence and during the continuance of an event of default, at the request of the Administrative Agent or the requisite lenders, interest on the obligations shall be increased by 2.0% per annum and shall be in accordance with the terms set forth above, provided that nothing herein shall be deemed to limit the Agents' and the H-I Secured Lenders' rights to accelerate the entire indebtedness in accordance with the terms of the Definitive Documentation following the occurrence of an Event of Default and the passage of any cure period, and to recover default interest in connection therewith.

**OPTIONAL PREPAYMENT/ INCENTIVE FOR EARLY REPAYMENT:**

The Amended and Restated H-I Notes may be prepaid without penalty or premium. Any such prepayment must be pro rata with prepayment of the Term Loan A to be issued to the H-II Secured Lenders, as set forth above, and the Term Loan A documentation shall be amended to include the reciprocal requirement.

**MANDATORY PREPAYMENT:**

In addition to the amortization set forth above, customary mandatory prepayments will be included in the Definitive Documentation, e.g., issuance of additional equity (with carve-outs for certain issuances consistent with Permitted Acquisitions), debt (with carve-outs for certain issuances consistent with Permitted Acquisitions), non-ordinary course sale of assets, tax refunds (to the extent paid), casualty events, and proceeds received from other "corporate events" or any other extraordinary receipts, with customary exceptions to be agreed upon by the Administrative Agent. Any such prepayment will be made on a pro rata basis when aggregated with mandatory prepayments of the Term Loan A to be issued to the H-II Secured Lenders, as set forth above, which also shall be made on a pro rata basis, provided that to the extent such extraordinary receipt (such as non-ordinary course sale, tax refund, casualty event etc.) pertains to collateral as to which the H-I Secured Lenders hold a senior lien, such prepayment shall be applied to obligations under the Amended and Restated H-I Facility, whereas to the extent such extraordinary receipt pertains to collateral as to which the H-II Secured Lenders hold a senior lien, such prepayment shall be applied to obligations under the Amended and Restated H-II Facility. The Amended and Restated H-II Facility documentation shall be amended to include reciprocal requirements.

In addition, provided that the pro forma adjusted LTM EBITDA (inclusive of pro forma adjusted LTM EBITDA from acquisitions during such twelve months), calculated at the end of each fiscal year, is no less than $40 million and $42.5 million, respectively, Borrowers shall make prepayments annually in an amount equal to four and one-half percent (4.5%) and nine percent (9%),

respectively,[3] of annual Excess Cash Flow for the immediately preceding fiscal year to be allocated proportionately among the H-I Secured Lenders; provided that Borrowers shall not be required to pay Excess Cash Flow if such payment plus the mandatory prepayments required under the Amended and Restated H-II Facility based on Excess Cash Flow would result in the Borrowers' Cash and Cash Equivalents to be below $7.5 million after giving effect to such payment, provided further, however, that in such instance Borrowers shall pay such amount of Excess Cash Flow as would not cause Borrowers' Cash and Cash Equivalents to be less than $7.5 million after fully accounting for the mandatory prepayments required under the Amended and Restated H-II Facility based on Excess Cash Flow at the time such payment is due. Excess Cash Flow to be defined as consolidated adjusted EBITDA actually generated during such year, minus the sum of scheduled cash principal payments and voluntary prepayments of the Senior Lending Facility actually made, scheduled payments of principal on other indebtedness actually made, unfinanced growth, maintenance and reimaging capital expenditures (and any budgeted but unspent capital expenditures for such fiscal year and all prior years including, without limitation, but without double counting, unspent funding for such expenditures provided by JLI and/or SOPUS as contemplated by their respective Plan Support Agreements) cash interest expense, income and franchise taxes paid in cash, certain restricted payments, any obligation payable in cash to SOPUS for such fiscal year as the result of not meeting any annual minimum purchase requirements in the Master Supply Agreement with SOPUS, and any other cash expenditures added back in connection with calculating adjusted EBITDA or appearing below the EBITDA line, and increases in working capital, plus, decreases in working capital.

**CLOSING DATE:**          Effective Date of the Plan.

**COLLATERAL:**            Each H-I Secured Lender shall retain, and its loans and claims will be evidenced and secured by, its existing prepetition notes, loan agreements, deeds of trusts and mortgages, security agreements, environmental indemnity agreements, landlord estoppel certificates, consents or agreements, prime landlord agreements, and any agreements or amendments related thereto, all with the same rights, remedies and priority as existed as of the Petition Date, provided that such agreements shall be amended and restated as is necessary to implement the Plan repayment terms and amended financial covenants, and further provided that to the extent applicable, the Borrowers will waive any and all existing claims or defenses regarding the perfection of such H-I Secured Lender's liens on the Borrower's assets and will reasonably cooperate with such H-I Secured Lender to perfect and/or reinstate the senior priority and

---

[3] These percentages reflect the H-I Secured Lenders' pro rata share of the total Excess Cash Flow available for all Mandatory Prepayments to both the H-I and H-II Secured Lenders, calculated consistent with the relationship between the principal amount of the Amended and Restated H-I Facility debt and the Term Loan A debt as described in footnote 1 and its accompanying text above.

perfection of any such liens that have lapsed. For purposes of clarification, there will be no liens on the stock of the parent holding company to be issued or retained pursuant to the Plan.

**CONDITIONS PRECEDENT:** Usual (e.g., inclusion of broad releases of claims related to the Borrowers in favor of and from the H-I Secured Lenders, payment of fees and expenses of H-I Secured Lenders as allowed by the Court). For purposes of clarification, the release of claims by the H-I Lenders in favor of specified non-debtors does not release, impair or discharge: (i) any agreements, instruments, loans, rights, claims, liabilities, debts, interests or obligations (etc.) that do not arise out of the H-I Secured Lender's loans to the Borrowers; and (ii) any agreements, consents or waivers with such released parties that are related to the Borrowers or the H-I Secured Lender's loans to the Borrowers, such as landlord estoppel certificates, consents or agreements. All claims and avoidance actions of or on behalf of the estates against the H-I Secured Lenders shall be released. The commitment of the H-I Secured Lenders with respect to the Plan shall be included in a Plan Support Agreement and conditioned on treatment not materially and adversely different from the treatment set forth in this Term Sheet.

In addition, Capmark's reasonable unpaid costs and expenses incurred on account of Capmark's legal and financial advisors from the Petition Date, to the extent unpaid, as and to the extent provided for under the EMAC Loan Documents, and subject to approval by the Bankruptcy Court, shall be paid in cash on the Effective Date.

Agreement from JLI to subordinate its royalty payments in the event of default on terms consistent with JLI Plan Support Agreement.

**REPRESENTATIONS AND WARRANTIES:** Representations and warranties to be consistent in scope with Existing H-II Credit Facility, including, but not limited to, corporate existence and good standing, authority to enter into and enforceability of loan documentation, occurrence of the effective date, governmental approvals, non-violation of other agreements, financial statements, litigation, compliance with environmental, pension and other laws, taxes, insurance, absence of material adverse event, absence of default or unmatured default under the proposed Senior Lending Facility, absence of change of control following effectiveness, no cash dividends, priority of the H-I Secured Lenders' liens as set forth above, and no management fees to Quad-C, Blackstone or affiliates (or any holder of 5% or more of

the equity securities of the Borrowers), provided that Blackstone and Quad-C shall be entitled to reimbursement of actual and reasonable out of pocket expenses in connection with Board and oversight responsibilities.

The phrase "consistent in scope" (above) means that the representations and warranties will be similar to those contained in the Existing H-II Credit Facility. It is noted herein that most of the representations and warranties in the Existing H-II Credit Facility are qualified by the likely occurrence of a material adverse event or the imposition of a material liability in connection therewith.

**COVENANTS:**

Non-financial covenants also will be consistent in scope with the Existing H-II Credit Facility. Financial covenants to be tested on a quarterly basis beginning the first full fiscal quarter after the Effective Date and to key off of reasonably agreed forecast ("Forecast"). All covenants are based on last twelve month EBITDA, Interest and Fixed Charges, as defined here or in the attached Exhibit A.

Maximum Senior Leverage Ratio:
The ratio of Senior Debt (defined as outstanding balance of the Senior Lending Facility and any other senior debt whether pari passu or senior to the Senior Lending Facility, including capital leases but specifically excluding (a) all real property leases for the operating premises whether or not those leases are treated as capital or operating leases under GAAP so long as such leases are not financing leases as an economic matter ("Non-Financing Leases"), and (b) any obligation to repay funding provided by JLI and/or SOPUS as contemplated by their respective Plan Support Agreements) to trailing twelve-month pro forma adjusted EBITDA shall not exceed the multiples set forth on Exhibit A for the corresponding time periods set forth on Exhibit A under the column named Financial Covenants at any time during which amounts are outstanding on the Senior Lending Facility.

Minimum Cash Interest Coverage Ratio:
The ratio of trailing twelve-month pro forma adjusted EBITDA to the total required annual cash payments of interest on the Senior Lending Facility (and any other senior debt whether pari passu or senior to the Senior Lending Facility, including capital leases but specifically excluding (a) all Non-Financing Leases and (b) any obligation to repay funding provided by JLI and/or SOPUS as contemplated by their respective Plan Support Agreements) shall not be less than the multiples set forth on Exhibit A for the corresponding time periods set forth on Exhibit A under the column named Financial Covenants at any time during which amounts are outstanding on the Senior Lending Facility.

Minimum Fixed Charge Coverage Ratio:
The ratio of trailing twelve-month pro forma adjusted EBITDA to the total required annual fixed charges (defined as cash interest plus

cash taxes plus required amortization other than Mandatory Prepayments) shall not be less than the multiples set forth on Exhibit A for the corresponding time periods set forth on Exhibit A under the column named Financial Covenants during which amounts are outstanding on the Senior Lending Facility.

Limitations on Capital Expenditures:
Maintenance and growth capital expenditures to be consistent with Forecast to be reasonably approved pursuant to the Definitive Documentation to be consistent with SOPUS/JLI agreements and to contain rollover for all previous capital expenditures provided in the Forecast but not spent. Note: cutbacks specified below will not apply to this financial covenant.

Pro forma adjusted EBITDA (pro forma adjustments reasonably acceptable to the Administrative Agent for the Term Loan A) is defined as EBITDA adjusted in the manner to be set forth in Definitive Documentation for underwriteable addbacks and extraordinary or one-time items.

Note – All financial covenants to be based upon Forecast and will be established utilizing the following cutbacks: for the eighteen (18) months after the Effective Date, twenty percent (20%); thereafter, seventeen and a half percent (17.5%).

**ACQUISITIONS**                   The Amended and Restated H-I Facility shall have no limitations on acquisitions.

**EVENTS OF DEFAULT:**             The Definitive Documentation shall contain events of default tied to the covenants, representations, warranties and other obligations.

**REQUISITE LENDERS:**             Consistent with the existing H-I facilities.

**GOVERNING LAW:**                 The Definitive Documentation for each Amended and Restated HI Note will remain governed by the law that applied to such note prepetition.

HEARTLAND AUTOMOTIVE                                    SUMMARY OF TERMS AND CONDITIONS

**EXHIBIT A**

**FINANCIAL COVENANTS**

All covenants are based on LTM EBITDA, Interest and Fixed Charges, as defined here or in the Term Sheet.  The following covenants assume an Effective Date of April 1, 2008.  These covenants assume that Fresh-Start Accounting treatment is not required, as per recommendation of the Debtors.  If Fresh-Start Accounting is required these covenants would be recalculated based on any impact resulting from the application of Fresh-Start Accounting.

**Financial Covenants**

|  | Senior Debt / Adjusted EBITDA | Adjusted EBITDA / Cash interest exp. | Fixed charge coverage ratio (1) | Limitation on CapEx ($000's) |
|---|---|---|---|---|
| Jun-09 | 8.3x | 1.6x | 1.4x | |
| Sep-09 | 9.0x | 1.4x | 1.3x | |
| Dec-09 | 8.3x | 1.6x | 1.4x | 9,015 |
| Mar-10 | 8.1x | 1.6x | 1.4x | |
| Jun-10 | 8.0x | 1.7x | 1.4x | |
| Sep-10 | 8.0x | 1.7x | 1.3x | |
| Dec-10 | 7.7x | 1.7x | 1.3x | 18,600 |
| Mar-11 | 7.4x | 1.8x | 1.3x | |
| Jun-11 | 7.1x | 1.9x | 1.4x | |
| Sep-11 | 6.9x | 1.9x | 1.4x | |
| Dec-11 | 6.6x | 2.0x | 1.4x | 12,400 |
| Mar-12 | 6.5x | 2.0x | 1.3x | |
| Jun-12 | 6.3x | 2.0x | 1.2x | |
| Sep-12 | 6.1x | 2.1x | 1.2x | |
| Dec-12 | 6.0x | 2.1x | 1.1x | 12,730 |
| Mar-13 | 5.9x | 2.1x | 1.1x | |
| Jun-13 | 5.7x | 2.2x | 1.1x | |
| Sep-13 | 5.6x | 2.2x | 1.1x | |
| Dec-13 | 5.5x | 2.2x | 1.1x | 13,015 |

(1) FCCR = Adjusted EBITDA / (Cash interest + cash taxes + required amortization).

# SCHEDULE 12

# FORM OF NEW UNSECURED NOTE

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**1933 ACT**"), OR THE SECURITIES LAWS OF ANY STATE.  THIS NOTE MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT OR SUCH REGISTRATION OR QUALIFICATION AS MAY BE NECESSARY UNDER THE SECURITIES LAWS OF ANY JURISDICTION, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED, IN EACH CASE. TRANSFER OF THIS NOTE OR ANY INTEREST HEREIN IS ALSO SUBJECT TO RESTRICTIONS UNDER THE TERMS HEREOF.

## PROMISSORY NOTE

$[_____]                                                         [_____ ___], 2009
                                                                New York, New York

        XVI.Principal and Interest.    **FOR VALUE RECEIVED, [HEARTLAND AUTOMOTIVE HOLDINGS, INC., a Delaware corporation] (the "Company"), hereby promises to pay to [NAME OF UNSECURED CREDITOR] (the "Payee"), at the Company's principal executive offices, the principal amount of [Insert Amount In Words] Dollars ($[_____]) or, if less, the unpaid principal amount outstanding under this Note, together with accrued and unpaid interest on the unpaid balance of the principal amount from the date of this Note (the "Effective Date"), as set forth below.**

The principal balance outstanding from time to time from the Effective Date until such amount is repaid shall bear simple interest at the rate of eight percent (8.00%) per annum (the "Interest Rate"), which interest shall be payable by the Company to the Payee, subject to the terms hereunder, on the 30th day of each June and 31st day of each December from the Effective Date through the Maturity Date as defined below (each such date of payment being an "Interest Payment Date"), in lawful money of the United States of America.  The first Interest Payment Date shall be June 30, 2009 and interest shall continue thereon till principal indebtedness outstanding and all accrued but unpaid interest shall have been paid.  Notwithstanding the foregoing, the final interest payment shall be due and payable on the Maturity Date.  Interest shall be determined in all instances based upon a 365 or 366 day year, as the case may be and actual number of calendar days elapsed.  Interest shall be calculated as simple interest on each Interest Payment Date and the Maturity Date, as the case may be, and not compounded.

The principal indebtedness outstanding and all accrued but unpaid interest shall be due and payable in full on [_____ __], 2012[1] ("Maturity Date").

---

[1]    Insert the date that is the third anniversary of the Effective Date.

Concurrently with the payment in full of all principal outstanding and accrued and unpaid interest payable hereunder, Payee shall surrender this Note to the Company at the Company's principal executive offices for cancellation.

XVII.Place and Manner of Payments.  **All payments and prepayments to be made to Payee in respect of principal or interest on this Note on an Interest Payment Date or Maturity Date shall become due at 2:00 p.m., New York City time, on the 10th day following such Interest Payment Date or Maturity Date, as the case may be, and shall be made by the Company mailing, or sending by courier, a check payable to Payee drawn on a bank in the United States to the address set forth on the signature page hereto (or such other address as the Payee shall have furnished to the Company in writing no later than the 30th prior to such Interest Payment Date or Maturity Date, as the case may be) on or before the day when due, in lawful money of the United States of America, with such payment or prepayment deemed to have been made when such check is deposited in the mail or delivered to the courier.  If any payment of principal or interest becomes due on a day that is not a business day, such payment shall be made on or before the immediately succeeding business day unless such immediately succeeding business day falls in another calendar month, in which case such payment shall be made on or before the immediately preceding business day.**

XVIII.Voluntary Prepayment.  **The Company may, at its option, prepay in whole or part, at any time, any outstanding principal amount together with any accrued but unpaid interest on the principal portion of this Note without penalty.  Any such payments received by the Payee on account of this Note before demand or acceleration shall be applied first, to accrued and unpaid interest, and second, to the unpaid principal balance hereof.**

XIX.Restriction on Prepayments.  **The Company shall not prepay, redeem or repurchase any other New Unsecured Note (as defined in the amended joint chapter 11 plan of reorganization filed by the Company and its affiliated debtors, as confirmed on [ ___], 2009) unless its contemporaneously makes a prepayment of this Note, in whole or in part, in accordance with Section 3 above in an amount equal to (x) the principal amount outstanding under this Note multiplied by (A) the amount of the principal prepayment, redemption or repurchase of a New Unsecured Note over (B) the principal amount outstanding under such New Unsecured Note immediately prior to such prepayment, redemption or repurchase thereof, plus (y) accrued but unpaid interest on the principal portion of this Note equal to the amount calculated in accordance with (x) above.**

XX.Acceleration.  **This Note shall become immediately due and payable if (i) the Company commences any proceeding in bankruptcy for dissolution, liquidation, winding-up or other relief under federal or state bankruptcy laws; or (ii) such bankruptcy proceedings are commenced against the Company or a receiver or trustee is appointed for the Company or a substantial part of its property, and such proceeding or appointment is not dismissed or discharged within sixty (60) days of its commencement.**

XXI.U.S. Federal Withholding Tax.  **U.S. federal withholding tax could apply to payments on the Note if the beneficial owner of the Note is not a U.S. Person (as defined in Section 7701(a)(30) of the U.S. Internal Revenue Code of 1986, as amended).  The**

Company will  withhold any amounts required to be withheld and any such amounts will be deemed paid by the Company to the Payee.   The Company will not be required to gross-up a Payee for any amounts it was required to withhold.

XXII. Transferability.  **This Note has been issued by the Company for the sole benefit of Payee and may not be sold, transferred, pledged or otherwise assigned without the prior written consent of the Company and Payee agrees not to take any actions which would cause any third party to have such an interest in the Note.**

XXIII. Register.  **The Company (or an agent for the Company) shall maintain a register at one of its offices in Omaha, Nebraska or such other location as designated from time to time by the Company (the "Register") on which it will record the Payee(s) and any Interest or Principal payments with respect to the Note.   Failure to make any such recordation, or any error in such recordation shall not affect the Company's obligations in respect of such Note.   Any transfer of a Note in accordance with Section 6 above may be effected only (A) by surrender of the Note, and either the reissuance by the Company of such Note to the transferee or the issuance by the Company of a new Note to the transferee; or (B) through a book entry system if the ownership of an interest in the Note, is required to be reflected in a book entry, whether or note physical securities are issued.**

XXIV. Assignment.  **The rights and obligations of the Company and the holder of this Note shall be binding upon any entity which becomes the successor of the Company or which otherwise assumes the Company's obligations provided that no such assignment by the Company shall relieve it of its obligations hereunder.**

XXV. Waiver and Amendment.  **Any provision of this Note may be amended, waived or modified only upon the written consent of both the Company and the Payee.**

XXVI. Waiver of Presentment, Demand, etc.  **The Company waives presentment, diligence, demand of payment, notice of dishonor, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note.**

XXVII. Attorneys Fees.  **In any action brought to enforce or interpret this Note, the prevailing party shall be entitled to receive its attorneys fees and costs in connection with such other relief as may be awarded.**

XXVIII. Notices.   **All notices and other communications required or permitted hereunder shall be in writing delivered personally or by certified or registered first class mail, postage prepaid, or otherwise delivered by hand or by messenger, and addressed (a) if to the Payee, at the address set forth on the Register or at such other address as the Payee shall have furnished to the Company in writing, or (b) if to the Company, at the address set forth on the signature page hereto or at such other address as the Company shall have furnished to the Payee in writing.  Each such notice or other communication shall for all purposes of this Note be treated as effective or having been given when delivered if delivered personally, or, if sent by mail, at the earlier of its receipt or five days after the**

same has been deposited in a regularly maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid.

XXIX. <u>Recourse.</u>  **The indebtedness under this Note is an unsecured obligation of the Company and does not constitute an obligation of any kind of the officers, directors or stockholders of the Company.**

XXX. <u>Governing Law.</u>  **This Note is delivered to the Payee, shall be governed by the internal laws of the State of New York without giving effect to its conflict of laws principles.**

*IN WITNESS WHEREOF, the Company has caused this Note to be issued and delivered as of the Effective Date first set forth above.*

Address for Notices:                          [HEARTLAND AUTOMOTIVE
                                              HOLDINGS, INC.]
_____

_____

_____         By:_____

Attention:_____          Title:_____

# SCHEDULE 13

# PRESERVED CAUSES OF ACTION

# Schedule 13

| Case No. | Case Caption | Court |
|---|---|---|
| 2008-L-000564 | HEARTLAND AUTOMOTIVE SERV v. AUTOSERVE LLC | IL COOK CIR. CT. |
| CH-07-1965 | HEARTLAND AUTOMOTIVE SERVICES v. WINDWARD PETROLEUM | TN SHELBY CHANCERY CT. |
| 04L-016867 | HEARTLAND AUTOMOTIVE DBA/ JIFFY LUBE 026 v. DALE DUREE | KS SHAWNEE 3RD JUDICIAL DIST. |
| 06L-014106 | HEARTLAND AUTOMOTIVE / DBA / JIFFY LUBE 026 v. TINGLE ANTOINE H | KS SHAWNEE 3RD JUDICIAL DIST. |
| 04L-022306 | HEARTLAND AUTOMOTIVE / DBA / JIFFY LUBE 026 v. JOHNSON LESLIE A | KS SHAWNEE 3RD JUDICIAL DIST. |
| 02L-029329 | HEARTLAND AUTOMOTIVE / DBA / JIFFY LUBE 026 v. WILLIAMS SILVA J | KS SHAWNEE 3RD JUDICIAL DIST. |
| 06L-015507 | HEARTLAND AUTOMOTIVE / DBA / JIFFY LUBE 026 v. WAETZIG JAMES ROBERT III | KS SHAWNEE 3RD JUDICIAL DIST. |
| 07LA09203 | HEARTLAND AUTOMOTIVE ET AL v. ROUNDTREE | KS JOHNSON 10TH JUDICIAL DIST. |
| 08LA08293 | HEARTLAND AUTOMOTIVE ET AL v. JOHNSON | KS JOHNSON 10TH JUDICIAL DIST. |
| 08LA07366 | HEARTLAND AUTOMOTIVE ET AL v. SCHULTZ | KS JOHNSON 10TH JUDICIAL DIST. |
| 06LA07274 | HEARTLAND AUTOMOTIVE ET AL v. LUKO | KS JOHNSON 10TH |

| | | JUDICIAL DIST. |
|---|---|---|
| 07CV02624 | HEARTLAND AUTOMOTIVE ET AL v. MWANGI | KS JOHNSON 10TH JUDICIAL DIST. |
| 08CV04883 | IN RE: AFTERMARKET FILTERS ANTITRUST LITIGATION | U.S.D.C. DIST. NO. ILL. |

# EXHIBIT A

# CHAPTER 11 PLAN OF REORGANIZATION

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| In re: | Chapter 11 Case |
| HEARTLAND AUTOMOTIVE HOLDINGS, INC., et al., | Case No. 08-40047 (RFN) |
| Debtors. | Jointly Administered |

---

## AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
## FOR HEARTLAND AUTOMOTIVE HOLDINGS, INC.,
## AND ITS AFFILIATED DEBTORS

---

Dated:  December 23, 2008

WHITE & CASE LLP
Thomas E Lauria
Gerard Uzzi
Lisa Thompson
Matt Garofalo
1155 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113

CADWALADER, WICKERSHAM & TAFT LLP
Andrew M. Troop
Ingrid Bagby
David Leamon
One World Financial Center
New York, NY  10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666

FORSHEY & PROSTOK LLP
Jeff P. Prostok
777 Main Street Suite 1290
Ft. Worth, TX 76012
Telephone:  (817) 877-8855
Facsimile:  (817) 877-4151

MUNSCH HARDT KOPF & HARR, P.C.
Joseph J. Wielebinski
Kevin M. Lippman
3800 Lincoln Plaza
500 North Akard Street
Dallas, TX  75201
Telephone:  (214) 855-7500
Facsimile:  (214) 855-7584

COUNSEL FOR THE DEBTORS AND
DEBTORS IN POSSESSION

COUNSEL FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS.................................................................................... 8

1.1.    "Administrative Expense Claim"................................................ 8
1.2.    "Affiliate" ................................................................................... 8
1.3.    "Allowed" ................................................................................... 8
1.4.    "Amended and Restated H-I Facility"........................................ 8
1.5.    "Amended and Restated H-I Facility Documents" .................... 9
1.6.    "Amended and Restated H-I Notes" .......................................... 9
1.7.    "Amended and Restated H-II Collateral Assignment Agreement"....... 9
1.8.    "Amended and Restated H-II Facility" ...................................... 9
1.9.    "Amended and Restated H-II Facility Documents" ................... 9
1.10.   "AMRESCO"............................................................................... 9
1.11.   "Assets" ...................................................................................... 9
1.12.   "Avoidance Actions".................................................................. 9
1.13.   "Ballot"....................................................................................... 9
1.14.   "Balloting Agent"....................................................................... 9
1.15.   "Bankruptcy Code".................................................................. 10
1.16.   "Bankruptcy Court".................................................................. 10
1.17.   "Bankruptcy Rules".................................................................. 10
1.18.   "Blackstone Debt Claims" ....................................................... 10
1.19.   "Blackstone Notes" .................................................................. 10
1.20.   "Business Day".......................................................................... 10
1.21.   "Capmark" ................................................................................ 10
1.22.   "Cash"........................................................................................ 10
1.23.   "Cash Collateral Order"............................................................ 10
1.24.   "Cash Option" ........................................................................... 10
1.25.   "Causes of Action".................................................................... 10
1.26.   "Certificate of Designation" ..................................................... 11
1.27.   "Chapter 11 Cases" .................................................................. 11
1.28.   "Claim"...................................................................................... 11
1.29.   "Claims Agent" ......................................................................... 11
1.30.   "Committee" .............................................................................. 11
1.31.   "Confirmation Date" ................................................................. 11
1.32.   "Confirmation Hearing" ........................................................... 11
1.33.   "Confirmation Order"................................................................ 11
1.34.   "Contested Claim"..................................................................... 11
1.35.   "Contested Claims Reserve"..................................................... 11
1.36.   "Convenience Claim"................................................................ 11
1.37.   "Cure Cost"................................................................................ 12
1.38.   "Debt Claim".............................................................................. 12
1.39.   "Debtor"..................................................................................... 12
1.40.   "Debtor-in-Possession" ............................................................ 12
1.41.   "DIP Agent"............................................................................... 12

| | | |
|---|---|---|
| 1.42. | "DIP Claim" | 12 |
| 1.43. | "DIP Lender" | 12 |
| 1.44. | "DIP Loan Facility" | 12 |
| 1.45. | "DIP Order" | 12 |
| 1.46. | "Disallowed" | 12 |
| 1.47. | "Disbursing Agent" | 12 |
| 1.48. | "Disclosure Statement" | 12 |
| 1.49. | "Disclosure Statement Order" | 12 |
| 1.50. | "Distribution Date" | 12 |
| 1.51. | "Dymas" | 13 |
| 1.52. | "Effective Date" | 13 |
| 1.53. | "Effective Date DIP Balance" | 13 |
| 1.54. | "EMAC Loan Documents" | 13 |
| 1.55. | "EMAC Trust" | 13 |
| 1.56. | "Entity" | 13 |
| 1.57. | "Equity Interest" | 13 |
| 1.58. | "Estate" | 13 |
| 1.59. | "Fee Application" | 13 |
| 1.60. | "Fee Claim" | 13 |
| 1.61. | "Final Order" | 13 |
| 1.62. | "Franchise Agreement" | 14 |
| 1.63. | "GE FFC" | 14 |
| 1.64. | "General Unsecured Claim" | 14 |
| 1.65. | "Guaranty" | 14 |
| 1.66. | "Guaranty Claims" | 14 |
| 1.67. | "Heartland" | 14 |
| 1.68. | "Heartland Common Stock Interest" | 14 |
| 1.69. | "H-I Lenders" | 14 |
| 1.70. | "H-I Lender Claim" | 14 |
| 1.71. | "H-II Lenders" | 14 |
| 1.72. | "H-II Lender Claim" | 14 |
| 1.73. | "H-II Lender Subordination Agreement" | 14 |
| 1.74. | "H-II PSA" | 14 |
| 1.75. | "Insider" | 14 |
| 1.76. | "Intercompany Claim" | 15 |
| 1.77. | "Internal Revenue Code" | 15 |
| 1.78. | "IRS" | 15 |
| 1.79. | "JLI" | 15 |
| 1.80. | "JLI Claim" | 15 |
| 1.81. | "JLI Lease" | 15 |
| 1.82. | "Master Supply Agreement" | 15 |
| 1.83. | "New Class A Common Stock" | 15 |
| 1.84. | "New Class B Common Stock" | 15 |
| 1.85. | "New Class A Preferred Stock" | 15 |
| 1.86. | "New Class B Preferred Stock" | 15 |
| 1.87. | "New Common Stock" | 15 |

1.88.   "New Equity Interests" ................................................................................ 16
1.89.   "New JLI Agreements" ............................................................................... 16
1.90.   "New Money Contribution" ........................................................................ 16
1.91.   "New Preferred Stock" ............................................................................... 16
1.92.   "New Unsecured Note" ............................................................................... 16
1.93.   "Notice of Confirmation" ........................................................................... 16
1.94.   "Objection Deadline" ................................................................................. 16
1.95.   "Original Collateral Assignment Agreement" ........................................... 16
1.96.   "Original Debt Documents" ....................................................................... 16
1.97.   "Original H-II Secured Credit Facility" .................................................... 16
1.98.   "Original H-I Notes" ................................................................................. 16
1.99.   "Other Equity Interests" ............................................................................ 17
1.100.  "Other Secured Claims" ............................................................................ 17
1.101.  "Person" ..................................................................................................... 17
1.102.  "Petition Date" ........................................................................................... 17
1.103.  "Plan" ......................................................................................................... 17
1.104.  "Plan Distribution" .................................................................................... 17
1.105.  "Plan Documents" ...................................................................................... 17
1.106.  "Plan Securities" ........................................................................................ 17
1.107.  "Plan Supplement" ..................................................................................... 17
1.108.  "Priority Non-Tax Claim" .......................................................................... 17
1.109.  "Priority Tax Claim" .................................................................................. 17
1.110.  "Pro Rata Share" ........................................................................................ 17
1.111.  "Professional" ............................................................................................ 17
1.112.  "QCMI" ...................................................................................................... 18
1.113.  "Quad-C" .................................................................................................... 18
1.114.  "Quad-C Contribution" .............................................................................. 18
1.115.  "Quad-C Contribution Documents" ........................................................... 18
1.116.  "Quad-C VI" ............................................................................................... 18
1.117.  "Rejection Damage Claim" ........................................................................ 18
1.118.  "Released Persons" ..................................................................................... 18
1.119.  "Reorganized Debtors" ............................................................................... 18
1.120.  "Reorganized Heartland Shareholder Agreement" .................................... 18
1.121.  "Schedules" ................................................................................................ 18
1.122.  "Section 503(b)(9) Bar Date" .................................................................... 19
1.123.  "Section 503(b)(9) Claims" ....................................................................... 19
1.124.  "Secured Claim" ......................................................................................... 19
1.125.  "Servicers" .................................................................................................. 19
1.126.  "SOPUS" ..................................................................................................... 19
1.127.  "SOPUS Claim" .......................................................................................... 19
1.128.  "Subordinated Claim" ................................................................................ 19
1.129.  "Subordinated Note Purchase Agreement" ................................................ 19
1.130.  "Subsidiary Debtor" ................................................................................... 19
1.131.  "Subsidiary Equity Interest" ...................................................................... 19
1.132.  "Supply Agreement" ................................................................................... 19
1.133.  "U.S. Trustee" ............................................................................................ 20

3

1.134. "VMI Agreement" ........................................................................... 20
1.135. "Voting Deadline" .......................................................................... 20

ARTICLE II. INTERPRETATION AND APPLICATION ............................................ 20

2.1.   Interpretation. ................................................................................... 20
2.2.   Application of Definitions and Rules of Construction Contained in the
       Bankruptcy Code. ............................................................................ 20
2.3.   Other Terms. .................................................................................... 20
2.4.   Incorporation of Plan Documents. ................................................... 20

ARTICLE III. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ............... 21

3.1.   Administrative Expense Claims and Tax Claims. ............................. 21
3.2.   Claims and Equity Interests. ............................................................ 21
3.3.   Deemed Allowance of Certain Claims. ............................................ 22
3.4.   Separate Classification of Other Secured Claims. ........................... 23

ARTICLE IV. IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND
EQUITY INTERESTS .......................................................................................... 23

4.1.   Impaired and Unimpaired Classes of Claims. ................................. 23
4.2.   Impairment Controversies. .............................................................. 23

ARTICLE V. PROVISIONS FOR TREATMENT OF CLAIMS AND EQUITY
INTERESTS UNDER THE PLAN ......................................................................... 24

5.1.   Class 1 – Priority Non-Tax Claims. ................................................ 24
5.2.   Class 2 – H-I Lender Claims. .......................................................... 24
5.3.   Class 3 – H-II Lender Claims. ......................................................... 24
5.4.   Class 4 – Other Secured Claims. ..................................................... 24
5.5.   Class 5 – General Unsecured Claims. .............................................. 25
5.6.   Class 6 – Blackstone Debt Claims. .................................................. 25
5.7.   Class 7 – JLI Claims. ...................................................................... 25
5.8.   Class 8 – SOPUS Claims. ................................................................ 25
5.9.   Class 9 – Intercompany Claims. ...................................................... 25
5.10.  Class 10 – Heartland Common Stock Interests. ............................... 26
5.11.  Class 11 – Subsidiary Equity Interests. ........................................... 26
5.12.  Class 12 – Other Equity Interests. ................................................... 26
5.13.  Class 13 – Convenience Claims. ...................................................... 26
5.14.  Deemed Satisfaction of Guaranty Claims. ....................................... 26

ARTICLE VI. PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS
UNDER THE PLAN ............................................................................................ 27

6.1.   Unclassified Claims. ........................................................................ 27
6.2.   Treatment of Administrative Expense Claims. ................................. 27
6.3.   Treatment of Priority Tax Claims. ................................................... 29

ARTICLE VII. ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
    REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY
    INTERESTS ......................................................................................... 29

7.1.    Classes Entitled to Vote. ........................................................ 29
7.2.    Class Acceptance Requirement. ............................................. 29
7.3.    Tabulation of Votes on a Non-Consolidated Basis. .............. 30
7.4.    Cramdown. ............................................................................. 30
7.5.    Confirmation of All Cases. .................................................... 30

ARTICLE VIII. MEANS FOR IMPLEMENTATION OF THE PLAN ..................................... 30

8.1.    Operations Between the Confirmation Date and the Effective Date ................... 30
8.2.    Certain Transactions On or Prior to the Effective Date ....................... 30
8.3.    Corporate Action. ................................................................... 31
8.4.    Termination of Certain Debt Obligations. ............................. 32
8.5.    Amendment and Restatement of Certain Debt Obligations ................ 32
8.6.    Continued Corporate Existence of the Debtors ....................... 32
8.7.    Re-vesting of Assets. .............................................................. 33
8.8.    Initial Boards of Directors. .................................................... 33
8.9.    Officers. ................................................................................. 33
8.10.   Retention of Causes of Action/Reservation of Rights ......................... 33

ARTICLE IX. THE DISBURSING AGENT .......................................................... 34

9.1.    Appointment of the Disbursing Agent. ................................. 34
9.2.    Powers and Duties. ................................................................ 34
9.3.    Exculpation. ........................................................................... 35

ARTICLE X. DISTRIBUTION PROVISIONS ........................................................ 35

10.1.   Sources of Cash for Plan Distributions. ................................ 35
10.2.   Investment of Funds Held by the Disbursing Agent; Tax Reporting by the
       Disbursing Agent. .................................................................. 35
10.3.   Plan Distributions. ................................................................. 36
10.4.   Timing of Plan Distributions. ................................................ 36
10.5.   Address for Delivery of Plan Distributions/Unclaimed Distributions. ................ 36
10.6.   Time Bar to Cash Payments. .................................................. 37
10.7.   Manner of Payment under the Plan. ...................................... 37
10.8.   Expenses Incurred on or after the Effective Date and Claims of the
       Disbursing Agent. .................................................................. 37
10.9.   Fractional Plan Distributions. ................................................ 37
10.10.  Surrender and Cancellation of Instruments. .......................... 37

ARTICLE XI. PROCEDURES FOR RESOLVING AND TREATING CONTESTED
    CLAIMS ............................................................................................. 38

11.1.   Prosecution of Contested Claims. ......................................... 38
11.2.   Objection Deadline. ............................................................... 38
11.3.   Claims Settlement. ................................................................. 38

11.4.    Entitlement to Plan Distributions Upon Allowance. ........................................... 38
11.5.    Contested Claims Reserve. ................................................................................. 39
11.6.    Estimation of Claims. ......................................................................................... 39
11.7.    No Recourse Against the Debtors or the Reorganized Debtors. ......................... 39

ARTICLE XII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES ............................................................................................................. 39

12.1.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ........ 39
12.2.    Cure. ................................................................................................................. 41
12.3.    Claims Arising from Rejected Contracts. ........................................................... 42

ARTICLE XIII. SETTLEMENTS AND COMPROMISES ..................................................... 42

13.1.    JLI. ................................................................................................................... 42
13.2.    SOPUS. ............................................................................................................. 42
13.3.    Quad-C. ............................................................................................................ 43

ARTICLE XIV. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN
        AND THE OCCURRENCE OF THE EFFECTIVE DATE ........................................... 44

14.1.    Conditions Precedent to Confirmation. .............................................................. 44
14.2.    Conditions Precedent to the Occurrence of the Effective Date. .......................... 45
14.3.    Waiver of Conditions. ....................................................................................... 45
14.4.    Effect of Non-Occurrence of the Effective Date. ............................................... 45

ARTICLE XV. RETENTION OF JURISDICTION ................................................................. 46

ARTICLE XVI. MISCELLANEOUS PROVISIONS ............................................................. 47

16.1.    Releases by the Debtors. .................................................................................... 47
16.2.    Release of Released Persons by Other Released Persons. ................................... 48
16.3.    Settlement of Controversies ............................................................................... 48
16.4.    Third Party Agreements; Subordination. ............................................................ 49
16.5.    Payment of Statutory Fees. ................................................................................ 49
16.6.    Satisfaction of Claims. ....................................................................................... 49
16.7.    Exculpation. ...................................................................................................... 50
16.8.    Discharge of Liabilities. ..................................................................................... 50
16.9.    Discharge of Debtors. ........................................................................................ 50
16.10.   Notices. ............................................................................................................. 51
16.11.   Headings. .......................................................................................................... 52
16.12.   Governing Law. ................................................................................................. 52
16.13.   Expedited Determination. .................................................................................. 52
16.14.   Exemption from Transfer Taxes. ........................................................................ 52
16.15.   Retiree Benefits. ................................................................................................ 52
16.16.   Notice of Entry of Confirmation Order and Relevant Dates. .............................. 52
16.17.   Interest and Attorneys' Fees. ............................................................................. 53
16.18.   Modification of the Plan. .................................................................................... 53
16.19.   Revocation of Plan. ........................................................................................... 53

6

16.20.  Setoff Rights. ................................................................................................. 53
16.21.  Compliance with Tax Requirements. .............................................................. 54
16.22.  Rates. .............................................................................................................. 54
16.23.  Injunctions....................................................................................................... 54
16.24.  Binding Effect. ................................................................................................ 55
16.25.  Severability. .................................................................................................... 55
16.26.  No Admissions. ............................................................................................... 55
16.27.  Dissolution of the Committee. ........................................................................ 56

## EXHIBITS

Debtors ……………………………………………………………………..          Exhibit A

The Official Committee of Unsecured Creditors of Heartland Automotive Holdings, Inc. and its affiliated debtors in the above-captioned jointly administered chapter 11 cases (the "Committee"), together with Heartland Automotive Holdings, Inc. and its affiliated debtors in the above-captioned jointly administered chapter 11 cases (the "Debtors"), hereby propose the following joint chapter 11 plan of reorganization:

## ARTICLE I.

## DEFINITIONS

In this Plan, the following definitions apply:

**1.1.**   "**Administrative Expense Claim**" means any right to payment, whether secured or unsecured, constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, and any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under section 330 or 503 of the Bankruptcy Code.

**1.2.**   "**Affiliate**" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

**1.3.**   "**Allowed**" means, with respect to a Claim: (i) any Claim against any Debtor which has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed, (ii) any timely filed, liquidated, non-contingent Claim as to which the time for objection permitted by the Plan has expired and no objection has been interposed, or (iii) any Claim expressly allowed by a Final Order or by agreement in accordance with the provisions of the Plan.

**1.4.**   "**Amended and Restated H-I Facility**" means that certain secured term loan facility between the Reorganized Debtors, the H-I Lenders, and the Servicers, as servicers for the same H-I Lenders as each served prepetition, governing the Allowed H-I Lender Claims equal to the full face amount of the prepetition senior secured indebtedness of the H-I Lenders.  A term sheet describing the principal terms of the Amended and Restated H-I Facility is attached as Schedule 11 to the Disclosure Statement.

**1.5.** **"Amended and Restated H-I Facility Documents"** means the form of credit agreement, and secured note and other documents in respect of the Amended and Restated H-I Facility as agreed upon by the Debtors, the H-I Lenders and the Committee.  The form of Amended and Restated H-I Facility Documents shall be consistent with the terms of Schedule 11 attached to the Disclosure Statement, as evidenced by the agreement of the parties or order of the Bankruptcy Court.  The Amended and Restated H-I Facility Documents are Plan Documents.

**1.6.** **"Amended and Restated H-I Notes"** means the promissory notes, payable by the Reorganized Debtors, issued in satisfaction of Allowed H-I Lender Claims.  The Amended and Restated H-I Notes are Plan Documents.

**1.7.** **"Amended and Restated H-II Collateral Assignment Agreement"** means that certain collateral assignment agreement between the Reorganized Debtors, Dymas, as administrative agent for the H-II Lenders, and JLI governing the collateral rights of Dymas, as administrative agent for the H-II Lenders in certain collateral securing the Amended and Restated H-II Facility, including Franchise Agreements, which amends the Original Collateral Assignment Agreement. The Amended and Restated H-II Collateral Assignment Agreement is a Plan Document.

**1.8.** "**Amended and Restated H-II Facility**" means that certain secured term loan facility between the Reorganized Debtors, the H-II Lenders, and Dymas, as administrative agent for the H-II Lenders, governing the Allowed H-II Lender Claims, which amends and restates the Original H-II Secured Credit Facility.  A term sheet describing the principal terms of the Amended and Restated H-II Facility is attached as Schedule 10 to the Disclosure Statement.

**1.9.** **"Amended and Restated H-II Facility Documents"** means the forms of credit agreement, security agreement, pledge agreement, and guaranty agreement for the Amended and Restated H-II Facility, along with the Amended and Restated H-II Collateral Assignment Agreement, and other documents in respect of the Amended and Restated H-II Facility, as agreed upon by the Debtors, Dymas, the H-II Lenders and the Committee.  The form of Amended and Restated H-II Facility Documents shall be consistent with the terms of Schedule 10 attached to the Disclosure Statement, as evidenced by the agreement of the parties or order of the Bankruptcy Court.  The Amended and Restated H-II Facility Documents are Plan Documents.

**1.10.** **"AMRESCO"** means AMRESCO Commercial Finance LLC.

**1.11.** "**Assets**" means, with respect to any Debtor, all of such Debtor's right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

**1.12.** "**Avoidance Actions**" means all Causes of Action of the Estates that arise under chapter 5 of the Bankruptcy Code and any analogous Causes of Action arising under state law.

**1.13.** **"Ballot"** means those certain ballots sent to holders of Claims and Equity Interests for purposes of voting on the Plan.

**1.14.** "**Balloting Agent**" means Epiq Bankruptcy Solutions, LLC.

**1.15.** "**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as codified at title 11 of the United States Code, as amended from time to time and applicable to the Chapter 11 Cases.

**1.16.** "**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, or such other court having jurisdiction over the Chapter 11 Cases.

**1.17.** "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and as applicable to the Chapter 11 Cases.

**1.18.** "**Blackstone Debt Claims**" means any and all Claims against any of the Debtors arising from the Subordinated Note Purchase Agreement, Blackstone Notes or any other documents appurtenant thereto, as applicable, which, subject to the occurrence of the Effective Date, shall be deemed Allowed in the amount of $67,397,562.74.

**1.19.** "**Blackstone Notes**" means the notes purchased under the Subordinated Note Purchase Agreement, and any other documents appurtenant thereto, as applicable.

**1.20.** "**Business Day**" means any day other than a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close for business in New York, New York.

**1.21.** "**Capmark**" means Capmark Finance Inc.

**1.22.** "**Cash**" means legal tender of the United States of America or readily marketable direct obligations of, or obligations guaranteed by, the United States of America.

**1.23.** "**Cash Collateral Order**" means the order of the Bankruptcy Court, dated March 20, 2008, granting the Debtors' authority to use cash collateral on a final basis, as the same may be amended.

**1.24.** "**Cash Option**" has the meaning set forth in Article 5.5.

**1.25.** "**Causes of Action**" means all claims, rights, actions, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, asserted or unasserted, whether based on federal, state, local, statutory or common law or any other law, rule or regulation, including, but not limited to: (i) any claims, causes of action, rights or remedies created by or arising under the Bankruptcy Code, including, but not limited, to transfers avoidable and/or recoverable under Sections 542, 544, 547, 548, 549 and 550 of the Bankruptcy Code on behalf of the Debtors and their Estates; (ii) any claims, causes of action, rights or remedies that arise out of, are based upon or relate to, directly or indirectly, the allegations, transactions, facts, and statements set forth, or referred to in the litigations set forth in Schedule 13 to the Disclosure Statement, (iii) any claims, causes of action, rights or remedies that arise out of, are based upon or relate to, directly or indirectly, any collection action by the Debtors or their Estates, including, but not

limited to, claims for statutory damages, service charges, costs and fees, (iv) any claims, causes of action, rights or remedies that the Debtors or their Estates may have against Five Diamonds LLC and/or its affiliates, including, but not limited to, claims for indemnification, negligence, breach of contract, and/or breach of the implied covenant of good faith and fair dealing, (v) any claims, causes of action, rights or remedies that the Debtors or their Estates may have against Cedar-Rollins LLC and/or its affiliates, including, but not limited to, claims for reimbursement, indemnification, property damages and/or lost profits.

**1.26.**    "**Certificate of Designation**" means each certificate of designation pursuant to which each class of New Preferred Stock has been issued.  Each Certificate of Designation is a Plan Document.

**1.27.**    "**Chapter 11 Cases**" means the cases commenced under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to each of the Debtors styled as <u>In re Heartland Automotive Holdings, Inc., et al.</u>, Chapter 11 Case No. 08-40047 (RFN), Jointly Administered.

**1.28.**    "**Claim**" means (a) any right to payment, whether or not such right is known or unknown, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is known or unknown, reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**1.29.**    "**Claims Agent**" means the entity designated by order of the Bankruptcy Court to process proofs of claim.

**1.30.**    "**Committee**" has the meaning set forth in the preamble.

**1.31.**    "**Confirmation Date**" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

**1.32.**    "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court, as it may be continued from time to time, to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

**1.33.**    "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan.

**1.34.**    "**Contested Claim**" means any Claim that is not an Allowed Claim or a Disallowed Claim.

**1.35.**    "**Contested Claims Reserve**" means a reserve of Cash that may be established in accordance with Article 11.5 of the Plan.

**1.36.**    "**Convenience Claim**" means (a) a Claim, excluding a Claim for principal and interest based on a note issued under any indenture or credit agreement, against any of the Debtors that otherwise would be a General Unsecured Claim that is for $2,500 or less; or (b) an Allowed

General Unsecured Claim of a holder that has irrevocably elected on its Ballot to reduce its
Claim to the amount of $2,500.

**1.37.** "**Cure Cost**" means any amount payable by a Debtor pursuant to Article 12.2 of the Plan
and section 365(b)(1) of the Bankruptcy Code.

**1.38.** "**Debt Claim**" means a Claim against any of the Debtors arising under the Original Debt
Documents.

**1.39.** "**Debtor**" means Heartland, and its direct and indirect subsidiaries that are debtors in the
Chapter 11 Cases as identified on Exhibit A annexed hereto.

**1.40.** "**Debtor-in-Possession**" means any Debtor, in its capacity as a debtor-in-possession
pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**1.41.** "**DIP Agent**" means HAS Funding LLC as agent for the DIP Lenders under the DIP
Loan Facility.

**1.42.** "**DIP Claim**" means any Claim of the DIP Agent and DIP Lenders under the DIP Loan
Facility.

**1.43.** "**DIP Lender**" means a lender under the DIP Loan Facility.

**1.44.** "**DIP Loan Facility**" means that certain credit agreement entered into on March 31, 2008
by the Debtors that are parties thereto, as borrowers, the DIP Agent as lead arranger, and the DIP
Lenders, together with all documents, instruments and agreements executed or entered into in
connection therewith, and any amendments thereto.

**1.45.** "**DIP Order**" has the meaning set forth in Article 6.2(e).

**1.46.** "**Disallowed**" when used with respect to a Claim, means a Claim, or such portion of a
Claim, that has been disallowed by a Final Order.

**1.47.** "**Disbursing Agent**" means the Reorganized Debtors, in (a) making the Plan
Distributions contemplated under the Plan, the Confirmation Order, or any other relevant Final
Order, and (b) performing any other act or task that is or may be delegated to the Disbursing
Agent under the Plan.

**1.48.** "**Disclosure Statement**" means the Disclosure Statement filed with respect to the Plan,
as it may be amended or modified from time to time.

**1.49.** "**Disclosure Statement Order**" means the order entered by the Bankruptcy Court
(a) approving the Disclosure Statement as containing adequate information required under
section 1125 of the Bankruptcy Code, and (b) authorizing the use of the Disclosure Statement for
soliciting votes on the Plan.

**1.50.** "**Distribution Date**" means, with respect to any Claim, (i) the Effective Date or a date
that is as soon as reasonably practicable after the Effective Date, if such Claim is then an

Allowed Claim, or (ii) a date that is as soon as reasonably practicable after the date such Claim becomes Allowed, if not Allowed on the Effective Date.

**1.51.** "**Dymas**" means Dymas Funding Company, LLC, as administrative agent for the H-II Lenders.

**1.52.** "**Effective Date**" means a date selected by the Debtors which must be a Business Day that is no later than thirty (30) Business Days after all of the conditions specified in Article 14.2 have been satisfied or waived (to the extent subject to waiver), but must in no case be later than June 30, 2009 unless consented to by the Committee and the Debtors, provided that such date shall not be extended past April 15, 2009 unless consented to by Dymas.

**1.53.** "**Effective Date DIP Balance**" has the meaning set forth in Article 6.2(e).

**1.54.** "**EMAC Loan Documents**" means that certain promissory note, mortgage, guaranty and related loan documents between Heartland Automotive Services of Austin, Inc., and the EMAC Trust.

**1.55.** "**EMAC Trust**" means the EMAC Owner Trust 1999-1 under that certain Loan Pool Pooling and Servicing Agreement, dated as of March 26, 1999.

**1.56.** "**Entity**" means any person or organization created by law, including, without limitation, any individual, company, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, or government or any political subdivision thereof.

**1.57.** "**Equity Interest**" means any outstanding ownership interest in any of the Debtors, including without limitation, interests evidenced by common or preferred stock, membership interests and options or other rights to purchase or otherwise receive any ownership interest in any of the Debtors and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation.

**1.58.** "**Estate**" means the estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

**1.59.** "**Fee Application**" means an application for allowance and payment of a Fee Claim.

**1.60.** "**Fee Claim**" means a Claim of a Professional.

**1.61.** "**Final Order**" means (a) an order or judgment of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing is then pending, or (b) in the event that an appeal, writ of certiorari, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, that no order shall fail to be a Final Order

13

solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

**1.62.** "**Franchise Agreement**" means any agreement between any of the Debtors and JLI pursuant to which any of the Debtors operate quick oil-change centers under the service mark "Jiffy Lube."

**1.63.** "**GE FFC**" means GE Capital Franchise Finance Corporation.

**1.64.** "**General Unsecured Claim**" means any unsecured Claim against a Debtor, other than an Administrative Expense Claim, a Blackstone Debt Claim, a Convenience Claim, an H-I Lender Claim, an H-II Lender Claim, an Intercompany Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a JLI Claim or a SOPUS Claim.

**1.65.** "**Guaranty**" means any guaranty by one or more Debtors of an obligation of any other Debtors.

**1.66.** "**Guaranty Claims**" means any Claim arising out of a Guaranty. Guaranty Claims shall be classified as General Unsecured Claims.

**1.67.** "**Heartland**" means Heartland Automotive Holdings, Inc., a Delaware corporation, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

**1.68.** "**Heartland Common Stock Interest**" means any outstanding ownership interest in Heartland evidenced by common stock held as of the Petition Date.

**1.69.** "**H-I Lenders**" means the lenders under the Original H-I Notes.

**1.70.** "**H-I Lender Claim**" means a Claim against any of the Debtors arising under the Original H-I Notes.

**1.71.** "**H-II Lenders**" means the lenders under the Original H-II Secured Credit Facility.

**1.72.** "**H-II Lender Claim**" means a Claim against any of the Debtors arising under the Original H-II Secured Credit Facility.

**1.73.** "**H-II Lender Subordination Agreemen**t" means that certain Amended and Restated Subordination Agreement, dated as of February 27, 2006, by and among BMP-SPV (J) Ltd., Blackstone Mezzanine Holdings, L.P., certain of the Debtors, and Dymas.

**1.74.** "**H-II PSA**" means that certain plan support agreement, as may be amended and supplemented from time to time and together with all exhibits, appendices and schedules thereto, made and entered into by and among the Debtors, the Committee, Dymas, and certain H-II Lenders, dated as of December 22, 2008.

**1.75.** "**Insider**" means with respect to any Person, all Persons that would fall within the definition assigned to such terms in section 101(31) of the Bankruptcy Code.

**1.76.** "**Intercompany Claim**" means any Claim held by any Debtor against any other Debtor that occurred or came into existence prior to the Petition Date.

**1.77.** "**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended, and any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

**1.78.** "**IRS**" means the United States Internal Revenue Service.

**1.79.** "**JLI**" means Jiffy Lube International, Inc. or any of its Affiliates.

**1.80.** "**JLI Claim**" means any Claim against any of the Debtors arising from or related to any oral or written agreements between and among JLI and the Debtors that could have been asserted in the Chapter 11 Cases.

**1.81.** "**JLI Lease**" means any lease of non-residential real property to which any of the Debtors and JLI (or any of its Affiliates) are parties.

**1.82.** "**Master Supply Agreement**" means that certain SOPUS Products Payment and Sales Agreement for Jiffy Lube Franchisees entered into by and between SOPUS and the Debtors. The Master Supply Agreement is a Plan Document.

**1.83.** "**New Class A Common Stock**" means the 300,000 shares of new class A common stock to be authorized by Heartland on or after the Effective Date pursuant to the Plan. A term sheet describing principal terms of the New Class A Common Stock is attached as Schedule 9 to the Disclosure Statement.

**1.84.** "**New Class B Common Stock**" means the 400,000 shares of new class B common stock to be authorized by Heartland on or after the Effective Date pursuant to the Plan. A term sheet describing principal terms of the New Class B Common Stock is attached as Schedule 9 to the Disclosure Statement.

**1.85.** "**New Class A Preferred Stock**" means the 1,200,000 shares of class A preferred stock in Heartland to be authorized by Heartland on or after the Effective Date pursuant to the Plan. A term sheet describing principal terms of the New Class A Preferred Stock is attached as Schedule 7 to the Disclosure Statement.

**1.86.** "**New Class B Preferred Stock**" means the 1,200,000 shares of class B preferred stock in Heartland to be authorized by Heartland on or after the Effective Date pursuant to the Plan. A term sheet describing the principal terms of the New Class B Preferred Stock is attached as Schedule 8 to the Disclosure Statement.

**1.87.** "**New Common Stock**" means collectively, the New Class A Common Stock and the New Class B Common Stock.

**1.88.** **"New Equity Interests"** means collectively, the New Common Stock and the New Preferred Stock.

**1.89.** "**New JLI Agreements**" means, collectively, those certain agreements between the Reorganized Debtors and JLI, entered into as of the Effective Date, including (i) the amendments to the Franchise Agreements, (ii) the amendments to the JLI Leases, and (iii) other agreements to be determined. Each of the New JLI Agreements is a Plan Document.

**1.90.** **"New Money Contribution"** has the meaning set forth in Article 13.3(c).

**1.91.** "**New Preferred Stock**" means collectively, the New Class A Preferred Stock and the New Class B Preferred Stock.

**1.92.** "**New Unsecured Note**" means an unsecured promissory note, payable by the Reorganized Debtors to be issued in satisfaction of Allowed General Unsecured Claims. A form of the New Unsecured Note is attached as Schedule 12 to the Disclosure Statement.

**1.93.** "**Notice of Confirmation**" means the notice of entry of the Confirmation Order to be filed with the Bankruptcy Court and mailed by the Claims Agent to holders of Claims and Equity Interests.

**1.94.** "**Objection Deadline**" means the deadline for filing objections to Claims as set forth in Article 11.2 of the Plan.

**1.95.** **"Original Collateral Assignment Agreement"** means that certain Agreement Concerning Collateral Assignment By and Among Jiffy Lube International, Inc., Jiffy Lube International of Maryland, Inc., Dymas Funding Company, LLC As Agent, HAS Holdings, Inc., Heartland Automotive Services, Inc., Heartland Automotive Services of Austin, Inc., Heartland Automotive Services II, Inc., A. Fanticola Companies, Inc., A.F.C. Northwest, Inc., Oil Express, Inc., Lube Acquisition, Inc., and Lube Pit, Inc. dated May 30, 2003.

**1.96.** "**Original Debt Documents**" means the Original H-II Secured Credit Facility, the Subordinated Note Purchase Agreement, the Blackstone Notes and the Original H-I Notes.

**1.97.** "**Original H-II Secured Credit Facility**" means that certain Second Amended and Restated Credit Agreement, dated as of February 27, 2006, among Heartland Automotive Holdings, Inc., HAS Holdings, Inc., Heartland Automotive Services II, Inc., as borrowers, the subsidiaries of Heartland Automotive Services II, as guarantors, the financial institutions from time to time party thereto, as lenders, Dymas Funding Company, LLC as administrative agent for such lenders and sole lead arranger, and General Electric Capital Corporation, as syndication agent for such lenders, and any and all guarantees issued in connection therewith, as all of the foregoing have been amended, modified, supplemented and/or restated from time to time.

**1.98.** "**Original H-I Notes**" means, collectively, the notes identified on Schedule 3 to the Disclosure Statement.

16

**1.99.** **"Other Equity Interests"** means all Equity Interests other than Subsidiary Equity Interests and Heartland Common Stock Interests.

**1.100.** "**Other Secured Claims**" means all Secured Claims other than H-I Lender Claims and H-II Lender Claims.

**1.101.** "**Person**" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated organization, governmental entity, or political subdivision thereof, or any other entity.

**1.102.** "**Petition Date**" means January 7, 2008.

**1.103.** "**Plan**" means this joint chapter 11 plan of reorganization, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time, and the exhibits and schedules hereto, as the same may be in effect at the time such reference becomes operative.

**1.104.** "**Plan Distribution**" means the payment or distribution under the Plan of Cash, Assets, Plan Securities or instruments evidencing an obligation under the Plan to the holder of an Allowed Claim or Allowed Equity Interest.

**1.105.** "**Plan Documents**" means the documents that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court as specified in Article 2.4 of the Plan.

**1.106.** "**Plan Securities**" means the New Preferred Stock, the New Common Stock and the New Unsecured Notes.

**1.107.** "**Plan Supplement**" means the compilation of Plan Documents or forms of documents specified in the Plan, including, but not limited to any exhibits or schedules to the Plan not included herewith, and except as otherwise provided herein, each in form and substance acceptable to the Committee and the Debtors, which the Committee and the Debtors shall, as provided in Article 2.4, file with the Bankruptcy Court on or before the date that is two (2) Business Days prior to the Confirmation Hearing, all of which are incorporated herein by reference.

**1.108.** "**Priority Non-Tax Claim**" means any Claim entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

**1.109.** "**Priority Tax Claim**" means any Claim, whether secured or unsecured, entitled to priority under section 507(a)(8) of the Bankruptcy Code.

**1.110.** "**Pro Rata Share**" means the proportion that an Allowed Claim or Equity Interest bears to the aggregate amount of all Claims or Equity Interests in a particular class, including Contested Claims or Equity Interests, but excluding Disallowed Claims, (a) as calculated by the Disbursing Agent; or (b) as determined or estimated by the Bankruptcy Court.

**1.111.** "**Professional**" means a Person retained or to be compensated for services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date pursuant to

sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in these Chapter 11 Cases.

**1.112.** "**QCMI**" means Quad-C Management, Inc.

**1.113.** "**Quad-C**" means Quad-C VI, QCMI, Quad-C VI Management Corp., HAS Funding LLC, Quad-C Advisors VI, LLC, Terrence Daniels, Stephen Burns, Matthew Engel, Gary Binning, Robert Haswell, and each of the current and former holders of the Heartland Common Stock Interests, and each of their respective present and former constituents, equity holders, members, stockholders, general or limited partners, investors, principals, officers, directors, servants, employees, agents, representatives, counsel, professionals, affiliates, relatives, successors, insurers, underwriters, administrators, executors, predecessors, representatives and assigns, but excluding the Debtors and the Reorganized Debtors.

**1.114.** "**Quad-C Contribution**" means the obligations of Quad-C that arise under the Quad-C Contribution Documents.

**1.115.** "**Quad-C Contribution Documents**" means that certain stock purchase agreement, and any documents annexed thereto, which are attached as Schedule 6 to the Disclosure Statement. The Quad-C Contribution Documents are Plan Documents.

**1.116.** "**Quad-C VI**" means Quad-C Partners VI, L.P.

**1.117.** "**Rejection Damage Claim**" means any Claim arising out of the rejection of an executory contract or unexpired lease.

**1.118.** "**Released Persons**" means (a) (i) the Debtors and the Reorganized Debtors, (ii) the Committee and the members thereof in their capacities as such, (iii) Shell Oil Company, (iv) JLI, (v) SOPUS, (vi) Quad-C, (vii) the Servicers and the H-I Lenders, and (viii) Dymas and  the H-II Lenders, and (b) each of (i) BMP-SPV (J) Ltd., and (ii) Blackstone Mezzanine Holdings, L.P., to the extent such Person votes in favor of the Plan and does not otherwise object to confirmation of the Plan; and (c) and all affiliates, officers, directors, principals, shareholders, parents, subsidiaries, members, auditors, accountants, financial advisors, predecessors, successors, servants, employees, agents, counsel, attorneys, partners, insurers, underwriters, administrators, executors, representatives or assigns of each of the foregoing Person listed in clause (a) and (b) to the extent such Person is a Released Person.

**1.119.** "**Reorganized Debtors**" means from and after the Effective Date, Heartland and its affiliated Debtors and any successors thereto by merger, consolidation, or otherwise.

**1.120.** "**Reorganized Heartland Shareholder Agreement**" means that certain shareholder agreement entered into as of the Effective Date that governs the relationships between the holders of the New Equity Interests.  The Reorganized Heartland Shareholder Agreement is a Plan Document.

**1.121.** "**Schedules**" means the schedules of assets and liabilities and list of Equity Interests and the statements of financial affairs filed by each of the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Official Bankruptcy

18

Forms of the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented by the Debtors from time to time in accordance with Bankruptcy Rule 1009.

**1.122.** "**Section 503(b)(9) Bar Date**" means December 22, 2008, which is the deadline for the filing of Section 503(b)(9) Claims established pursuant to an order of the Bankruptcy Court.

**1.123.** "**Section 503(b)(9) Claims**" means any Claims against any of the Debtors entitled to administrative expense status pursuant to section 503(b)(9) of the Bankruptcy Code.

**1.124.** "**Secured Claim**" means (a) a Claim secured by a lien on any Assets, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, and which is duly established in the Chapter 11 Cases, but only to the extent of the value of the holder's interest in the collateral that secures payment of the Claim; (b) a Claim against the Debtors that is subject to a valid right of recoupment or setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to recoupment or setoff as provided in section 506(a) of the Bankruptcy Code; and (c) a Claim deemed or treated under the Plan as a Secured Claim; provided, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as a General Unsecured Claim unless, in any such case the class of which Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

**1.125.** "**Servicers**" means AMRESCO, Capmark and GE FFC, or any one of their affiliates, and any successor, including any successor agent, in their capacities as servicers under the Amended and Restated H-I Facility.

**1.126.** "**SOPUS**" means Pennzoil-Quaker State Company d/b/a SOPUS Products.

**1.127.** "**SOPUS Claim**" means any Claim against any of the Debtors arising from or related to any oral or written agreements between and among SOPUS and the Debtors that could have been asserted in the Chapter 11 Cases.

**1.128.** "**Subordinated Claim**" means a Claim (other than a Blackstone Debt Claim) against any Debtor subordinated by a Final Order.

**1.129.** "**Subordinated Note Purchase Agreement**" means that certain Amended and Restated Note Purchase Agreement, dated as of February 27, 2006, by and among Heartland Automotive Services II, Inc., as issuers, and BMP-SPV (J) Ltd. and Blackstone Mezzanine Holdings, L.P., as purchasers, and all guarantees issued in connection therewith.

**1.130.** "**Subsidiary Debtor**" means any Debtor other than Heartland.

**1.131.** "**Subsidiary Equity Interest**" means any Equity Interest in a Subsidiary Debtor.

**1.132.** "**Supply Agreement**" means those certain supply agreements by and among the Debtors and SOPUS that are existing and in effect as of the Effective Date.

**1.133.**  "**U.S. Trustee**" means the Office of the United States Trustee for Region 6.

**1.134.**  "**VMI Agreement**" means that certain vendor management inventory agreement between SOPUS and the Debtors, entered as of the Effective Date.  The VMI Agreement is a Plan Document.

**1.135.  "Voting Deadline"** means the date by which votes on the Plan must be submitted to the Balloting Agent.

## ARTICLE II.

## INTERPRETATION AND APPLICATION

**2.1.**    <u>**Interpretation.**</u>

Unless otherwise specified, all section, article, exhibit and schedule references in the Plan are to the respective section in, article of, or exhibit or schedule to, the Plan, as the same may be amended, waived, or modified from time to time.  Words denoting the singular number shall include the plural number and vice versa, as appropriate, and words denoting one gender shall include the other gender.  The Disclosure Statement may be referred to for purposes of interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy Court to be ambiguous.

**2.2.**    <u>**Application of Definitions and Rules of Construction Contained in the Bankruptcy Code.**</u>

Words and terms defined in section 101 of the Bankruptcy Code have the same meanings when used in the Plan, unless a different definition is set forth in Article 1 hereof.  The rules of construction contained in section 102 of the Bankruptcy Code, other than section 102(5) of the Bankruptcy Code, apply to the construction of the Plan.  For the purposes of construction of the Plan, "or" is disjunctive.

**2.3.**    <u>**Other Terms.**</u>

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.

**2.4.**    <u>**Incorporation of Plan Documents.**</u>

All appendices, exhibits and schedules to the Plan and the Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein.  All Plan Documents shall be filed with the Bankruptcy Court as part of the Plan Supplement not less than two (2) days prior to the commencement of the Confirmation Hearing, <u>provided</u>, <u>however</u>, that any Plan Documents that are or may be subject to confidentiality provisions or otherwise contain confidential or propriety information may be filed in redacted form or under seal.

Holders of Claims and Equity Interests may obtain a copy of the Plan Documents (in redacted form, as applicable, and excluding any Plan Documents that are filed under seal), once filed, by a written request sent to the following address:

> Heartland Automotive Ballot Processing Center
> c/o Epiq Bankruptcy Solutions, LLC
> Attention: Kate Mailloux
> 757 Third Avenue, 3rd Floor
> New York, NY 10017
> Telephone: (866) 897-6436
> Facsimile: (646) 282-2501

## ARTICLE III.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Except as otherwise provided herein, for the purposes of organization, voting and all confirmation matters, all Claims and all Equity Interests in the Debtors will be classified as set forth in this Article III.

**3.1.** **Administrative Expense Claims and Tax Claims.**

As provided by section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims will not be classified under the Plan, and will instead be treated separately as unclassified Claims on the terms set forth in Article VI.

**3.2.** **Claims and Equity Interests.**

The Claims against and the Equity Interests in, with respect to and to the extent applicable for, each Debtor are classified under the Plan as follows:

(a)   Class 1 – Priority Non-Tax Claims

Class 1 shall consist of all Priority Non-Tax Claims.

(b)   Class 2 – H-I Lender Claims

Class 2 shall consist of all H-I Lender Claims.

(c)   Class 3 – H-II Lender Claims

Class 3 shall consist of all H-II Lender Claims.

(d)   Class 4 – Other Secured Claims

Class 4 shall consist of all Other Secured Claims.

(e)   Class 5 – General Unsecured Claims

Class 5 shall consist of all General Unsecured Claims.

(f)   Class 6 – Blackstone Debt Claims

Class 6 shall consist of all Blackstone Debt Claims.

21

(g)    <u>Class 7 – JLI Claims</u>

Class 7 shall consist of all JLI Claims.

(h)    <u>Class 8 – SOPUS Claims</u>

Class 8 shall consist of all SOPUS Claims.

(i)    <u>Class 9 – Intercompany Claims</u>

Class 9 shall consist of all Intercompany Claims.

(j)    <u>Class 10 – Heartland Common Stock Interests</u>

Class 10 shall consist of all Heartland Common Stock Interests.

(k)    <u>Class 11 – Subsidiary Equity Interests</u>

Class 11 shall consist of all Subsidiary Equity Interests.

(l)    <u>Class 12 – Other Equity Interests</u>

Class 12 shall consist of all Other Equity Interests.

(m)    <u>Class 13 – Convenience Claims</u>

Class 13 shall consist of all Convenience Claims.

**3.3.    <u>Deemed Allowance of Certain Claims.</u>**

(a)    Subject to the occurrence of the Effective Date, the Claims of each holder of an H-I Lender Claim that votes in favor of the Plan shall be deemed Allowed and fully secured in the amounts set forth on Schedules 5 and 11 to the Disclosure Statement, and such holders shall waive any rights to (i) any prepayment penalties on account of such provisions in the Original H-I Notes, and (ii) any attorneys' fees or any interest on account of such H-I Lender Claims arising after the Petition Date, except to the extent such fees and interest were required to be paid by the Cash Collateral Order and have not been paid by the Debtors.  Notwithstanding the foregoing, <u>Capmark</u> shall not be deemed to have waived any claim for (i) reasonable unpaid costs and expenses incurred on account of Capmark's legal and financial advisors from the Petition Date, to the extent unpaid, as and to the extent provided for under the EMAC Loan Documents, and (ii) accrued and unpaid postpetition interest at the applicable non-default rate in accordance with the EMAC Loan Documents.  The Debtors and their Estates shall be deemed to have waived any and all rights and claims regarding the perfection, validity and enforceability of the H-I Lender Claims, rights of offset or recoupment against the H-I Lender Claims, rights to recover payments made by the Servicers or any existing or prior H-I Lender to or on behalf of the Debtors prepetition or postpetition, rights to seek to recharacterize the H-I Lender Claims in any way, any and all rights to subordinate the H-I Lender Claims, Avoidance Actions against the Servicers or any existing or prior H-I Lender, or rights to challenge the value or adequacy of the collateral securing the H-I Lender Claims.

(b)    Subject to the occurrence of the Effective Date and <u>provided</u> <u>that</u> Dymas has not objected to the Plan in violation of its obligations under the H-II PSA, the H-II Lender Claims shall be deemed Allowed and fully secured in the aggregate amount of $190,408,859.88 (inclusive of all outstanding letters of credit), plus interest, attorneys' fees and any other advisory

22

fees payable under the Cash Collateral Order, to the extent such interest attorneys' fees and any other advisory fees have not been paid in accordance therewith, but excluding any claim for interest attorneys' fees or any other advisory fees not payable in accordance with the Cash Collateral Order. The Debtors and their Estates shall be deemed to have waived any and all rights and claims regarding the perfection, validity and enforceability of the H-II Lender Claims, rights of offset or recoupment against the H-II Lender Claims, rights to recover payments made by Dymas or any existing or prior H-II Lender to or on behalf of the Debtors prepetition or postpetition, rights to seek to recharacterize the H-II Lender Claims in any way, any and all rights to subordinate the H-II Lender Claims, Avoidance Actions against Dymas and any existing or prior H-II Lender, or rights to challenge the value or adequacy of the collateral securing the H-II Lender Claims.

> (c)    Each Ballot for a General Unsecured Claim shall indicate the Debtors' estimate of such holder's Allowed General Unsecured Claim, or, to the extent such Claim is disputed, contingent or unliquidated, the Debtors' good faith offer of settlement with respect to such General Unsecured Claim. Each holder of a General Unsecured Claim may accept the Debtors' estimate or offer of settlement with respect to such Claim by affirmatively indicating such acceptance on such holder's Ballot. Upon such election, subject to the occurrence of the Effective Date, such holder's General Unsecured Claim shall be deemed an Allowed Claim in the amount indicated by the Debtors on such Ballot without further order of the Court. In the event that the Effective Date does not occur, such election by the holder and the Debtors' estimate or offer of settlement shall have no force and effect and shall be deemed inadmissible in any further proceedings pursuant to Rule 408 of the Federal Rules of Evidence.

**3.4.    Separate Classification of Other Secured Claims.**

> Although all Other Secured Claims against the Debtors have been placed in a single class for purposes of nomenclature, each such Other Secured Claim shall be treated as a separate class for purposes of voting on the Plan and receiving Plan Distributions.

## ARTICLE IV.

## IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND EQUITY INTERESTS

**4.1.    Impaired and Unimpaired Classes of Claims.**

> Priority Non-Tax Claims, Other Secured Claims, Intercompany Claims and Subsidiary Equity Interests are not impaired under the Plan. All other classes of Claims and Equity Interests are impaired under the Plan.

**4.2.    Impairment Controversies.**

> If a controversy arises as to whether any Claim or Equity Interest, or any class of Claims or Equity Interests, is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

# ARTICLE V.

## PROVISIONS FOR TREATMENT OF CLAIMS
## AND EQUITY INTERESTS UNDER THE PLAN

The classes of Claims against and Equity Interests in, with respect to and to the extent applicable for, each Debtor shall be treated under the Plan as follows:

**5.1.**    **Class 1 – Priority Non-Tax Claims.**

Each Allowed Priority Non-Tax Claim shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles the holder in respect of such Claim shall be fully reinstated and retained, and such Allowed Priority Non-Tax Claim (including any amounts to which such holder is entitled pursuant to section 1124(2) of the Bankruptcy Code) shall be paid in full in accordance with such reinstated rights on the Effective Date.

**5.2.**    **Class 2 – H-I Lender Claims.**

Each holder of an Allowed H-I Lender Claim shall, on the Distribution Date, in full satisfaction of such holder's Allowed H-I Lender Claim, receive Amended and Restated H-I Note(s) representing its *pro rata* interest in the Amended and Restated H-I Facility based on the amount of its Allowed H-I Lender Claim, the terms of which facility are set forth in Schedule 11 to the Disclosure Statement, which shall be deemed part of the Plan.  Notwithstanding Article 1.51, the Distribution Date with respect to the treatment of the H-I Lender Claims shall be deemed to occur on the Effective Date in accordance with the Amended and Restated H-I Facility Documents.

**5.3.**    **Class 3 – H-II Lender Claims.**

Each holder of an Allowed H-II Lender Claim shall, on the Distribution Date, in full satisfaction of such holder's Allowed H-II Lender Claim, receive a *pro rata* interest in the Amended and Restated H-II Facility based on the amount of its Allowed H-II Lender Claim, the terms of which facility are set forth in Schedule 10 to the Disclosure Statement, which shall be deemed part of the Plan.  Notwithstanding Article 1.51, the Distribution Date with respect to the treatment of the H-II Lender Claims shall be deemed to occur on the Effective Date in accordance with the Amended and Restated H-II Facility Documents.

**5.4.**    **Class 4 – Other Secured Claims.**

Except to the extent that the holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Allowed Other Secured Claim shall, on the Effective Date, be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of a default.  All Allowed Other Secured Claims that are not due and payable on or before the Effective Date shall, at the Debtors' option, be paid (i) in the ordinary course of business in accordance with the course of practice between the Debtors

and such holder with respect to such Claim, or (ii) by transfer of the Collateral securing such Claim to the holder of such Claim, each in full and complete satisfaction, settlement and release of and in exchange for such Claim.

### 5.5.    **Class 5 – General Unsecured Claims.**

Each holder of an Allowed General Unsecured Claim shall receive on the Distribution Date in full and final satisfaction of such Claim, either (i) a New Unsecured Note in a principal amount equal to one hundred percent (100%) of the amount of such holder's Allowed General Unsecured Claim, or (ii) a single Cash payment in an amount equal to seventy percent (70%) of the amount of such holder's Allowed General Unsecured Claim if such holder elects by affirmatively indicating on its Ballot to accept the treatment in this clause (ii) in lieu of receiving a New Unsecured Note as set forth in clause (i) (the "Cash Option"); provided, however, that only holders of General Unsecured Claims that are Allowed Claims as of the Effective Date shall be eligible to receive the treatment provided for in clause (ii).

### 5.6.    **Class 6 – Blackstone Debt Claims.**

Each holder of an Allowed Blackstone Debt Claim shall receive a *pro rata* share of (i) 200,000 shares of the New Class A Common Stock, and (ii) 1,000,000 shares of the New Class A Preferred Stock in full satisfaction of its Allowed Class 6 Blackstone Debt Claims.

### 5.7.    **Class 7 – JLI Claims.**

Except as provided in Article 13.1, each holder of a JLI Claim shall be deemed to have waived any and all Claims, prepetition or otherwise, against any of the Released Persons in exchange for (i) the assumption of the Franchise Agreements and related JLI Leases (in each case as modified by the New JLI Agreements), and (ii) the releases provided for in Articles 16.1 and 16.2 of the Plan.

### 5.8.    **Class 8 – SOPUS Claims.**

Except as provided in Article 13.2, each holder of a SOPUS Claim shall be deemed to have waived any and all Claims, prepetition or otherwise, against any of the Released Persons in exchange for (i) the replacement of all existing Supply Agreements with the Master Supply Agreement and the VMI Agreement, and (ii) the releases provided for in Article 16.1 and 16.2 of the Plan.

### 5.9.    **Class 9 – Intercompany Claims.**

Each Allowed Intercompany Claim shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles a holder in respect of such Claim shall be fully reinstated and retained.

**5.10.    Class 10 – Heartland Common Stock Interests.**

Each holder of an Allowed Heartland Common Stock Interest shall, on the Effective Date,  receive one (1) share of New Class B Common Stock on account of each one thousand (1,000) shares of Allowed Heartland Common Stock Interests currently outstanding. Upon such distribution, all Heartland Common Stock Interests shall be canceled.  Any fractional shares of New Class B Common Stock shall be rounded up so that the holder of the fractional Allowed Heartland Common Stock Interest receives one  (1) additional whole share of New Class B Common Stock on account of the fractional share the holder would have received.

**5.11.    Class 11 – Subsidiary Equity Interests.**

Each Allowed Subsidiary Equity Interest shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Equity Interest entitles a holder in respect of such Equity Interest shall be fully reinstated and retained.

**5.12.    Class 12 – Other Equity Interests.**

On the Effective Date, all Other Equity Interests shall be cancelled and the holders of such Other Equity Interests shall receive no distribution on account of such interests.

**5.13.    Class 13 – Convenience Claims.**

Each holder of an Allowed Convenience Claim shall receive on the Distribution Date a single Cash payment in an amount equal to one hundred percent (100%) of such holder's Allowed Convenience Claim.

**5.14.    Deemed Satisfaction of Guaranty Claims.**

All Guaranty Claims shall be allowed in the amount of zero dollars ($0.00) and deemed satisfied in full as a result of distributions made on the underlying Allowed claim guaranteed in respect of such Guaranty Claim, pursuant to Article 5.  From and after the Effective Date, any Guaranty shall be of no further force or effect.  Notwithstanding the foregoing, all H-I Lender Claims (including H-I Lender Claims that constitute Guaranty Claims) shall be allowed, as provided in Article 3.3(a) and satisfied as provided in Article 5.2 of the Plan. Notwithstanding the foregoing, all H-II Lender Claims (including H-II Lender Claims that constitute Guaranty Claims) shall be allowed, as provided in Article 3.3(b) and satisfied as provided in Article 5.3 of the Plan.

## ARTICLE VI.

## PROVISIONS FOR TREATMENT
## OF UNCLASSIFIED CLAIMS UNDER THE PLAN

**6.1.    Unclassified Claims.**

Administrative Expense Claims and Priority Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively. Administrative Expense Claims and Priority Tax Claims are not designated as classes of Claims for the purposes of this Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

**6.2.    Treatment of Administrative Expense Claims.**

All Administrative Expense Claims shall be treated as follows:

(a)    Time for Filing Administrative Expense Claims.

The holder of an Administrative Expense Claim, other than (i) a DIP Claim, (ii) a Fee Claim; (iii) a liability incurred and payable after the Petition Date in the ordinary course of business by a Debtor (and not past due); (iv) a Section 503(b)(9) Claim; or (v) an Administrative Expense Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors, the Committee, and the U.S. Trustee, notice of such Administrative Expense Claim within forty (40) days after service of Notice of Confirmation or such other specific date as may be established by the Bankruptcy Court.  Such notice must include at a minimum (A) the name of the Debtor(s) which are purported to be liable for the Claim, (B) the name of the holder of the Claim, (C) the amount of the Claim, and (D) the basis of the Claim (including any documentation evidencing or supporting such Claim).  **THE FAILURE TO FILE A PROOF OF ADMINISTRATIVE CLAIM ON OR BEFORE THE ADMINISTRATIVE CLAIMS BAR DATE AND THE FAILURE TO SERVE SUCH NOTICE TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED, DISALLOWED AND DISCHARGED WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT.**

(b)    Time for Filing Fee Claims.

Each Professional who holds or asserts a Fee Claim shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within forty-five (45) days after the Effective Date or such other specific date as may be established by the Bankruptcy Court.  **THE FAILURE TO FILE TIMELY AND SERVE SUCH FEE APPLICATION SHALL RESULT IN THE FEE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

(c)    Time for Filing Section 503(b)(9) Claims.

In accordance with the procedures set out in the Bankruptcy Court's order establishing the Section 503(b)(9) Bar Date, each holder of a Section 503(b)(9) Claim was

27

required to submit to the Claims Agent, with copies to counsel for the Debtors, and the Committee, a request for allowance of such Section 503(b)(9) Claim prior to the Section 503(b)(9) Claim Bar Date. **THE FAILURE TO SUBMIT SUCH REQUEST BY THE SECTION 503(B)(9) BAR DATE SHALL RESULT IN THE SECTION 503(B)(9) CLAIM BEING DEEMED DISALLOWED AS AN ADMINISTRATIVE EXPENSE CLAIM.** Such disallowance does not prevent such Claim from being Allowed as a Claim other than as an Administrative Expense Claim to the extent otherwise allowable.

      (d)    <u>Allowance of Administrative Expense Claims, Fee Claims and Section 503(b)(9) Claims</u>.

      An Administrative Expense Claim (other than a DIP Claim, a Fee Claim or Section 503(b)(9) Claim) with respect to which notice has been properly filed and served pursuant to Article 6.2(a), or a Section 503(b)(9) Claim with respect to which a request for allowance has been properly filed and served pursuant to Article 6.2(c), shall become an Allowed Administrative Expense Claim if no objection is filed within thirty (30) days after the later of (i) the Effective Date, or (ii) the date of service of the applicable notice of Administrative Expense Claim or such later date as may be approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing.  If an objection is filed within such 30-day period (or any extension thereof), the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order.  A Fee Claim in respect of which a Fee Application has been properly filed and served pursuant to Article 6.2(b) shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order.

      (e)    <u>DIP Claims</u>

      All amounts due on account of DIP Claims have been Allowed as super-priority Administrative Expense Claims pursuant to decretal paragraph 7 of the order approving the DIP Loan Facility entered by the Bankruptcy Court on March 20, 2008 (the "<u>DIP Order</u>").  All obligations of the Debtors under the DIP Loan Facility will be satisfied either through (i) the release by the DIP Agent, the DIP Lender and any other holder of a DIP Claim of all amounts due under the DIP Loan Facility as of the Effective Date, calculated with attorneys' fees (to the extent permitted under the DIP Loan Facility), but without any penalties, default rates of interest or premiums or other charges (the "<u>Effective Date DIP Balance</u>"), all of which, to the extent applicable, will be waived by the DIP Agent, the DIP Lender and any other holder of a DIP Claim, if the Quad-C Contribution shall have been fully and irrevocably funded or (ii) the payment of the Effective Date DIP Balance in full in cash on the Effective Date, if the Quad-C Contribution shall not have been made or irrevocably funded.

      (f)    <u>Payment of Allowed Administrative Expense Claims</u>.

      On the Distribution Date, each holder of an Allowed Administrative Expense Claim, excluding DIP Claims, which shall be satisfied in accordance with Article 6.2(e) above, shall receive in full satisfaction of such Claims (i) the amount of such holder's Allowed Administrative Expense Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by the Debtors and such holder; <u>provided</u>, that such treatment shall not

provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim; provided, further, that an Administrative Expense Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business.

**6.3.** **Treatment of Priority Tax Claims.**

(a)    Unless otherwise agreed with a holder of an Allowed Priority Tax Claim, the Debtors, in their sole discretion, may choose whether Allowed Priority Tax Claims will be paid either: (1) in Cash, in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest from the Effective Date at a fixed annual rate equal to five percent (5%) and paid in regular installments of equal amount over a period not exceeding five (5) years from the Petition Date; or (2) in full in Cash on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim.  The Debtors reserve the right to prepay, without penalty, at any time under option (1) above. Alternatively, a holder of an Allowed Priority Tax Claim may elect to receive the same treatment of its Claims as is offered to holders of Allowed General Unsecured Claims as provided in Article 5.5.

(b)    The Confirmation Order shall enjoin any holder of an Allowed Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer or director of the Debtors that otherwise would be liable to such holder for payment of a Tax Claim so long as the Debtors are in compliance with Article 6.3.  So long as the holder of an Allowed Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person, officer or director under Article 6.3 or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding shall be tolled.

## ARTICLE VII.

## ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS

**7.1.** **Classes Entitled to Vote.**

Except for Priority Non-Tax Claims, Intercompany Claims, Subsidiary Equity Interests, and Other Equity Interests, all classes of Claims and Equity Interests are entitled to vote on the Plan.

**7.2.** **Class Acceptance Requirement.**

A class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such class that have voted on the Plan.  A class of Equity Interests shall have accepted the Plan if it is accepted by holders of at least two-thirds (2/3) in amount of the Equity Interests in such class that actually vote on the Plan.

**7.3.**    **Tabulation of Votes on a Non-Consolidated Basis.**

        The Balloting Agent will tabulate all votes on the Plan on a non-consolidated basis by class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code with respect to each Debtor.

**7.4.**    **Cramdown.**

        If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code, except subsection (8) thereof, the Plan shall be treated as a request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of section 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each class of Claims that is impaired under, and has not accepted, the Plan.

**7.5.**    **Confirmation of All Cases.**

        Except as provided in Article 16.18, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors.

## ARTICLE VIII.

## MEANS FOR IMPLEMENTATION OF THE PLAN

**8.1.**    **Operations Between the Confirmation Date and the Effective Date.**

        Through the Effective Date, the Debtors shall not (a) enter into, renew or extend any contract or other agreement (i) outside the ordinary course of business or (ii) with annual expenditures of more than $100,000.00 or (iii) having a term of more than one year or (b) terminate or hire any executive with an annual compensation of greater than $100,000.00 without obtaining the written consent of Blackstone and the Committee, which consent shall not be unreasonably withheld or delayed; provided, however, that the forgoing limitations shall not apply to the renewal or extension of leases of nonresidential real property.

**8.2.**    **Certain Transactions On or Prior to the Effective Date.**

        Pursuant to section 1123(a)(5) of the Bankruptcy Code, the Reorganized Debtors shall, on or prior to the Effective Date (i) issue all Plan Securities; (ii) execute and deliver all debt instruments and related documents, including collateral documents, contemplated under the Plan; (iii) perform all of their obligations under the Quad-C Contribution Documents; (iv) execute and deliver the New JLI Agreements, the Master Supply Agreement and the VMI Agreement; (v) implement all settlements and compromises as set forth in or contemplated by the Plan; (vi) amend and restate its constituent documents in accordance with the terms of this Plan; and (vii) perform all obligations under the Plan Documents.

**8.3.    Corporate Action.**

(a)    The entry of the Confirmation Order shall constitute authorization for the Debtors and the Reorganized Debtors (as the case may be) to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including without limitation, any action required by the stockholders or directors of the Debtors and the Reorganized Debtors (as the case may be), including, among other things, (i) the adoption or amendment of any organizational documents; (ii) the termination and cancellation of any Original Debt Documents or any other outstanding instrument, document or agreement evidencing Debt Claims as required by the Plan; (iii) the issuance of the Plan Securities; (iv) the execution and delivery of the Quad-C Contribution Documents; (v) all transfers of Assets that are to occur pursuant to the Plan; (vi) the incurrence of all obligations contemplated by the Plan and the making of all Plan Distributions; (vii) the reinstatement and assumption of all indemnity obligations to the directors and officers of the Debtors; (viii) the implementation of all settlements and compromises as set forth in or contemplated by the Plan; (ix) taking of all actions to preserve and provide for the prosecution of the Avoidance Actions; and (x) entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule or regulation.

(b)    The officers of the Debtors and the Reorganized Debtors, as the case may be, are authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary action required in connection therewith, in the name of and on behalf of the Debtors. All obligations of the Debtors to indemnify and hold harmless their current and former directors, officers and employees, whether arising under the Debtors' constituent documents, contract, law or equity, shall be fully reinstated and assumed by the Debtors upon the occurrence of the Effective Date with the same effect as though such obligations constituted executory contracts that are assumed (or assumed and assigned, as applicable) under section 365 of the Bankruptcy Code, and all such obligations shall be fully enforceable on their terms from and after the Effective Date. Nothing in this Plan, including Articles 16.1 and 16.2, shall release any obligations of the Debtors to indemnify and hold harmless their current and former directors, officers and employees. Nothing in this Plan, including Article 16.22, shall enjoin any of the Debtors' current and former directors, officers and employees from asserting any indemnity or hold harmless right against the Debtors, excluding any claim for payment of attorneys' fees arising out of or relating to the Chapter 11 Cases or investigations related thereto, except to the extent such attorneys' fees were incurred in the defense of a claim that was asserted or the subject of investigation or discovery after the Effective Date and, which claim was released pursuant to Articles 16.1 and 16.2. (By way of example only, no person or entity falling within the definition of Quad-C shall be entitled to any indemnity from the Debtors or Reorganized Debtors with respect to any fee, cost, expense, loss or the like incurred in connection with the Committee's investigation or discovery with respect to possible Claims or Causes of Action against Quad-C undertaken during the course of the Chapter 11 Cases, which possible Claims and Causes of Action are to be released pursuant to the Plan.) The prosecution of any so-indemnified Cause of Action shall upon the occurrence of the Effective Date be enjoined and

prohibited, <u>except</u> solely for the purpose of obtaining a recovery from the issuer of any available insurance policy proceeds.

(c)    The constituent documents of the Reorganized Debtors shall, as of the Effective Date, be amended to (i) authorize and issue the New Preferred Stock; (ii) authorize and issue the New Common Stock; (iii) require the New Common Stock to vote together as a single class; and (iv) prohibit the issuance of non-voting equity securities by such Debtor as required by section 1123(a)(6) of the Bankruptcy Code, <u>provided</u>, <u>however</u>, that following the Effective Date, the Reorganized Debtors shall be entitled to issue non-voting securities, in their sole discretion, and solely in accordance with the terms of the Plan Documents.

## 8.4.    <u>Termination of Certain Debt Obligations</u>.

Upon the occurrence of the Effective Date, the Subordinated Note Purchase Agreement shall be cancelled and annulled (along with such other documents appurtenant thereto).  Immediately upon the completion of all Plan Distributions to the holders of Debt Claims, the Reorganized Debtors shall be authorized and directed (without further approval, act or other determination under applicable law, regulation, order or rule) to take such action as shall be necessary or appropriate to terminate and extinguish all of the Debtors' obligations under the the Subordinated Note Purchase Agreement.

## 8.5.    <u>Amendment and Restatement of Certain Debt Obligations</u>

Upon the occurrence of the Effective Date, the Original H-II Facility (along with such other documents appurtenant thereto) shall be amended and restated in accordance with the terms of the Amended and Restated H-II Facility Documents.  Notwithstanding this Article 8.5, any other provision of the Plan, the Confirmation Order, or applicable non-bankruptcy law, the liens, security interests, mortgages and other interests in collateral granted to the H-II Lenders shall remain valid, perfected and in full force and effect in accordance with their terms, without interruption or the need for any restatement, reaffirmation or re-perfection, but shall secure the obligations under the Amended and Restated H-II Facility.

Upon the occurrence of the Effective Date, the Original H-I Notes (along with such other documents appurtenant thereto) shall be amended and restated in accordance with the terms of the Amended and Restated H-I Facility Documents.  Notwithstanding this Article 8.5, any other provision of the Plan, the Confirmation Order, or applicable non-bankruptcy law, the liens, security interests, mortgages and other interests in collateral granted to the  H-I Lenders shall remain valid, perfected and in full force and effect in accordance with their terms, without interruption or the need for any restatement, reaffirmation or re-perfection, but shall secure the obligations under the Amended and Restated H-I Facility and the Amended and Restated H-I Notes.

## 8.6.    <u>Continued Corporate Existence of the Debtors</u>.

Each of the Debtors shall continue to exist, as a Reorganized Debtor, after the Effective Date as a separate entity, with all the powers available to such legal entity, in accordance with applicable law and pursuant to their constituent documents, as modified by the Plan.  On or after the Effective Date, the Reorganized Debtors may, within their sole and

exclusive discretion, take such action as permitted by applicable law, their constituent documents, and the Plan Documents, as they determine is reasonable and appropriate, <u>including</u> (a) causing any or all of the Reorganized Debtors to be merged into one or more of the other Reorganized Debtors or other legal entities; (b) liquidating any of the Reorganized Debtors; and (c) changing the legal name of any of the Reorganized Debtors.

### 8.7.   <u>Re-vesting of Assets.</u>

Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates and any property acquired by a Debtor or Reorganized Debtor under the Plan shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided herein.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for all fees, disbursements, expenses or related support services of Professionals (including fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

### 8.8.   <u>Initial Boards of Directors.</u>

From and after the Effective Date, the members of the board of directors (or managers, as applicable) of the Reorganized Debtors shall be as identified in the Plan Supplement.  Thereafter, the members of the board of directors (or managers, as applicable) of each of the Reorganized Debtors shall be selected and determined in accordance with the provisions of the organizational documents of such Reorganized Debtors and applicable law, including the Reorganized Heartland Shareholder Agreement that is included in the Plan Documents.

### 8.9.   <u>Officers.</u>

The current officers of each of the Debtors shall continue in such positions after the Effective Date in accordance with their respective employment agreements, if any, and applicable law.  From and after the Effective Date, the officers of each of the Reorganized Debtors shall be selected and appointed by the respective boards of directors of such entities, in accordance with, and pursuant to, the provisions of applicable law and their respective organizational documents, including the Reorganized Heartland Shareholder Agreement that is included in the Plan Documents.

### 8.10.   <u>Retention of Causes of Action/Reservation of Rights.</u>

Except as set forth in Articles 16.1 and 16.2 of the Plan, all Causes of Action belonging to any of the Debtors shall, upon the occurrence of the Effective Date, shall be vested in the Reorganized Debtors for the benefit of the Debtors and their Estates.  Except as set forth in Articles 16.1 and 16.2 of the Plan, the rights of the Reorganized Debtors to commence, prosecute

33

or settle such Causes of Action, respectively, shall be preserved notwithstanding the occurrence of the Effective Date.

**No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Committee will not pursue any and all available Causes of Action against them. The Debtors and the Estates, on their own behalf and on behalf of the Committee, expressly reserve all rights to prosecute any and all Causes of Action against any Person, <u>except</u> as otherwise provided in the Plan.** Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, the Debtors, on their own behalf and on behalf of the Committee, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, <u>including</u> without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon or after the confirmation or consummation of the Plan.

Except as set forth in Articles 16.1 and 16.2 of the Plan, nothing in the Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claims left unimpaired by the Plan, except for avoidance actions pursuant to section 547 of the Bankruptcy Code (provided, however, that the Debtors' right to object to any Claim pursuant to section 502(d) of the Bankruptcy Code is fully preserved, including but not limited to the right to object to any Claim of a recipient of a transfer that is avoidable under section 547 of the Bankruptcy Code).

Although these rights are preserved, the Plan does not contemplate the prosecution of preference or fraudulent conveyance claims.

## ARTICLE IX.

## THE DISBURSING AGENT

**9.1.**    **Appointment of the Disbursing Agent.**

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be appointed to serve as the Disbursing Agent, and shall have all powers, rights, duties and protections afforded the Disbursing Agent under the Plan. The Disbursing Agent shall make all distributions on account of H-II Lender Claims to Dymas, in its capacity as administrative agent for the H-II Lenders, which funds Dymas shall distribute to the H-II Lenders pursuant to the Plan. Dymas shall be entitled to the exculpation protections provided in Article 9.3 of the Plan with respect to any distributions Dymas makes on account of H-II Lender Claims.

**9.2.**    **Powers and Duties.**

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall be empowered and directed to (a) take all steps and execute all instruments and documents necessary to make Plan Distributions to holders of Allowed Claims and Equity Interests; (b) comply with the Plan and the obligations thereunder; (c) employ, retain, or replace professionals

34

to represent it with respect to its responsibilities; (d) object to Claims as specified in Article XI, and prosecute such objections; (e) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment, or Allowance of any Claim as provided in Article XI; (f) make annual and other periodic reports regarding the status of distributions under the Plan to the holders of Allowed Claims that are outstanding at such time; such reports to be made available upon request to the holder of any Contested Claim; and (g) exercise such other powers as may be vested in the Disbursing Agent pursuant to the Plan, the Plan Documents or order of the Bankruptcy Court.

### 9.3.    Exculpation.

**Except as otherwise provided in this Article 9.3, the Disbursing Agent, together with its officers, directors, employees, agents, and representatives, are exculpated pursuant to the Plan by all Persons, Entities, holders of Claims and Equity Interests, and all other parties in interest, from any and all Causes of Action arising out of the discharge of the powers and duties conferred upon the Disbursing Agent by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the Disbursing Agent's willful misconduct or gross negligence.  No holder of a Claim or an Equity Interest, or representative thereof, shall have or pursue any Cause of Action (a) against the Disbursing Agent or its officers, directors, employees, agents, and representatives for making Plan Distributions in accordance with the Plan, or (b) against any holder of a Claim for receiving or retaining Plan Distributions as provided for by the Plan.  Nothing contained in this Article 9.3 shall preclude or impair any holder of an Allowed Claim or Allowed Equity Interest from bringing an action in the Bankruptcy Court against any Debtor to compel the making of Plan Distributions contemplated by the Plan on account of such Claim or Equity Interest.**

### ARTICLE X.

### DISTRIBUTION PROVISIONS

### 10.1.    Sources of Cash for Plan Distributions.

All Cash necessary for the Disbursing Agent to make payments and Plan Distributions shall be obtained from the Cash of the Reorganized Debtors and the Cash held in the Contested Claims Reserve, if any, as applicable.

### 10.2.    Investment of Funds Held by the Disbursing Agent; Tax Reporting by the Disbursing Agent.

The Disbursing Agent may, but shall not be required to, invest any funds held by the Disbursing Agent pending the distribution of such funds pursuant to the Plan in investments that are exempt from federal, state, and local taxes.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Disbursing Agent of a private letter ruling if the Disbursing Agent so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Disbursing Agent), the

Disbursing Agent may (a) treat the funds and other property held by it as held in a single trust for federal income tax purposes in accordance with the trust provisions of the Internal Revenue Code (sections 641 et seq.), and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

**10.3.    Plan Distributions.**

   Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall make the required Plan Distributions specified under the Plan on the relevant Distribution Date therefor.  The Disbursing Agent shall make all distributions on account of H-II Lender Claims to Dymas, in its capacity as administrative agent for the H-II Lenders, which funds Dymas shall distribute to the H-II Lenders under the Plan.  Dymas shall be entitled to the exculpation protections provided in Article 9.3 with respect to any distributions Dymas makes on account of H-II Lender Claims.

**10.4.    Timing of Plan Distributions.**

   Each Plan Distribution shall be made on the relevant Distribution Date therefor.  In the event a Plan Distribution shall be payable on a day other than a Business Day, such Plan Distribution shall instead be paid on the immediately succeeding Business Day, but shall be deemed to have been made on the date otherwise due.  A Plan Distribution shall be deemed to have been timely made if made on such date or within ten (10) days thereafter.

   For federal income tax purposes, except to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest, provided, however, that notwithstanding all of the foregoing, the application of any distributions made on account of the H-I Lender Claims or the H-II Lender Claims and payments under Amended and Restated H-I Facility and the Amended and Restated H-II Facility shall be governed by Amended and Restated H-I Facility and the Amended and Restated H-II Facility, respectively.

**10.5.    Address for Delivery of Plan Distributions/Unclaimed Distributions.**

   Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of an Allowed Claim shall be made at the address of such holder as set forth (a) in the Schedules, (b) on the proof of Claim filed by such holder, (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e) or (d) in any notice served by such holder giving details of a change of address.  If any Plan Distribution is returned to the Disbursing Agent as undeliverable, no Plan Distributions shall be made to such holder unless the Disbursing Agent is notified of such holder's then current address within ninety (90) days after such Plan Distribution was returned.  After such date, if such notice was not provided, a holder shall have forfeited its right to such Plan Distribution, and the undeliverable Plan Distributions shall be returned to the Reorganized Debtors.  Supplemental Plan Distributions may be made from time to time at the discretion of the Disbursing Agent.

**10.6.   Time Bar to Cash Payments.**

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof.  Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.  Any claim in respect of such a voided check shall be made within one hundred and eighty (180) days after the date of issuance of such check. If no request is made as provided in the preceding sentence, any claims in respect of such void check shall be discharged and forever barred and such unclaimed Plan Distribution shall revert to the Reorganized Debtors.

**10.7.   Manner of Payment under the Plan.**

Unless the Person receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank.  Cash payments to foreign creditors may, in addition to the foregoing, may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**10.8.   Expenses Incurred on or after the Effective Date and Claims of the Disbursing Agent.**

Except as otherwise ordered by the Bankruptcy Court or as provided in the Plan, the amount of any reasonable fees and expenses incurred (or to be incurred) by the Disbursing Agent on or after the Effective Date (including, but not limited to, taxes) shall be paid when due. Professional fees and expenses incurred by the Disbursing Agent from and after the Effective Date in connection with the effectuation of the Plan shall be paid in the ordinary course of business.  Any dispute regarding compensation shall be resolved by agreement of the parties or if the parties are unable to agree, as determined by the Bankruptcy Court.

**10.9.   Fractional Plan Distributions.**

Notwithstanding anything to the contrary contained herein, no Plan Distributions of fractional shares or fractions of dollars (whether in Cash or New Equity Interests) will be made.  Fractional shares and fractions of dollars shall be rounded to the nearest whole unit (with any amount equal to or less than one-half share or one-half dollar, as applicable, to be rounded down).

**10.10.   Surrender and Cancellation of Instruments.**

As a condition to receiving any Plan Distribution, on or before the Distribution Date, the holder of an Allowed Claim evidenced by a certificate, instrument or note, other than any such certificate, instrument or note that is being reinstated or being left unimpaired under the Plan, shall (i) surrender such certificate, instrument or note representing such Claim, and (ii) execute and deliver such other documents as may be necessary to effectuate the Plan in the sole determination of the Disbursing Agent.  Such certificate, instrument or note, shall thereafter be cancelled and extinguished.  The Disbursing Agent shall have the right to withhold any Plan

37

Distribution to be made to or on behalf of any holder of such Claims unless and until (1) such certificates, instruments or notes are surrendered, or (2) any relevant holder provides to the Disbursing Agent an affidavit of loss or such other documents as may be required by the Disbursing Agent together with an appropriate indemnity in the customary form.  Any such holder who fails to surrender such certificates, instruments or notes, or otherwise fails to deliver an affidavit of loss and indemnity prior to the second anniversary of the Effective Date, shall be deemed to have forfeited its Claims and shall not participate in any Plan Distribution.  All property in respect of such forfeited Claims shall revert to the Reorganized Debtors.

## ARTICLE XI.

## PROCEDURES FOR RESOLVING
## AND TREATING CONTESTED CLAIMS

**11.1.    Prosecution of Contested Claims.**

After the Effective Date, only the Reorganized Debtors may object to the allowance of Contested Claims filed with the Bankruptcy Court.  All objections that are filed and prosecuted as provided herein shall be litigated to Final Order or compromised and settled in accordance with Article 11.3.

**11.2.    Objection Deadline.**

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date (subject to being extended by the order of the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made.

**11.3.    Claims Settlement.**

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Disbursing Agent shall have authority to settle or compromise all Claims and Causes of Action without further review or approval of the Bankruptcy Court.

**11.4.    Entitlement to Plan Distributions Upon Allowance.**

Notwithstanding any other provision hereof, if any portion of a Claim is a Contested Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Claim becomes an Allowed Claim that is not a Contested Claim, subject to the setoff rights as provided in Article 16.19.  When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim the holder of such Allowed Claim shall thereupon become entitled to receive the Plan Distributions in respect of such Claim the same as though such Claim had been an Allowed Claim on the Effective Date.

**11.5.    Contested Claims Reserve.**

The Debtors may establish a Contested Claims Reserve in a segregated account for the purpose of effectuating distributions to the holders of Contested Claims pending the allowance or disallowance of such Claims in accordance with the Plan.

**11.6.    Estimation of Claims.**

The Debtors and the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Contested Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Contested Claim, the amount so estimated shall constitute either (a) the Allowed amount of such Contested Claim; (b) a maximum limitation on such Contested Claim, or (c) in the event such Contested Claim is estimated in connection with the estimation of other Claims within the same Class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Contested Claims so estimated.   If the estimated amount constitutes a maximum limitation on the amount of such Claim, or on more than one such Claim within a Class of Claims, as applicable, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claims.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or otherwise resolved by any mechanism approved by the Bankruptcy Court.

**11.7.    No Recourse Against the Debtors or the Reorganized Debtors.**

If a Contested Claim Reserve is established pursuant to Article 11.5 prior to the Effective Date, any holder of a Contested Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable distribution under the Plan solely from any Contested Claim Reserve established on account of such Contested Claims.  In no event shall any holder of a Contested Claim have any recourse with respect to distributions made, or to be made, under the Plan to holders of such Claims, to any Debtor or the Reorganized Debtors on account of such Contested Claim, regardless of whether such Contested Claim shall ultimately become an Allowed Claim, and regardless of whether sufficient Cash or other property remains available for distribution in the Contested Claim Reserve established on account of such Contested Claims at the time such Claim becomes entitled to receive a distribution under the Plan.

## ARTICLE XII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**12.1.    Assumption and Rejection of Executory Contracts and Unexpired Leases.**

(a)    All executory contracts and unexpired leases of the Debtors shall be rejected pursuant to the provisions of section 365 of the Bankruptcy Code effective as of and subject to

the occurrence of the Effective Date, unless another date is specified in the Plan <u>except</u>:  (i) any executory contracts and unexpired leases that are the subject of separate motions to assume and assume and assign filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the Effective Date; (ii) contracts and leases listed in Schedule 4 attached to the Disclosure Statement and any subsequently filed "Schedule of Assumed Executory Contracts and Unexpired Leases" to be filed by the Debtors with the Bankruptcy Court before the entry of, or as an exhibit to, the Confirmation Order; (iii) all executory contracts and unexpired leases assumed or assumed under this Plan or by order of the Bankruptcy Court entered before the Effective Date; (iv) any executory contract or unexpired lease that is the subject of a dispute over the amount or manner of cure pursuant to the next article hereof and for which the Debtors make a motion to reject such contract or lease based upon the existence of such dispute filed at any time; (v) any agreement, obligation, security interest, transaction or similar undertaking that the Debtors believe is not executory or a lease that is later determined by the Bankruptcy Court to be an executory contract or unexpired lease that is subject to assumption or rejection under section 365 of the Bankruptcy Code; (vi) any oral or written joint defense agreements relating to actual, potential, or threatened litigation or investigations involving any of the Debtors, which shall be assumed; (vii) any guaranty or similar agreement executed by a third party which guarantees repayment or performance of an obligation owed to any of the Debtors or to indemnify the Debtors; and (viii) agreements with third parties regarding preservation of the confidentiality of documents produced by the Debtors.  Any order entered postconfirmation by the Bankruptcy Court, after notice and a hearing, authorizing the rejection of an executory contract or unexpired lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief was granted and such order was entered preconfirmation.  The Debtors reserve the right to amend Disclosure Statement Schedule 4 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" prior to the entry of the Confirmation Order.  Each executory contract and unexpired lease to be assumed by the Debtors shall include modifications, amendments, supplements, restatements or other similar agreements made directly or indirectly by any agreement, instrument or other document that affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Disclosure Statement Schedule 4 or any "Schedule of Assumed Executory Contracts and Unexpired Leases."

(b)      The inclusion of a contract, lease or other agreement in Article 12.1(a) or on Disclosure Statement Schedule 4 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" shall not constitute an admission by the Debtors as to the characterization of whether any such included contract, lease, or other agreement is, or is not, an executory contract or unexpired lease or whether any claimants under any such contract, lease or other agreement are time-barred from asserting Claims against the Debtors.  The Debtors reserve all rights with respect to the characterization of any such agreements.

(c)      The Plan shall constitute a motion to reject such executory contracts and unexpired leases rejected pursuant to this Article 12.1, and the Debtors shall have no liability thereunder <u>except</u> as is specifically provided in the Plan.  Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code, subject to the occurrence of the Effective Date, and a finding by the Bankruptcy Court that each such rejected agreement, executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interests of the Debtors and their estates.

(d)     The Plan shall constitute a motion to assume and assign to the Reorganized
Debtors such executory contracts and unexpired leases as set forth in Schedule 4 or any
"Schedule of Assumed Executory Contracts and Unexpired Leases."  Entry of the Confirmation
Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumption and
assignment pursuant to sections 365(a), (b) and (f) of the Bankruptcy Code, and a finding by the
Bankruptcy Court that the requirements of section 365(f) of the Bankruptcy Code have been
satisfied.  Any non-Debtor counterparty to an agreement listed on Schedule 4 or any "Schedule
of Assumed Executory Contracts and Unexpired Leases" or any other contract or unexpired lease
otherwise designated as being assumed or assumed and assigned in Article 12.1(a) who disputes
the assignment of an executory contract or unexpired lease must file with the Bankruptcy Court,
and serve upon the Debtors and the Committee, a written objection to the assumption and
assignment, which objection shall set forth the basis for the dispute by no later than ten (10) days
prior to the Confirmation Hearing.  The failure to timely object shall be deemed a waiver of any
and all objections to the assumption and assignment of executory contracts and leases as set forth
in Disclosure Statement Schedule 4 or any "Schedule of Assumed Executory Contracts and
Unexpired Leases" or as otherwise designated as being assumed or assumed and assigned in
Article 12.1(a).

**12.2.   Cure.**

         At the election of the Debtors, any monetary defaults under each executory
contract and unexpired lease to be assumed under this Plan shall be satisfied pursuant to section
365(b)(1) of the Bankruptcy Code: (a) by payment of the default amount in Cash on the Effective
Date or as soon thereafter as practicable; or (b) on such other terms as agreed to by the parties to
such executory contract or unexpired lease.  In the event of a dispute regarding: (i) the amount of
any cure payments; (ii) the ability to provide adequate assurance of future performance under the
contract or lease to be assumed or assigned; or (iii) any other matter pertaining to assumption or
assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be
made following the entry of a Final Order resolving the dispute and approving assumption or
assignment, as applicable.  Disclosure Statement Schedule 4 or any "Schedule of Assumed
Executory Contracts and Unexpired Leases" attached to the Disclosure Statement set forth the
Debtors' cure obligations for each agreement which a cure obligation must be satisfied as a
condition to the assumption and assignment of such agreement.  Any non-Debtor counterparty to
an agreement listed on the Disclosure Statement Schedule 4 or any "Schedule of Assumed
Executory Contracts and Unexpired Leases" who disputes the scheduled cure obligation (or
objects to the omission of a scheduled cure obligation) must file with the Bankruptcy Court, and
serve upon the Debtors and the Committee, a written objection to the cure obligation, which
objection shall set forth the basis for the dispute, the alleged correct cure obligation, and any
other objection related to the assumption or assumption and assignment of the relevant
agreement by no later than ten (10) Business Days prior to the Confirmation Hearing.  If a non-
Debtor counterparty fails to file and serve an objection which complies with the foregoing, the
cure obligation set forth on the Disclosure Statement Schedule 4 or any "Schedule of Assumed
Executory Contracts and Unexpired Leases" shall be binding on the non-Debtor counterparty,
and the non-Debtor counterparty shall be deemed to have waived any and all objections to the
assumption and assignment of the relevant agreement as proposed by the Debtors.

**12.3.**   **Claims Arising from Rejected Contracts.**

Rejection Damage Claims must be submitted to the Claims Agent, with copies to counsel for the Debtors and the Committee, by the first Business Day that is at least thirty (30) days following the Effective Date.  The foregoing submission deadline applies only to Rejection Damage Claims arising out of executory contracts and unexpired leases that are rejected pursuant to the Plan.  Nothing in the Plan shall alter the submission deadline for a party to an executory contract or unexpired lease that was rejected by separate motion or by operation of law.  Properly submitted Rejection Damage Claims shall be treated as Class 5 General Unsecured Claims under the Plan subject to objection by the Reorganized Debtors.  Any such Rejection Damage Claims that are not properly submitted pursuant to this Article 12.3 will forever be barred from assertion and shall not be enforceable against the Reorganized Debtors, their respective Estates, Affiliates or Assets.

## ARTICLE XIII.

## SETTLEMENTS AND COMPROMISES

**13.1.**   **JLI.**

As set forth in Article 5.7, as of the Effective Date, JLI (and any other Person who may be a holder of a JLI Claim as of the Effective Date) shall be deemed to have waived any and all Claims it holds or may hold against (i) any other Released Person and (ii) any of the Debtors arising prior to the Effective Date (whether prepetition, rejection, arising under section 503(b)(9) of the Bankruptcy Code or otherwise) and relating to any of the Debtors in exchange for (a) the assumption of the Franchise Agreements and related JLI Leases (in each case as modified by the New JLI Agreements in the Plan Documents), and (b) the releases provided for in Articles 16.1 and 16.2.  Notwithstanding any of the foregoing, the Plan shall in no way limit or waive JLI's right to assert Claims for unpaid but accrued royalties on actual Gross Sales (as defined in the Franchise Agreements), lease payments and Franchise Agreement renewal fees, each arising after the Petition Date, and the Debtors' right to assert claims for fleet credits, rebates, other credits and similar items owing to the Debtors after the Petition Date.  Except as provided in this Article, neither JLI (nor any other Person who may be a holder of a JLI Claim) shall be entitled to receive any Plan Distribution.

All of the Franchise Agreements, as amended pursuant to the terms of the New JLI Agreements, shall be assumed as of the Effective Date.  The Amendments shall supersede any contrary provisions in the Franchise Agreements, and shall contain such other terms and conditions as may be agreed upon between JLI and the Debtors.  The amendments to the Franchise Agreements shall be set forth as a single global amendment, provided, however, that each Franchise Agreement shall remain a valid and distinct contractual obligation (as amended by such global amendment) existing independent of any other Franchise Agreement.

**13.2.**   **SOPUS.**

As set forth in Article 5.8, as of the Effective Date, SOPUS (and any other Person who may be a holder of a SOPUS Claim as of the Effective Date) shall be deemed to have

waived any and all Claims it holds or may hold against (i) any other Released Person and (ii) any of the Debtors arising prior to the Effective Date (whether pre-petition, rejection, arising under section 503(b)(9) of the Bankruptcy Code or otherwise) and relating to any of the Debtors in exchange for (i) the replacement of all existing Supply Agreements with the Master Supply Agreement and the VMI Agreement included in the Plan Documents, and (ii) the releases provided for in Articles 16.1 and 16.2. Notwithstanding any of the foregoing, the Plan shall not release and shall in no way limit SOPUS's right to assert any Claim for unpaid goods or services delivered to the Debtors after the Petition Date, and the Debtors' right to assert Claims for rebates, credits and similar items owing by SOPUS to the Debtors for goods or services delivered to the Debtors after the Petition Date and nothing herein alters a party's obligation to comply with the terms of the existing product supply agreements through the Effective Date. Except as provided in this Article, neither SOPUS nor any other Person who may be a holder of a SOPUS Claim shall be entitled to receive any Plan Distribution.

All of the existing Supply Agreements shall be terminated as of the Effective Date and shall be replaced as of the Effective Date by the Master Supply Agreement. The Master Supply Agreement shall supersede any earlier agreements by and among the Debtors and SOPUS and shall contain other such terms and conditions as may be agreed upon between SOPUS and the Debtors. In addition, the VMI Agreement shall be entered in and effective as of the Effective Date. For proprietary and confidentiality reasons, the Master Supply Agreement and VMI Agreement filed or to be filed with the Plan or Plan Supplement have been redacted with respect to, among other things, pricing terms.

## 13.3. **Quad-C.**

(a)    On or before the Effective Date, HAS Funding, LLC or its designee(s) shall fulfill its obligations under the Quad-C Contribution Documents. In addition, Quad-C shall release and waive all of their respective Claims against each other Released Person as set forth in Article 16.2.

(b)    In exchange for its performance under the Quad-C Contribution Documents, HAS Funding LLC or its designee(s) shall receive on the Effective Date (i) 300,000 shares of New Class B Common Stock, less any shares of New Class B Common Stock to be issued to holders of Allowed Heartland Common Stock Interests, as provided for in Article 5.10 and (ii) 1,000,000 shares of New Class B Preferred Stock. In addition, Quad-C shall receive releases and waivers of all Claims against them from each other Released Person as set forth in Articles 16.1 and 16.2.

(c)    If, on the Effective Date, HAS Funding LLC or its designee(s) has not deposited into the Debtors' main operating account an amount (the "New Money Contribution") equal to the difference between $28 million and the Effective Date DIP Balance, (i) Quad-C shall not be entitled to the release provided for in Article 13.3(b), (ii) the defined term "Released Persons" in Article 1.118 shall be modified to exclude the reference to Quad-C in clause (a) of such definition and exclude Quad-C from clause (c) of such definition regardless of whether Quad-C might otherwise be an affiliate, officer, director, principal, shareholder, parent, subsidiary, member, auditor, accountant, financial advisor, predecessor, successor, servant, employee, agent, counsel, attorney, partner, insurer, underwriter, administrator, executor, representative or assign of a Released Person, and (iii) the releases set forth in Articles 16.1 and 16.2 shall not apply to

Quad-C, and any Claims or Causes of Action that any of the Released Persons holds or may hold against Quad-C are expressly preserved and vest in the Reorganized Debtors for their benefit and the benefit of their creditors.  Further, if, on the Effective Date, HAS Funding LLC or its designee(s) has not deposited the New Money Contribution (as calculated above) into the Debtors' main operating account, in accordance with Article 13.3(a), Article 14.2(e)(i) shall be deleted from the Plan.

(d)     If on or before December 31 2008, Quad-C has not represented to the Debtors, the Committee and Blackstone that HAS Funding LLC has direct control over immediately available funds in the amount of the New Money Contribution and that such funds have been segregated for the sole purpose of satisfying the New Money Contribution, the Debtors and/or the Committee shall have the right to seek to replace the Quad-C Contribution with funding from alternative sources, upon notice to and a hearing before the Bankruptcy Court, and subject to the terms of the Quad-C Plan Support Agreement approved by the Bankruptcy Court on  December 18, 2008, as amended from time to time.  Provided, that, (i) the terms of such alternative funding are not materially less favorable to the Debtors or the H-II Lenders than the terms of the Quad-C Contribution and (ii) the Bankruptcy Court approves such alternative funding, the Plan shall be deemed amended without the need for further notice or solicitation.

## ARTICLE XIV.

## CONDITIONS PRECEDENT TO
## CONFIRMATION OF THE PLAN AND
## THE OCCURRENCE OF THE EFFECTIVE DATE

**14.1.**   **Conditions Precedent to Confirmation.**

The following are conditions precedent to confirmation of the Plan:

(a)     The clerk of the Bankruptcy Court shall have entered an order or orders:

(i)     approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii)    authorizing the solicitation of votes with respect to the Plan;

(iii)   determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan;

(iv)    confirming and giving effect to the terms and provisions of the Plan;

(v)     determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtors and the Plan;

(vi)    approving the Plan Documents;

(vii)   authorizing the Debtors to execute, enter into, and deliver the Plan Documents and to execute, implement, and to take all actions otherwise necessary or appropriate to give effect to, the transactions contemplated by the Plan and the Plan Documents;

(viii)    approving the Amended and Restated H-I Facility Documents;

(ix)    approving the Amended and Restated H-II Facility Documents; and

(x)    approving the New JLI Agreements, the Master Supply Agreement and the VMI Agreement.

(b)    The Confirmation Order, the Plan Documents and the Plan are each in a form satisfactory to the Committee and the Debtors.

**14.2.    Conditions Precedent to the Occurrence of the Effective Date.**

The following are conditions precedent to the occurrence of the Effective Date:

(a)    The Confirmation Order shall have been entered by the Clerk of the Bankruptcy Court, be in full force and effect and not be subject to any stay or injunction;

(b)    There is sufficient available free Cash to make a seventy percent (70%) distribution on account of all Allowed General Unsecured Claims who have elected the Cash Option;

(c)    All necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan, including, without limitation, satisfaction or waiver of all conditions to the obligations of (i)  the Debtors under the Plan and the Plan Documents, (ii) JLI and SOPUS under the New JLI Agreements, the Master Supply Agreement and the VMI Agreement, (iii) Quad-C to make payments under the Quad-C Contribution Documents, and (iv) the Debtors and JLI under the Amended and Restated H-II Facility Documents.

(d)    The New JLI Agreements, the Master Supply Agreement and the VMI Agreement have been executed and delivered; and

(e)    (i)    The Quad-C Contribution shall have been made and fully and irrevocably funded; or

(ii)    If Quad-C fails to make the Quad-C Contribution, alternative equity funding has been obtained.

**14.3.    Waiver of Conditions.**

The Committee and the Debtors may waive any one or more of the conditions set forth in Article 14.1 or Article 14.2(b), (c) or (d) in a writing executed by each of them without notice or order of the Bankruptcy Court and without notice to any parties in interest.  This Article 14.3 is subject to the obligations of the Committee and the Debtors under the H-II PSA.

**14.4.    Effect of Non-Occurrence of the Effective Date.**

If the Effective Date shall not occur, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Equity Interests in a Debtor; (b) prejudice in any manner the rights of any party-in-interest; or (c) constitute an admission, acknowledgement, offer or undertaking by the Debtors, the Committee or any other party-in-interest.  Without limiting the generality of the foregoing sentence, in the

event that the Effective Date has not occurred on or before June 30, 2009, Quad-C shall be permitted to seek confirmation of a plan of reorganization other than the Plan, subject to receiving any and all necessary relief from the Bankruptcy Court.

## ARTICLE XV.

## RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) that relates to the following:

(i)      To hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with Article XII hereof for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases to which any of the Debtors is a party or with respect to which any of the Debtors may be liable, and to hear and determine any and all Claims and any related disputes (including, without limitation, the exercise or enforcement of setoff or recoupment rights, or rights against any third party or the property of any third party resulting therefrom or from the expiration, termination or liquidation of any executory contract or unexpired lease);

(ii)      To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Disbursing Agent or the Debtors, as applicable, after the Effective Date;

(iii)      To hear and determine any objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow, disallow or estimate any Contested Claim in whole or in part;

(iv)      To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

(v)      To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(vi)      To hear and determine all Fee Applications and applications for allowances of compensation and reimbursement of any other fees and expenses authorized to be paid or reimbursed under the Plan or the Bankruptcy Code;

(vii)      To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan, the Plan Documents or their interpretation, implementation, enforcement, or consummation, provided, however, that the Bankruptcy Court shall not retain exclusive jurisdiction over the Amended and Restated H-I Facility Documents and the Amended and Restated H-II Facility Documents;

46

(viii)    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Confirmation Order (and all exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

(ix)    To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or Cause of Action by, on behalf of, or against the Estates;

(x)    To determine such other matters that may be set forth in the Plan, or the Confirmation Order, or that may arise in connection with the Plan, or the Confirmation Order;

(xi)    To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Reorganized Debtors, the Debtors-in-Possession, or the Disbursing Agent may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xii)    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with any setoff and/or recoupment rights of the Debtors or any Person under the Plan;

(xiii)    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with Causes of Action of the Debtors (including Avoidance Actions) commenced by the Disbursing Agent, the Debtors or any third parties, as applicable, before or after the Effective Date;

(xiv)    To enter an order or final decree closing the Chapter 11 Cases;

(xv)    To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan or the Confirmation Order; and

(xvi)    To hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code.

## ARTICLE XVI.

## MISCELLANEOUS PROVISIONS

**16.1.    Releases by the Debtors.**

On the Effective Date, except as expressly provided in Articles 13.1 and 13.2, each of the Released Persons shall be released by each Debtor, and their respective Estates, from any and all Claims, including without limitation Avoidance Actions, liens, encumbrances, security interests, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that any Debtor is entitled to assert in its own right or on behalf of the holder of any claim or equity interest or other Person, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or prior to the Effective Date in any way relating to any Debtor, the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or

consummation of any of the Plan, or the property to be distributed under the Plan, the disclosure statement concerning the Plan, any contract, employee pension or other benefit plan, instrument, release or other agreement of document created, modified, amended, terminated or entered into in connection with either the Plan or any agreement between the Debtors and any Released Person, or any other act taken or omitted to be taken in connection with the Company's bankruptcy.  Without limitation of the foregoing, each such Released Person shall be released and exculpated from any and all Claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that any holder of a claim or equity interest is entitled to assert in its own right or on behalf of any other person, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence relating to the Debtors and taking place prior to the Effective Date.

**16.2.    Release of Released Persons by Other Released Persons.**

On the Effective Date, except (a) as expressly provided under the Plan with respect to (i) Plan Distributions on account of Allowed Claims or Allowed Equity Interests, if any, that any of the Released Persons may have against any of the Debtors' estates, and (ii) any other rights or obligations under the Plan or the Plan Documents, and (b) as otherwise provided in Articles 13.1 and 13.2, each of the Released Persons shall release each other from any and all Claims, including without limitation Avoidance Actions, liens, encumbrances, security interests, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that any Released Person is entitled to assert against any other Released Person, based in whole or in part upon any act or omission, transaction, agreement, event or occurrence taking place on or before the Effective Date in any way relating to any Debtor, the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Plan, or the property to be distributed under the Plan, the disclosure statement concerning the Plan, any contract, employee pension or other benefit plan, instrument, release or other agreement of document created, modified, amended, terminated or entered into in connection with either the Plan or any agreement between the Debtors and any Released Person, or any other act taken or omitted to be taken in connection with the Company's bankruptcy.  Notwithstanding any of the foregoing, this Plan shall not release any obligations of the Debtors to indemnify and hold harmless their current and former directors, officers and employees, except for claims or causes of actions against any current and former directors, officers and employees resulting from the willful misconduct or gross negligence of such indemnified party, whether arising under the Debtors' constituent documents, contract, law or equity.  In addition, the Debtors shall not indemnify or hold harmless any current and former directors, officers and employees for any claim for payment of attorneys' fees arising out of or relating to the Chapter 11 Cases or any investigation related thereto.

**16.3.    Settlement of Controversies**

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution, releases, treatment, and other benefits provided under the Plan, including without limitation, the provisions of Articles 13, 16.1 and 16.2, the provisions of the Plan shall constitute a good faith settlement of all claims and controversies resolved pursuant to the Plan.  The entry

of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing settlements and all other settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such settlements are in the best interests of the Debtors, their Estates, creditors, and other parties in interest and are fair, equitable, and within the range of reasonableness.

**16.4.    Third Party Agreements; Subordination.**

The Plan Distributions to the various classes of Claims and Equity Interests hereunder shall not affect the right of any Person to levy, garnish, attach, or employ any other legal process with respect to such Plan Distributions by reason of any claimed subordination rights or otherwise.  All of such rights and any agreements relating thereto shall remain in full force and effect, except as compromised and settled pursuant to the Plan.  Plan Distributions shall be subject to or modified by any Final Order directing distributions other than as provided in the Plan.  The right of the Debtors to seek subordination of any Claim or Equity Interest pursuant to section 510 of the Bankruptcy Code is fully reserved; and the treatment afforded any Claim or Equity Interest that becomes a Subordinated Claim or subordinated Equity Interest at any time shall be modified to reflect such subordination. Unless the Confirmation Order provides otherwise, no Plan Distributions shall be made on account of a Subordinated Claim or subordinated Equity Interest.  Notwithstanding the foregoing, neither the Debtors, the Reorganized Debtors, nor any other party in interest shall reserve or preserve any right to subordinate the H-I Lender Claims, which are expressly Allowed as provided in Article 3.3(a) hereof and satisfied as provided in Article 5.2 hereof.  Notwithstanding the foregoing, (i) the subordination rights of the holders of H-II Lender Claims under the H-II Lender Subordination Agreement shall be deemed fully satisfied by the distributions made pursuant to Article 5.3 hereof, and (ii) neither the Debtors, the Reorganized Debtors, nor any other party in interest shall reserve or preserve any right to subordinate the H-II Lender Claims, which are expressly Allowed as provided in Article 3.3(b) hereof and satisfied as provided in Article 5.3 hereof.

**16.5.    Payment of Statutory Fees.**

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date.

**16.6.    Satisfaction of Claims.**

The rights afforded in the Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any accrued postpetition interest, against the Debtors and the Debtors-in-Possession, or any of their Estates, Assets, properties, or interests in property.  Except as otherwise provided herein, on the Effective Date, all Claims against and Equity Interests in the Debtors and the Debtors-in-Possession shall be satisfied, discharged, and released in full.  The Reorganized Debtors shall not be responsible for any pre-Effective Date obligations of the Debtors or the Debtors-in-Possession, except those expressly assumed by any Reorganized Debtor(s), as applicable.  Except as otherwise provided herein, all Persons and Entities shall be precluded and forever barred from asserting against the

49

Reorganized Debtors, their respective successors or assigns, or their Estates, Assets, properties, or interests in property any event, occurrence, condition, thing, or other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

**16.7.   Exculpation.**

**The Debtors and any Released Persons shall not be liable for any Cause of Action arising in connection with or out of the administration of the Chapter 11 Cases, pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, <u>except</u> for gross negligence or willful misconduct as determined by Final Order of the Bankruptcy Court.  The Confirmation Order shall enjoin all holders of Claims and Equity Interests from asserting or prosecuting any Claim or cause of action against any Released Person as to which such Released Person has been exculpated from liability pursuant to the preceding sentence.**

**16.8.   Discharge of Liabilities.**

Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, the Debtors shall be discharged from all Claims and Causes of Action to the fullest extent permitted by section 1141 of the Bankruptcy Code, and all holders of Claims and Equity Interests shall be precluded from asserting against the Reorganized Debtors, the Debtors, the Estates, the Assets, or any property dealt with under the Plan, any further or other Cause of Action based upon any act or omission, transaction, event, thing, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date.

**<u>EXCEPT</u> AS OTHERWISE PROVIDED IN THE PLAN, THE REORGANIZED DEBTORS SHALL NOT HAVE, AND SHALL NOT BE CONSTRUED TO HAVE OR MAINTAIN ANY LIABILITY, CLAIM, OR OBLIGATION, THAT IS BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OTHER OCCURRENCE OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE PLAN (<u>INCLUDING</u>, WITHOUT LIMITATION, ANY LIABILITY OR CLAIMS ARISING UNDER APPLICABLE NON-BANKRUPTCY LAW AS A SUCCESSOR TO THE DEBTORS) AND NO SUCH LIABILITIES, CLAIMS, OR OBLIGATIONS FOR ANY ACTS SHALL ATTACH TO THE REORGANIZED DEBTORS.**

**16.9.   Discharge of Debtors.**

<u>Except</u> as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, without further notice or order, all Claims of any nature whatsoever shall be automatically discharged forever.  <u>Except</u> as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the Debtors, their Estates, and all successors thereto shall be deemed fully discharged and released from any and all Claims, <u>including</u>, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim

50

based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or (c) the holder of a Claim based upon such debt has accepted the Plan. The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors, their Estates, and all successors thereto. As provided in section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtors, their Estates, or any successor thereto at any time obtained to the extent it relates to a Claim discharged, and operates as an injunction against the prosecution of any action against the Reorganized Debtors or property of the Debtors or their Estates to the extent it relates to a discharged Claim.

**16.10. <u>Notices</u>.**

Any notices, requests, and demands required or permitted to be provided under the Plan, in order to be effective, shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

Heartland Automotive Holdings, Inc.
Attention: Robert J. Kmiecik, Esq.
11308 Davenport Street
Omaha, NE 68154
Telephone: (402) 333-0990
Facsimile: (402) 933-9472

and

White & Case LLP
Attention: Gerard Uzzi, Esq.
Attention: Lisa Thompson, Esq.
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

and

Cadwalader, Wickersham & Taft LLP
Attention: Andrew M. Troop, Esq.
Attention: Ingrid Bagby, Esq.
Attention: Burke A. Dunphy, Esq.
One World Financial Center
New York, NY 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

and

Klee, Tuchin, Bogdanoff & Stern LLP
Attention: Lee R. Bogdanoff, Esq.
Attention: Martin R. Barash, Esq.
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90025
Telephone: (310) 407-4000
Facsimile: (310) 407-9090

**16.11.  Headings.**

The headings used in the Plan are inserted for convenience only, and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

**16.12.  Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of New York, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments, agreements or documents.

**16.13.  Expedited Determination.**

The Disbursing Agent is hereby authorized to file a request for expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed with respect to the Debtors.

**16.14.  Exemption from Transfer Taxes.**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

**16.15.  Retiree Benefits.**

Pursuant to section 1129(a)(13), on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

**16.16.  Notice of Entry of Confirmation Order and Relevant Dates.**

Promptly upon entry of the Confirmation Order, the Debtors shall publish as directed by the Bankruptcy Court and serve on all known parties in interest and holders of

Claims and Equity Interests, notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Plan.

**16.17.  Interest and Attorneys' Fees.**

(a)   Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in this Plan, the Confirmation Order or as otherwise required by the Bankruptcy Court or by applicable law.

(b)   Except as set forth in the Plan or as ordered by the Bankruptcy Court, no award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim.

**16.18.  Modification of the Plan.**

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Committee and the Debtors at any time before confirmation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Committee and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  The Committee and the Debtors may modify the Plan at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.  This Article 16.18 is subject to the obligations of the Committee and the Debtors under the H-II PSA.

**16.19.  Revocation of Plan.**

The Committee and the Debtors reserve the right to, after consultation with JLI and SOPUS, revoke and withdraw the Plan or to adjourn the Confirmation Hearing with respect to the Plan and/or submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code.  If the Committee and the Debtors revoke or withdraw the Plan, or if the Effective Date does not occur under  the Plan, all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained herein and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims against or Equity Interests or to prejudice in any manner the rights of any of the Debtors or any other Person in any other further proceedings involving any of the Debtors.  This Article 16.19 is subject to the obligations of the Committee and the Debtors under the H-II PSA.

**16.20.  Setoff Rights.**

Except as otherwise provided in Articles 3.3(a) and 3.3(b), in the event that any Debtor has a Claim of any nature whatsoever against the holder of a Claim against such Debtor, then such Debtor may, but is not required to, set off against the Claim (and any payments or

other Plan Distributions to be made in respect of such Claim hereunder) such Debtor's Claim against such holder, subject to section 553 of the Bankruptcy Code. Neither the failure to set off nor the allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that any Debtor may have against the holder of any Claim.

**16.21.  Compliance with Tax Requirements.**

In connection with the Plan, the Debtors and the Disbursing Agent, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local, and foreign taxing authorities and all Plan Distributions hereunder shall be subject to such withholding and reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim or Equity Interest that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such Plan Distribution.  The Disbursing Agent has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to the Disbursing Agent for payment of any such tax obligations.

**16.22.  Rates.**

The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

**16.23.  Injunctions.**

**On the Effective Date and except as otherwise provided herein, all Persons who have been, are, or may be holders of Claims against or Equity Interests in the Debtors shall be permanently enjoined from taking any of the following actions against or affecting the Debtors, the Reorganized Debtors, the Estates, the Assets, the Disbursing Agent, or any of the Released Persons, or their respective assets and property, with respect to such Claims or Equity Interests (other than actions brought to enforce any rights or obligations under the Plan):**

**(i)      commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);**

**(ii)     enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order;**

**(iii)    creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance; and**

**(iv)     asserting any setoff, right of subrogation or recoupment of any kind; provided, that any defenses, offsets or counterclaims which the Debtors may have or assert in respect of the above referenced Claims are fully preserved in accordance with Article 16.19.**

16.24.  **Binding Effect.**

The Plan shall be binding upon the Reorganized Debtors, the holders of all Claims and Equity Interests, parties in interest, Persons and Entities and their respective successors and assigns.  To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

16.25.  **Severability.**

IN THE EVENT THE BANKRUPTCY COURT DETERMINES THAT ANY PROVISION OF THE PLAN IS UNENFORCEABLE EITHER ON ITS FACE OR AS APPLIED TO ANY CLAIM OR EQUITY INTEREST OR TRANSACTION, THE DEBTORS AND THE COMMITTEE MAY MODIFY THE PLAN IN ACCORDANCE WITH ARTICLE 16.17 SO THAT SUCH PROVISION SHALL NOT BE APPLICABLE TO THE HOLDER OF ANY SUCH CLAIM OR EQUITY INTEREST OR TRANSACTION SUCH A DETERMINATION OF UNENFORCEABILITY SHALL NOT (A) LIMIT OR AFFECT THE ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF THE PLAN OR (B) REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR REJECTION OF THE PLAN.

16.26.  **No Admissions.**

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTIONS, THIS PLAN SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS PLAN SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS OR THEIR AFFILIATES, AS DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CHAPTER 11 CASES.

**16.27.** <u>**Dissolution of the Committee**</u>.

Effective on the Effective Date, the Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to (i) applications for Fee Claims or reimbursement of expenses incurred as a member of the Committee, and (ii) any motions or other actions seeking enforcement or implementation of the provisions of this Plan or the Confirmation Order or pending appeals of orders entered in the Chapter 11 Cases.

Dated: December 23, 2008

Respectfully submitted,

**The Official Committee of Unsecured Creditors of Heartland Automotive Holdings, Inc., <u>et al</u>.**

By:_____
Name: Salvatore Gentile
Title:  Committee Co-chair

By:_____
Name:
Title:

**Heartland Automotive Holdings, Inc.**

By:_____
Name: Eric F. Glover
Title:  President and Chief Executive Officer

**HAS Holdings, Inc.,**

By:_____
Name: Eric F. Glover
Title:  President and Chief Executive Officer

**Heartland Automotive Services, Inc.**

By:_____
Name: Eric F. Glover
Title:  President and Chief Executive Officer

**Heartland Automotive Services of Austin, Inc.**

By:_____
Name: Eric F. Glover
Title:  President and Chief Executive Officer

**16.27.** **Dissolution of the Committee.**

      Effective on the Effective Date, the Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to (i) applications for Fee Claims or reimbursement of expenses incurred as a member of the Committee, and (ii) any motions or other actions seeking enforcement or implementation of the provisions of this Plan or the Confirmation Order or pending appeals of orders entered in the Chapter 11 Cases.

Dated: December 23, 2008            Respectfully submitted,

                           **The Official Committee of Unsecured Creditors**
                           **of Heartland Automotive Holdings, Inc., et al.**

                           By:_____
                           Name: Salvatore Gentile
                           Title: Committee Co-chair

                           By:_____
                           Name: J Gregg Pritchard Plas
                           Title: Agent for Products Plas

**Heartland Automotive Holdings, Inc.**

                           By:_____
                           Name: Eric F. Glover
                           Title:  President and Chief Executive Officer

**HAS Holdings, Inc.,**

                           By:_____
                           Name: Eric F. Glover
                           Title:  President and Chief Executive Officer

**Heartland Automotive Services, Inc.**

                           By:_____
                           Name: Eric F. Glover
                           Title:  President and Chief Executive Officer

**Heartland Automotive Services of Austin, Inc.**

                           By:_____
                           Name: Eric F. Glover
                           Title:  President and Chief Executive Officer

**16.27. <u>Dissolution of the Committee</u>.**

Effective on the Effective Date, the Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to (i) applications for Fee Claims or reimbursement of expenses incurred as a member of the Committee, and (ii) any motions or other actions seeking enforcement or implementation of the provisions of this Plan or the Confirmation Order or pending appeals of orders entered in the Chapter 11 Cases.

Dated: December 23, 2008

Respectfully submitted,

**The Official Committee of Unsecured Creditors of Heartland Automotive Holdings, Inc., <u>et al</u>.**

By:_____
Name: Salvatore Gentile
Title:  Committee Co-chair

By:_____
Name:
Title:

**Heartland Automotive Holdings, Inc.**

By:_____
Name: Eric F. Glover
Title:  President and Chief Executive Officer

**HAS Holdings, Inc.,**

By:_____
Name: Eric F. Glover
Title:  President and Chief Executive Officer

**Heartland Automotive Services, Inc.**

By:_____
Name: Eric F. Glover
Title:  President and Chief Executive Officer

**Heartland Automotive Services of Austin, Inc.**

By:_____
Name: Eric F. Glover
Title:  President and Chief Executive Officer

**Heartland Automotive Services II, Inc.**

By:
Name: Eric F. Glover
Title:   President and Chief Executive Officer

**Oil Express, Inc.**

By:
Name: Eric F. Glover
Title:   President and Chief Executive Officer

**Lube Pit, Inc.**

By:
Name: Eric F. Glover
Title:   President & Chief Executive Officer

**Lube Acquisition, Inc.**

By:
Name: Eric F. Glover
Title:   President & Chief Executive Officer

**A. Fanticola Companies, Inc.**

By:
Name: Eric F. Glover
Title:   President & Chief Executive Officer

**A.F.C. Northwest, Inc.**

By:
Name: Eric F. Glover
Title:   President & Chief Executive Officer

**EXHIBIT A**

**DEBTORS**

**HEARTLAND AUTOMOTIVE HOLDINGS, INC.**
**HAS HOLDINGS, INC.**
**HEARTLAND AUTOMOTIVE SERVICES, INC.**
**HEARTLAND AUTOMOTIVE SERVICES II, INC.**
**A. FANTICOLA COMPANIES, INC.**
**A.F.C. NORTHWEST, INC.**
**LUBE ACQUISITION, INC.**
**OIL EXPRESS, INC.**
**LUBE PIT, INC.**
**HEARTLAND AUTOMOTIVE SERVICES OF AUSTIN, INC.**

# EXHIBIT B

## DISCLOSURE STATEMENT ORDER, SOLICITATION PROCEDURES ORDER AND
## NOTICE OF THE CONFIRMATION HEARING

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Case |
| | ) | |
| HEARTLAND AUTOMOTIVE HOLDINGS, INC., et al., | ) | Case No. 08-40047 (rfn-11) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

**ORDER APPROVING THE DISCLOSURE STATEMENT RELATING
TO THE AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
HEARTLAND AUTOMOTIVE AND ITS AFFILIATED DEBTORS**

Upon the motion of Heartland Automotive Holdings, Inc. and its affiliated debtors (collectively, the "Debtors"), dated November 26, 2008 (the "Motion")[1] for entry of an order approving the Disclosure Statement Related to the Joint Chapter 11 Plan of Reorganization for Heartland Automotive Holdings, Inc. and its Affiliated Debtors, dated November 21, 2008 (as may be amended from time to time, the "Plan") [Docket No. 914]; and upon the objections of (i) BP Lubricants USA Inc. d/b/a Castrol; (ii) Capmark Finance Inc.; (ii) CEF Funding II, L.L.C.; (iii) Dymas Funding Company, LLC; and (iv) AMRESCO Commercial Finance, LLC. (collectively, the "Objections"); and the Objections having been withdrawn, resolved or otherwise overruled by the Court; and upon the record of the hearing held on December 18, 2008 (the "Disclosure Statement Hearing") to consider the approval of the Disclosure Statement relating to the Plan (as amended), dated December 23, 2008 (the "Disclosure Statement") [Docket No. __ ]; and it appearing that the Court has jurisdiction to consider this matter; and due and proper notice of the deadline to object to the Disclosure Statement and the Disclosure

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

Statement Hearing having been given; and it appearing that no other or further notice need be

given; and upon the record of the Disclosure Statement Hearing and all the proceedings had

before the Court; and the Court having determined after due deliberation that the Disclosure

Statement contains adequate information, as such term is defined in section 1125 of title 11 of

the United States Code, 11 U.S.C. §§ 101, <u>et.</u> <u>seq.</u> (the "Bankruptcy Code"); and sufficient cause

appearing therefor, it is hereby

ORDERED that, in accordance with section 1125 of the Bankruptcy Code and

Rule 3017(b) of the Federal Rules of Bankruptcy Procedure, the Disclosure Statement is hereby

approved; and it is further

ORDERED that the Disclosure Statement, as the same may be amended and

modified to incorporate immaterial modifications, fill in blanks to reflect any modifications that

the Debtors and the Committee determine appropriate, which do not materially change the

Disclosure Statement or materially affect any rights of a party in interest be, and it hereby is,

approved as containing adequate information within the meaning of section 1125 of the

Bankruptcy Code; and it is further

ORDERED that the hearing to consider confirmation of the Plan (the

"Confirmation Hearing") shall be held on January 16, 2009 at 9:30 a.m., Central Standard Time

The Confirmation Hearing may be continued to a later date without the need for further notice

other than a statement in open court made at the Confirmation Hearing.  The deadline for filing

objections to confirmation of the Plan shall be January 12, 2009 at 4:00 p.m., Central Standard

Time; and it is further

ORDERED that this Court shall, and hereby does, retain jurisdiction with respect

to all matters arising from or in relation to the implementation of this Order.

### # # # End of Order # # #

**PREPARED BY:**

Jeff P. Prostok
State Bar No. 16352500
Forshey &Prostok LLP
777 Main St., Suite 1290
Ft. Worth, TX  76102
(817) 877-8855

    -and-

Thomas E Lauria
State Bar No. 11998025
Gerard Uzzi
Lisa Thompson
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8200

ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Case |
| | ) | |
| HEARTLAND AUTOMOTIVE HOLDINGS, | ) | Case No. 08-40047 (rfn-11) |
| INC., <u>et al.</u>, | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |

**ORDER (I) APPROVING FORM OF BALLOTS AND PROPOSED SOLICITATION
AND TABULATION PROCEDURES FOR THE PLAN; (II) APPROVING THE
SOLICITATION PACKAGES AND PRESCRIBING THE FORM AND MANNER OF
NOTICE AND DISTRIBUTION THEREOF; AND (III) ESTABLISHING PROCEDURES
FOR VOTING IN CONNECTION WITH THE PLAN CONFIRMATION PROCESS
<u>AND TEMPORARY ALLOWANCE OF CLAIMS RELATED THERETO</u>**

Upon the motion of Heartland Automotive Holdings, Inc. and its affiliated debtors

(collectively, the "Debtors"), dated November 26, 2008 (the "Motion")[1] for entry of an order (i)

approving the form of ballots and proposed solicitation and tabulation procedures for the Joint

Chapter 11 Plan of Reorganization for Heartland Automotive Holdings, Inc. and its Affiliated

Debtors, dated November 21, 2008 (as may be amended from time to time, the "Plan") [Docket

No. 914]; (ii) approving the Solicitation Packages and prescribing the form and manner of notice

and distribution thereof; and (iii) establishing procedures for voting in connection with the Plan

confirmation process and temporary allowance of claims related thereto; and upon the record of

the hearing held on December 18, 2008 to consider the Motion; and it appearing that the Court

has jurisdiction over this matter; and due and proper notice of the Motion having been given; and

it appearing that no other or further notice need be given; and it appearing that the relief

requested in the Motion, as amended hereby, is in the best interests of the Debtors, their estates,

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

their creditors and equity interest holders; and upon the record of the proceedings had before the

Court; and sufficient cause appearing therefor, it is hereby

ORDERED that, in accordance with Bankruptcy Rule 3017(c), the date and time

set as the deadline for voting on the Plan shall be January 12, 2009 at 4:00 p.m., Central Standard

Time (the "Voting Deadline"); and it is further

ORDERED that pursuant to Bankruptcy Rules 3017(c) and 3018(a), the date for

purposes of determining the creditors and equity interest holders entitled to vote on the Plan or,

in the case of non-voting classes, for purposes of determining the creditors and equity interest

holders entitled to receive certain non-voting materials shall be the date of entry of this Order

(the "Record Date"); and it is further

ORDERED that with respect to the Record Date, the Debtors propose that the

record holders of claims be determined based upon the following:  (a) with respect to holders of

scheduled claims or interests entitled to vote on the Plan, the Debtors' Schedules as of the

Record Date; and (b) with respect to holders of filed claims or interests entitled to vote on the

Plan and not otherwise addressed above, the Claims Registry maintained by Epiq Bankruptcy

Solutions, LLC ("Epiq") as of the Record Date; and it is further

ORDERED that any notices of claim transfers received by Epiq or other similarly

situated registrars after the Record Date shall not be recognized for purposes of voting; and it is

further

ORDERED that the following voting procedures (the "Voting Procedures") are

hereby approved:

> **A.**     **if a claim is deemed allowed pursuant to the Plan, then such
> claim shall be allowed for voting purposes in the amount and
> classification deemed allowed in the Plan;**

B.      except as otherwise provided herein and unless temporarily allowed for voting purposes by the Court, if a filed proof of claim asserts a claim in a wholly undetermined or unliquidated amount or is docketed in the Claims Registry as of the Record Date in the amount of $0, then such claim shall be allowed for voting purposes as a General Unsecured Claim only in the amount of $1.00;

C.      except as otherwise provided herein and unless temporarily allowed for voting purposes by the Court, if a filed proof of claim asserts a claim in a partially undetermined or unliquidated amount, then such claim shall be allowed for voting purposes only in the amount of the known or liquidated portion of the claim;

D.      unless temporarily allowed for voting purposes by the Court or the Debtors have consented pursuant to a "Stipulation" (as defined below), if a claim is listed in the Debtors' Schedules as contingent, unliquidated, or disputed and a proof of claim was not (i) filed by the applicable Bar Date for the filing of proofs of claim established by the Court or (ii) deemed timely filed by an order of the Court prior to the Voting Deadline, then such claim shall be disallowed for voting purposes;

E.      notwithstanding anything else provided herein, if (i) the Debtors have objected to a claim or equity interest by serving an objection to the entirety of a claim or equity interest on or before the date of the entry of this Order and (ii) the claim has not been temporarily allowed for voting purposes by the Court, then such claim or equity interest shall be disallowed for voting purposes;

F.      unless otherwise provided by an order of the Court, the allowed amount of any proof of claim for voting purposes shall be the amount as docketed in the Claims Registry[2] as of the Record Date; or with respect to a holder of an Allowed General Unsecured Claim that accepts the Debtors' estimate of such claim as provided for on such holder's Ballot, the amount of such estimate; or with respect to a holder of a General Unsecured Claim that is contingent, unliquidated or disputed, the Debtors' "offer of settlement", provided such holder has elected to accept such offer on its Ballot;

---

[2]    With respect to each proof of claim, to the extent there is a discrepancy between the amount as  listed on a proof of claim and the amount as docketed in the Claims Registry, the amount as  listed on a proof of claim shall control.

G.    **unless otherwise provided by an order of the Court or otherwise provided herein, for purposes of determining eligibility to vote, the classification of a claim shall be determined based on the classification as docketed in the Claims Registry as of the Record Date; <u>provided</u>, <u>however</u>, that any claims for which Epiq was unable to identify the classification shall be classified as General Unsecured Claims;**

H.    **unless temporarily allowed for voting purposes by the Court, if a single proof of claim has been filed against multiple Debtors (in contravention of this Court's orders governing the filing of proofs of claims in these cases), then such claim shall be allowed for voting purposes only against the Debtor as docketed in the Claims Registry as of the Record Date;**

I.    **if a claim or equity interest is allowed pursuant to a Court-approved settlement (except for a claim or equity interest that is temporarily allowed by the Court, which claim may vote so long as such order temporarily allowing the claim is entered by the Voting Deadline) on or before ten days prior to the Voting Deadline, then such claim will be entitled to vote on the Plan in accordance with the terms of such settlement;**

J.    **unless temporarily allowed for voting purposes by the Court, if (i) a proof of claim was filed after the applicable Bar Date, (ii) the creditor did not obtain leave to file such late claim, and (iii) the proof of claim is not docketed in the Claims Registry as of the Record Date as an amendment of a timely filed claim, then such claim shall be disallowed for voting purposes only;**

K.    **unless otherwise temporarily allowed for voting purposes by the Court, if a proof of claim does not list a Debtor or the Debtor is unidentifiable on the proof of claim, then such claim shall be disallowed for voting purposes;**

L.    **unless otherwise temporarily allowed for voting purposes by the Court, if a claim is disallowed pursuant to section 502(d) of the Bankruptcy Code or is equitably subordinated under the Bankruptcy Code, then such claim shall be disallowed for voting purposes only;**

M.    **if the Debtors schedule a claim and the creditor filed a proof of claim superseding such scheduled claim, the scheduled claim is deemed superseded in accordance with Bankruptcy Rule 3003(c)(4) and such scheduled claim shall be disallowed for voting purposes; and**

**N.      in addition to the foregoing, the Debtors may seek an order of the Court disallowing a claim for voting purposes no later than ten (10) days prior to the commencement of a hearing to confirm the Plan (the "Confirmation Hearing");**

**and it is further**

ORDERED that to the extent that a Claimant desires to have its contingent, unliquidated, undetermined or otherwise disputed claim allowed for voting purposes in a way other than as set forth in the Voting Procedures, such Claimant is required to serve on the Debtors and the Committee and file with the Court a motion seeking entry of an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing its claim only for purposes of voting to accept or reject the Plan (the "Temporary Allowance Motion"), provided that such motion is filed on or before January 12, 2009 at 4:00 p.m.. Prevailing Central Time (the "Temporary Allowance Motion Deadline"); and it is further

ORDERED that all timely filed Temporary Allowance Motions shall be heard prior to the commencement of the Confirmation Hearing; and it is further

ORDERED that any claim that is the subject of a Temporary Allowance Motion must be temporarily allowed by an order of the Court prior to the commencement of the Confirmation Hearing; and it is further

ORDERED that the Debtors and any Claimant whose claim is contingent, unliquidated, undetermined or otherwise disputed may enter into a stipulated settlement (a "Stipulation") for the treatment of one or more claims for voting purposes in lieu of the filing by a creditor of a Temporary Allowance Motion or other pleadings by the Debtors seeking to reduce the amount of the creditor's claim for voting purposes only; and it is further

ORDERED that the following expedited procedures with respect to Court approval of a Stipulation shall apply:

    a.    the Debtors shall serve a copy of the Stipulation via facsimile or overnight mail (the "Mailing Date") on: (i) the Claimant under the respective Stipulation; (ii) counsel to the Committee; and (iii) the Limited Service List pursuant to this Court's Complex Case Management Order, dated January 9, 2008 (the "Case Management Order") authorizing such notice (collectively, the "Notice Parties").

    b.    If an objection to a Stipulation is timely served upon, and actually received by, counsel to the Debtors within five (5) days of the Mailing Date, the Debtors will seek a hearing to consider the objection at the Court's earliest convenience.

    c.    If no objections by a Notice Party are timely received, then the Debtors will file the Stipulation with the Court, with a certification that notice was provided to the Notice Parties and that no objection was timely received, as well as a proposed form of order authorizing the Stipulation, and the Court may enter such order without the need for a hearing;

and it is further

ORDERED that the forms of Ballots substantially in the form attached to the Motion as collective Exhibits "B" and "C" are approved; and it is further

ORDERED that each holder of a General Unsecured Claim shall receive a Ballot containing the following three elections: (i) such holder may elect to vote to accept or reject the Plan; (ii) such holder may elect to accept the Debtors' estimate of such holder's Allowed General Unsecured Claim or accept the Debtors' offer of settlement with respect to General Unsecured Claims that are contingent, unliquidated or disputed and (iii) such holder may elect to receive, in full and final satisfaction of such Claim, either (a) a New Unsecured Note in a principal amount equal to one hundred percent (100%) of the amount of such holder's Allowed General Unsecured Claim, or (b) a single Cash payment in an amount equal to seventy percent (70%) percent of the amount of such holder's Allowed General Unsecured Claim if such holder elects by affirmatively indicating on its Ballot to accept the treatment in this clause in lieu of receiving a New Unsecured Note; and it is further

ORDERED that only holders of General Unsecured Claims that are Allowed Claims as of the Effective Date are eligible to receive Cash in lieu of a New Unsecured Note; and it is further

ORDERED that each holder of a General Unsecured Claim that is <u>not</u> an Allowed Claim as of the time of solicitation of the Plan will have the opportunity to have such Claim deemed an Allowed Claim as of the Effective Date.  The Debtors' will indicate on such holder's Ballot the Debtors' good faith determination of the Allowed Amount of such holder's Claim or offer of settlement of such Claim to the extent such Claim is otherwise disputed, contingent or unliquidated.  In accordance with the Plan, such holder's Claim shall be deemed an Allowed Claim, subject to the occurrence of the Effective Date, in the amount indicated by the Debtors on such Ballot if such holder accepts the Debtors' determination or offer of settlement by affirmatively indicating that acceptance on such holder's Ballot.  Such holder's election to accept the Debtors' offer of settlement is not contingent upon such holder voting in favor of the Plan.   If such holder does not accept the Debtor's offer of settlement, such holder may vote to accept or reject the Plan in the amount of such holder's General Unsecured Claim. In the event the Effective Date does not occur, the Plan provides that any election by the holder and the Debtors' estimate or offer of settlement shall have no force and effect and shall be deemed inadmissible in any further proceedings pursuant to Rule 408 of the Federal Rules of Evidence; and it is further

ORDERED that if a holder accepts the Debtors' determination or offer of settlement of such holder's Class 5 - General Unsecured Claim by affirmatively indicating that acceptance on such holder's Ballot, such holder's claim shall be deemed to be satisfied in full in connection with such settlement and any and all other claims arising out of such holder's Class 5

- General Unsecured Claim shall be deemed to be waived, released and discharged; and it is further

ORDERED that following approval of the Disclosure Statement, the Debtors shall distribute or cause to be distributed solicitation packages (the "Solicitation Packages") containing copies of the following:

a.      **the Disclosure Statement Order;**

b.      **the Voting Procedures Order;**

c.      **an applicable Ballot, substantially in the forms attached to the Motion as Exhibits "B" and "C," together with the applicable voting instructions, substantially in the forms attached to the Motion as Exhibits "D-1" and "D-2", and a pre-addressed return envelope; and**

d.      **the Disclosure Statement (together with the Plan attached thereto).**

**and it is further**

ORDERED that the Debtors shall mail the Solicitation Packages by no later than two (2) business days after entry of the Disclosure Statement Order, absent further relief from the Court, (the "Solicitation Date") to:

**subject to sub-section (c) below, record holders of scheduled claims, as of the Record Date, to the extent that such claims (i) are listed in the Debtors' Schedules in an amount greater than zero and are not identified as contingent, unliquidated or disputed, (ii) have not been superseded by a timely filed claim, and (iii) entitle the holder thereof to vote on the Plan;**

**O.      subject to subsection (c) below, record holders of timely filed proofs of claim, as of the Record Date, to the extent that such claims (i) have not been disallowed, expunged, disqualified or suspended prior to the Record Date, (ii) are not the subject of a pending objection as of the date set forth in the Voting Procedures Order unless, notwithstanding being the subject of an objection, the Voting Procedures entitle such claimant to vote on the Plan in the manner set forth in the Voting Procedures, and (iii) entitle the holders thereof to vote on the Plan; and**

P.    **with respect to equity securities, the record holders of equity securities, as of the Record Date, to the extent that the holders of such equity interests are entitled to vote on the Plan.**

**and it is further**

ORDERED that the Debtors shall distribute or cause to be distributed by the Solicitation Date, the Solicitation Package without a (i) Ballot, (ii) voting instructions or (iii) return envelope to (a) the U.S. Trustee; (b) the counsel to the Committee; (c) the Securities and Exchange Commission; (d) the District Director of the Internal Revenue Service; (e) all counterparties to the Debtors' executory contracts and unexpired leases; and (f) all parties entitled to receive notice under the Case Management Order; and it is further

ORDERED that the Debtors shall be excused from distributing Solicitation Packages to those entities with listed addresses that previously have been returned as undeliverable, unless the Debtors receive written notice of accurate addresses for such entities prior to the hearing to consider approval of the proposed Disclosure Statement; and it is further

ORDERED that the following additional procedures with respect to the solicitation of votes on the Plan are hereby approved:

*     <u>Return of Ballots</u>:

All Ballots will be accompanied by return envelopes addressed to the Debtors' tabulation center (the "Ballot Tabulation Center"), which must be returned as outlined in the applicable Ballot. All Ballots must be *actually received* at the Debtors' Ballot Tabulation Center by the date and time set forth in the Voting Procedures Order.

*     <u>Solicitation and Tabulation Agent</u>:

The Debtors will be using Epiq Bankruptcy Solutions, LLC ("Epiq") for purposes of distributing Solicitation Packages and tabulating votes on the Plan. Epiq will be responsible for the distribution of Solicitation Packages to, and tabulation of Ballots received from, the entities Epiq solicited.

\*          <u>Inquiries</u>:

All inquiries related to the Plan, the Disclosure Statement, and the Voting Procedures should be directed to Epiq at the phone number set forth on the appropriate Ballot.

and it is further

ORDERED that to the extent that a creditor was not initially sent a Solicitation Package, and the creditor files a Temporary Allowance Motion on or before the Temporary Allowance Motion Deadline, the Debtors shall mail promptly, <u>via</u> express or overnight mail, a Solicitation Package together with the appropriate Ballot (as discussed below, the "Temporary Allowance Ballot") to such creditor; creditor shall receive the appropriate Temporary Allowance Ballot substantially in the form of the Ballot attached to the Motion as Exhibit "C", together with the applicable form of Voting Instructions substantially in the form attached to the Motion as Exhibit "D-2" (the "Temporary Allowance Voting Instructions") and shall execute and return the Temporary Allowance Ballot to counsel to the Debtors prior to the commencement of the hearing to consider the Temporary Allowance Motion by the Voting Deadline; and it is further

ORDERED that unless the Debtors provide otherwise, the Debtors' "offer of settlement" for purposes of the Temporary Allowance Ballot for holders of Class 5 - General Unsecured Claims shall be deemed to be $0 and such holder's election with respect to whether to accept or reject such settlement shall be deemed to be a rejection; and it is further

ORDERED that the Temporary Allowance Ballots shall be clearly and conspicuously titled as "provisional" Ballots and each Temporary Allowance Ballot shall, directly under the title for such Ballot, include a statement in bold, conspicuous text substantially as follows:

**This is a provisional Ballot ("Provisional Ballot") that has been sent to you because you have filed a motion requesting the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the**

**"Bankruptcy Court") to temporarily allow your claim for voting purposes. Receipt of this Provisional Ballot does not mean that your claim has been allowed for voting purposes. Rather, the amount and classification of your claim (if any) shall be determined by order of the Bankruptcy Court on or before January 16, 2009. The Debtors have provided you with this Provisional Ballot to provide you with sufficient time to review the Plan, Disclosure Statement and related materials so that you may determine how to vote on the Plan if your claim is ultimately allowed for voting purposes. Please review the attached voting instructions, complete this Provisional Ballot as directed and return it to counsel to the Debtors no later than the commencement of the hearing to consider your motion. If you have any questions about this Provisional Ballot, please contact counsel to the Debtors;**

and it is further

ORDERED that if the creditor is a holder of Class 5 – General Unsecured Claim it will receive a Class 5 Temporary Allowance Ballot substantially in the form of the Ballot attached to the Motion as Exhibit "C-1," together with the applicable form of Voting Instructions substantially in the form attached to the Motion as Exhibit "D-3" (the "Class 5 Temporary Allowance Voting Instructions") and shall execute and return the Class 5 Temporary Allowance Ballot to counsel to the Debtors prior to the commencement of the hearing to consider the Temporary Allowance Motion. The Class 5 Temporary Allowance Ballots shall be clearly and conspicuously titled as "provisional" Ballots; and it is further

ORDERED that the Debtors shall send to such holders of unimpaired claims in the Non-Voting Classes a notice of nonvoting status, substantially in the form attached to the Motion as Exhibit "E" (the "Notice of Non-Voting Status – Unimpaired Classes"), which identifies the classes designated as unimpaired, informs the claimant of the Confirmation Hearing date and the objection deadline with respect to the Plan, and sets forth that a copy of the Plan and Disclosure Statement may be obtained via the Internet at http://www.txnb.uscourts.gov and http://chapter11.epiqsystems.com/heartland, as therein provided; and it is further

ORDERED that the Notice of Non-Voting Status – Unimpaired Classes satisfies the requirements of Bankruptcy Rule 3017(d), and accordingly, copies of the Disclosure Statement and exhibits thereto, including the Plan, which is attached as Exhibit "A" to the Disclosure Statement, need not be mailed to any holder of an unimpaired claim unless such party makes a specific request in writing for the same; and it is further

ORDERED that to the extent that the Debtors modify the Plan and Disclosure Statement to provide that any additional class, other than Class 12 – Other Equity Interests, under the Plan is not entitled to receive any distribution, the holders of claims or interests in such class or classes will be conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and the Debtors shall send to holders a notice of nonvoting status, substantially in the form attached to the Motion as Exhibit "F" (the "Notice of Non-Voting Status – Deemed Rejected Class" and, collectively with the Notice of Non-Voting Status – Unimpaired Classes, the "Notices of Non-Voting Status"), which identifies the class designated as being deemed to have rejected the Plan, informs the claimant of the Confirmation Hearing date and the Plan Objection Deadline and sets forth that a copy of the Plan and Disclosure Statement may be obtained via the Internet at http://www.txnb.uscourts.gov and http://chapter11.epiqsystems.com/heartland, as therein provided; and it is further

ORDERED that the Notice of Non-Voting Status – Deemed Rejected Class satisfies the requirement of Bankruptcy Rule 3017(d), and accordingly, copies of the Disclosure Statement and exhibits thereto, including the Plan, which is attached a Exhibit "A" to the Disclosure Statement, need not be mailed to any holder of a claim that has been deemed to have rejected the Plan unless such party makes a specific request in writing for the same; and it is further

ORDERED that the following procedures (the "Tabulation Procedures") are hereby approved:

a. **Votes will be tabulated on a non-consolidated basis by class and by Debtor;**

b. **A vote shall be disregarded if the Court determines, after notice and a hearing, that a vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code;**

c. **Any Ballot that is returned to Epiq Bankruptcy Solutions, LLC ("Epiq"), but which is unsigned, or has a non-original signature, shall <u>not</u> be counted, unless otherwise ordered by the Court;**

d. **All votes to accept or reject the Plan must be cast by using the appropriate Ballot and in accordance with the voting instructions attached to the Motion as Exhibits "D-1" and "D-2." Votes that are cast in any other manner shall <u>not</u> be counted, unless otherwise ordered by the Court;**

e. **A holder of claims and/or equity interests in more than one class must use separate Ballots for each class of claims and/or equity interests;**

f. **If multiple Ballots are received for a holder of claims voting the same claims, the last Ballot received from such holder prior to the Voting Deadline will be the Ballot that is counted; provided Epiq shall implement and utilize reasonable procedures to record the date, time, location and method of receipt of ballots so that such information is available to the Court in the event of any dispute;**

g. **If multiple Ballots are received from different holders purporting to hold the same claim or equity interest, in the absence of contrary information establishing which Claimant or holder held such claim or equity interest as of the Record Date, the last Ballot received prior to the Voting Deadline will be the Ballot that is counted, unless otherwise ordered by the Court;**

h. **If multiple Ballots are received from a holder of a claim or equity interest and someone purporting to be his, her, or its attorney or agent, the Ballot received from the holder of the claim or equity interest will be the Ballot that is counted, and the vote of the purported attorney or agent will <u>not</u> be counted, unless otherwise ordered by the Court;**

i. **A Ballot that is completed, but on which the Claimant or holder of equity interest did not indicate whether to accept or reject the Plan or that indicates both an acceptance and rejection of the Plan shall <u>not</u> be counted, unless otherwise ordered by the Court;**

j. **Any Ballot that partially accepts and partially rejects the Plan shall <u>not</u> be counted, unless otherwise ordered by the Court;**

  k.  **A holder of claims or equity interest shall be deemed to have voted the full amount of its claim in each class and shall <u>not</u> be entitled to split its vote within a class;**

  l.  **Epiq shall not accept a vote by facsimile, telecopy transmission or electronic mail, unless otherwise ordered by the Court;**

  m.  **For the purpose of voting on the Plan, Epiq will be deemed to be in constructive receipt of any Ballot timely delivered to any address that Epiq designates for the receipt of Ballots cast on the Plan;**

  n.  **Prior to the Confirmation Hearing, Epiq shall prepare and file with the Court a tabulation affidavit (the "Tabulation Affidavit") outlining which classes were entitled to vote, the procedures followed to tabulate the results and providing a summary of the voting results. Attached as Exhibit A to the Tabulation Affidavit shall be a copy of the voting report, detailing how each creditor voted. Attached as Exhibit B to the Tabulation Affidavit, shall be a listing of defective ballots, outlining which ballots were considered defective and why.**

**and it is further**

    ORDERED that notwithstanding any provision of this Order to the contrary: (i) Dymas Funding Company, LLC ("Dymas") and its counsel may (but shall be under no obligation to) distribute copies of the form of Class 3 Ballot to the H-II Lenders, (ii) Dymas or its counsel may receive completed Class 3 Ballots and transmit such Ballots to Epiq or counsel for the Debtors or the Committee, (iii) such Class 3 Ballots shall be deemed timely and properly received if received by Epiq or such counsel by the Voting Deadline, and (iv) such distribution, receipt, and transmission of completed Class 3 Ballots may be made by email, facsimile or other means; and it is further

    ORDERED that any entity entitled to vote to accept or reject the Plan may change its vote before the Voting Deadline by casting a superseding Ballot so that the superseding Ballot is received by Epiq on or before the Voting Deadline; and it is further

    ORDERED that unless otherwise agreed to by the Debtors, entities desiring to change their votes after the Voting Deadline may do so only with approval of the Court for

"cause" pursuant to Bankruptcy Rule 3018(a) by filing a motion with the Court on or before the

Plan Objection Deadline so that it may be heard and considered at the Confirmation Hearing; and

it is further

ORDERED that the provision of notice in accordance with the procedures set

forth in this Order shall be deemed good and sufficient notice of the Voting Deadline; and it is

further

ORDERED that this Court shall, and hereby does, retain jurisdiction with respect

to all matters arising from or in relation to the implementation of this Order.

# # # End of Order # # #

**PREPARED BY:**

Jeff P. Prostok
State Bar No. 16352500
FORSHEY &PROSTOK LLP
777 Main St., Suite 1290
Ft. Worth, TX  76102
(817) 877-8855

-and-

Thomas E Lauria
State Bar No. 11998025
Gerard Uzzi
Lisa Thompson
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8200

ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION

Thomas E Lauria
State Bar No. 11998025
Gerard Uzzi
Lisa Thompson
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 819-8200
Facsimile:   (212) 354-8113

Jeff P. Prostok
State Bar No. 16352500
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Ft. Worth, TX  76102
Telephone: (817) 877-8855
Facsimile:  (817) 877-4151

ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| In re: | Chapter 11 Case |
| HEARTLAND AUTOMOTIVE HOLDINGS, INC., et al., | Case No. 08-40047 (rfn-11) |
| Debtors. | Jointly Administered |

## NOTICE OF CONFIRMATION HEARING

**PEASE TAKE NOTICE THAT** on November 21, 2008, Heartland Automotive

Holdings, Inc., and its affiliated Debtors (collectively, the "Debtors") filed their *Joint Chapter 11*

*Plan of Reorganization for Heartland Automotive Holdings, Inc., and its Affiliated Debtors*

[Docket No. 914] (the "Joint Chapter 11 Plan") and Disclosure Statement Relating to the Joint

Chapter 11 Plan [Docket No. 915].

**PLEASE TAKE FURTHER NOTICE THAT** on December 23, 2008, the Debtors filed

an *Amended Joint Chapter 11 Plan of Reorganization for Heartland Automotive Holdings, Inc.,*

*and its Affiliated Debtors* [Docket No. __ ] (the "Amended Joint Chapter 11 Plan") and

Disclosure Statement Relating to the Amended Joint Chapter 11 Plan [Docket No. __ ] (the

"Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE THAT** on December 23, 2008, the Court entered an Order approving the Disclosure Statement relating to the Amended Joint Chapter 11 Plan [Docket No. ___].

**PLEASE TAKE FURTHER NOTICE** that the confirmation hearing on the Amended Joint Chapter 11 Plan will commence on **January 16, 2009 at 9:30 a.m. (CST)** before the Honorable Russell F. Nelms, United States Courthouse, Room 204, 501 W. Tenth, Fort Worth, Texas.

**PLEASE TAKE FURTHER NOTICE** that any response or opposition to the confirmation of the Amended Joint Chapter 11 Plan must be filed with the Bankruptcy Court and served upon (i) counsel to the Debtors at White & Case LLP, Attn: Matthew Garofalo, 1155 Avenue of the Americas, New York, NY 10036, (ii) counsel to the Official Committee of Unsecured Creditors of the Debtors at Cadwalader Wickersham & Taft LLP, Attn: Burke Dunphy, One World Financial Center, New York, NY 10281, and (iii) the United States Trustee for Region 6, so that it is received by no later than **January 12, 2009 at 4:00p.m. (CST)**.

Dated:   December __, 2008
       Fort Worth, Texas

                             Jeff P. Prostok
                             State Bar No. 16352500
                             FORSHEY & PROSTOK LLP
                             777 Main St., Suite 1290
                             Ft. Worth, TX  76102
                             (817) 877-8855

                             By _____
                                 Jeff P. Prostok
                             -and-

                             Thomas E Lauria
                             State Bar No. 11998025
                             Gerard Uzzi
                             Lisa Thompson
                             WHITE & CASE LLP
                             1155 Avenue of Americas
                             New York, NY 10036
                             (212) 819-8200
                             ATTORNEYS FOR THE DEBTORS AND DEBTORS
                             IN POSSESSION

**EXHIBIT C**

**PROJECTIONS AND SUMMARY OF SIGNIFICANT ASSUMPTIONS**

A.      **Projected Consolidated Financial Statements**

The Projections should be read in conjunction with the assumptions, qualifications, and the footnotes to the tables contained in the Projections, the historical consolidated financial information (including the notes and schedules thereto), and the information contained in "Selected Financial Information."

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS NOR IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. THE DEBTORS' INDEPENDENT ACCOUNTANTS, DELOITTE & TOUCHE, HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO. FURTHERMORE, THE FINANCIAL PROJECTIONS CONTAINED IN THE DISCLOSURE STATEMENT WERE PREPARED SOLELY BY THE DEBTOR, AND THE COMMITTEE EXPRESSES NO OPINION WITH RESPECT TO SUCH PROJECTIONS.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH THEIR BUSINESS PLANS AND STRATEGIES OR PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. ACCORDINGLY, THE DEBTORS DO NOT INTEND, AND DISCLAIM ANY OBLIGATION, TO (1) FURNISH UPDATED BUSINESS PLANS OR PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE, OR TO HOLDERS OF SECURITIES OF ANY REORGANIZED DEBTOR, OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (2) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC, OR (3) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THE PROJECTIONS HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT AND PROFESSIONALS, BASED ON INFORMATION PROVIDED BY THE DEBTORS AND THEIR PROFESSIONALS. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND EITHER THE DEBTORS' OR THE COMMITTEE'S CONTROL. THE DEBTORS AND THE COMMITTEE CAUTION THAT NO ASSURANCES CAN BE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR THE ABILITY OF THE REORGANIZED DEBTORS TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE

UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER.  THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THE ASSUMPTIONS AND RESULTANT COMPUTATIONS WERE MADE SOLELY FOR PURPOSES OF PREPARING THE PROJECTIONS.

**B.      Summary of Significant Assumptions**

(a)    **Effective Date**

For convenience, the Projections are presented with an assumed consummation date of January 1, 2009 (the "Assumed Effective Date").  The Debtors and the Committee expect the Debtors to emerge from Chapter 11 during the first quarter of 2009 and do not expect such delay to have a material adverse impact on the operations and financial performance of the Reorganized Debtors.  Any significant delay in the Assumed Effective Date of the Plan beyond the first quarter of 2009 may have a material adverse impact on the operations and financial performance of the Reorganized Debtors.

(b)    **Business Plan Overview**

a.    Generally

The Business Plan is premised on the Debtors' remaining part of the JLI system and entering into the Master Supply Agreement with SOPUS and the New JLI Agreements with JLI, each as described above.

b.    Car Count

The market environment throughout the latter part of 2007 and 2008 has been especially sensitive to the economic slowdown in the United States and the rapid escalation of oil and gasoline prices.  These factors have contributed significantly to a difficult operating environment for the entire quick lube industry as well as the Debtors.  The Business Plan assumes that car counts will decline an average of 1.4% annually during the Projection Period, as the Debtors expect that recent, negative, short term trends will not continue over the Projection Period when taken as a whole.  In addition to improving macroeconomic factors, the Debtors' management believes negative car count trends affecting the industry can be improved through a number of initiatives.  The Reorganized Debtors will spend on average approximately $40,000 per store to re-image and improve their existing JLI stores, which will entail new signage, painting and other aesthetic benefits, that it is hoped will, among other things, lead to increased volume (car count) by attracting more new and returning customers.

c.    Store Base & Growth

The Business Plan contemplates the Debtors exit their Chapter 11 Cases operating approximately 389 stores under the Jiffy Lube service mark.  The Business Plan assumes the addition of 100 new stores during the 5-year Projection Period.  Store growth will be generated

by a combination of existing JLI store acquisitions, the acquisition of non-JLI stores, and the development of new stores. Given the Debtors' history of growth (See Section V.A. and C.), the Debtors believe the addition of 100 stores over the Projection Period is a reasonable assumption.

> d.    Oil Mix and Average Ticket

The Debtors have assumed their sales mix of conventional and premium motor oil will be 59.0% and 41.0%, respectively, in the first year post Effective Date and will change to 45.9% and 54.1%, respectively, by the end of the fifth year post Effective Date. The Debtors and the Committee have assumed that by selling Pennzoil brand motor oil exclusively, customer purchases of premium oils such as synthetic, high mileage and blend will increase significantly and support higher retail prices. Additionally, as the average age of cars on the road increases, the Debtors have assumed an increase in the amount of high mileage oil sold to customers. The Debtors also have assumed that an increase in sales of premium grade oils, which represent higher margin items, will increase the average ticket.

> e.    JLI and SOPUS Support and Incentives

Under the terms of the New JLI Agreement and the Master Supply Agreement, JLI and SOPUS are obligated to provide significant financial and operational support. The Business Plan reflects this financial support over the five year Projection Period.

> (c)    **Corporate Overhead**

The Debtors project corporate overhead expenses based on historical costs. The Projections assume that commencing in the second year post Effective Date a Consumer Price Index of 3.0% per year creates escalation in corporate overhead costs, but that escalation will be managed through efficiency improvements and increased leverage gained from store growth.

The Projections do not take into account any potential cost savings that could be achieved through rationalization of the Reorganized Debtors organizational structure.

> (d)    **Cost of Goods**

The Business Plan assumes over the Projection Period, cost of goods sold, which includes oil and non-oil products purchased under the Master Supply Agreement as well as labor and certain other direct expenses, represent on average approximately 53.7% of revenue, which is line with the Debtors' historical experience. Under the Business Plan, cost of goods sold is reduced by certain support the Reorganized Debtors will receive from SOPUS under the Master Supply Agreement. In addition, cost of goods is further reduced under the Business Plan by the amount the Reorganized Debtors will receive for the sale of waste oil.

The Business Plan assumes that commencing in the second year post Effective Date SOPUS increases the Reorganized Debtors oil costs at 2% per annum and that the Reorganized Debtors average ticket cost increases at 1.6% per annum.

(e)    **Store Operating Expenses**

Store operating expenses include costs related to operating the stores, and include, among other things, rent, royalty payments, real estate and property taxes, advertising, costs related to the Reorganized Debtors' POS system and employee hiring and training.

The Debtors project annual store operating expenses based on historical levels and expect the majority of these costs to remain constant as a percentage of revenue with certain exceptions.

Store expenses in the Projections are net of approximately $6.6 million in aggregate rent concessions over the Projection Period, which the Debtors have negotiated with their landlords during the Chapter 11 Cases.

(f)    **Income Taxes**

The Projections assume that to the extent the Reorganized Debtors are obligated to pay federal and state income taxes, they would do so at a 40.0% tax rate. The Projections further assume that as of the Effective Date, the Reorganized Debtors' have an NOL of $28.5 million, which offsets the Debtors' cash tax liability in full for each of the first and second tax years post Effective Date and a portion of the third tax year post Effective Date tax liability (please see the discussion in "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES – U.S. Federal Income Tax Consequences to the Debtors" regarding situations where an annual limitation on NOLs could be imposed). The Projections assume that starting in the third tax year post Effective Date, the Reorganized Debtors will pay taxes at a combined rate of 40% on its income and do not take into account any offsets that might be available.

(g)    **Capital Expenditures**

The Projections include capital expenditures associated with the Reorganized Debtors' store transfer and acquisition strategy. Additionally, as a result of the reimaging efforts, the Debtors have assumed decreased maintenance capital expenditures in the first three years of the Projection Period compared to historical levels as a result of the recent reimaging efforts. Maintenance capital expenditures will increase in the fourth year post Effective Date to historical levels.

(h)    **Interest Expense**

The Projections assume the Reorganized Debtors pay cash interest on the Amended and Restated H-I Notes at the rates set forth in the Original H-I Notes. The Projections also assume the Reorganized Debtors will pay interest on the Amended and Restated H-II Facility as follows: (i) cash interest on the Term Loan A Note at a rate of L+450bps per annum, and (ii) cash and PIK interest on the Term Loan B Note at a rate of L+450bps and 2.50%, respectively, per annum. The Projections further assume that the Reorganized Debtors will accrue quarterly dividends at a 12.5% per annum rate on the New Preferred Stock A and New Preferred Stock B.

(i)      **Trade Payables**

The Projections assume the Reorganized Debtors pay SOPUS within thirty-five (35) days from the date the Reorganized Debtors receive an electronic invoice from SOPUS pursuant to the terms of the Master Supply Agreement.  The Projections also assume the Reorganized Debtors pay all other trade payables on thirty-five (35) day terms.

(j)      **Liquidity**

The Projections assume the Reorganized Debtors' cash flow, together with the Quad-C Contribution and other support capital, will be sufficient to fund:  (i) the reimaging of the Reorganized Debtors' 389 stores over approximately 2 years, (ii) the Reorganized Debtors' interest obligations, and (iii) amortization of a portion of its secured debt obligations.

Heartland Automotive Services, Inc.
Income Statement

| Description | First Year Post Effective Date $ in millions | % | Second Year Post Effective Date $ in millions | % | Third Year Post Effective Date $ in millions | % | Fourth Year [1] Post Effective Date $ in millions | % | Fifth Year Post Effective Date $ in millions | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue: | | | | | | | | | | |
| Existing Stores | $292,854 | 100.0% | $299,836 | 94.1% | $306,392 | 88.8% | $316,142 | 83.9% | $313,964 | 79.6% |
| Acquisitions/Transfer/Greenfield Stores | 0 | 0.0% | 18,774 | 5.9% | 38,801 | 11.2% | 60,589 | 16.1% | 80,672 | 20.4% |
| Revenue | 292,854 | | 318,611 | | 345,193 | | 376,731 | | 394,636 | |
| Store Base (end of year) | 389 | | 414 | | 439 | | 464 | | 489 | |
| | | | | | | | | | | |
| Net Cost of Goods Sold | 150,804 | 51.5% | 163,591 | 51.3% | 176,091 | 51.0% | 190,520 | 50.6% | 199,094 | 50.5% |
| Other Direct Expenses | 8,039 | 2.7% | 8,775 | 2.8% | 9,496 | 2.8% | 10,345 | 2.7% | 10,823 | 2.7% |
| Total Direct Expenses | 158,843 | 54.2% | 172,365 | 54.1% | 185,587 | 53.8% | 200,865 | 53.3% | 209,917 | 53.2% |
| | | | | | | | | | | |
| Gross Profit and Margin | 134,011 | 45.8% | 146,245 | 45.9% | 159,606 | 46.2% | 175,866 | 46.7% | 184,719 | 46.8% |
| Store Operating Expenses | 78,644 | 26.9% | 86,884 | 27.3% | 94,461 | 27.4% | 103,662 | 27.5% | 113,014 | 28.6% |
| Store Operating Income | 55,367 | 18.9% | 59,361 | 18.6% | 65,145 | 18.9% | 72,205 | 19.2% | 71,705 | 18.2% |
| | | | | | | | | | | |
| Administrative Expenses | 17,164 | 5.9% | 17,967 | 5.6% | 18,694 | 5.4% | 19,437 | 5.2% | 20,196 | 5.1% |
| | | | | | | | | | | |
| **Adjusted EBITDA** | **$38,203** | **13.0%** | **$41,394** | **13.0%** | **$46,451** | **13.5%** | **$52,768** | **14.0%** | **$51,509** | **13.1%** |
| | | | | | | | | | | |
| Depreciation | 5,239 | | 6,321 | | 6,678 | | 6,969 | | 7,065 | |
| Amortization | 2,289 | | 2,045 | | 2,014 | | 1,668 | | 1,263 | |
| | | | | | | | | | | |
| Interest Expense | | | | | | | | | | |
| New Exit Facility | 0 | | 0 | | 0 | | 0 | | 0 | |
| H-I Replacement Note | 2,118 | | 1,887 | | 1,637 | | 1,365 | | 1,079 | |
| H-II Replacement Note - Term Loan A | 9,104 | | 8,104 | | 6,578 | | 5,645 | | 4,836 | |
| H-II Replacement Note - Term Loan B | 6,712 | | 6,892 | | 7,066 | | 7,244 | | 7,427 | |
| New Secured Notes | 0 | | 0 | | 0 | | 0 | | 0 | |
| New Unsecured Notes | 0 | | 0 | | 0 | | 0 | | 0 | |
| Letter of Credit | 0 | | 0 | | 0 | | 0 | | 0 | |
| Total Interest Expense | 17,934 | | 16,884 | | 15,282 | | 14,255 | | 13,342 | |
| | | | | | | | | | | |
| Capital Lease Adj. | 3,359 | | 2,700 | | 2,021 | | 1,661 | | 858 | |
| | | | | | | | | | | |
| Other Income | $1,556 | | $1,606 | | $1,656 | | $1,706 | | $1,756 | |
| | | | | | | | | | | |
| **Income/(Loss) Before Taxes** | **$10,938** | | **$15,051** | | **$22,111** | | **$29,921** | | **$30,736** | |
| | | | | | | | | | | |
| Corporate Income Taxes | 4,375 | | 6,020 | | 8,844 | | 11,968 | | 12,295 | |
| | | | | | | | | | | |
| Net Income/(Loss) Before Preferred | 6,563 | | 9,030 | | 13,267 | | 17,953 | | 18,442 | |
| | | | | | | | | | | |
| Preferred Dividend - PIK Series A | 8,381 | | 9,479 | | 10,720 | | 12,124 | | 13,712 | |
| Preferred Dividend - PIK Series B | 3,013 | | 3,407 | | 3,853 | | 4,358 | | 4,929 | |
| | | | | | | | | | | |
| **Net Income/(Loss) After Preferred** | **($4,831)** | | **($3,856)** | | **($1,307)** | | **$1,470** | | **($200)** | |

[1] Assumes a 53 week year

Heartland Automotive Services, Inc.
Cash Flow

| Description | First Year Post Effective Date $ in millions | Second Year Post Effective Date $ in millions | Third Year Post Effective Date $ in millions | Fourth Year [2] Post Effective Date $ in millions | Fifth Year Post Effective Date $ in millions |
|---|---|---|---|---|---|
| Net Income | ($4,831) | ($3,856) | ($1,307) | $1,470 | ($200) |
| | | | | | |
| Depreciation and Amortization [1] | 8,008 | 8,646 | 8,773 | 8,435 | 7,870 |
| Deferred Dividend Payout - H-II Replacement - Term Loan B | 1,677 | 1,719 | 1,762 | 1,807 | 1,852 |
| Deferred Dividend Payout - Series A | 8,381 | 9,479 | 10,720 | 12,124 | 13,712 |
| Deferred Dividend Payout - Series B | 3,013 | 3,407 | 3,853 | 4,358 | 4,929 |
| Deferred Income Taxes | 4,375 | 6,020 | 8,844 | 3,239 | 3,622 |
| Deferred Rent | 1,091 | 814 | 520 | 277 | (27) |
| Loss (Gain) on Disposal of Assets | - | - | - | - | - |
| | | | | | |
| (Increase)/Decrease in Accounts Receivable | 51 | (251) | (259) | (307) | (174) |
| (Increase)/Decrease in Inventories | (687) | (1,836) | (981) | (1,154) | (638) |
| (Increase)/Decrease in Other Current Assets | 13 | (65) | (67) | (79) | (45) |
| Increase/(Decrease) in Trade Accounts Payable | 4,209 | 1,285 | 692 | 816 | 453 |
| Increase/(Decrease) in Accrued Expenses | (9,864) | 519 | 484 | 569 | 484 |
| Increase/(Decrease) in Accrued Taxes | - | - | - | - | - |
| **Net Cash Provided by (Used in) Operating Activities** | **$15,436** | **$25,883** | **$33,036** | **$31,554** | **$31,838** |
| | | | | | |
| Acquisitions & System Transfers (Goodwill) | - | (7,650) | (7,817) | (8,066) | (8,010) |
| Acquisitions & System Transfers (Non Competes) | - | (523) | (534) | (551) | (547) |
| Acquisitions & System Transfers (PP&E) | - | (685) | (700) | (722) | (717) |
| New Stores | - | (592) | (592) | (592) | (592) |
| Maintenance Cap Expenditure | (2,250) | (2,395) | (2,539) | (3,578) | (3,771) |
| Store Rebranding Capital Expenditure | (10,373) | (5,987) | (800) | (800) | (800) |
| POS System | - | - | - | - | - |
| POS System - New & Acquired Stores | - | - | - | - | - |
| Capital Expenditures Support | - | - | - | - | - |
| Capital Expenditures Support - New and Acquired Stores | - | 1,000 | 1,000 | 1,000 | 1,000 |
| New Franchise Fees and Renewals | (225) | (890) | (890) | (920) | (905) |
| (Increase)/Decrease in Other Assets | - | (325) | (335) | (398) | (226) |
| **Net Cash Provided by (Used in) Investing Activities** | **(12,848)** | **(18,046)** | **(13,208)** | **(14,628)** | **(14,569)** |
| | | | | | |
| Increase/(Decrease) in Capital Lease (Current) | 382 | 384 | 35 | 443 | 463 |
| Increase/(Decrease) in Capital Lease (Long Term) | (2,485) | (2,869) | (2,903) | (3,346) | (3,809) |
| Net Cash Provided by (Used in) Capital Leases | (2,102) | (2,485) | (2,869) | (2,903) | (3,346) |
| | | | | | |
| Cash Flow Allocated to Restricted Cash | 3,890 | - | - | - | - |
| | | | | | |
| **Cash Available for Debt Repayment** | **$26,505** | **$29,358** | **$16,959** | **$14,023** | **$13,923** |
| | | | | | |
| **Debt Repayment** | | | | | |
| | | | | | |
| Cash For Retirement of H-I Replacement Note | 26,505 | 29,358 | 16,959 | 14,023 | 13,923 |
| H-I Replacement Note Mandatory Repayment | (2,499) | (2,692) | (2,932) | (3,168) | (3,186) |
| H-I Replacement Note Retired | (2,499) | (2,692) | (2,932) | (3,168) | (3,186) |
| | | | | | |
| Cash For Repayment of Exit Facility | 24,005 | 26,666 | 14,027 | 10,855 | 10,737 |
| Exit Facility Repaid | 0 | 0 | 0 | 0 | 0 |
| Exit Facility Addition | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| Cash Balance before Sweep | 34,005 | 36,666 | 24,027 | 20,855 | 20,737 |
| | | | | | |
| H-II Replacement Note - Term Loan A | 0 | (26,666) | (14,027) | (10,855) | (10,737) |
| | | | | | |
| Ending Cash after Debt Repayment | $34,005 | $10,000 | $10,000 | $10,000 | $10,000 |

[1] Includes capital lease depreciation

[2] Assumes a 53 week year

Heartland Automotive Services, Inc.
Balance Sheet

| Description | First Year Post Effective Date $ in millions | Second Year Post Effective Date $ in millions | Third Year Post Effective Date $ in millions | Fourth Year [1] Post Effective Date $ in millions | Fifth Year Post Effective Date $ in millions |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash | $34,005 | $10,000 | $10,000 | $10,000 | $10,000 |
| Accounts Receivable | 2,852 | 3,103 | 3,362 | 3,669 | 3,844 |
| Inventories | 10,587 | 12,423 | 13,404 | 14,558 | 15,196 |
| Other Current Assets | 738 | 803 | 870 | 949 | 994 |
| Net PP&E | 87,070 | 86,038 | 79,621 | 74,057 | 68,642 |
| Other Assets | 3,694 | 4,019 | 4,355 | 4,753 | 4,978 |
| Goodwill | 212,279 | 219,296 | 226,523 | 234,391 | 242,590 |
| **Total Assets** | **$351,226** | **$335,682** | **$338,134** | **$342,378** | **$346,245** |
| **Liabilities & Shareholders Equity** | | | | | |
| Trade Payables | $7,413 | $8,698 | $9,390 | $10,206 | $10,658 |
| Accrued Expenses | 5,502 | 6,022 | 6,506 | 7,075 | 7,559 |
| Accrued Taxes | 3,399 | 3,399 | 3,399 | 3,399 | 3,399 |
| Capital Leases Current | 2,485 | 2,869 | 2,903 | 3,346 | 3,809 |
| **Total Current Liabilities** | **$18,799** | **$20,987** | **$22,198** | **$24,026** | **$25,426** |
| Exit Facility | - | - | - | - | - |
| H-I Replacement Note | 22,402 | 19,710 | 16,778 | 13,610 | 10,424 |
| H-II Replacement Note - Term Loan A | 121,392 | 94,726 | 80,699 | 69,844 | 59,107 |
| H-II Replacement Note - Term Loan B | 68,117 | 69,836 | 71,598 | 73,405 | 75,257 |
| New Secured Notes | - | - | - | - | - |
| New Unsecured Notes | - | - | - | - | - |
| LT Capital Leases | 74,763 | 71,895 | 68,991 | 65,645 | 61,836 |
| Deferred Rent | 11,496 | 12,310 | 12,830 | 13,107 | 13,080 |
| Deferred Income Taxes | (2,607) | 3,413 | 12,258 | 15,497 | 19,119 |
| Other Long Term Debt | 15,560 | 12,470 | 9,180 | 5,690 | 2,000 |
| Other Long Term Liabilites | 99 | 99 | 99 | 99 | 99 |
| Additional Paid in Capital | - | - | - | - | - |
| New Preferred Stock - Series A | 72,366 | 81,845 | 92,565 | 104,690 | 118,402 |
| New Preferred Stock - Series B | 26,013 | 29,420 | 33,273 | 37,631 | 42,561 |
| Retained Equity | (111,617) | (111,617) | (111,617) | (111,617) | (111,617) |
| Shareholders Equity | 34,443 | 30,588 | 29,281 | 30,751 | 30,551 |
| **Total Liabilities & Shareholders Equity** | **$351,226** | **$335,682** | **$338,134** | **$342,378** | **$346,245** |

[1] Assumes a 53 week year

# EXHIBIT D

# PRO FORMA STATEMENTS

| Description | Month Ending 12/31/2008 $ | Closing Adjustments 12/31/2008 $ | Mgmt Plan FYE 12/31/2008 $ | Restructuring Transaction Adjustments 12/31/2008 | Pro Forma FYE 12/31/2008 $ |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash | $8,493 | - | $8,493 | 23,636 (1) | $32,129 |
| Restricted Cash | $0 | - | $0 | 3,890 (2) | $3,890 |
| Accounts Receivable | 2,904 | - | 2,904 | - | 2,904 |
| Inventories | 9,900 | - | 9,900 | - | 9,900 |
| Other Current Assets | 751 | - | 751 | - | 751 |
| Net PP&E | 84,056 | - | 84,056 | - | 84,056 |
| Other Assets | 3,694 | - | 3,694 | - | 3,694 |
| Goodwill | 214,343 | - | 214,343 | - | 214,343 |
| **Total Assets** | **$324,141** | **$0** | **$324,141** | **$27,526** | **$351,667** |
| | | | | | |
| **Liabilities & Shareholders Equity** | | | | | |
| Trade Payables | 18,204 | - | $18,204 | (15,000) (3) | $3,204 |
| Accrued Expenses | 11,384 | (1,699) (1) | 9,685 | 5,681 (4) | 15,366 |
| Accrued Taxes | 3,399 | - | 3,399 | - | 3,399 |
| Capital Leases Current | 2,102 | - | 2,102 | - | 2,102 |
| **Total Current Liabilities** | **$35,089** | **(1,699)** | **$33,390** | **-$9,319** | **$24,071** |
| | | | | | |
| Exit Facility | - | - | - | - | - |
| H-I Replacement Note | - | - | - | 24,901 (5) | 24,901 |
| H-II Replacement Note - Term Loan A | - | - | - | 121,392 (6) | 121,392 |
| H-II Replacement Note - Term Loan B | - | - | - | 66,440 (7) | 66,440 |
| New Unsecured Notes | - | - | - | | - |
| Debtor in Possession Loan | 7,115 | 1,699 (1) | 8,814 | (8,814) (8) | - |
| Pre-petition Debt | 276,018 | 174 (2) | 276,192 | (276,192) (9) | - |
| LT Capital Leases | 78,436 | - | 78,436 | (1,188) (10) | 77,248 |
| Other Long Term Debt | - | - | - | 19,450 (11) | 19,450 |
| Deferred Rent | 10,405 | - | 10,405 | - | 10,405 |
| Deferred Income Taxes | (6,982) | - | (6,982) | - | (6,982) |
| Other Long Term Liabilities | 1,043 | - | 1,043 | (944) (12) | 99 |
| New Preferred Stock A | - | - | - | 63,985 (5,12) | 63,985 |
| New Preferred Stock B | - | - | - | 23,000 (13) | 23,000 |
| Equity | (119,950) | - | (119,950) | 8,333 (14) | (111,617) |
| Retained Earnings | 42,967 | (174) (2) | 42,793 | (3,518) | 39,275 |
| **Total Liabilities & Shareholders Equity** | **$324,141** | **$0** | **$324,141** | **$27,526** | **$351,667** |

**Notes to Closing Adjustments:**

(1) DIP was increased by $1.7 million to reflect payment of December interest on H1 and H2 debt in December; corresponding entry is a $1.7 million reduction in Accrued Expenses

(2) Pre-petition Debt was increased by $174k to reflect capitalization of pre-petition professional fees

**Notes to Pro Forma Adjustments:**

(1) Cash increased on a net basis due to the changes described below

(2) Restricted cash increased by $3.9 million to reflect cash reserved for reimaging expenses and funded by Other Long Term Debt; offsetting adjustment is an increase in Other Long Term Debt of $3.9 million

(3) Trade Payables decreased by $15 million; offsetting entry is an $9.1 million decrease in Cash and $5.9 million increase in Equity, broken out as follows: 1) $10 million represents trade taking 70 cents on the dollar in cash as opposed to 100 cents in note; 2) $2.1 million represents $03(b)(9) claims; 3) $2.9 million represents forgiven JLI/SOPUS claims

(4) Accrued Expenses increased by $5.7 million comprised of following: 1) $3.8 million reduction related to Blackstone accrued interest, offsetting entry is a combined increase of $3.8 million in New Preferred Stock A and Equity; 2) $9.7 million increase related to accrued and unpaid Professional Fees and employee retention and incentive bonuses, offsetting entry is a $9.7 million decrease in Retained Earnings; 3) $250k decrease related to Priority Tax Claims, offsetting entry is a $250k decrease in Cash

(5) Securitized Debt Replacement Note increased by $24.9 million; corresponding entry is a $24.9 million reduction in Pre-petition Debt

(6) Term Loan A increased by $121.4 million; corresponding entry is a $121.4 million reduction in Pre-petition Debt

(7) Term Loan B increased by $66.4 million; corresponding entry is $66.4 million reduction in Pre-petition Debt and $64k reduction in Other Long Term Liabilities

(8) DIP decreased by $8.8 million to reflect payoff of DIP at exit

(9) Pre-petition Debt decreased by the above mentioned amounts and $63.5 million of Blackstone debt; offsetting entry is a combined increase of $63.5 million in New Preferred Stock A and Equity

(10) LT Capital Leases was decreased by $1.2 million due to the cancellation of the existing oil contract; offsetting entry is an increase in Retained Earnings

(11) Other Long Term Debt increased by the above mentioned amounts and $15.6 million in support capital; offsetting entry is an increase in Cash

(12) Other Long Term Liabilities decreased by the above mentioned amount and the following: 1) $852k decrease related to the cancellation of the existing oil contract; offsetting entry is an increase in Retained Earnings; 2) $28k decrease in Blackstone PIK Interest; offsetting entry is a combined increase of $28k increase in New Preferred Stock A and Equity

(13) New Preferred Stock B increased by $23 million, offsetting entry is a $23 million increase in Cash

(14) Equity increased from the above mentioned amounts and by $5 million of new equity investment, corresponding entry is a $5 million increase in Cash

NOTE: This Pro Forma has been prepared on the assumption that fresh start accounting will not apply to the Reorganized Debtors upon emergence from Chapter 11. If fresh start accounting is applied, however, the presentation of the Reorganized Debtors' financial statements will require certain modifications to the value ascribed to certain assets. The impact of these changes to the recording of the Debtors' assets and liabilities on its financial statements, however, should not impact the Reorganized Debtors' ability to perform under the Plan.